UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

CONSWALLO TURNER, TIESHA
FOREMAN, ANGELINA WELLS,
VERONICA KING, NAVAQUOTE, LLC          **CLASS ACTION**
and WINN INSURANCE AGENCY, LLC,
individually and on behalf of all others
similarly situated,                                       (Jury Trial Demanded)

       Plaintiffs,

v.

ENHANCE HEALTH, LLC,
TRUECOVERAGE, LLC,
SPERIDIAN TECHNOLOGIES, LLC,
NUMBER ONE PROSPECTING, LLC
d/b/a MINERVA MARKETING,
MATTHEW B. HERMAN and
BRANDON BOWSKY,

       Defendants.

_____/

## CLASS ACTION COMPLAINT

Class Plaintiffs, Conswallo Turner, Tiesha Foreman, Angelina Wells, Veronica King, NavaQuote, LLC ("NavaQuote") and WINN Insurance Agency LLC ("WINN"), file this class action complaint individually and on behalf of all others similarly situated against Defendants, Enhance Health, LLC ("Enhance Health"), TrueCoverage, LLC ("True Coverage"), Speridian Technologies, LLC ("Speridian"), Matthew B. Herman, Number One Prospecting, LLC d/b/a Minerva Marketing ("Minerva") and Brandon Bowsky, and allege:

## I.      INTRODUCTION

1.      Defendants constitute a RICO Enterprise targeting the poorest members of American society.  The consumer victims of this Enterprise comprise the first of two primary

classes in this lawsuit, the "Consumer Class." Defendants' motives are simple — maximize profits by seizing the Affordable Care Act ("ACA") health insurance market for low-income Americans. Defendants' tactics also directly injure the healthcare insurance agents who comprise this suit's other primary class, the "Agent Class."

2.      Since at least 2022, Defendant TrueCoverage and its largest "downline" agent, Enhance Health, along with other relevant nonparties that serve as their downline agents, have spent tens of thousands of dollars daily to purchase Consumer Initiated Inbound Calls ("CIICs" or "Leads") from outside lead-generation firms, including Defendant Minerva, that "capture" those victims by running fraudulent ads on social media. These ads lure consumers with the false promise of hundreds of dollars per month in cash benefits, such as subsidy cash cards to pay for common expenses like rent, groceries and gas:



3.     TrueCoverage and Enhance Health, which have sales operations based primarily in Broward County, Florida, know these Leads are generated fraudulently. They know that the ads mischaracterize as "cash" advance premium tax credits (or "APTCs") paid by the federal government directly to the insurance carriers (not consumers) to offset the cost of premiums for the health insurance. They know consumers are calling for the promise of cash benefits that do not exist.

4.     But using uniformly constructed sales scripts designed to deflect consumers' inquiries about the monthly cash payments, TrueCoverage, Enhance Health and their downline agents mislead consumers to believe that those cash benefits will be coming "in the mail" from health insurance companies like Ambetter, Cigna and others. TrueCoverage, Enhance Health and their downline agents use these sales calls to obtain the consumers' names, birthdates and states of residence, access their information and enroll them into ACA health insurance plans for a commission.

5.     What TrueCoverage, Enhance Health and their downlines *then* do with this personally identifiable information (or "PII"), whether the consumer enrolls in a healthcare plan or not, forms another facet the RICO Enterprise. TrueCoverage, Enhance Health and their downlines use the PII to access the accounts of consumers who already have an ACA health plan, then remove the plan's agent of record (or "AOR"). They replace that AOR with their own in-house or downline AOR. These "AOR Swaps" are done without the consumer's knowledge or consent, and allow TrueCoverage, Enhance Health and their downlines to essentially steal the original AOR's commissions for the policy. Class Plaintiff Veronica King's AOR was swapped at least eight times.

6.      TrueCoverage, Enhance Health and their downlines sometimes go even farther, by "Twisting" the consumer's existing policy.  Twisting is a form of insurance fraud that involves replacing an existing insurance plan with another plan that has similar or worse benefits solely to generate a new commission.  TrueCoverage, Enhance Health and their downlines can do this by changing a discrete piece of information about the consumer within the ACA database — for example, by changing the consumer's address slightly, or adding a middle initial.  They do this without the consumer's knowledge or consent.  Class Plaintiffs Turner, Wells and Foreman were all victims of Twisting by TrueCoverage, Enhance Health and/or their downlines.

7.      TrueCoverage, Enhance Health and their downlines also use consumers' PII to create entirely new applications in the ACA database that result in an additional policy or multiple policies for one consumer without that consumer's knowledge or consent.  TrueCoverage, Enhance Health and their downlines sometimes accomplish this "Dual-App" scheme by breaking up a family into two plans — for example, creating a new policy for the husband while leaving the wife and children on the original policy.  Class Plaintiff Foreman (and her husband) were victimized by this Dual-App scheme.

8.      Class Plaintiffs and Consumer Class members suffered damages as a result of these actions.  They suffered out-of-pocket damages relating to the loss of medical treatments, the loss of in-network health care providers and specialists, the loss of prescription coverage, an increase in the amount of the co-pays covered by the policies and/or even the loss of coverage altogether.  They suffered out-of-pocket costs relating to correcting the changes to their data and AORs.  And some, like Class Plaintiff Tiesha Foreman, suffered tax penalties from being put into plans they did not qualify for.

9. Health insurance agents comprising the "Agent Class" were also damaged. Class Plaintiffs NavaQuote and WINN Insurance Agency, and Agent Class members like them, have each lost thousands of dollars in commissions from these AOR-Swap, Twisting and Dual-App schemes. They have also incurred thousands of dollars in heroic but Sisyphean efforts to stop this practice.

10. The key to the Enterprise's ability to pull off this scheme lies in the technology at its center. For at least two years, TrueCoverage, Enhance Health and their downlines have utilized a proprietary enhanced direct enrollment platform (or "EDE Platform") called Benefitalign, which was developed by TrueCoverage's parent company, Defendant Speridian. Benefitalign gives them direct access to the ACA Marketplace Exchange database (the "Marketplace" or "Exchange") maintained and facilitated by the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services (or "CMS"). Using Benefitalign, TrueCoverage, Enhance Health and their downlines can enroll consumers in ACA health insurance without requiring them to visit www.healthcare.gov (or "Healthcare.gov"). Benefitalign enables TrueCoverage, Enhance Health and their downlines to enroll the maximum number of consumers in the shortest amount of time without outside scrutiny. Most importantly, it allows TrueCoverage, Enhance Health and their downlines to make unilateral changes to a consumer's data on the Exchange database, including canceling in-force health insurance plans or changing the AOR. All that is needed is the consumer's name, date of birth and state of residence — information gathered from the consumer when he or she reached out, seeking cash benefits, in response to a fraudulent ad. In mid-2023, Enhance Health purchased its own proprietary EDE Platform, JET Health Solutions, to continue doing what it was doing with Benefitalign.

11.     Other members of the RICO Enterprise include the individuals who control Enhance Health and Minerva.  Matthew Herman, 38, is the CEO of Enhance Health, which acted as TrueCoverage's downline agent and used Speridian and Benefitalign's platform technology. Herman touts himself as a "Famed Business Mogul & Investor" on his Instagram account, "moneymatt305."  Herman, too, knew about his company's purchase of Leads generated by fraudulent ads, yet directed and/or allowed Enhance Health's ongoing use of the misleading sales scripts and twisting of consumer insurance policies, as well as its use of the AOR-Swap, Twisting and Dual-App schemes.

12.     Brandon Bowsky, 31, is founder and CEO of Minerva, which both generates and buys and sells Leads sourced from fraudulent ads.  Bowsky has stated publicly that he was the first person to advise insurance agencies to enter the ACA space for low-income consumers.  His company Minerva was Enhance Health's primary lead generator and sold Leads to TrueCoverage and its downlines as well.  Bowsky knew that Minerva's Leads were being used by Enhance Health, TrueCoverage and their downlines to sell health insurance to consumers who were seeking the advertised monthly cash payments.  In fact, as explained below, Bowsky and Minerva recorded the confidential calls between consumers and TrueCoverage and Enhance Health agents without the consent of Consumer Plaintiffs and Class Members, in violation of multiple ACA federal regulations.  He knew the lure of cash benefits was causing consumers to call, and that the agencies Minerva sold the fraudulent Leads to use them to enroll those consumers into a healthcare plan, thus increasing the demand for Minerva's Leads.

13.     Defendants' actions constitute a RICO Enterprise.  Class Plaintiffs, on behalf of the class members they represent, seek an injunction stopping Defendants from continuing the schemes described in this lawsuit.  Class Plaintiffs also seek damages on behalf of themselves, the

Consumer Class and the Agent Class for the economic injuries caused by Defendants' actions, as well as an award of treble damages and attorney's fees and costs.  Finally, Consumer Class Plaintiffs and class members seek damages arising out of Defendants' failure to protect Class Plaintiffs' and class members' PII from unlawfully being accessed, collected, used and/or disclosed.

## II.   PARTIES, JURISDICTION AND VENUE

### A.   Plaintiffs

14.   Plaintiff Conswallo Turner is a resident and citizen of the state of Texas.  Turner is a "person" under 18 U.S.C. § 1964.

15.   Plaintiff Tiesha Foreman is a resident and citizen of the state of Georgia.  Foreman is a "person" under 18 U.S.C. § 1964.

16.   Plaintiff Angelina Wells is a resident and citizen of the state of Texas.  Wells is a "person" under 18 U.S.C. § 1964.

17.   Plaintiff Veronica King is a resident and citizen of the state of Georgia.  King is a "person" under 18 U.S.C. § 1964.

18.   Plaintiff NavaQuote, LLC is a Delaware limited liability company with its principal place of business in the state of Georgia.  NavaQuote is a "person" under 18 U.S.C. § 1964. NavaQuote's members are Callie Navrides and Peter Navrides, both residents and citizens of Georgia.

19.   Plaintiff WINN Insurance Agency LLC is a Florida limited liability company with its principal place of business in the state of South Carolina.  WINN is a "person" under 18 U.S.C. § 1964.  WINN's sole member is Marsha Broyer, a resident and citizen of South Carolina.

B. **Defendants**

20.     Defendant Enhance Health, LLC is a Florida limited liability company with its principal place of business in Broward County, Florida.  Enhance Health is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Enhance Health's sole member and manager is Matthew Herman.

21.     Defendant Matthew Herman is a citizen and resident of Broward County, Florida. He is the sole member and manager, and Chief Executive Officer, of Enhance Health.

22.     Defendant TrueCoverage, LLC is New Mexico limited liability company registered to do business in the State of Florida.  TrueCoverage is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961. TrueCoverage's member is Girija Panicker, a citizen and resident of New Mexico.

23.     Defendant Speridian Technologies, LLC is a New Mexico limited liability company registered to do business in the State of Florida.  Speridian is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Speridian's manager is Girish Panicker and its member is Hari Pillai, who are both residents and citizens of New Mexico.

24.     Defendant Number One Prospecting LLC d/b/a Minerva Marketing is a Florida limited liability company with its principal place of business is in Broward County, Florida. Minerva is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Minerva's sole member and manager is Brandon Bowsky.

25.     Defendant Brandon Bowsky is a resident and citizen of Broward County, Florida, and is the sole member and manager of Minerva, and also serves as its president.

**C.**     **Subject Matter Jurisdiction**

26.     The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Classes who are citizens of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed classes.  This Court also has federal question subject matter jurisdiction pursuant to 18 U.S.C. § 1964.

