UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-cv-60591-DAMIAN

CONSWALLO TURNER, TIESHA
FOREMAN, ANGELINA WELLS,
VERONICA KING, NAVAQUOTE, LLC
and WINN INSURANCE AGENCY, LLC,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

ENHANCE HEALTH, LLC,
TRUECOVERAGE, LLC,
SPERIDIAN TECHNOLOGIES, LLC,
NUMBER ONE PROSPECTING, LLC
d/b/a MINERVA MARKETING,
MATTHEW B. HERMAN and
BRANDON BOWSKY,

        Defendants.

_____/

**CLASS ACTION**
(Jury Trial Demanded)

## PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

Plaintiffs respectfully request leave to serve discovery on Defendant TrueCoverage, LLC

and its downlines prior to the Rule 26(f) discovery conference to prevent spoliation and alteration

of evidence and, in support, state as follows:

## BACKGROUND

A.   <u>Summary of the Case</u>

On April 12, 2024, Plaintiffs filed this putative class action against Defendants

TrueCoverage, Enhance Health, and others for engaging in a RICO enterprise that involved

Defendants and their downline agencies capturing victims by running fraudulent ads on social

media.  These ads lure consumers with the false promise of hundreds of dollars per month in cash

benefits, such as subsidy cash cards to pay for common expenses like rent, groceries and gas. Class Action Complaint ("CAC") ¶ 2.

TrueCoverage, Enhance Health as well as the call-centers operated by their downline agencies, which are based primarily in Broward County, Florida, know leads coming into their call-centers from these advertisements are generated fraudulently.  They know that the ads mischaracterize the benefits as "cash" when, in reality, they are advance premium tax credits (or "APTCs") paid by the federal government directly to the insurance carriers (not consumers) to offset the cost of premiums for health insurance.  In other words, they know consumers are calling for the promise of cash benefits that do not exist.  CAC ¶ 3.

In the CAC, Plaintiffs allege that Defendants and their downline agencies use uniformly constructed sales scripts designed to mislead consumers and deflect their inquiries about the monthly cash payments.  TrueCoverage, Enhance Health, and their downline agents mislead consumers to believe that those cash benefits will be coming "in the mail" from health insurance companies like Ambetter, Cigna, and others.  They use these sales calls to obtain the consumers' names, birthdates, and states of residence so that they can access the consumers' information in the federal government's Affordable Care Act ("ACA") Marketplace database and enroll them into ACA health insurance plans for a commission. CAC ¶ 4.

Plaintiffs allege that TrueCoverage, Enhance Health and their downlines *then* use consumers' personally identifiable information (or "PII")—regardless of whether the consumer consents to enrollment in a healthcare plan—to access the consumers' ACA Marketplace accounts. From there, Defendants enroll them in ACA plans without their consent or, for consumers who already have an ACA health plan, they remove the existing plan's agent of record (or "AOR") and replace that AOR with their own in-house or downline AOR.  These "<u>AOR Swaps</u>" are done

without the consumer's knowledge or consent, and allow TrueCoverage, Enhance Health and their downlines to essentially steal the original AOR's commissions for the policy. CAC ¶ 5.

TrueCoverage, Enhance Health and their downlines often go even farther—by "<u>twisting</u>" the consumers' existing policy.  Twisting is a form of insurance fraud that involves replacing an existing insurance plan with another plan that has similar or worse benefits solely to generate a new commission.  TrueCoverage, Enhance Health and their downlines do this by changing a discrete piece of information about the consumer within the ACA database — for example, by changing the consumer's address slightly, or adding a middle initial.  They do this without the consumer's knowledge or consent. CAC ¶ 6.

TrueCoverage, Enhance Health and their downlines also use consumers' PII to create entirely new applications in the ACA database that result in an additional policy or multiple policies for one consumer without that consumer's knowledge or consent.  They sometimes accomplish this "<u>Dual-App</u>" scheme by breaking up a family into two plans — for example, by creating a new policy for the husband while leaving the wife and children on the original policy. CAC ¶ 7.

