UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-cv-60591-DAMIAN/Valle

CONSWALLO TURNER, TIESHA
FOREMAN, ANGELINA WELLS,
VERONICA KING, NAVAQUOTE, LLC          **CLASS ACTION**
and WINN INSURANCE AGENCY, LLC,
individually and on behalf of all others
similarly situated,                                         (Jury Trial Demanded)

        Plaintiffs,

v.

ENHANCE HEALTH, LLC,
TRUECOVERAGE, LLC,
SPERIDIAN TECHNOLOGIES, LLC,
NUMBER ONE PROSPECTING, LLC
d/b/a MINERVA MARKETING,
MATTHEW B. HERMAN and
BRANDON BOWSKY,

        Defendants.
_____/

**PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY DIRECTED
TO DEFENDANT ENHANCE HEALTH LLC**

Plaintiffs respectfully request leave to serve discovery on Defendant Enhance Health LLC ("Enhance Health") and its downlines prior to the Rule 26(f) discovery conference to prevent spoliation and alteration of evidence and, in support, state:

**INTRODUCTION**

Plaintiffs have gathered evidence showing that Enhance Health knew that consumers were calling in response to false cash-card advertisements and used scripts to mislead consumers about those cash cards. Plaintiffs also have gathered evidence showing that Enhance Health controlled the marketing and sales functions of its downline agencies. For example, Enhance Health

controlled the advertising leads its downlines received, monitored sales calls and instructed its downlines to enroll consumers with a given carrier each day, regardless of whether that carrier's policy was best for those consumers. As one downline's text communication stated, "Please push AETNA in the state of TEXAS! Matt [Herman] the CEO will be monitoring this very closely." *See* Declaration of Nivea Nazario de Melo ¶ 17, attached as **Exhibit 1** ("Nazario de Melo Decl.").

Enhance Health also monitored and directed its downlines' sales efforts. Enhance Health's marketing department communicated with its downline sales agencies through informal group texts on participants' cell phones. For example, in one text message forwarded to a group of agents at a downline called Net Health Advisors ("NHA"), Enhance Health's marketing team criticizes an NHA agent for losing a sale by failing to mislead the consumer about cash cards. An Enhance Health employee, believed to be marketing director Mark Schuler, writes "Please teach your agents before you lose another sale. . . . She needed to explain [to the consumer] that if you approved for a health plan you will then also get a spending card from the carrier for everyday needs yes sir."

In response to an inquiry by Plaintiffs, counsel for Enhance Health confirmed in an email that Enhance Health has sent preservation letters to its downlines. However, given that Plaintiffs' investigation has revealed that text messages on personal cell phones are and were a primary way for Enhance Health to communicate with its downlines about the sales efforts at the center of this case, those personal text messages should be collected and produced immediately to prevent spoliation.

Also, Plaintiffs seek immediately a list of the downlines to which Enhance Health communicated the litigation hold. Plaintiffs need assurances that Enhance Health has directed its preservation letters to all downlines and a formal explanation of what steps were taken to preserve evidence, including text messages. By extension, Plaintiffs need the date or dates that Enhance

Health sent the preservation letters to those downlines, and whether Enhance Health preserved its information when it first learned about the potential of this lawsuit.

Thus, to ensure the preservation and production of important relevant information about Enhance Health's knowledge of and assistance in the scheme described in the Complaint, Plaintiffs seek early but limited discovery from Enhance Health relating to the timing and substance of its preservation letters, the identities of its downlines and any text messages sent by Enhance Health's officers or employees to downlines.

## **BACKGROUND**

A.  <u>Summary of the Case</u>

On April 12, 2024, Plaintiffs filed this putative class action against Defendants TrueCoverage, Enhance Health and others for engaging in a RICO enterprise that involved Defendants and their downline agencies capturing victims by running fraudulent ads on social media. These ads lure consumers with the false promise of hundreds of dollars per month in cash benefits, such as subsidy cash cards to pay for common expenses like rent, groceries and gas. Class Action Complaint ("CAC") ¶ 2.