**D.**     **Personal Jurisdiction**

27.     Enhance Health, LLC ("Enhance Health").   This Court has specific personal jurisdiction over Enhance Health pursuant to Section 48.193(1)(a), Fla. Stat.  Enhance Health regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.  It is registered with the Florida Secretary of State's office to do business in Florida.  Enhance Health maintains its headquarters and principal place of business in Sunrise, Florida.  It also has offices in Miramar and Coral Springs, Florida.  Its sole member is Matthew Herman, a South Florida resident.  Enhance Health also caused injury to persons or property within Florida that arose out of acts and omissions it took inside the state while engaging in solicitation of, or service activities for, people within Florida.  Moreover, as further alleged in this Complaint, Enhance Health committed one or more tortious acts within Florida.

28.     This Court also has general personal jurisdiction over the Enhance Health pursuant to Section 48.193(2), Fla. Stat.  Enhance Health is engaged in substantial and not isolated activity within this state.

a.     From its offices in South Florida, Enhance Health solicited and interacted with consumers in Florida and throughout the country via telephone, internet, text,

email and mail.

b.      Pursuant to an exclusive agreement, it purchased fraudulent Leads from a Florida-based company, Defendant Minerva.

c.      Enhance Health's agents, from offices in South Florida, made misrepresentations and omissions that induced Consumer Class members, including a substantial number of Florida consumers, to enroll in ACA health insurance plans.

d.      From its offices in South Florida, Enhance Health obtained Consumer Class members' PII, and subsequently used that information to re-enroll Consumer Class members into additional ACA health insurance plan(s) without proper knowledge and consent.

e.      From its offices in South Florida, it engaged in AOR Swaps, Twisting and Dual Apps.

f.      From its offices in South Florida, Enhance Health submitted Consumer Class members' health insurance applications to the ACA Marketplace.

g.      Enhance Health received commission payments to its offices in South Florida.

h.      Enhance Health wired commissions to its agents from its offices in South Florida.

i.      Enhance Health wired payments to downline agents in Florida.

j.      Enhance Health entered into contracts in the State of Florida, including but not limited to contracts with its agents that operated from Enhance Health call centers located in its offices in South Florida.

k.      Enhance Health provided customer service to Class Plaintiffs and class members from its offices in Florida.

l.      Enhance Health sent enrollment documents to the Marketplace as well as documents and communications to Plaintiffs and class members from its offices in Florida.

m.      From its Florida offices, Enhance Health paid advances to its downline agents to support the unlawful misconduct alleged herein.

29.      <u>Matthew Herman</u> ("Herman").  Herman is an individual who during all times was a resident and citizen of the state of Florida.  Herman is Enhance Health's managing member and Chief Executive Officer.  Working from Enhance Health's South Florida offices, Herman oversaw and directed the Enhance Health sales team and the misleading scripts that they used with consumers.  He directed Enhance Health's strategy and growth, embracing a strategy that relied upon the use of fraudulent Leads to enroll consumers in ACA health plans, twist those plans and remove and replace agents of record.

30.      <u>TrueCoverage, LLC</u>.  This Court has specific personal jurisdiction over TrueCoverage pursuant to Section 48.193(1)(a), Fla. Stat.  TrueCoverage regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.  TrueCoverage maintains or maintained within the relevant period offices in Miramar, Deerfield Beach and Miami.  It is registered with the Florida Secretary of State's office to do business in Florida.  Its registered agent is Matthew Goldfuss, a Florida resident.  True Coverage also caused injury to persons or property within Florida that arose out of acts and omissions it took inside and outside the state while engaging in solicitation of, or service activities for, people within Florida.  Moreover, as further alleged in this Complaint, TrueCoverage committed one or more

tortious acts within Florida.

31.     This Court also has general personal jurisdiction over TrueCoverage pursuant to Section 48.193(2), Fla. Stat.   TrueCoverage is engaged in substantial and not isolated activity within this state.

      a.      From its offices in South Florida, TrueCoverage solicited and interacted with consumers in Florida and throughout the country via telephone, internet, text, email and mail.

      b.      It purchased fraudulent Leads from a Florida-based company, Defendant Minerva.

      c.      TrueCoverage's agents, from offices in South Florida, made misrepresentations and omissions that induced Consumer Class members, including a substantial number of Florida consumers, to enroll in ACA health insurance plans.

      d.      From its offices in South Florida, it engaged in AOR Swaps, Twisting and Dual Apps.

      e.      From its offices in South Florida, TrueCoverage obtained Consumer Class members' PII, and subsequently used that information to re-enroll those Consumer Class members (many of whom were in Florida) into new or additional health insurance plan(s) without proper knowledge and consent.

      f.      From South Florida, TrueCoverage agents submitted Consumer Class members' health insurance applications to the ACA Marketplace.

      g.      TrueCoverage received commission payments to its offices in South Florida.

h.      TrueCoverage wired commissions to its agents from its offices in South Florida.

i.      TrueCoverage wired payments to downline agents, including Enhance Health, in Florida.

j.      TrueCoverage entered into contracts in the State of Florida, including but not limited to contracts with agents that operated from TrueCoverage call centers located in its offices in South Florida.

k.      TrueCoverage provided customer service to Class Plaintiffs and class members from its offices in Florida.

l.      TrueCoverage sent enrollment documents to the Marketplace as well as documents and communications to Plaintiffs and class members from its offices in Florida.

m.      From its Florida offices, TrueCoverage paid advanced commissions to its downline agents to support the unlawful misconduct alleged herein.

32.      Speridian Technologies, LLC ("Speridian").   This Court has specific personal jurisdiction over Speridian pursuant to Section 48.193(1)(a), Fla. Stat.   Speridian regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.   Speridian is registered with the Florida Secretary of State's office to do business in Florida.   Speridian controls Defendants TrueCoverage and Benefitalign.   As further alleged in this Complaint, Speridian committed one or more tortious acts within Florida by controlling and financing the Florida operations of TrueCoverage and Benefitalign, including but not limited to paying the salaries of TrueCoverage's agents in Florida, with knowledge that TrueCoverage and Benefitalign were committing a fraud.

33.     This Court also has general personal jurisdiction over Speridian pursuant to Section 48.193(2), Fla. Stat.  Speridian is engaged in substantial and not isolated activity within this state.

        a.     Speridian developed and provided access to the platform used by Florida-based companies, like Enhance Health, and companies operating in Florida, like True Coverage, to enroll and manage consumers, including a substantial number of Florida-based consumers, as part of the Enterprise and scheme described in this lawsuit.

        b.     Speridian financed TrueCoverage's and Benefitalign's operations and growth in South Florida by paying advanced commissions as well as by paying the salaries of TrueCoverage's health insurance agents and Benefitalign's employees. These financial arrangements were memorialized in loan agreements and employment agreements executed in Florida.

34.     <u>Number One Prospecting, LLC d/b/a Minerva Marketing</u> ("Minerva").  This Court has specific personal jurisdiction over Minerva pursuant to Section 48.193(1)(a), Fla. Stat. Minerva is a Florida limited liability company which maintains its headquarters and principal place of business in Fort Lauderdale, Florida.  It regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida, and has at least one office in Florida. Minerva also caused injury to persons or property within Florida that arose out of acts and omissions it took inside and outside the state while engaging in solicitation of, or service activities for, people within Florida.  Minerva committed one or more tortious acts within Florida.

35.     This Court also has general personal jurisdiction over the Enhance Health pursuant to Section 48.193(2), Fla. Stat.  Minerva is engaged in substantial and not isolated activity within this state.

a.      From its offices in South Florida, Minerva generated and bought Leads and sold them to health insurance brokers in Florida, including but not limited to Enhance Health and TrueCoverage, for the enrollment of consumers into health insurance policies under the ACA.

b.      Minerva received payments for its Leads at its offices in Florida.

c.      Minerva entered into contracts in Florida, including an exclusive agreement whereby Enhance Health, a Florida-based company, agreed to buy all of its Leads from Minerva.

d.      From its offices in South Florida, Minerva obtained Consumer Class members' personally identifiable information and monitored those members' calls in violation of federal regulations.

36.     <u>Brandon Bowsky</u> ("Bowsky").  Bowsky is an individual who during all times material was a resident and citizen of the state of Florida.  Bowsky is founder and CEO of Minerva. Bowsky has stated publicly that he was the first person to advise agencies like TrueCoverage and Enhance Health to enter the ACA space for low-income consumers.  Bowsky knew that the creation of that industry would result in demand for his company's Leads.  Indeed, Minerva became Enhance Health's exclusive lead generator and also sold Leads to TrueCoverage.  Bowsky directed Minerva's strategy and growth, and caused Minerva to generate and buy, and then sell to Enhance Health, TrueCoverage and their downlines, Leads that misleadingly represented to consumers that they would receive cash benefits.  Bowsky knew that Minerva's Leads were being used by Enhance Health, TrueCoverage and their downlines to sell health insurance to consumers who were seeking the advertised monthly cash payments.  He knew the lure of cash benefits were causing consumers to call, and that the agencies to whom Minerva sold the fraudulent Leads used

15

them to enroll those consumers into a healthcare plan, thus increasing the demand for Minerva's Leads.

37.     <u>Venue</u>.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because (i) a substantial part of the events or omissions giving rise to Class Plaintiffs' claims occurred in this District, and (ii) each of the Defendants' contacts with this District would be sufficient to subject them to personal jurisdiction in this District if this District were a separate State.  Defendants regularly and systematically operate, conduct, engage in and carry on a business or business venture in this District, and have generated significant revenue from consumers in this District.  Defendants committed one or more tortious acts within this District.  Defendants' contacts within this District were substantial and not isolated.

### III.     RELEVANT NONPARTIES

38.     <u>Benefitalign, LLC</u> ("Benefitalign").  Benefitalign LLC operates a proprietary enhanced direct enrollment platform (or "EDE Platform") owned and developed by Speridian. Benefitalign has provided TrueCoverage (and until June 2023, Enhance Health) direct access to the Exchange.  Using Benefitalign, TrueCoverage, Enhance Health and their downlines have enrolled consumers in ACA health insurance without requiring them to visit Healthcare.gov.

39.     <u>JET Health Solutions</u>.  Like Benefitalign, JET Health Solutions is a CMS-approved, Phase 3 Enhanced Direct Enrollment provider.  It was purchased by Enhance Health in July 2023. Upon information and belief, after the acquisition Enhance Health began enrolling class members, possibly including some of the Class Plaintiffs, into ACA plans through the newly acquired EDE platform.

40.     <u>Inshura, LLC</u>.  Inshura is owned and controlled by Speridian.  It is a CMS-approved, Phase 3 Enhanced Direct Enrollment platform.  Certain TrueCoverage downlines such

as Protect Health/DMS, listed above, use Inshura to enroll class members, possibly including some of the Class Plaintiffs, into ACA plans through that EDE platform.

41.     Girish Panicker ("Panicker").  Panicker is founder and Chairman of the Board of Speridian and its group of companies, including TrueCoverage and Benefitalign.  Panicker oversees and directs Speridian, TrueCoverage and Benefitalign.  During the relevant timeframe, he directed those companies' strategy and growth, embracing a strategy that relied upon the use of fraudulent Leads to enroll consumers, including a substantial number of Florida customers, in ACA health plans, and to twist those plans and remove and replace agents of record.

42.     Matthew Goldfuss ("Goldfuss").  Goldfuss is TrueCoverage's National Director: Individual and Medicare Sales.  Working from TrueCoverage's South Florida offices, Goldfuss oversees and directs the TrueCoverage sales team and the misleading scripts that they used with consumers.