Class Plaintiffs and Consumer Class members suffered damages as a result of these actions. They suffered out-of-pocket damages relating to the loss of medical treatments, the loss of in-network health care providers and specialists, the loss of prescription coverage, an increase in the amount of the co-pays covered by the policies and/or even the loss of coverage altogether.  They suffered out-of-pocket costs relating to correcting the changes to their data and AORs.  And some, like Class Plaintiff Tiesha Foreman, suffered tax penalties from being put into plans they did not qualify for.  CAC ¶ 8.

B.    <u>Recent Developments After Class Action Complaint Was Filed</u>

Plaintiffs' counsel began investigating this case in January 2024.  On or about January 31, 2024, counsel issued an online press release entitled, *CONSUMER ALERT: LKLSG and Doss Firm, LLC Investigating Potential Lawsuit Against True Coverage, LLC For Using Deceptive and Misleading Online Advertisements Falsely Promising Cash Cards to Consumers to Entice Them Into Purchasing Obamacare Health Insurance Plans.*[1]

After Plaintiffs' counsel issued that press release, they received more information about the Defendants, which led to the filing of the class action complaint on April 12, 2024.  After filing, the surrounding media coverage caused an influx of additional evidence to pour in from fraud victims, former agents/employees of TrueCoverage, Enhance Health, their downline agencies, and Minerva Marketing. Former agents of Digital Media Solutions, Inc. d/b/a Protect Health ("DMS"), one of TrueCoverage downline agencies, also came forward and provided valuable evidence supporting the allegations. DMS is listed as a relevant non-party in the Class Complaint. CAC ¶ 44.  Plaintiffs obtained sworn testimony from several former agents of TrueCoverage and DMS that the fraudulent scheme alleged in the Complaint is true and accurate.

Importantly, Plaintiffs have obtained evidence showing that TrueCoverage and its downline agency, DMS, destroyed and/or altered evidence after it was reasonably foreseeable that this litigation and/or regulatory action(s) would commence.  Two witnesses, Bayla Smith and Albert Mabry, provided sworn testimony that TrueCoverage and DMS destroyed and/or altered evidence to conceal its participation in the alleged fraud before and after Plaintiffs filed the Complaint on April 12, 2024.  *See* **Exhibit 1** (Declaration of Bayla Smith) ("Smith Decl.");

---

[1] https://www.prnewswire.com/news-releases/consumer-alert-lklsg-and-doss-firm-llc-investigating-potential-lawsuit-against-true-coverage-llc-for-using-deceptive-and-misleading-online-advertisements-falsely-promising-cash-cards-to-consumers-to-entice-them-into-purchasing--302049577.html

**Exhibit 2** (Declaration of Heather Cattaneo) ("Cattaneo Decl"); **Exhibit 3** (Declaration of Jannai Palmer) ("Palmer Decl."); **Exhibit 4** (Declaration of Francisco Morales) ("Morales Decl."); **Exhibit 5** (Declaration of Albert Mabry) ("Mabry Decl.").

Upon learning about the spoliation issue and prior to filing this motion, Plaintiffs' counsel contacted counsel for TrueCoverage.  Counsel for TrueCoverage stated that it initiated a litigation hold for TrueCoverage at or around the time that the Complaint was filed, but not for any of TrueCoverage's downline agencies. TrueCoverage's explanation for not initiating a litigation hold on the downlines is that TrueCoverage does not control them. As explained below, however, in addition to TrueCoverage's regulatory (and likely contractual) obligation to supervise its downline agencies, the attached Declarations of Francisco Morales and Albert Mabry show that TrueCoverage has the requisite control and practical ability to preserve its downlines documents.

Based on Plaintiffs' counsel's investigation thus far, TrueCoverage has approximately thirty downline agencies that employ sales agents selling ACA health insurance.  A list of known downline agencies with TrueCoverage is attached as Exhibit A to the Declaration of Peter Sitaras. **Exhibit 6**, Ex. A. (Sitaras Decl.).  The expedited discovery that Plaintiffs are requesting is targeted to internal communications of TrueCoverage and its downlines and their vendors.  A copy of proposed written discovery requests are attached as **Exhibit 7**.