Plaintiffs allege that TrueCoverage, Enhance Health as well as the call-centers operated by their downline agencies, which are based primarily in Broward County, Florida, know leads coming into their call centers from these advertisements are generated fraudulently. They know that the ads mischaracterize the benefits as "cash" when, in reality, they are advance premium tax credits (or "APTCs") paid by the federal government directly to the insurance carriers (not consumers) to offset the cost of premiums for health insurance. In other words, they know consumers are calling for the promise of cash benefits that do not exist. CAC ¶ 3.

3

Plaintiffs allege that Defendants and their downline agencies use uniformly constructed sales scripts designed to mislead consumers and deflect their inquiries about the monthly cash payments. TrueCoverage, Enhance Health and their downline agents mislead consumers to believe that those cash benefits will be coming "in the mail" from health insurance companies like Ambetter, Cigna, and others. They use these sales calls to obtain the consumers' names, birthdates and states of residence so that they can access the consumers' information in the federal government's Affordable Care Act ("ACA") Marketplace database and enroll them into ACA health insurance plans for a commission. CAC ¶ 4.

Plaintiffs allege that TrueCoverage, Enhance Health and their downlines *then* use consumers' personally identifiable information (or "PII") — regardless of whether the consumer consents to enrollment in a healthcare plan — to access the consumers' ACA Marketplace accounts. From there, Defendants enroll them in ACA plans without their consent or, for consumers who already have an ACA health plan, they remove the existing plan's agent of record (or "AOR") and replace that AOR with their own in-house or downline AOR. These "<u>AOR Swaps</u>" are done without the consumer's knowledge or consent, and allow TrueCoverage, Enhance Health and their downlines to essentially steal the original AOR's commissions for the policy. CAC ¶ 5.

TrueCoverage, Enhance Health and their downlines often go even farther — by "<u>twisting</u>" the consumers' existing policy. Twisting is a form of insurance fraud that involves replacing an existing insurance plan with another plan that has similar or worse benefits solely to generate a new commission. TrueCoverage, Enhance Health and their downlines do this by changing a discrete piece of information about the consumer within the ACA database — for example, by

4

changing the consumer's address slightly, or adding a middle initial. They do this without the consumer's knowledge or consent. CAC ¶ 6.

Plaintiffs allege that TrueCoverage, Enhance Health and their downlines also use consumers' PII to create entirely new applications in the ACA database that result in an additional policy or multiple policies for one consumer without that consumer's knowledge or consent. They sometimes accomplish this "Dual-App" scheme by breaking up a family into two plans — for example, by creating a new policy for the husband while leaving the wife and children on the original policy. CAC ¶ 7.

Class Plaintiffs and Consumer Class members suffered damages as a result of these actions. They suffered out-of-pocket damages relating to the loss of medical treatments, the loss of in-network health care providers and specialists, the loss of prescription coverage, an increase in the amount of the co-pays covered by the policies and/or even the loss of coverage altogether. They suffered out-of-pocket costs relating to correcting the changes to their data and AORs. And some, like Class Plaintiff Tiesha Foreman, suffered tax penalties from being put into plans they did not qualify for. CAC ¶ 8.

B.  Recent Developments After Class Action Complaint Was Filed

On or about January 31, 2024, Plaintiffs' counsel issued an online press release entitled, *CONSUMER ALERT: LKLSG and Doss Firm, LLC Investigating Potential Lawsuit Against True Coverage, LLC For Using Deceptive and Misleading Online Advertisements Falsely Promising Cash Cards to Consumers to Entice Them Into Purchasing Obamacare Health Insurance Plans*.[1] Subsequently, Plaintiffs' counsel received more information about the Defendants that led to the

---

[1] https://www.prnewswire.com/news-releases/consumer-alert-lklsg-and-doss-firm-llc-investigating-potential-lawsuit-against-true-coverage-llc-for-using-deceptive-and-misleading-online-advertisements-falsely-promising-cash-cards-to-consumers-to-entice-them-into-purchasing--302049577.html

filing of the class action complaint on April 12, 2024. After filing, the surrounding media coverage spurred additional evidence to come in from fraud victims, former agents/employees of TrueCoverage, Enhance Health, their downline agencies and Minerva Marketing.