43.     Bain Capital Insurance.  According to its press releases, Bain Capital Insurance provided Enhance Health with $150 million in capital in November 2021.  Bain Capital Insurance is the dedicated insurance investment and solutions business of Bain Capital, a leading global private investment firm with over $150 billion under management across 22 offices on four continents.  Enhance Health uses the capital provided by Bain Capital Insurance to finance its call centers and the commissions of its downline agencies.

44.     Protect Health and Digital Media Solutions.  Protect Health is a health insurance agency based in Nevada that is owned by the publicly traded company, Digital Media Solutions ("DMS").  Protect Health has agents in numerous states across the country who sell ACA health plans to members of the class.  Protect Health has been a downline agency of TrueCoverage since at least October 1, 2023.  TrueCoverage has a downline producer agreement with Protect Health

and is involved in the selling of policies based on the fraudulent advertisements described in the complaint.  DMS also sold Leads to Enhance Health and TrueCoverage that were generated from the deceptive advertisements at issue in the case.

45.     <u>Ensure Health Group Corporation and Barachy Lucian</u>.   Ensure Health Group Corporation is a Delaware corporation with a principal place of business in Plantation, Florida. According to the Florida Secretary of State's website, Barachy Lucian is the Vice President of Ensure Health Group.  Ensure Health Group is a downline agency of TrueCoverage and has a downline producer agreement with Protect Health and is involved in selling ACA health plans to class members.    Beginning in at least 2022, Barachy Lucian was involved in training TrueCoverage's and Enhance Health's agents on selling ACA health insurance plans through Speridian's EDE platform, Benefitalign.

46.     <u>Health First Insurance Agency</u>.  Health First Insurance Agency is a health insurance agency that sells ACA health plans to class members. According to the Florida Department of Financial Service, Jonathan Massa is the agent in charge of Health First Insurance Agency, and until approximately March 5, 2024, was a downline agency of Enhance Health.   Health First Insurance Agency is involved in the selling of policies based on the fraudulent advertisements described in the complaint.

47.     <u>My Health Advisers, Inc., Erica Richmond and Gabriel Pasztor</u>.   My Health Advisers, Inc. is a Florida corporation created on April 18, 2019.  It has a principal place of business in Broward County, Florida.  My Health Advisers is an insurance agency located in Oakland Park, Florida.  According to records maintained by the Florida Department of Financial Services, Gabriel Pasztor is listed as the agent in charge of My Health Advisers, Inc.

48.     According to the Florida Secretary of State's website, Erica Richmond was the

President of My Health Advisers from September 16, 2020, to August 26, 2022.  During some of this time period, Erica Richmond was the head of customer service for Enhance Health.

49.     Gabriel Pasztor is listed on the Florida Secretary of State's records as President of the company from August 26, 2022, to the present.  Upon information and belief, Gabriel Pasztor and his wife Paola Fritz are listed as AOR on many of ACA health plans sold to Plaintiffs and class members.   Erica Richmond, Gabriel Pasztor and his wife Paola Fritz have relevant information about the sale of the policies and the allegations related to AOR switching.

50.     PolicyBind, LLC.  PolicyBind, LLC is a Florida limited liability company with a principal place of business in Miami, Florida.  PolicyBind generated Leads from deceptive and fraudulent advertisements and sold them to TrueCoverage and/or Enhance Health.

51.     WeCall Media, Inc.  WeCall is a Delaware corporation with a principal place of business in North Carolina.   WeCall generated Leads from deceptive and fraudulent advertisements and sold them to TrueCoverage and/or Enhance Health.

52.     My ACA, LLC.  My ACA, LLC is a Delaware limited liability company and is a related entity to WeCall Media, LLC.  My ACA, LLC sold Leads to TrueCoverage and/or Enhance Health that were generated from the deceptive and fraudulent advertisements at issue.

53.     Retreaver.  Retreaver is a Canadian software company based in Ontario, Canada.  According to its website, Retreaver is a cloud-based software that provides real-time, inbound call data by tagging, tracking and routing callers to agents.  Upon information and belief, Defendants Minerva and Bowsky use(d) Retreaver to tag, track and route incoming calls (Leads) from class members who responded to the fraudulent and deceptive advertisements to Defendants' sales agents.  The Retreaver software was/is also used by Minerva and Bowsky to record the confidential phone calls between Enhance Health's agents and consumers without the knowledge

and consent of members of the class.

54.     <u>Esotech d/b/a Total Leads Domination ("TLDCRM")</u>.  Esotech, Inc. d/b/a Total Leads Domination is a Florida corporation with its principal place of business located in Hialeah, Florida.  According to its website, TLDCRM provides, among other things, dialer services, lead management services and data management services.  Throughout the class period, Enhance Health and TrueCoverage used the TLDCRM software for their CRM (Customer Relationship Management) system.  They used TLDCRM, in part, to accept inbound calls at their call centers that were routed to them by software such as Retreaver throughout the Class Period.

55.     <u>John Doe Entities</u>.  All lead generation firms, downline agencies and agents referenced in **Exhibit 1**.

**IV.     FACTUAL BACKGROUND**

56.     As a starting point, it is helpful to understand the ACA regulations that address how consumers, including Class Plaintiffs and class members, are enrolled into the ACA health insurance at issue, how Defendants fit into the regulatory framework and how Defendants violate those regulations.

**A.     The ACA and How the Private Sector Became Involved in the Enrollment Process**

57.     The Patient Protection and Affordable Care Act ("ACA"), signed into law on March 23, 2010, was intended to reform aspects of the private health insurance market and expand the availability and affordability of health care coverage.  The ACA provides an opportunity for individuals who do not have group health insurance through their employer and are not on Medicare or public assistance programs such as Medicaid, to purchase individual health insurance each year.

58.     The ACA required the establishment of a health insurance marketplace in each state and the District of Columbia to assist individuals and small businesses in comparing, selecting and enrolling in health plans offered by participating private issuers of qualified health plans.  CMS is responsible for overseeing the establishment of these marketplaces, including creating a federally facilitated marketplace ("FFM" or the "Marketplace") for states not establishing their own.  CMS was responsible for designing, developing and implementing the IT systems needed to support the Marketplace.  This included the creation of Healthcare.gov — the website that provides a consumer portal to the Marketplace — and related data systems supporting eligibility and enrollment.

59.     The Marketplace began accepting applications for consumer enrollment on October 1, 2013.  However, individuals attempting to access Healthcare.gov encountered numerous problems.  In response to these problems, CMS began seeking ways to incorporate the private sector into developing and integrating technology into the enrollment process.

### 1.    **The Private Sector Enters the Picture Through "Direct Enrollment"**

60.     As an initial step, CMS created and allowed for a service called "Direct Enrollment" or "DE."  Direct Enrollment allows private insurance carriers of approved Qualified Health Plans (or "QHPs") and private third-party "web-brokers" (online insurance agents) to enroll consumers through the Exchange, with or without the assistance of an agent or broker.  In this "classic" DE experience, consumers start at a carrier or web-broker's website and are redirected to Healthcare.gov to complete an eligibility application.  After completing the application, they are sent back to the issuer or web-broker's website to shop for and enroll in a plan.

61.     For the first few years, DE experienced technical challenges, in part because many consumers who attempted to enroll through carriers or web-brokers were dropping off in the

middle of the process while being directed back and forth between Healthcare.gov and the carrier or web-broker's site.

> ### 2. Enhanced Direct Enrollment Is Introduced to Expand and Improve the Private Sector's Enrollment Efforts, But Critics Become Concerned

62.     To address the issue, in 2017 the Department of Human Health and Performance announced that the agency was considering creating an "Enhanced Direct Enrollment" (or "EDE") pathway.  EDE allows certain private entities, including insurance carriers and web-brokers, to directly enroll consumers into QHPs through the Exchange without redirecting consumers to Healthcare.gov.

63.     In November 2018, CMS issued a release that described the rollout of the EDE pathway as a partnership with the private sector to help make enrollment more user friendly.  CMS announced that the EDE program would allow the private sector to connect directly to Healthcare.gov and touted a "great new opportunity [for] the private sector to come up with innovative ways to create a uniquely tailored end-to-end user experience."

64.     But critics of the EDE pathway model foresaw problems.  They warned that giving the private sector such access to the Marketplace database could expose consumers to fraudulent schemes and misleading information on web-broker sites.  For example, on March 15, 2019, the Center on Budget and Policy Priorities published a report entitled "'Direct Enrollment' in Marketplace Coverage Lacks Protections for Consumers, Exposes Them to Harm — New 'Enhanced Direct Enrollment' Heightens Risks."  The report warned that web-brokers, through the use of marketing technology, could use the database information to target and harm consumers.

65.     CMS released detailed guidance for entities wishing to implement the EDE pathway.  These guidelines noted that entities would be allowed to implement one of three phase options of the technology, each successive phase allowing the entity to directly enroll a greater

percentage of consumers.  The highest and most stringent level, Phase 3, allows an entity to support all consumer applicants.  Phase 3 requires the entity to sign a privacy and security agreement with CMS that contains important consumer protections.  Among other things, these protections restrict how consumer PII can be created, collected, used and/or disclosed, and impose safeguards for safeguarding consumer PII.

66.     TrueCoverage and Benefitalign are both Phase 3 EDE platforms (and both are owned and controlled by Speridian).  Each publicly touts the heightened security and privacy safeguards that need to be implemented to achieve Phase 3 status.  For example, Speridian's website claims that Benefitalign has been audited by a third party for extensive security and privacy, is compliant with nearly 300 CMS security and privacy standards and has been reviewed, approved and audited by CMS.

67.     Benefitalign is an *agent-facing* EDE platform, meaning that it is designed to be used by health insurance agents to enroll consumers in ACA health insurance plans on the Marketplace database:



**B.**      **The ACA Imposes Important Regulatory Requirements That Defendants Violated**

68.     Before delving into the fraudulent advertisements, sales scripts, AOR Swaps and Twisting conducted by Defendants comprising the RICO Enterprise, it is important to describe the regulatory environment that Defendants exist in — and how they flouted its requirements and restrictions.  Viewed within this context, Defendants' actions directed toward consumers and agents becomes even clearer.

69.     Defendants fall within three categories of entities described by the ACA regulations.

70.     Enhance Health and TrueCoverage are each considered an "Agent or broker" because they are "licensed by the State as an agent, broker or insurance producer" pursuant to 45 CFR § 155.20.

71.     Speridian, Benefitalign and TrueCoverage are each a "Web-broker" under 45 CFR § 155.20.  A web-broker is an Exchange-registered individual or group of agents or brokers "that develops and hosts a non-Exchange website that interfaces with an Exchange to assist consumers with direct enrollment in QHPs offered through the Exchange . . . ."

72.     And Minerva, Bowsky and Herman are considered "Non-Exchange entities," defined under 45 CFR § 155.260 to include those who are not part of the Exchange but who obtain and use consumers' PII.  They are "any individual or entity that (i) Gains access to personally identifiable information submitted to an Exchange; or (ii) Collects, uses, or discloses personally identifiable information gathered directly from applicants, qualified individuals, or enrollees while that individual or entity is performing functions agreed to with the Exchange."

73.     Because they are agents, brokers and/or web-brokers, ACA's regulations place "standards of conduct" on Speridian, Benefitalign, Enhance Health, TrueCoverage and Bowsky.

Pursuant to 45 CFR § 155.220(j)(2), they must not deceive consumers.  They must "[p]rovide consumers with correct information, without omission of material fact, regarding the Federally-facilitated Exchanges, QHPs (ACA health insurance plans) offered through the Federally-facilitated Exchanges, and insurance affordability programs, and refrain from marketing or conduct that is misleading (including by having a direct enrollment website that HHS determines could mislead a consumer into believing they are visiting *HealthCare.gov*), coercive, or discriminates based on race, color, national origin, disability, age, or sex." (emphasis added).