C.     Evidence of Spoliation, Notice of Litigation, and Control of Downlines

1.     Baila Smith Declaration

In her Declaration, Ms. Smith recounts her experience as an agent at the TrueCoverage Deerfield Beach Call Center. She worked for TrueCoverage and Speridian Technologies (collectively referred to as "TrueCoverage") from approximately July 2023 to March 19, 2024, at a call center in Deerfield Beach, Florida. *See* Smith Decl. ¶ 3.  Her testimony describes how

TrueCoverage used the alleged fraudulent advertisements defraud consumers. *Id.* ¶ 4. TrueCoverage required its agents to use sales scripts to defraud consumers. *Id.* ¶¶ 5-8.

In addition, TrueCoverage and Speridian executives and management, including Matthew Goldfuss, National Sales Director, John Runkel, Sr. Director of Quality Assurance, Kevin Hale, and Gabriel Harrison, Regional Director, knew that consumers were calling in response to the false advertisements promising cash cards and they pressured agents to use them to enroll consumers into ACA plans. *Id.* ¶ 9. Agents were instructed by management, including Matthew Goldfuss and Gabriel Harrison, to enroll consumers into health plans no matter what, even if they already had health insurance. If consumers that called in already had an ACA health insurance plan, agents were instructed to re-enroll them anyway whether or not it was appropriate for their needs. *Id.* ¶ 10.

TrueCoverage knew that consumers were complaining to TrueCoverage, state insurance regulators, and CMS about the company using fraudulent advertisements to enroll consumers and switching consumers into new ACA plans without their consent. For example, on or about January 11, 2023, Matthew Goldfuss sent an email to agents, which stated as follows:

**Subject:** Emails from CMS or DOI's

Good afternoon team,

If you receive an email from CMS or a Department of Insurance from any particular state, **DO NOT RESPOND!** Let me repeat, **DO NOT RESPOND!** Forward them over to me, we will send that off to our compliance team to investigate the complaints and we will create the response to back up any allegation that is made.

If you respond to the complaint yourself, you are putting yourself at risk. We have the recordings, call logs, email and text communications to corroborate any enrollment that was done.

Again, **DO NOT RESPOND** if you get that email, forward it on over to me and we'll take care of it.

Thank you

**truecoverage**™
Insurance Marketplace

One-stop-shop for all your Insurance needs.

**Matthew Goldfuss** | National Director – Individual & Medicare Sales
Truecoverage LLC | 2400 Louisiana Blvd SE, Bldg 3, Albuquerque, NM 87110
O: (505) 384-7478 | M: (305-600-4184)
Email: matthew.goldfuss@truecoverage.com  |
www.truecoverage.com

*Id.* ¶ 11. Clearly, by January 12, 2024, TrueCoverage anticipated regulatory action(s).

TrueCoverage also knew on or about January 31, 2024, that there was a threat of a possible class action lawsuit, because Plaintiffs' counsel released an online announcement that they were investigating TrueCoverage for its use of online advertisements falsely promising cash cards to enroll consumers. *Id.* ¶ 12. Agents at the Deerfield Beach call center expressed concern to management about the investigation(s) and Gabriel Harrison downplayed their significance. *Id.* ¶ 13.

Shortly thereafter, on or about March 15, 2024, TrueCoverage terminated many agents and Michele Wilson of human resources sent Ms. Smith an email asking for meeting the following week. *Id.* ¶ 15. That weekend, Ms. Smith decided she was going to resign and logged into her TrueCoverage portal to review the email that Ms. Wilson sent requesting the meeting. *Id.* ¶ 17.

When Ms. Smith logged in, she went through her emails, Teams group chats, and recorded Zoom meetings, and noticed that many Teams group chat messages, emails and recordings that previously existed had been deleted. For example, TrueCoverage had a Microsoft Teams Group Chat for the Deerfield Beach call center. Ms. Smith testified that she knew that there were a lot of group chat entries that incriminated TrueCoverage's management, including Matthew Goldfuss, Gabriel Harrison and Kevin Hale. The incriminating entries were gone. She noticed that there were also incriminating emails that were gone. In addition, there were Microsoft Teams recorded

video conferences that contained incriminating statements by TrueCoverage's management. Those recordings were gone. *Id.* ¶ 18.

### 2. Heather Cattaneo Declaration

Ms. Cattaneo provided a similar account of her experience at TrueCoverage in her Declaration.  During her time at the company, she took pictures of some (but not all) of the incriminating Microsoft Teams Group Chats and saved some of the emails described in Bayla Smith's Declaration that are critically important to the case.