On June 26, 2024, Plaintiffs filed a motion for expedited discovery directed toward TrueCoverage and its downline agencies after Plaintiffs' counsel learned that TrueCoverage and at least one of its downline agencies, Digital Media Solutions, Inc. d/b/a Protect Health ("DMS") destroyed and/or altered evidence that is critical to Plaintiffs' case. Plaintiffs filed declarations of former sales agents with TrueCoverage and DMS in support of the motion. [Docs. 27 and 32]. Some of the information that is believed to be deleted was Microsoft Teams Group Chats at TrueCoverage's Deerfield Beach call center. *Id*.

This Court set a hearing on Plaintiffs' motion for expedited discovery against TrueCoverage on August 8, 2024. [Doc. 30].

Similar to former agents of TrueCoverage, former agents of Enhance and its downlines have provided evidence that supports the allegations in the CAC. Plaintiffs have gathered evidence showing that Enhance Health knew that consumers were calling in response to false cash-card advertisements and used scripts to mislead consumers about those cash cards. Plaintiffs also have gathered evidence showing that Enhance Health controlled the marketing and sales functions of its downline agencies.

For example, former Enhance Health agent Elizabeth Novotny provided a declaration stating that consumers were calling Enhance Health seeking cash cards, and Enhance Health knew it:

> Throughout my tenure with Enhance Health, virtually all the inbound calls (at least 9 out of 10) that I received from consumers were in response to online advertisements and consumers were calling in expecting to receive a cash card that promised to pay them thousands of dollars per month that could be used to pay for

> groceries, rent, etc. These advertisements were false and misleading because the cash card did not exist, and the money being promised was actually a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance.
>
> Enhance Health knew that consumers were calling in response to the false advertisements because the sales scripts required us to be vague about the cash card and told us to tell consumers that any benefits would come in the mail after the insurance policy was issued and that they would need to contact the carrier and ask them about the reward programs they offer.

See Declaration of Elizabeth Novotny, ¶¶ 4-5, attached **Exhibit 2** ("Novotny Decl.").

The same misconduct occurred at Enhance Health's downline agencies. For example, a former agent at Enhance Health's downline agency, Net Health Affiliates, Inc. ("NHA"), provided a declaration stating that NHA knew that consumers were calling for cash cards, but that agents were instructed to enroll those consumers regardless:

> NHA was and/or is a downline agency of Enhance Health. It is my understanding that Enhance Health's marketing department controlled what leads NHA received. Throughout my tenure with NHA, consumers called into our call center in response to advertisements from those leads. Approximately 95% of inbound calls were from consumers calling in expecting to receive cash cards that promised to pay them thousands of dollars per month that could be used to pay for groceries, rent, etc. These advertisements that led consumers to call were false and misleading because the cash cards did not exist as portrayed and the money being promised actually was a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance. The advertisements also told consumers that they prequalified for these benefits, which was not true.
>
> The sales scripts that we were required to follow encouraged us to be vague about the cash card and we were instructed to tell customers that they would need to contact the carrier and ask them about the reward programs they offer.
>
> Throughout my time at NHA, we were instructed by management, including Ervence Pierre, to enroll consumers into health plans no matter what, even if they already had health insurance. If consumers that called in already had an ACA health insurance plan, we were instructed to re-enroll them anyway, including switching carriers, regardless of whether it was appropriate for their needs.