74.     Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, all Defendants must execute an agreement that includes provisions binding them to comply with ACA's privacy and security standards and obligations and must also execute agreements with any downstream entities binding them to the same privacy and security standards. *See* 45 CFR §§ 155.220(j)(2)(iv), 155.260(b)(2).

75.     As described in more detail in the sections below, Speridian, Enhance Health, TrueCoverage and Bowsky flouted the standards of conduct for agents, brokers and web-brokers outlined in 45 CFR § 155.220(j)(2).  They purchased and/or financed the purchase of Leads that deceived consumers into thinking they would receive cash cards or other cash benefits. TrueCoverage, controlled and/or directed by Speridian, used misleading sales scripts to deflect questions about those cash benefits, and engaged in twisting and AOR-swapping that harmed consumers.  Enhance Health did the same.

76.     Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, all Defendants violated the regulations' security standards and obligations. Enhance Health and Herman never entered into a security agreement with non-Exchange entity Minerva or Bowsky, and allowed them to record customer calls in breach of the security and

privacy regulations.  Enhance Health was a downline agent of TrueCoverage and Speridian. Neither TrueCoverage nor Speridian caused Enhance Health to execute a security agreement.

**C.**       **Defendants Engage in a RICO Enterprise**

       **1.**       **Changes in the ACA Create a Year-Round Market for Enrolling Low-Income Americans**

77.     In the wake of COVID, the federal government took multiple steps to expand the availability of affordable ACA health plans to Americans.  In 2021, the American Rescue Plan Act temporarily enhanced eligibility for, and the amount of, APTCs that consumers could use to offset the premiums for ACA health plans.

78.     APTCs are tax credits paid by the federal government directly to the insurance carriers (not consumers) to offset the cost of premiums for the health insurance.  Importantly, to qualify for premium tax credits, consumers must satisfy income requirements.  Consumers can use APTCs to lower their monthly insurance payments when they enroll in a plan through the Marketplace.  The consumer's APTC is based on the estimated annual household income and the household size that the consumer reports on their Marketplace application.  The consumer's APTC is determined at the end of the year based on the actual household income and household size for the year.  Depending on their actual household income for the year, consumers may be required to repay excess APTCs received when filing their federal income tax return.

79.     Separately, in September 2021 the U.S. Department of Health & Human Services finalized a new special enrollment period (SEP) in states that use HealthCare.gov, granting year-round enrollment in ACA-compliant health insurance if an applicant's household income does not exceed 150% of the federal poverty level and if the applicant is eligible for an APTC (or subsidy) to cover the cost of the plan. This SEP started on March 22, 2022.

80.     According to the U.S. Census Bureau, in 2022, approximately 40 million Americans below the age of 65 fall within this market segment of at or below 150% of the federal poverty level.  As explained below, the year-round special enrollment period provided Defendants with the perfect opportunity to market and sell ACA plans to a market segment of low-income individuals that have may be in need for low-cost health insurance.

**2.      In 2022, Enhance Health and TrueCoverage Enter the New, Year-Round Market for Enrolling Low-Income Consumers**

81.     Using a $150 million investment from Bain Capital, Enhance went into business in late 2021.  Initially, Enhance Health planned to market and sell Medicare Advantage policies to seniors.  But Enhance Health quickly redirected its focus to the low-income ACA market, seeking to capitalize on the year-long SEP that was set to begin on March 22, 2022.

82.     Enhance Health and Herman determined that ACA health plans that stayed in force for at least two years were the most profitable for agents selling those plans.  Furthermore, low-income policyholders were most likely to keep a policy in force for at least two years because they did not have to pay for premiums — those premiums were covered by the government's APTCs.  But Enhance Health and Herman understood that to obtain profitability in such a market, Enhance Health needed to enroll a high volume of consumers.

83.     TrueCoverage spotted the opportunity at around the same time.  TrueCoverage realized that by using Benefitalign's readily available EDE platform, it could obtain complete access and control to Marketplace data and enroll large numbers of customers in a short amount of time without scrutiny — in other words, without having to enroll in the Healthcare.gov website.

84.     Benefitalign was Speridian and TrueCoverage's proprietary EDE platform.  It was not openly available to other agencies.  Yet Speridian, TrueCoverage and Benefitalign allowed Enhance Health, which had just received a $150 million infusion of capital, to use the platform

and work together to capture the ACA market for low-income Americans.  Using the Benefitalign platform, Enhance Health quickly became TrueCoverage's largest downline agent.  TrueCoverage trained Enhance Health's agents for ACA-related sales calls.

85.     To support the large scale of such an operation, TrueCoverage and Enhance Health opened call centers and staffed them with hundreds of insurance agents, mostly from South Florida.  In addition, TrueCoverage and Enhance Health created downline networks of other agencies to enroll even more consumers.

86.     TrueCoverage and Enhance Health knew that their downlines were using fraudulent ads and misleading scripts and engaging in AOR Swaps, Twisting and Dual-Apping.  They shared in the commissions captured by their downlines.

### 3.     To Drive Enrollments, Defendants Use False Advertisement Campaigns Targeting Low-Income Americans

87.     To drive enrollment, TrueCoverage, Enhance Health and their downlines purchased customer Leads.  Enhance Health entered into an agreement to purchase Leads exclusively from Minerva.  True Coverage and its other downlines purchased Leads from Minerva and other lead generators.

88.     Minerva and the other lead generators generated their Leads by posting advertisements on social media like Facebook, and by sending text messages directly to consumers.  Minerva both created its own advertisements to generate Leads and purchased Leads from other lead generators who created advertisements.

89.     Beginning in 2022, Minerva and other lead generators began posting and texting advertisements that falsely represented that consumers could receive cash benefits, such as cash cards or stimulus checks ("stimmys"), to cover household expenses like groceries, medical bills and rent.  Just a few examples of these advertisements include:



90.    When customers click these advertisements or text messages, they are asked a couple of short questions, including whether the consumer earned less than a certain amount per year and whether they were on Medicaid.  While these questions are made to appear to relate to the consumer's qualifications for a cash benefit, these questions were actually posed to determine whether the consumer qualified for APTCs to pay for health insurance.  If the consumer's answers qualified him or her for APTCs, that consumer was brought to a landing page that told them they were "prequalified."   The landing pages continued to use language that misled consumers to believe they were applying for cash benefits that could be used for daily expenses:





91.     The landing pages contained toll-free phone numbers for consumers to call.  These phone numbers led to the sales agents of Enhance Health, TrueCoverage and/or their downlines. The calls were routed through Minerva's routing software Retreaver, which also records the confidential sales calls without Consumer Class Plaintiffs' and class members' consent.

92.     Enhance Health, TrueCoverage and their downlines knew that these Leads were being generated by misleading advertisements.  The prequalified consumers who were calling them repeatedly asked about the nonexistent cash cards, cash subsidies and other cash benefits being touted in the ads.  Rather than try to dispel the belief consumers had obtained from the ads and landing pages, Enhance Health, TrueCoverage and their downlines deflected consumers' inquiries about the cash benefits to enroll them into a health insurance plan anyway.

93.     For example, on December 13, 2023, TrueCoverage's Senior Director of Quality Assurance, John Runkel, sent an email to TrueCoverage's sales agents from his Speridian email address acknowledging that ***"[w]e are misquoting subsidies and additional benefits. . . .  We have been quoting to consumers that they are going to receive a 'subsidy card' in the mail to help pay***

*for groceries, bills, rent and expenses."* (emphasis added).  Runkel explained to TrueCoverage sales agents that the subsidies were not cash benefits.  Rather, they were health insurance premium payments made directly from the government to the insurance carrier for the consumer's benefit. Runkel also explained that while some carriers provided cash rewards (such as a gym membership or "$10 Subway card") for healthy activities, TrueCoverage had no authority to speak about additional benefits.  Finally, Runkel told TrueCoverage's sales agents that *"[t]he only thing we can do is follow our script and be vague."* (emphasis added).

94.     By referring to "our script," Runkel meant a series of scripts that TrueCoverage used to quickly enroll consumers for ACA health insurance in less than 10 minutes.  Again, volume was key.

95.     TrueCoverage told its agents that failure to follow the scripts were grounds for termination.

96.     TrueCoverage's sales script was created to work seamlessly with the landing page from the misleading advertisement.  It begins with a question that references the landing page: "Fantastic, and you saw that prequalified result that led you to us?  Great!"  From there, the script asks just a few more simple questions designed to verify the consumer's qualifications for an ACA insurance plan: current healthcare coverage, name, date of birth, zip code, marital status, dependents and "anticipated" income.

97.     If the consumer referenced the cash benefits he or she had seen in the advertisement and landing page, TrueCoverage provided its agents with another script — a rebuttal script — to guide them.  The rebuttal script instructed the sales agent to quickly deflect the consumer's question about a cash card.  For example:

**Online Ad Rebuttals**

**REBUTTALS TO CASH CARDS AND $$ QUESTION**

**They say—I am calling about the cash card?**

**Rebuttal**: Yes, you may qualify for additional benefits with eligible plans.  Let us start the qualification process to find the plan that fits your needs, what is your zip code?

98.     Runkel's email caused a stir among TrueCoverage's salespeople, some of whom were worried that they may be misleading consumers, and that they may not be paid commissions on their sales.  TrueCoverage's Regional Director in its Deerfield Beach sales office, Gabriel Harrison, tried to reassure his agents:

> That email was mainly directed to Other centers not ours, we are the **TOP PRODUCERS** , if you are putting in your numbers then losing 1 sale or even 3 by the end of the week is not going to Affect you!!  Get with the Picture guys , everything is great and you all have been paid very well , plus we feed you, plus we give you Bonus for just doing your job , we give out cash spiffs to push you to hit numbers for your own Gain, we give out Prizes for those of you who Put in that extra work to be successful , Guys we pay out Huge checks and everyone knows it, why would we as a company  Harm your pay ? We are here to Help you all Become Fat and Happy With a Wheel Borrow full of **CASH**!

> Guys don't get stuck in your head, lets push forward and continue the success we have started and make next year an awesome year with a Big book of Business!

99.     One former TrueCoverage agent said the company trained its agents to lie to consumers and not disclose the truth about the nature of the subsidy.  Another explained that TrueCoverage's supervisors attempted to justify the company's actions by reminding sales agents that even though consumers were not getting a cash card or other cash benefit, they were at least getting health insurance.

100.     In a January 11, 2024, email, Goldfuss instructed agents not to speak with any government agent or CMS: "If you receive an email from CMS or a Department of Insurance from any particular state, **DO NOT RESPOND!**"

101.    Enhance Health also incorporated sales scripts with aimed to deflect consumers' attention away from the advertised cash subsidies and benefits, and quickly sign them up.

102.    Despite knowing that Minerva and other lead generators were generating the advertisements and Leads that were misleading consumers, TrueCoverage, Enhance Health and their downlines continued to pay Minerva and other lead generators millions of dollars for those Leads.  As they did, the scheme's reach expanded.

103.    Indeed, in a recent, March 29, 2024, article entitled "Enhance Health: Helping Hundreds of Thousands of Americans Find Health Insurance Coverage Every Year," Herman proclaimed that "Enhance Health is the largest enroller of ACA plans in the country — we help hundreds of thousands of Americans find health insurance coverage every year."  Herman also noted that nearly all of Enhance Health's clients are low-income Americans, stating "97% of our members pay $0 a month in insurance premiums while obtaining the coverage they need."