Ms. Cattaneo testified that agents in the Deerfield Beach call center frequently complained about the false advertisements on TrueCoverage's group chat. Agents were told by Matthew Goldfuss, Gabriel Harrison and others in the management to stop complaining and they threatened to pull agents off the sales floor. Cattaneo Decl. ¶ 10.

For example, Ms. Cattaneo took a picture of a Group Chat that took place on October 6, 2023, in which Gabriel Harrison, the Regional Director and head of the Deerfield Beach call center, scolded agents for participating in the group chat complaining about the prevalence of the fraudulent advertisements falsely promising the cash cards and stated, "NEXT PERSON WHO SAYS SOMETHING NEGATIVE IS OFF THE PHONES[.]" *Id.* at Ex. A. Matthew Goldfuss, the National Sales Director then wrote, "If you have issues with it, speak to Gabe, we don't need toxicity spread to everyone[.]" Gabriel Harrison followed with "BUYERS ARE LIARS" and "If YOU dont WANT UNLIMITED FREE LEADS THEN COME SEE ME."  *Id.* at ¶ 12, Ex. A.

On November 3, 2023, John Runkel, Senior Director of Quality Assurance, sent an email instructing agents at the beginning of Open Enrollment to deceive consumers about the cash cards being promised in the ads. *See id.* ¶ 13, Ex. B.

TrueCoverage management praised agents who were vague about the existence of the cash benefit being falsely promised. For example, on or about January 30, 2024, Kevin Hale sent a group chat to the sales agents in the Deerfield Beach call center. In the group chat, Kevin Hale wrote:

> I've got agents like Adolfo with 20 deals today.  So if you have 5 or less, there actually may be some shame in your game. . . .  <u>As always, [the] Where's my money? Folks should be sales.  I heard someone telling the client they don't get a check, WRONG! and the call went South from there. Read your rebuttals.</u>

*Id.* ¶ 15, Ex. D.

Agents were instructed by management, including Matthew Goldfuss and Gabriel Harrison, to enroll consumers into health plans no matter what, even if they already had health insurance.  For example, on or about November 20, 2023, Matthew Goldfuss sent an email and group chat message instructing everyone "For right now, <u>WE DO WANT YOU TO ENROLL EVERYONE</u> that comes your way." […] "<u>SO ENROLL THEM ALL!</u>" *Id.* at Ex. E. On December 15, 2023, Gabriel Harrison sent an email to the agents stating, "Every call that comes in that line you are to enroll them[.]" *Id.* ¶ 16, Ex. F.

Ms. Cattaneo testified that in or around February 2024, TrueCoverage was under scrutiny by CMS and insurance regulators, in part, for using fraudulent advertisements to enroll consumers and for unlawfully switching consumers into new ACA plans without their consent. Also, they learned of the threat of a possible class action lawsuit. *Id.* ¶ 17.

On or about February 26, 2024, Matthew Goldfuss claimed that TrueCoverage had stopped using the fraudulent ads and acknowledged that the fraudulent advertisements caused consumers to be deceived and that they had been the cause of the high volume of calls. In an email and group chat on February 26, 2024, Matthew Goldfuss wrote as follows:

> Good early evening team,

<u>Many of you are most likely wondering why call volume has dropped off over the past few weeks and especially so the past few days.  We have made a decision to have 0 tolerance policy with companies that are sending us ads that are either outright deceptive or could be misconstrued as misleading</u>.  We have informed our lead partners of this policy and as a result this is why you are seeing call volumes decline.  The call volume will pick back up but before we begin that process we are committed to rooting out the bad ads and call volumes will most likely remain weak for most likely the next couple of weeks.

There are other calls centers that don't care if they run bad ads and they are willing to take that risk.  <u>If TrueCoverage wanted to we could easily open back up the spigots and have a lot more call volume but we are in this for the long-term.  We would rather do things the right way.</u>

We appreciate everyone's patience on the matter.

*Id.* ¶ 18, Ex. G (emphasis added).