Nazario de Melo Decl. ¶¶ 5-7. In addition, it was clear that leads were coming from lead generators that included Defendant Minerva:

7

> NHA used a dialing system called TLD and as sales agents, the dialer showed where the leads came from. The two lead generators that had the most volume of leads that used fraudulent ads promising cash cards were, "My ACA" and "MNV," which referred to Minerva Marketing.

*Id*. at ¶ 13.

Enhance Health also predetermined which health insurance carriers to assign consumers to maximize Enhance Health's compensation. Enhance Health instructed its downlines to enroll consumers with those carriers, regardless of whether that carrier's policy was best for those consumers. As one downline's text communication stated, "Please push AETNA in the state of TEXAS! Matt [Herman] the CEO will be monitoring this very closely." *Id.* at ¶¶ 15-17.

Enhance Health also monitored and directed its downlines' sales efforts. Enhance Health's marketing department communicated with its downline sales agencies through informal group texts on agents' personal cell phones. For example, in one text message forwarded to a group of agents at a downline called NHA, Enhance Health's marketing team criticizes an NHA agent for losing a sale by failing to mislead the consumer about cash cards:



*Id.* at ¶ 12.

Given that Enhance Health communicated with its downlines by and through the personal cell phones of their sales agents and management, Plaintiffs are understandably concerned that communications, including group texts, have not been preserved. Nazario de Melo's declaration explains how Enhance Health avoided more traditional means of business communications, such

9

as emails or messages through an Enhance Health server, by instead communicating with and controlling its downline agencies through personal cell phone texts. She testified that Enhance Health's marketing employees would text instructions to the personal cell phones of NHA's sales team leader, who would then text those instructions to NHA's sales agents:

> Enhance Health's marketing department created a group text with Ervence Pierre, our NHA sales team leader, and possibly other members of leadership at NHA. The group chat between Enhance Health's marketing department and Ervence Pierre was called "EH/NHA."
>
> Ervence Pierre would send us screenshots of the instructions he was receiving from Enhance Health through the EH/NHA group text. He would forward these screenshots to a group text comprised of NHA sales agents, including myself. We were asked to use our personal cell phones to participate in the NHA group text.

A consequence of communicating through personal cell phone texts, however, is that current and former sales agents like Nazario de Melo now have important relevant evidence on their personal cell phones that may not be within the possession, custody or control of Defendant Enhance Health or its downlines.

This problem is magnified given that Plaintiffs have uncovered that Enhance Health has at least 40 downline agencies. *See* Declaration of Peter Sitaras, attached **Exhibit 3**. Nazario de Melo testified that NHA alone had up to 60 agents during the 2023 Open Enrollment Period from November 2023 to January 2024. While NHA was not the largest or smallest downline of Enhance Health., an average of 60 agents over 40 downlines would be as many 2,400 sales agents with critical evidence on their personal cell phones.

## **LEGAL STANDARD**

"The Federal Rules of Civil Procedure provide that discovery *may commence before* the parties have engaged in a discovery conference, if ordered by the court." *TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 694 (S.D. Fla. 2014) (citing Fed. R. Civ. P. 26(d) and (f)). "Control of discovery is committed to the sound discretion of the trial court and its

10

discovery rulings will be reversed only where they are arbitrary or clearly unreasonable." *Id.* (quoting *Williamson v. U.S. Dep't of Ag.,* 815 F.2d 368, 373 (5th Cir. 1987)). Federal courts in this Circuit "allow parties to conduct expedited discovery in advance of a Rule 26(f) conference where the party establishes 'good cause' for such discovery." *Id.* "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* "Expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time." *Dell Inc. v. Belgium Domains, LLC*, 2007 WL 6862341 at *6 (S.D. Fla. 2007).

## **ARGUMENT**

Here, Plaintiffs should be granted leave to serve limited discovery relating to the timing and substance of Enhance Health's preservation letters, the identities of its downlines and any text messages between Enhance Health's officers or employees to its downlines and sales agents.