104.    Minerva also knew what was going on.  It generated some of the Leads itself.  For example, when an unrelated agency purchased some of Minerva's Leads and began receiving calls from consumers, that agency quickly realized that those consumers were calling for cash benefits, not health insurance.  The agency complained to Minerva's marketing director, who replied in a text that the calls had a healthy success rate, and that the agency should enroll them anyway.  He wrote "the calls you're getting are ***internally generated*** and have a raw to sale rate of about 34%. [W]e'll audit the calls of course, ***but agents are usually able to flip these consumers pretty easily and get them on a no cost plan***." (emphasis added).  (The reference to auditing the calls confirms that Minerva was recording consumer calls in violation of ACA regulatory security and privacy policies).

105.     As for Class Plaintiffs and class members, they justifiably relied on the advertisements and the statements and omissions made in the scripts.  The misleading nature of the advertisements and scripts caused them to enroll and/or provide their PII.

    **4.**     **Defendants Engage in Twisting, AOR Swaps and Dual Apps**

106.     Even if Class Plaintiffs and class members decided not to enroll, by luring consumers to call in, Defendants received information that allowed defendants to further increase commissions, to the detriment of the Consumer Class and Agent Class.

107.     Enhance Health, TrueCoverage and their downline agents engaged in AOR-Swaps to steal other agents' commissions.  Using the Benefitalign platform and consumers' names, dates of birth and zip code, they were able change consumers' Agent of Record within the Marketplace database without the consumer's knowledge or consent.  In doing so, they captured the monthly commissions of agents like NavaQuote and Broyer who had originally worked with the consumers directly to sign them up.  One former agent of TrueCoverage downline ProtectHealth said she was made to do more than 500 AOR Swaps and was instructed to reenroll policies without contacting the consumer.

108.     Enhance Health, TrueCoverage and their downline agents also engaged in Twisting.  One step beyond an AOR swap, they used the Benefitalign platform and consumers' names, dates of birth and zip code to change a consumer's actual health plan without the consumer's knowledge or consent; for example, by changing the consumer to a new insurance carrier or a different plan within the same carrier.  This also allowed Enhance Health, TrueCoverage and their downline agents to capture the monthly commissions of agents like NavaQuote and Broyer.

109.     On February 26, 2024, CMS published a notice acknowledging the problem.   The first three bullet points outlined the issue:

- CMS has identified instances of consumers being enrolled into an unwanted plan.

- This action, referred to as an Unauthorized Plan Switch (UPS), results in the consumer's desired policy being cancelled or terminated.

- Many consumers are unaware of the switch until they attempt to use the desired policy to see a doctor or fill a prescription and are denied.

110.     Enhance Health, TrueCoverage and their downline agents also engaged in the creation of dual applications, or a "Dual-App."   In this scenario, they would leave a consumer's original plan in place, but submit a new application — a dual policy — for that consumer without the consumer's knowledge or consent.   This created a new policy and a new commission. Sometimes, this Dual-Apping was achieved by splitting up a family plan; for example, by submitting an application and creating a separate policy for a husband, leaving the wife and children on the original plan.

111.     These schemes hurt consumers in multiple ways.   Some consumers were signed up into twisted or dual plans that they do not qualify for.   The APTCs they received, sometimes unknowingly, caused a tax penalty at the end of the year.   Some were put into plans that their doctors are not a part of.   Or the new plans had higher deductibles or copays.

112.     Agents are damaged by AOR swaps and twisting because they lose their commissions.

**5.     Thousands of Consumers Have Complained About the Scheme**

113.     TrueCoverage's online reviews contain numerous testimonials from consumers describing their experience with the schemes:

I received this insurance through a $6,400 subsidy that was offered. I received an insurance with 0 deductible but my doctor or therapist does not accept that insurance.

       -Maria

I think that you shouldn't act like people are getting money to get people to get coverage through your agency.  Also shouldn't tell people you're on health.gov because I found nothing on health.gov about truecoverage.

       -Sarah L.

On November 30th I called and signed up for the $6,400 subsidy. THEIR WEBSITE said it was to help pay for gas, bills, utilities. I even asked the lady and texted her and she said YES, ITS TO PAY FOR ANYTHING. I was told it would be in 30 days. 30 days later I call back (she would never respond to text when I asked about it) and the guy said that she forgot to finish last step and that it ($6,400)would be in in ***** days but they'd make sure it was sent in next week. Never received it. All a huge scam.

       -Shane K

On November 30th 2023, I was calling for the stimulus package the government was offering, and the number I was provided sent me to this company. I was told by ******** ****** that I was going to be getting a stimulus package of $1730.54 monthly to cover gas, groceries, and bills. I was also getting a medical coverage from ***** effective Jan. 1 2024 with a $0 premium. I was told that this was from the Stimulus program to help the middle class stuck in the middle financially and medically, and we took the offer and I had to provide the SSN for my ENTIRE family to be Automatically qualified. I told her my children already had medical coverage from ********** and she said it was fine. We signed up due to the prior knowledge presented to us, and after a few days I became skeptical and reached out to ******** on December 11th 2023 to clarify what we were getting and the call was automatically sent to voice-mail. I called the business number and was told that the information presented to us was NOT accurate, and I immediately went to cancel my policy. My concern is my family's personal information (SSN most importantly) is in their system and im worried for potential fraud due to already being misled and lied to.

       -"Initial Complaint" 12/11/23

This company is advertising $6400 for individual that need assistance with health coverage. Once I reached out they tried to sell

me a low cost health coverage. I am complaining because they are using foul advertising practices. I'm sure this is just the tip of the iceberg. Stop them now!!!

      -Initial Complaint 10/30/23

Falsely advertising a savings benefit card that you can use to purchase groceries or pay rent get gas. However I never received it and the agent has not responded to any of my calls or messages. I specifically signed up for this for this card only

      -Initial Complaint 9/26/23

114. Other putative class members had similar experiences with Enhance Health:

They say you qualify for 0 copay and 0 on prescriptions, but they also said that you qualified for the benefit card to help pay groceries, rent, and Bill's. But only sign you up for the insurance. Then when you call they say that you need to check your perks and rewards and find out that they only give surveys for 25to50 dollars prepaid visa. That you have to wait 5to10 days to receive. Now I don't know about you but I don't know any person that food bills rent comes to 50 dollars. They told all those lies to get you to sign up for insurance. Now I want to know what else they hiding. I will find out stay posted

      -Robbie Torres Rivera

Never received anything but spam calls.  You are only giving your info to be sold off.  Please don't call these scammers don't give ur info. You are not getting any subsidy card or health insurance at all.

      -Philemon Blevins

So I signed up because it offer up me a $550 subsidy that I would get each month to put towards food groceries and other thing so I received the insurance card but not the subsidy card so when I call to check on it I was informed that the $550 goes towards the cost of your insurance plan and you will not receive a subsidy to do as you would like… it's all a scam and is not explained to u in detail.. so don't sign up thinking you will get a subsidy card to do as you please because you won't… you have to earn rewards to get any cash benefits.. I will keep the insurance because it's affordable but this is so misleading

      -Wyshieka Thompson

This place steals your information, cancels your current healthcare plan then enrolls you in a plan without your consent or knowledge.

I have heard many people have the same issue with someone stealing their information and being signed up for terrible healthcare plans and they have all ended with Enhance Health. When I attempted to call the company and find out how they got my information I was transferred multiple times and laughed at.

-Nicole

I got a plan thru AmBetter. But what was misleading was that I was told by an Enhance Health service representative, as well as the advertising, that I will be receiving money on a card to spend on healthy groceries. This is a lie. Why they tell people that, I dunno, it's just a stupid tax credit. That's not gonna help me, I make $9,000 a year and pay no taxes and get nothing back. I got patched thru to AmBetter after giving a ear full to the Enhance Health representative, they were not so nice that time, and he just wanted to get rid of me. After giving another ear full to the AmBetter representative, she apologized profusely and said she deals with about 15 to 20 cals everyday with people like me. Well, duh, you people are misrepresenting what your offering. I reported it to the FCC and the Fraud Government website. It's ridiculous, they use YouTube and Facebook and put all these pictures of groceries and even the representative when I signed up said that. Very scummy and scammy. I don't appreciate being lied to, I was actually in need of healthy food cause I am poor, thanks for getting my hopes up and crushing them. That's very uncool. Screw you people. Look at the corporate double speak with the reply they gave me. I would NEVER call you people ever again. If I need anything at all, I will call AmBetter, my actual insurance provider. Your just a broker agent and signed me up. Now go away and go lie to someone else. We the people are sick of scumbags like you that pray on the hopes and mislead people. Your words mean nothing to me, just more lies.

-"Account Removed"

Ad said I would get amazing health plan and $540/m card for expenses for things like groceries but after signing up I was given a bottom of the barrel (bronze with 10k deductable, literally worst plan I've ever seen) and no expense card. I am considering sueing.

-Justin McPharison

Not sure if I got the right information, I got connected to them through and add that featured Oprah,and it stated that they were giving $1,300.00 cash per month for signing up. All a scam.No one can answer my question, insurance company says it was a scam.

   -Carlos Marin

Gave me HIGH deductibles, and no mention of the $1000+ government check that I should qualify for (according to ad - that draws you in). So.. I believe I've been scammed!

   -LauraT

My complaint is that what was advertised to me and spoken to me over the phone during my conversation was filled with lies and deceptive information.I was told that I would be getting $402 each month to be used however I wanted to use it. On anything I wanted to use it on, like bills, food, gas, clothes... But after getting my paperwork in the mail and reading it , it clearly states that the $402 can only be used towards the cost of the insurance they set up for me. For co-pays and visits. Nothing else can it be used for. I was lied to and mislead the whole conversation. I would of never ever had them set this up if I would of known this and now I have to come out of my pocket and switch my insurance and pay for premiums again. Thanks for a whole lot of wasted time and ********* that I really can't afford to spend.

   -"Initial Complaint" 7/23/23

I signed up with healthcare coverage through a licensed agent. That same day my information was stolen and I was registered in a different plan without my authorization or knowledge. The date of the incident is November 7th, 2023. The insurance company is Enhance Health, the agent attached to the policy is ******************************* and his license number is *******

   -"Initial Complaint" 11/28/23

This company is able to change and cancel insurance on the marketplace without the owners permission. My insurance was canceled unsuspectedly and when I called to find out why I was told that this company had put me down on their insurance and canceled my marketplace insurance when I did not ask them to. I called this company three times to find out how they were able to cancel my insurance and they hung up on me all three times.

   -"Initial Complaint" 11/03/23

I have never heard of this company before today. An insurance agent by the name of ****** Madame **** (NPN ********) affiliated with this company somehow got a hold of my personal information and submitted a health insurance application without my knowledge or consent. ****** Madame **** then proceeded to enroll me into a BlueCross BlueShield plan, again without my knowledge or consent. I have no idea who this insurance agent is or how they obtained my information. I received notice from Healthcare.gov that an application was submitted, after which I received an email from Enhance Health with a reference number and this agent's name stating my eligibility verification was completed.I don't know if this Company is in the business of submitting fraudulent insurance applications or if this agent acted independently. A complaint has been filed with the state ********** of **********

    -"Initial Complaint" 9/11/23

Healthcare coverage got changed without consent!

    -"Initial Complaint" 8/16/23

## D.  Victims Included the Class Plaintiffs

115.  The scheme described above was applied to Class Plaintiffs, including consumers and agents.

### 1.  The Consumer Class Plaintiffs

116.  Conswallo Turner.  Turner is 52 years old and lives in Orange, Texas, with her son, Joshua Janice.  In late 2023, she started looking for health insurance.  With the help of Callie Navrides at NavaQuote, on December 9, 2023, Turner applied for a UnitedHealthcare Gold plan through the Healthcare marketplace.  The application was approved and the policy was set to go into effect on January 1, 2024.