TrueCoverage nevertheless continued to generate leads based on the fraudulent advertisements.  For example, on or about March 5, 2024, a consumer that Ms. Cattaneo spoke with sent her a copy of the false advertisement that led her to speak with her at TrueCoverage. A screen shot of the advertisement is below.



*Id.* ¶ 20, Ex. H.

    3.   <u>Jannai Palmer</u>

Jannai Palmer was a sales agent at TrueCoverage and she provided a declaration that corroborates Heather Cattaneo and Bayla Smith's experience at TrueCoverage.  Ms. Palmer's testimony also confirmed that TrueCoverage anticipated by early February 2024 (at the latest) that that this litigation would commence. Ms. Palmer testified:

> In late January or early February, the agents learned that a law firm had sent out a press release about a potential class action against TrueCoverage. That week, a training session was conducted for all agents. The trainer told us to improvise into the script a request that the caller consent to the switching of their Agent of Record without notice. The trainer conducted a number of calls in front of us where he did this. The consent wasn't part of the script itself.

Palmer Decl. ¶ 11.

4.   <u>Francisco Morales</u>

Francisco Morales was a sales agent at TrueCoverage and DMS. He provided a Declaration that corroborates the other witnesses' experiences at TrueCoverage.  Mr. Morales' testimony also confirmed that TrueCoverage controls DMS.

On multiple occasions, Mr. Morales complained to TrueCoverage management, including but not limited to Gabriel Harrison, about the fact that TrueCoverage was defrauding consumers through its deceptive advertisements and its sales process.  Each time, his complaints were dismissed.  Morales Decl. ¶ 14.

On or about February 1, 2024, Gabriel Harrison and Michele Wilson met with Mr. Morales and told he that they had made the decision to let him go. A few days later, Mr. Morales sent an email to Gabriel Harrison and Michele Wilson asking for a general reference and he inquiring about other job opportunities.  Ms. Wilson told him that Gabriel Harrison would help him get hired at one of TrueCoverage's downlines, DMS. *Id.* ¶ 15.

On or about February 6, 2024, Carrie Smetzer with DMS offered Mr. Morales a sales position at DMS and his start date was February 8, 2024.  Mr. Morales participated in sales training at DMS during the first few weeks of his employment.  Some of the sales training was organized by TrueCoverage and its Regional Director, Gabriel Harrison, conducted the sales training. DMS's sales training was conducted via Microsoft Teams and agents were permitted to post questions through the group chat function of Teams. There were about 87 participants in the sales training and the sales agents consisted of new TrueCoverage agents and newly hired DMS agents. Like Mr. Morales, many of the participants in the sales training were also former TrueCoverage sales agents. *Id.* ¶ 16. Because TrueCoverage was clearly controlling DMS's sales practices by doing the training, Mr. Morales was concerned that DMS would be engaging in the same deceptive sales practices as TrueCoverage. As a result, during the training session, Mr. Morales posted a

question on the Microsoft Teams Q&A chat asking whether DMS was going to be using the same type of misleading advertisements to lure in consumers. Gabriel Harrison did not respond. *Id.* ¶ 17.

Clearly, TrueCoverage controlled who worked at its downline(s), the sales training and sales practices at its downlines.

5.   Albert Mabry.

Mr. Mabry worked as an agent with DMS from approximately October 19, 2023, to June 7, 2024. Mabry Decl. ¶ 3. Mabry testified that DMS was/is a downline of TrueCoverage, LLC and that DMS used Inshura, TrueCoverage's enrollment platform to enroll consumers into ACA plans. *Id.* ¶ 4.

Mr. Mabry testified that while he worked in the sales team at DMS, the vast majority of calls that he received were from consumers that were expecting to receive cash cards that promised to pay them thousands of dollars per month that could be used to pay for groceries, rent, etc. These advertisements were false and misleading because the cash cards did not exist. Instead, customers could qualify for a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance. The advertisements also told consumers that they prequalified for these benefits, which was not true. *Id.* ¶ 5.

Mr. Mabry testified that as part of the lead generation process, DMS purchased leads that utilized "fronters," which are individuals that generate leads by either making outbound calls/texts to consumers or by fielding calls from consumers in response to the false advertisements. In both cases, Mr. Mabry believes that the fronters lied to consumers about the existence of the cash card prior to transferring those consumers to live agents like Mr. Mabry. *Id.* ¶ 6.