The circumstances in this case are unusual. Plaintiffs' investigation already has generated evidence that Enhance Health itself knew about and participated in the alleged scheme. For example, former Enhance Health agent Elizabeth Novotny declares, among other things, that i) during her tenure with Enhance Health from November 2023 to January 2024, virtually all incoming calls came from consumers seeking cash cards in response to false advertisements; ii) Enhance Health knew what was going on, as evidenced by the scripts it provided agents directing them to tell consumers that cash card benefits would be arriving by mail; and iii) Enhance Health directed its agents to switch the plans of consumers already enrolled in an ACA policy, and to switch consumers' agents of record ("AORs"). *See* Novotny Decl. ¶¶ 3-9.

Plaintiffs' investigation also has revealed that Enhance Health not only knew that its downlines were doing the same things, but that Enhance Health controlled and directed those

11

downlines. Enhance Health controlled the advertising leads its downlines received, monitored sales calls and instructed its downlines to enroll consumers with a given carrier each day, regardless of whether that carrier's policy was best for those consumers. *See* Nazario de Melo Decl. ¶ 15-17. And Enhance Health's marketing department communicated with its downline sales agencies through informal group texts on participants' cell phones, even directing downline agents to mislead consumers about the purported cash cards. *See id.* ¶ 5-7, 12-13.

While Enhance Health states generally that it has sent preservation letters to its employees and downlines, the fact that key communications were made on *personal* cell phones heightens the potential for loss or spoliation. Given the circumstances, including not only the pressure from this lawsuit but also burgeoning Congressional inquiries, the individuals involved are incentivized to "lose" incriminating data, particularly on personal devices. Indeed, Plaintiffs have uncovered evidence that another defendant in the case, TrueCoverage, deleted similarly incriminating group chats with agents. In an abundance of caution, Plaintiffs seek leave requesting group text data that would require Enhance Health and its representatives to scrutinize and collect relevant data from the personal devices of its employees and downlines now, to ensure its preservation.

Plaintiffs also seek the production of Enhance Health's preservation letters now to establish the dates and recipients of those letters. This information will help Plaintiffs ascertain whether all of Enhance Health's downlines received the letter.[2] It will help them ascertain when those letters were sent. The farther those letters were sent from the date the lawsuit was filed (or perhaps an even earlier trigger date for preservation purposes), the greater the possibility of information loss that would warrant additional early discovery directed toward Enhance Health and its downlines.

---

[2] Determining exactly who Enhance Health's downline entities are has been difficult, but Plaintiffs thus far have established the list contained in **Exhibit 3**, a declaration of Peter J. Sitaras, Esq.

12

WHEREFORE, Plaintiffs respectfully ask this Court for leave to serve the proposed requests for production and interrogatories attached as **Exhibits 4** and **5** or any other or further relief the Court deems appropriate.

## LOCAL RULE 7.1(A)(3) CERTIFICATION

Counsel for Plaintiffs conferred with counsel for Enhance Health in a good faith attempt to resolve the issues raised by this motion and Enhance Health opposes the relief sought herein.

Dated: July 5, 2024.

Respectfully submitted,

| | |
|---|---|
| LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP | THE DOSS FIRM, LLC |
| By: /s/Jason Kellogg<br>Jason K. Kellogg, P.A.<br>Florida Bar No. 0578401<br>Primary email: jk@lklsg.com<br>Secondary email: ame@lklsg.com<br>100 Southeast Second Street<br>Miami Tower, 36th Floor<br>Miami, Florida 33131<br>Telephone: (305) 403-8788<br>Facsimile: (305) 403-8789 | By: /s/Jason Doss<br>Jason R. Doss<br>Florida Bar No. 0569496<br>Primary email: jasondoss@dossfirm.com<br>1827 Powers Ferry Road Southeast<br>Atlanta, Georgia 30339<br>Telephone: (770) 578-1314<br>Facsimile: (770) 578-1302 |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 5, 2024, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF.

By: /s/ Jason Kellogg
Jason K. Kellogg, P.A.