117.  Shortly thereafter, Turner saw a Facebook ad promising a monthly cash card to pay household expenses.  She called the number on the ad and provided her name, date of birth and state of residence.  Armed with this information, agents switched Turner's plan and her AOR no less than five times in a span of weeks in December 2023 without her knowledge and consent.

This included agent Daniel Pojoga of Enhance Health, who without Turner's knowledge and consent switched Turner to a Blue Advantage Gold HMO in December 2023 that did not include Turner's son, Joshua.

118.    As a result of these actions, Turner has been damaged including but not limited to the loss of coverage and resulting medical payments for her son Joshua and higher deductibles and co-pays than the policy sold to her by NavaQuote. In addition, Plaintiff suffered damages resulting from the time and expense she has spent trying to correct the problems caused by the unlawful conduct.

119.    <u>Tiesha Foreman</u>.  Foreman is 50 years old and lives in Douglasville, Georgia.

120.    In or around December 9, 2022, Mrs. Foreman's husband, Larry Foreman, responded to an online ad stating that he prequalified for a cash card.  He spoke with a TrueCoverage agent who enrolled him (but not Mrs. Foreman or their child) into an Oscar Health Plan.  Upon information and belief, the agent led Mr. Foreman to believe that he would receive a cash card and $0 health insurance by falsely mischaracterizing that the advanced premium tax credit ("APTC"), which is paid by the government to the insurance carrier, would be paid to Mr. Foreman in the form of a cash card.

121.    To qualify Mr. Foreman for the tax credit, TrueCoverage underreported the family's household income.  Specifically, TrueCoverage did not include Tiesha Foreman's income in the household income calculation.  Mrs. Foreman is an accountant that makes approximately $95,000 per year, an income amount that disqualified her and her family from receiving the APTC.

122.    The following year, the Foremans received a 1095-A showing that that the Oscar policy was only in effect from January 1, 2023, to January 31, 2023 (one month), and that the Foremans owed the IRS approximately $871 for the APTC that it paid to Oscar Health.

123. On or about February 13, 2023, TrueCoverage agent Marius Boncea re-enrolled Mr. Foreman (but not his wife or child) into a second health insurance policy issued by Cigna HealthCare of Georgia. Mr. Foreman does not recall ever agreeing to enroll into this policy. Once again, TrueCoverage underreported the Foremans' household income to qualify Mr. Foreman for the APTC, even though the Foremans' household income was too high to qualify for the subsidy.

124. The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from March 1, 2023, to April 30, 2023 (two months), and that the Foremans owed the IRS approximately $1,741.76 for the APTC that it paid to Cigna.

125. In April 2023, Mrs. Foreman was unaware that her husband had responded to the online ad and had been enrolled in multiple policies in the months prior. At that time, the Foremans' oldest son was removed as a dependent on their income taxes, which qualified as the event that allowed the Foremans to enroll in an ACA plan outside the standard open enrollment period. As a result, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace to provide health insurance coverage for the remainder of 2023.

126. On or around October 17, 2023, TrueCoverage agent Hans Mardy enrolled Mrs. Foreman into a Cigna plan without her knowledge and consent. The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from November 1, 2023, to November 30, 2023 (one month), and that the Foremans owed the IRS approximately $1,793.32 for the APTC that it paid to Cigna.

127. On or about October 26, 2023, Mr. Foreman was switched into an Ambetter health by another agent, Gabriel Pasztor, an agent affiliated with TrueCoverage.

128. A couple of weeks later, on November 4, 2023, another agent believed to be

affiliated with TrueCoverage, Christopher Morales, submitted another application without the Foremans' knowledge or consent.

129.     In December 2023, during the Open Enrollment Period, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace, to provide health insurance coverage for 2024, effective January 1, 2024.

130.     On January 22, 2024, Foreman learned that the Oscar coverage that she purchased in December 2023 had been cancelled.  She called the Marketplace and learned that without her knowledge or consent, Pasztor submitted a health insurance application on her behalf.

131.     In addition, on or about February 22, 2024, Enhance Health enrolled Mr. Foreman into an Ambetter health insurance plan without his knowledge and consent.

132.     As a result of this switching of plans, the Foremans were left without health insurance for the months of January and February 2024 and incurred uncovered medical expenses.

133.     At this point, Mrs. Foreman sought help from Callie Navrides and NavaQuote. Navrides and Mrs. Foreman spent a significant amount of time unwinding the problem through the Marketplace.  Ultimately, Mrs. Foreman was able to obtain a new health insurance plan that was effective April 1, 2024, but is still trying to re-instate the Oscar policy that she purchased during the last Open Enrollment Period, so that her medical expenses incurred during the first three months of the year are covered.

134.     As a result of these actions, Mrs. Foreman suffered significant damages, including tax damages, loss of benefits, unpaid medical expenses and uncovered medications.  Mrs. Foreman has also suffered damage by having to expend unnecessary time fixing these problems.

135.     <u>Angelina Wells</u>.  Wells is 53 years old and a resident of Texas.  On or around November 14, 2023, she saw a Facebook ad stating that she could receive a $6,400 cash card and

free insurance.  She clicked the ad and answered some basic questions that told her she was "preapproved" and provided a phone number to call.  Wells believes that she spoke with an agent named Christian Jerome, whom, upon information and belief, works with TrueCoverage or one of its downline agencies.  Jerome obtained Wells' name, date of birth, income and state of residence. According to Healthsherpa's database, Jerome signed her up for an Ambetter Standard Silver plan. Wells asked Jerome about the cash card, and Jerome told her it would come later.  Wells never received the cash card she was promised.

136.     In or around January 22, 2024, Wells contacted NavaQuote and expressed concern to Callie Navrides that she had been enrolled in health insurance policies that did not meet her needs without her consent.

137.     Specifically, Wells stated at that she learned that she had a United Healthcare plan but that the plan did not her meet needs.   Wells stated that she did not recall enrolling into the health plan at all.

138.     In response, Navrides researched the issue on Healthsherpa and learned that Wells had been switched at least three times to different policies between November 2023 and January 22, 2024.

139.     Specifically, Navrides learned that Wells was switched into a Cigna Bronze plan by TrueCoverage agent Maurice Thrower, and then switched again into a United Healthcare plan by Pasztor.

140.     In an effort to help Wells and get her enrolled into a policy that met her needs, on or about January 22, 2024, Navrides enrolled Wells into a Cigna Connect Gold Enhanced Diabetes Care plan, which would ensure that Wells' diabetes treatment and medication(s) would be covered in an affordable way.

141.    Four days later, on January 26, 2024, TrueCoverage removed Navrides as AOR and replaced her with one of its downline agents, Francisco Umana, and then enrolled Wells into an Ambetter Everyday Gold plan.  TrueCoverage did so without Wells' knowledge or consent.  The change caused Wells' Cigna Connect Gold Enhanced Diabetes Care plan to be canceled.

142.    On February 22, 2024, Wells received an unsolicited text message from TrueCoverage thanking her for enrolling into another Cigna health plan.   Wells does not recall consenting to enroll in another Cigna plan other than the one sold to her by Navrides.

143.    On March 18, 2024, Wells contacted Navrides and expressed concern that the pharmacy told her that her Cigna plan sold by Navrides had been cancelled and that her diabetes medication had a $50 copay.

144.    After learning about these issues, Navrides and Wells spent a significant amount of time unwinding the problem through the Marketplace.  Ultimately, they were able to reinstate the Cigna Connect Gold Enhanced Diabetes Care plan originally sold by Callie Navrides.

145.    As a result of these actions, which included using false advertising to induce Wells to provide her personal information and then later using that information to "twist" Wells' policy, Wells has been damaged.  Setting aside the fact that she did not receive the promised cash card, Wells suffered significant damages including loss of benefits and medication.   Wells also suffered damage by having to expend unnecessary time fixing these problems.

146.    <u>Veronica King</u>.  King is 53 years old and lives in Warner Robins, Georgia.  Since 2011, King has used agent Marsha Broyer of WINN Insurance to help her navigate and purchase health insurance.

147.    On or about November 30, 2023, Broyer consulted with King and enrolled her into a health plan that met her needs.

148.    In a three-month period from November 30, 2023, to February 25, 2024, at least eight other agents switched themselves as AOR on King's health plan and changed when them without King's knowledge or consent, including at least two Enhance Health agents.

149.    On November 30, 2023, which is the same day that Broyer enrolled King into her policy, agent Christhian Crevoisier with Ensure Health Group, a downline of TrueCoverage, canceled the original policy and enrolled King into another health plan.

150.    On or about December 19, 2023, Broyer discovered that the plan had been switched and she reenrolled King back into the original health plan.

151.    On December 22, 2023, Enhance Health agent Anpherny Simpson accessed King's account and became King's AOR without her consent.  And on February 25, 2024, Enhance Health agent Ryan Rossien became King's AOR without her consent.

152.    As a result of these twisting actions, King has been damaged including loss of continuity of care resulting from the agent of record and enrollment into additional health plans, and out-of-pocket costs spent attempting to deal with the issues created.

**2.    The Agent Class Plaintiffs**

153.    <u>NavaQuote LLC</u>.  NavaQuote LLC is a small, family-owned and -operated insurance agency based in Augusta, Georgia.  NavaQuote was founded by the husband-and-wife team of Peter and Callie Navrides.  It specializes in health, life and Medicare insurance products. Callie Navrides serves as the company's principal agent.  Peter Navrides leverages his background in software, marketing and technology to help grow the agency.

154.    NavaQuote takes pride in seeking to develop long-term relationships with its clients through trust and open communication.  To accomplish this, the Navarides commit themselves to the highest ethical standards and to providing expert guidance to help clients make informed

insurance decisions.

155.    NavaQuote expends significant resources to market its services online and maintain an online presence, including its website.  The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of ACA health plans.  When NavaQuote sells an insurance policy through the Marketplace, Callie Navrides becomes listed as AOR and NavaQuote receives a monthly sales commission.

156.    Since the agency opened in October 2023, NavaQuote sold approximately 50 health plans to consumer, but lost 23 to the AOR Swaps.  Through continued and laborious researching, as well as frequent communication with their clients, the Navrides have determined that other agencies are removing Callie Navrides as AOR without the consent or knowledge of either NavaQuote or its clients.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Navrides as AOR, those agents are essentially stealing or poaching NavaQuote's clients — and its commissions.

157.    Each time a client is poached, Callie Navrides must spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent. The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the reestablishment of Navrides' status as AOR.

158.    Through its investigation, which has been difficult, laborious and costly — not only in terms of lost time that could have been used to help more clients and generate more

commissions, but also out-of-pocket costs expended through these efforts — NavaQuote has determined that TrueCoverage and Enhance Health agents are among the biggest offenders.

159.     As just a few examples, Enhance Health agent Daniel Pojoga poached NavaQuote client Conswallo Turner.  TrueCoverage agents including Christian Jerome, Francisco Umana and Maurice Thrower attempted to poach Angelina Wells from NavaQuote.

160.     The actions of TrueCoverage and Enhance Health have damaged NavaQuote through a loss of commissions.  It may take weeks for Healthcare.gov to reinstate Callie Navrides as agent of record.  If the calendar rolls into a new month during that period, she does not receive that month's commission.  It goes to the poacher.  NavaQuote has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional Leads to replace lost clients.

161.     Because of TrueCoverage and Enhance Health's actions, NavaQuote intends to pivot away from sales of health insurance plans in the Marketplace.