When consumers were transferred to live DMS agents, they were required by DMS in a sales script to first ask whether they were calling in about the $6,400 benefit.  The sales script was kept in Convoso, which is the dialer system used by DMS.  *Id.* ¶ 7.  The sales scripts also provided DMS agents with rebuttals that they were required to use when responding to questions about the cash cards. The rebuttals required agents to be vague about the cash card and agents were instructed to tell customers that they would need to ask their insurance carrier about the reward programs they offer after enrollment. *Id.* ¶ 8.

Mr. Mabry testified that he received sales training when he first started at DMS.  The sales training only lasted a week, which he found to be strange and inadequate for a number of reasons, including that it did not train agents on the insurance products that they would be expected to sell to consumers.  In addition, the training involved agents listening to approximately 6-7 live calls. Each of those calls had a fronter on the line who would transfer consumers to live agents with DMS.  Mr. Mabry found these training calls to be very unusual, because consumers were calling in for the cash cards and the fronters/agents misrepresented the nature of the subsidy as described above. During the training, Mr. Mabry expressed concerns to his supervisors, Bret Easterling and John Ascherl, about the deceptive nature of the cash cards being promised. *Id.* ¶ 9.

Approximately two weeks after he started working at DMS, Mr. Mabry complained to Michael Kosmas, an executive with DMS, that the ad campaigns used by DMS promising cash cards were deceiving consumers.  Mr. Mabry testified that each time, his complaints were dismissed by management and he was told not to worry about it and to use his "sales rebuttal skills" to work around it. *Id.* ¶ 10.

Mr. Mabry testified that TrueCoverage controlled the enrollment process through its enrollment platform, Inshura. Throughout Mr. Mabry's tenure with DMS, TrueCoverage and

Inshura provided support to DMS's sales department.  For example, in December 2023, an application on Inshura's enrollment platform showed that the application was "Locked."  Mr. Mabry was instructed by a representative of TrueCoverage to send a screenshot to tappcustomerservice@truecoverage.com and TrueCoverage instructed him to "cancel/terminate" the application. In February 2024, TrueCoverage provided DMS agents with sales training about selling ancillary products such as dental and vision coverage. *Id.* ¶ 11.

Mr. Mabry testified that DMS used Rackspace as its email platform and Skype and Slack for messaging and group chats among the sales team, Tango Team, and customer service.  DMS used Zoom for virtual training. It used MME, a separate dialer used by customer service and the Tango Team, which kept text histories for agents.  DMS used MME to contact consumers. DMS also kept records on Google shared drives. Mr. Mabry recalls other agents complaining about the deceptive advertisements and DMS's unscrupulous sales practices on Slack, Skype and Zoom. *Id.* ¶ 12.

Mr. Mabry testified that from April through June 2024, DMS took steps to cover up fraudulent enrollments in a number of ways. For example, for consumers that did not qualify for $0 health insurance, agents were instructed to change their income without talking to the consumers to falsely make it appear that they qualified. This was accomplished by falsifying the CMS income attestation forms.  *Id.* ¶ 14.

He also testified that throughout his tenure at DMS, agents were instructed to use Inshura to "scrub" applications submitted to determine if they had been canceled or terminated. If so, DMS instructed agents to reenroll those consumers without contacting them. Beginning in May 2024, DMS tried to cover up their practice of enrolling consumers without consent by instructing agents to try to contact the consumers to obtain retroactive consent.  *Id.* ¶ 15.

During early May 2024, DMS agents were instructed to pull all applications in Inshura that had Michelle Dumont listed as the AOR to determine if they were enrolled or terminated. Alejandro Contreras told Mr. Mabry that the research was requested because Michelle Dumont's AOR was showing for a different agency. There were approximately 875 applications, and all terminated applications were reenrolled by Tango Team under a different AOR. *Id.* ¶ 16.

Mr. Mabry testified that in or around May 2024, he again complained about DMS using fraudulent leads promising cash card to consumers. In mid-May 2024, on a Zoom meeting that he attended along with Alejandro Contreras, John Ascherl and Samantha Gulledge, Mr. Mabry was told that DMS would be getting a different lead generation system. *Id.* ¶ 17.