162.     <u>WINN Insurance Agency</u>.  Marsha Broyer, who is licensed to sell insurance in 13 states, owns WINN Insurance Agency LLC.  Broyer's mission is to do what is right for her clients by providing the best service and the best health insurance products.  Broyer was one of only a handful of the thousands of licensed health insurance agents in the U.S. to be invited to participate in the 2023 CMS Agent and Broker Summit and provide feedback to the government.

163.     Broyer experienced first-hand the importance of comprehensive medical insurance. In 2003, Broyer lost sight in her right eye.  Doctors discovered a brain tumor.  Fortunately, the tumor was treated with gamma knife technology and Broyer regained her eyesight.  But because she had inadequate insurance, Broyer was left with tens of thousands of dollars in medical bills and had no choice but to file for bankruptcy.  This experience informs every interaction she has

with her clients and potential clients.

164.    With the help of a $94,000 SBA loan, Broyer started WINN in October 2021. Working seven days a week, within a year she had developed 350 customers, largely through client referrals.

165.    WINN expends significant resources to market its services, including the creation and maintenance of a website and the purchase of exclusive Leads, which cost $100 each.  The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of insurance policies.  When WINN sells an insurance policy through the Marketplace, Broyer becomes listed as AOR and receives a monthly sales commission of approximately $30 per month per member for each application.  So if a family of four is on a single application, WINN receives $1,440/year for that policy ($30 x 4 = $120 for 12 months).

166.    Since the beginning of 2023, Broyer has been removed as AOR in at least 81 of her clients' policies and replaced by agents that have no relationship to her.  More than 20 of those clients have been lost for good.  Through continued and laborious researching, as well as frequent communication with their clients, Broyer has determined that other agencies are removing her as AOR without consent.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Broyer as AOR, those agents are essentially stealing or poaching WINN's clients — and its commissions.

167.    Through Broyer's investigation, which has been difficult, laborious and costly — not only in terms of lost time that could have been used to help more clients and generate more commissions, but also out-of-pocket costs expended through these efforts — WINN has determined that TrueCoverage and Enhance Health's agents are among the biggest offenders.

168.    For example, Enhance Health agent Ryan Rossien poached WINN client Veronica

King and Paula Langley.  And TrueCoverage agents and/or downline agents Gabriel Pasztor, Paola Fritz and Christian Jerome poached client Paula Langley.

169.    Each time a client is poached, Broyer is forced to spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent. The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the reestablishment of Broyer's status as AOR.

170.    And then, in all likelihood, Broyer must repeat this process all over again, because the switching occurs over and over.  One of WINN's clients, Langley, who is a 59-year-old with a pacemaker and a heart condition, has been switched no less than 20 times since February 2023.

171.    In all, Broyer estimates that she spends about 1/3 of her time dealing with this scheme.

172.    The actions of TrueCoverage and Enhance Health have damaged WINN through a loss of commissions.  It may take weeks for Healthcare.gov to reinstate Broyer as AOR.  If the calendar rolls into a new month during that period, WINN does not receive that month's commission.  It goes to the poaching agent.  WINN has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional Leads to replace lost clients.

173.    Because of TrueCoverage and Enhance Health's actions, WINN has lost a sizeable percentage of its income, giving Broyer no choice but to take a second job as an agent for a wireless

phone company.

## V.    RICO ALLEGATIONS

174.    TrueCoverage, Enhance Health, Speridian, Minerva, their officers and employees, including but not limited to Herman, Bowsky, Panicker and Goldfuss; as well as independent contractors; agents including Protect Health, Ensure Health Group, Health First Insurance Agency, My Health Advisers, Inc.; third-party subagents; lead generators such as PolicyBind, WeCall Media and My ACA; EDE Platforms like Benefitalign, JET Health and Inshura; and the John Doe Entities operated, managed, directed and/or conspired with an associated-in-fact enterprise (the "Enterprise").

175.    The Enterprise generated false advertisements to lure low-income consumers to enroll in ACA healthcare plans and provide PII, and to capture commissions through the use of AOR-Swaps, Twisting and Dual-App tactics.  The purpose was to maximize revenues and capture a larger share of the ACA health insurance market for low-income Americans.

176.    The Enterprise used the wires and mails to perpetrate the fraud.  TrueCoverage, Enhance Health and their downline agents used standardized scripts to make misrepresentations and omissions to Class Plaintiffs and class members over the phone.  They used email or mail to send confirmatory documentation.  The used the internet and phone lines to enroll customers, misuse PII and capture commissions.

177.    TrueCoverage and Enhance Health monitored sales calls.  Their downlines monitored sales calls without entering into any CMS-approved security or privacy agreement required by ACA regulations.  Minerva also monitored sales calls without any of the required CMS approval.

178.    Throughout its existence, the Enterprise engaged in, and its activities affected,

interstate commerce.  The Enterprise involved commercial activities across state lines, including marketing campaigns, phone and internet solicitations and the solicitation and receipt of money and PII from Class Plaintiffs and class members across the country.

179.    TrueCoverage, Enhance Health and Herman participated in the operation and management of the Enterprise's affairs, through among other methods and means, the following:

    a.  Developing agencies designed to enroll Class Plaintiffs and class members into ACA healthcare plans;

    b.  Recruiting agents;

    c.  Developing the third-party distribution channels that ran through their downlines;

    d.  Financing the operations of downline agencies through the use of advanced commissions and/or prepaid commissions called "heap deals";

    e.  Training each other's sales agents and the sales agents of downline agencies;

    f.  Monitoring sales agents, including but not limited to monitoring sales calls;

    g.  Accounting for, auditing and distributing commissions;

    h.  Dealing with and providing customer service to Class Plaintiffs and class members;

    i.  Allowing and coordinating agents to register for licenses;

    j.  Reviewing and approving the scripts; and

    k.  Purchasing Leads.

180.    Minerva and Bowsky participated in the operation and management of the Enterprise's affairs, through among other methods and means, the following:

    a.  Developing fraudulent ads;

b.  Creating, buying and selling Leads to Enhance Health, True Coverage and their downlines;

c.  Recording customers' conversations with health insurance agents without their knowledge or consent; and

d.  Tagging, tracking and routing callers to agents.

181.  Speridian participated in the operation and management of the Enterprise's affairs, through among other methods and means, entering into employment agreements with TrueCoverage agents and paying them a salary, financing the sales operations of TrueCoverage and Benefitalign, and developing the platform used by TrueCoverage, Enhance Health and their downlines to enroll customers, misuse PII and capture commissions.

182.  Enhance Health further participated in the operation and management of the Enterprise's affairs, through among other methods and means, purchasing the platform that Enhance Health and its downlines used after June 2023 to enroll customers, misuse PII and capture commissions.

183.  Herman participated in the management and operation of the Enterprise's sales, compliance, training and administrative functions.

184.  Defendants were knowing and willing participants in the Enterprise and its scheme, and reaped revenues and/or profits therefrom.

185.  Speridian, TrueCoverage, Enhance Health and Minerva each has an ascertainable structure separate and apart from the pattern of racketeering activity in which they engaged.  The Enterprise is separate and distinct from Speridian, TrueCoverage, Enhance Health, Minerva, Herman and Bowsky.

186.  Speridian, TrueCoverage, Enhance Health, Minerva, Herman and Bowsky, who are

persons associated-in-fact with the Enterprise, knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), (5) and 1962(c).  The racketeering activity was made possible by the regular and repeated use of the facilities, services, distribution channels and agents of the Enterprise.

187.    Defendants committed multiple racketeering acts, including aiding and abetting such acts.  The racketeering acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims and methods of commission.  Further, the racketeering acts were continuous, occurring on a regular (daily) basis throughout a time period beginning in 2022 through the present.

188.    Defendants' predicate racketeering acts within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

     a.  Wire Fraud.  All Defendants violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials by wire and/or email for the purpose of executing the scheme, which used material misrepresentations and omissions to induce consumers, including Consumer Class Plaintiffs and class members, to enroll customers, misuse PII and capture commissions.  The materials that Defendants sent or caused to be sent include but were not limited to social media advertisements, text messages and enrollment packets containing membership cards and customer service-related letters.

     b.  Mail Fraud.  Speridian, TrueCoverage, Enhance Health and Herman violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received,

materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme, which used material misrepresentations and omissions to induce consumers, including Class Plaintiffs and class members, to enroll in ACA healthcare plans, including enrollments without knowledge or consent. The materials that Speridian, TrueCoverage, Enhance Health and Herman sent or caused to be sent include but were not limited to enrollment packets containing membership cards, and customer service-related letters.

189.     In devising and executing the scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they directed and carried out a scheme or artifice to defraud or obtain money by means of materially false misrepresentations or omissions.  For the purpose of executing the scheme, Defendants committed or caused to be committed these racketeering acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the scheme.

190.     Defendants had knowledge of the essential nature of the scheme.  They knew that false advertisements were being used to lure consumers to enroll in ACA healthcare plans, misuse PII and capture commissions.  Despite that knowledge, the Defendants committed the predicate acts of wire and mail fraud described above.

## VI.     CLASS ACTION ALLEGATIONS

191.     Class Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes described as follows:

<u>Consumer Class</u>.  All individuals enrolled by TrueCoverage, Enhance Health, their agents and/or subagents into ACA plan(s) within the applicable statutes of limitations, and who suffered damages as a result of:

    (i)    responding to an advertisement falsely offering immediate cash benefits and enrolling in an ACA plan that they did not need or qualify for;

    (ii)    TrueCoverage, Enhance Health, their agents and/or subagents changing and/or cancelling their ACA plan(s) and/or their plans' AOR;

    (iii)    TrueCoverage, Enhance Health, their agents and/or subagents applying for and/or enrolling them in a new ACA plan; and/or

    (iv)    non-exchange entities, including but not limited to Minerva, obtaining their personally identifiable information without consent.

<u>Agent Class</u>.  All individuals or entities who, within the applicable statute(s) of limitation, suffered damages as a result of TrueCoverage, Enhance Health, their agents and/or subagents engaging in AOR Swaps, Twisting and/or Dual-Apping.

192.    The Customer Class is represented by Turner, King, Wells and Foreman.  The Agent Class is represented by NavaQuote and Broyer.

193.    Excluded from the Classes are TrueCoverage, Enhance Health, Speridian, Minerva, their agents and/or subagents, and their directors, officers, employees or independent contractors.

194.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

195.    <u>Numerosity</u>.  The members of the Classes are so numerous that joinder of all members is impracticable.  The Customer Class exceeds the numerosity requirement because hundreds of thousands of consumers have been victimized by the scheme.  The false ads that created Leads to TrueCoverage, Enhance Health and their downlines resulted in hundreds of thousands of enrollments by class members.  As for the Agent Class, the CMS reported that 74,100 Marketplace-registered agents and brokers assisted on nearly 5.5 million consumers enrolled in

2023 OEP alone.

196.    <u>Commonality</u>.  There are numerous questions of fact or law that are common to Class Plaintiffs and all the members of the Classes.  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

<blockquote>

a.   Whether TrueCoverage, Enhance Health, their agents and/or subagents engaged in a scheme to buy and utilize Leads stemming from advertisements that falsely offered consumers cash or cash equivalents;

b.   Whether TrueCoverage, Enhance Health, their agents and/or subagents engaged in AOL Swaps, Twisting and/or Dual-Apps;

c.   Obtained Class Plaintiffs' and class members' PII without consent;

d.   Whether Defendants directed, operated and/or managed the scheme;

e.   Whether Defendants violated 18 U.S.C. § 1962(c) or (d);

f.   Whether Defendants violated the terms of the required web-broker agreements with CMS and/or violated applicable federal regulations by failing to protect Class Plaintiffs' and class members' PII from unlawfully being accessed, collected, used or disclosed;

g.   Whether Class Plaintiffs and class members suffered damages; and

h.   Whether Class Plaintiffs and class members are entitled to treble damages, punitive damages, attorneys' fees and/or expenses.