## **STANDARD**

"The Federal Rules of Civil Procedure provide that discovery *may commence before* the parties have engaged in a discovery conference, if ordered by the court." *TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 694 (S.D. Fla. 2014) (citing Fed. R. Civ. P. 26(d) and (f)). "Control of discovery is committed to the sound discretion of the trial court and its discovery rulings will be reversed only where they are arbitrary or clearly unreasonable." *Id.* (quoting *Williamson v. U.S. Dep't of Ag.,* 815 F.2d 368, 373 (5th Cir. 1987)). Federal courts in this Circuit "allow parties to conduct expedited discovery in advance of a Rule 26(f) conference where the party establishes 'good cause' for such discovery." *Id.* "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.*

> Good cause has been found, for example, where there is a showing of irreparable harm that can be addressed by limited, expedited discovery, where failing to allow expedited discovery would substantially impact the progress of the case on the court's docket, ***or where there is a need to preserve evidence that may be destroyed before it can be obtained by ordinary discovery***.

*In re Chiquita Brands Int'l, Inc.*, No. 07-60821-CV, 2015 WL 12601043, at *3 (S.D. Fla. Apr. 7, 2015) (citations omitted) (emphasis added); *see also Dell Inc. v. Belgium Domains, LLC*, 2007 WL 6862341 at *6 (S.D. Fla. 2007) ("Expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time.").

## <u>ARGUMENT</u>

Good cause exists to permit expedited discovery because there is a need to preserve evidence that may be destroyed or altered before discovery would ordinarily commence. *See In re Chiquita Brands*, 2015 WL 12601043, at *3. Plaintiffs have obtained evidence that TrueCoverage failed to preserve evidence after the duty to do so arose, and that failure has continued at least with respect to its downlines. TrueCoverage has stated that it issued a litigation hold notice on April 12, 2024, which is the day this lawsuit was filed. However, TrueCoverage's duty to preserve arose well before that date.

In this Circuit, the duty to preserve evidence arises when litigation is reasonably foreseeable. *See*, *e.g.*, *Graff v. Baja Marine Corp.*, 310 Fed. App'x 298, 301 (11th Cir. 2009) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."); *Title Capital Mgmt., LLC v. Progress Residential, LLC*, No. 16-21882-CV, 2017 WL 5953428, at *4 (S.D. Fla. Sept. 29, 2017) ("The duty to preserve relevant evidence is triggered not only when litigation is pending, but also when it reasonably foreseeable to that party."); *Selinger v. Kimera Labs, Inc.*, No. 20-24267-CIV, 2022 WL 668340, at *5 (S.D. Fla. Mar. 4, 2022) ("The Eleventh Circuit, for instance, has repeatedly followed the principle that the duty to preserve relevant evidence arises when litigation is 'pending or reasonably foreseeable' at the time of the alleged

spoliation.") (quoting *Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 20-11141, 2022 WL 433457, at *14 (11th Cir. Feb. 14, 2022)); *Silverstein v. Boehringer Ingelheim Pharm., Inc.*, No. 19-CIV-81188, 2020 WL 13119102, at *5 (S.D. Fla. Aug. 5, 2020) ("A duty to preserve evidence arises when a party reasonably anticipates litigation.").

Under that standard, the Eleventh Circuit has affirmed sanctions for destruction or alteration of evidence that took place before litigation actually began. *See*, *e.g.*, *Alabama Aircraft*, 2022 WL 433457, at *14-16 (affirming sanction for pre-litigation bad faith conduct in the form of adverse jury instruction); *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 Fed. Appx. 646, 657 (11th Cir. 2016) (affirming finding of bad faith pre-litigation conduct when evidence manipulated and tested before the lawsuit filed but after defendant received demand letter through counsel and employees discussed the possibility of litigation).

Defendants had a duty to preserve documents as of January 31, 2024, **at the latest**. Defendants received notice of the CMS investigation in early 2024 and counsel for Plaintiffs issued a press release on January 31, 2024, indicating they were investigating potential legal action against True Coverage for allegedly misleading consumers into purchasing ACA or Obamacare health plans.  TrueCoverage knew about the press release and the investigations.  *See* Morales Decl. ¶¶ 12-13; Cattaneo Decl. ¶17-18; Smith Decl. ¶¶ 12-14.