</blockquote>

197.    <u>Typicality</u>.  Turner, King, Wells and Foreman have claims that are typical of the members of the False Advertising Consumer Class.  Turner and Wells received a false advertisement that caused them to purchase major medical insurance from TrueCoverage, Enhance

Health, their agents and/or subagents.  Turner, King, Wells and Foreman were all the victim of AOL Swaps, Twisting and/or Dual Apps.  NavaQuote and Broyer have claims that are typical of the members of the Agent Class.  Each was damaged when they were removed as AOR on their clients' ACA health insurance plans.  Furthermore, the claims of the Classes arise under legal theories that apply to Class Plaintiffs and all other class members within those respective Classes.

198.    <u>Adequacy of Representation</u>.  Class Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Class Plaintiffs do not have claims that are unique to Class Plaintiffs and not the other class members within their respective Classes, nor are there defenses unique to Class Plaintiffs that could undermine the efficient resolution of the claims of the Classes.  Further, Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.  There is no hostility between Class Plaintiffs and the unnamed class members.  Class Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

199.    <u>Predominance</u>.  Common questions of law and fact predominate over questions affecting only individual class members.  The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

200.    <u>Superiority</u>.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.  The damages sought by Class Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

201.    Manageability.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

202.    Ascertainability.  Class members are readily ascertainable.  Some or all of Defendants keep detailed electronic records that show, among other information, the false advertisements, the names of those who responded to the false advertisements and the names and transaction histories of class members whose plan or AOR status was changed by one or more Defendants.

### COUNT I
### (Violation of RICO § 1962(c) Against All Defendants)

203.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 202 as if fully set forth herein.

204.    The Enterprise is engaged in, and its activities affect, interstate commerce.

205.    Defendants are entities or individuals capable of holding a legal or beneficial interest in property, and therefore each meets the definition of a culpable "person" under 18 U.S.C. § 1961.

206.    Defendants were associated with the Enterprise and conducted and participated in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

207.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

208.    Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other and constituted a "pattern of racketeering activity."

209.    Defendants used thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisement, AOR Swaps, Twisting and Dual Apps that injured consumers and agents, including Class Plaintiffs and class members.

210.    Defendants knew about and directed these activities.  Defendants obtained money and property belonging to Class Plaintiffs and class members as a result of these violations.  Class Plaintiffs and class members have been injured in their business or property by Defendants' overt acts of mail and wire fraud.

211.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. § 1962, including but not limited to payment of out-or-pocket medical expenses, out-of-pocket expenses to address and undo the results of Defendants' scheme and/or the payment of tax penalties.  Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of Defendants' scheme.

212.    Class Plaintiffs and class members' injuries were directly and proximately caused by Defendants' racketeering activity.

213.    Defendants knew and intended that Class Plaintiffs and class members would rely on the scheme's misrepresentations and omissions.

214.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action and to recover their treble damages, the costs of bringing this suit and reasonable attorney's fees.  Defendants are liable to Class Plaintiffs and class members for three times their actual damages as proved at trial, plus interest and attorneys' fees.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards actual damages, treble damages, interest and attorney's fees, and/or such other and further relief as the Court deems just and proper.

## <u>COUNT II</u>
### (Section 1962(d) RICO Conspiracy Against All Defendants)

215.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 202 as if fully set forth herein.

216.    Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Defendants conspired to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

217.    With knowledge of the essential nature of the scheme, Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of affairs of the Enterprise through a pattern of racketeering activity.  Defendants committed predicate acts that they knew were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

218.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards actual damages, treble damages, interest and attorney's fees, and/or such other and further relief as the Court deems just and proper.

<u>**COUNT III**</u>
**(Aiding and Abetting a Violation of RICO Section 1962(c) Against All Defendants)**

219.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 202 as if fully set forth herein.

220.     Defendants aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisement, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

221.     Defendants each had knowledge of the scheme and provided substantial assistance toward its commission.

222.     Defendants substantially benefited from their participation in the scheme, earning millions of dollars of fees and other revenue from Class Plaintiffs and class members.

223.     As a direct and proximate result of Defendants' aiding and abetting of predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards actual damages, treble damages, interest and attorney's fees, and/or such other and further relief as the Court deems just and proper.

## COUNT IV
### (Negligence Per Se Against All Defendants)

224.    Plaintiffs restate and reallege Paragraphs 1-76, 91, 104, 115-73 and 191-202 as if fully set forth herein.

225.    Defendants Speridian and TrueCoverage and their EDE platforms, Benefitalign and Inshura, as web-brokers under the ACA regulations, entered into agreement(s) with CMS governing the way each is required to operate under federal regulations, including provisions related to protecting Consumer Class Plaintiffs' and class members' PII from unlawful dissemination.

226.    CMS's standard web-broker agreement with Speridian, TrueCoverage, Benefitalign and Inshura required those entities to comply with, among other things, all regulations related to preventing Consumer Class Plaintiffs' and class members' PII from being collected, accessed and/or disclosed to any downline persons or entities, including agents, brokers and non-exchange entities such as Enhance Health and the lead generation firm Minerva, without informed consent from Consumer Class Plaintiffs and class members.

227.    Federal regulations promulgated under the ACA also impose duties on all Defendants to ensure that all Exchange privacy and security standards implemented were consistent with the following principles: PII should be created, collected, used and/or disclosed only to the extent necessary to accomplish a specified purpose or purposes(s).  *See* 45 CFR 155.260(a)(3)(v).

228.    These regulations, which are designed to protect consumers' PII from unlawful disclosure, also apply to agents and brokers that are downline of Speridian and TrueCoverage, such as Enhance Health.  For example, 45 CFR 155.220(j)(2)(iv) requires all web-brokers, agents and brokers to protect Consumer Class Plaintiffs' and class members' PII.  That duty also extends

to Minerva, Bowsky and Herman, who fall within the definition of a non-exchange entity. *See* 45 CFR § 155.260(b)(3).

229.    In addition, Defendants TrueCoverage, Speridian and Enhance Health were required to enter into contracts with Minerva, Bowsky and Herman that included provisions that included, among other things, (i) a description of the functions to be performed by the non-Exchange entity, (ii) language binding the non-Exchange entity to comply with the privacy and security standards and obligations adopted in accordance with 45 CFR § 155.260(b)(3) and specifically listing or incorporating those privacy and security standards and obligations, and (iii) language requiring the non-Exchange entities, Minerva, Bowsky and Herman, to bind any other downstream entities, including but not limited to other lead generation firms that Defendants purchased leads from, to the same privacy and security standards and obligations to which the non-Exchange entity has agreed in its contract or agreement with the Exchange. *See* 45 CFR 155.260(b)(2).

230.    Upon information and belief, Minerva and Bowsky did not enter into such an agreement with Bowsky and Minerva, and if they did, Bowsky and Minerva did not comply with their obligations to protect Consumer Class Plaintiffs' and class members' PII from being disclosed.

231.    For example, each lead that is generated by lead generation firms, including but not limited to Minerva and Bowsky, is routed to TrueCoverage, Enhance Health and/or their downline agencies and agents.  Those agencies receive the calls from consumers through routing software that is under the sole control of the lead generating entity such as Minerva.

232.    At all times material, Minerva and Bowsky used the routing software, Retreaver, to forward leads to TrueCoverage and Enhance Health.  The purpose of the routing software is to

route the incoming calls from consumers to the appropriate agency that purchased the ad. The routed call received by TrueCoverage, Enhance Health and their downline agencies is first received by their dialing software. Then the call is routed to the appropriate call center and individual agent. During the Class Period, Enhance Health and TrueCoverage used Total Leads Domination (TDS) as their dialer software.

233.    Importantly, Defendants' routing software (Retreaver) and dialer software (TLD) records the confidential calls between consumers and the agents for Enhance Health, TrueCoverage and their downlines at the same time, without consent of Consumer Class Plaintiffs and class members.

234.    Upon information and belief, the other lead generation firms used by Defendants to obtain Leads also use routing software that records the confidential calls between consumers and the agents for Enhance Health, TrueCoverage and their downlines at the same time without consent of Consumer Class Plaintiffs and class members.

235.    Once the calls are recorded by the lead generation firms, Speridian, TrueCoverage and Enhance Health permitted Minerva and Bowsky to retain the recordings of the calls between consumers and TrueCoverage and Enhance Health agents. These calls contain confidential PII, including social security numbers and personal medical information, and Minerva and Bowsky have been permitted to retain custody of the recorded calls for their own business purposes without consent of Consumer Class Plaintiffs and class members. This conduct violates the terms of the web-broker agreements and federal regulations described above.

236.    Minerva and Bowsky, as well as the other lead generation firms used by Defendants, fall within the definition of non-exchange entities pursuant to 45 CFR 155.260(b)(1) because they: (i) gain access to personally identifiable information submitted to an Exchange; or

(ii) collect, use, or disclose personally identifiable information gathered directly from applicants, qualified individuals, or enrollees while that individual or entity is performing functions agreed to with the Exchange.

237.    The purpose of web-broker agreements and the above federal regulations is to protect consumers like Consumer Class Plaintiffs and class members by providing that each QHP issuer that uses a provider network must ensure that the provider network consisting of in-network healthcare providers, as available to all enrollees, meet certain standards, including but not limited to requiring QHP issuers to publish an up-to-date, accurate and complete provider directory.

238.    Consumer Class Plaintiffs and class members were harmed as a result of Defendants' violations of the web-broker agreement and federal regulations cited above.  The harm includes but may not be limited to:

    a.   unauthorized use of the Consumer Class Plaintiffs' and class members' PII, resulting in harm including but not limited to unauthorized AOL Swaps, Twisting and/or Dual Apps;

    b.   theft of the Consumer Class Plaintiffs and class members' personal, financial and confidential medical information;

    c.   costs associated with the detection and prevention of the Consumer Class Plaintiffs and class members' identity theft and unauthorized use of the Consumer Plaintiffs and class members' PII;

    d.   the imminent and certainly impending injury flowing from the substantial risk of potential fraud and identify theft posed to the Consumer Class Plaintiffs and class members by their PII being placed in the hands of criminals on the Internet black market; and

e.   the loss of the Consumer Class Plaintiffs' and class members' privacy.

239.    Consumer Class Plaintiffs and class members fall within the class of persons that the web-broker agreement and federal regulations were intended to protect.

240.    The harm or injury suffered by the Consumer Class Plaintiffs and class members as a result of Defendants' violation of the obligations contained in the web-broker agreement and applicable federal regulations is the same harm that the contractual provisions and regulations were intended to guard against.

241.    Defendants' violations are capable of having a causal connection between it and the damage or injury inflicted.

WHEREFORE, Consumer Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards damages, interest and/or such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Class Plaintiffs hereby demand a trial by jury on all allowable claims and forms of relief.

Dated:  April 12, 2024.

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP

THE DOSS FIRM, LLC

By: /s/Jason Kellogg
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Secondary email: ame@lklsg.com
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, Florida  33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: /s/Jason Doss
Jason R. Doss
Florida Bar No. 0569496
Primary email: jasondoss@dossfirm.com
1827 Powers Ferry Road Southeast
Atlanta, Georgia  30339
Telephone: (770) 578-1314
Facsimile: (770) 578-1302