Plaintiffs have obtained evidence that, despite that notice, TrueCoverage failed to preserve, destroyed, and altered relevant evidence after the duty to preserve arose.  For example, a former TrueCoverage employee has signed a declaration stating that in March 2024, she logged into her TrueCoverage portal and saw that incriminating Teams group chat messages, emails, and video conference recordings that previously existed had been deleted.  Smith Decl. ¶¶ 17-18.

Importantly, its failure to preserve is ongoing, as TrueCoverage **still** has not undertaken any efforts to preserve evidence with respect to its downlines.  A party's preservation duties extend to evidence in that party's possession, custody, **or control.**  *See Selectica, Inc. v. Novatus, Inc.*, 6:13-CV-1708-ORL-40, 2015 WL 1125051, at *4 (M.D. Fla. Mar. 12, 2015).  "A party may be in control of information that it does not own or physically possess. . .Control has been construed broadly by the courts as the legal right, authority or practical ability to obtain the materials sought upon demand."  *Id.* (citations omitted).  "Using this test, a party might control a non-party based upon their relationship. The attorney-client relationship and the corporate parent-subsidiary relationship are examples."  *Id.*

TrueCoverage stated that it has not undertaken any litigation hold with respect to TrueCoverage's downlines because it claims they are not under TrueCoverage's control.  Not so.  Plaintiffs have evidence that TrueCoverage has substantial control over its downlines, including the employment of agents and sales training.  For example, after terminating a TrueCoverage employee, TrueCoverage helped him get hired a week later at one of its downlines, DMS.  Morales Decl. ¶ 15.  The DMS sales training was conducted by TrueCoverage and its regional director, Gabriel Harrison.  *Id.* at ¶ 16.  The sales training was attended by new TrueCoverage sales agents and new DMS sales agents, many of whom were former TrueCoverage agents.  *Id.*  Another former agent at DMS has stated that TrueCoverage provided sales training and support, including instructing DMS agents to "cancel/terminate" applications.  *See* Mabry Decl. ¶ 11.

Accordingly, TrueCoverage's duty to preserve extends to its downlines and Plaintiffs have obtained evidence that relevant evidence is being altered or destroyed by the downlines.  For example, from April through June 2024, DMS instructed employees to change consumers' income to make them qualify for $0 health insurance by falsifying CMS income attestation forms. Mabry

Decl. ¶ 14. Beginning in May 2024, employees were also instructed to contact consumers to obtain retroactive consent for reenrollments.  *Id.* at ¶ 15.

For these reasons, good cause exists to alter the normal discovery process and grant this request for limited expedited discovery to preserve evidence and minimize and track the further destruction of evidence.  Accordingly, Plaintiffs respectfully request the Court's grant leave for Plaintiffs to immediately serve the following narrowly tailored discovery prior to the Rule 26(f) discovery conference: (1) request for production to TrueCoverage, attached as **Exhibit 7**; and (2) subpoenas for documents to TrueCoverage's downlines and Enhanced Enrollment Platforms, BenefitAlign and Inshura, seeking those same categories of documents.  Plaintiffs also request leave to conduct any other discovery to determine the extent of the spoliation.

## <u>LOCAL RULE 7.1(A)(3) CERTIFICATION</u>

Counsel for Plaintiffs conferred with counsel for TrueCoverage in a good faith attempt to resolve the issues raised by this motion and TrueCoverage opposes the relief sought herein.

Dated: June 26, 2024

By: /s/ *Jason K. Kellogg*
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Secondary email: ame@lklsg.com
Victoria J. Wilson
Florida Bar No. 92157
Primary email: vjw@lklsg.com
Secondary email: service@lklsg.com
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

Respectfully submitted,

By: /s/ *Jason R. Doss*
Jason R. Doss
Florida Bar No. 0569496
Primary email: jasondoss@dossfirm.com
1827 Powers Ferry Road Southeast
Atlanta, Georgia 30339
Telephone: (770) 578-1314
Facsimile: (770) 578-1302

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 26, 2024, a true and correct copy of the foregoing was

filed via CM/ECF and served upon parties registered with CM/ECF in this case.

By: *<u>/s/ Jason Kellogg</u>*