UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-cv-60591-DAMIAN/Valle

CONSWALLO TURNER, TIESHA
FOREMAN, ANGELINA WELLS,
PAULA LANGLEY, VERONICA
KING, NAVAQUOTE, LLC
and WINN INSURANCE AGENCY, LLC,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

ENHANCE HEALTH, LLC,
TRUECOVERAGE, LLC,
SPERIDIAN TECHNOLOGIES, LLC,
BENEFITALIGN, LLC,
NUMBER ONE PROSPECTING, LLC
d/b/a MINERVA MARKETING,
BAIN CAPITAL INSURANCE FUND L.P.,
DIGITAL MEDIA SOLUTIONS LLC,
NET HEALTH AFFILIATES, INC.,
MATTHEW B. HERMAN,
BRANDON BOWSKY, GIRISH PANICKER,
and MATTHEW GOLDFUSS,

        Defendants.

_____/

**CLASS ACTION**

(Jury Trial Demanded)

## AMENDED CLASS ACTION COMPLAINT

Class Plaintiffs, Conswallo Turner, Tiesha Foreman, Angelina Wells, Veronica King, Paula Langley, NavaQuote, LLC ("NavaQuote") and WINN Insurance Agency LLC ("WINN"), file this first amended class action complaint individually and on behalf of all others similarly situated against Defendants, Enhance Health, LLC ("Enhance Health"), TrueCoverage, LLC, and to the extent it does business as Inshura ("True Coverage"), Speridian Technologies, LLC ("Speridian Technologies"), Benefitalign LLC, ("Benefitalign"), Number One Prospecting, LLC

d/b/a Minerva Marketing ("Minerva"), Bain Capital Insurance Fund L.P. ("Bain Insurance"), Digital Media Solutions LLC d/b/a Protect Health ("Protect Health"), Net Health Affiliates, Inc. ("NHA"), Matthew B. Herman ("Herman"), Brandon Bowsky ("Bowsky"), Girish Panicker ("Panicker") and Matthew Goldfuss ("Goldfuss"), and allege:

## I.     <u>INTRODUCTION</u>

1.     Since the filing of this lawsuit on April 12, 2024, the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services (or "CMS") has issued public statements acknowledging "the very concerning activity by some agents and brokers related to unauthorized plan switches and unauthorized enrollments— where a consumer was switched from their selected plan into a new one or signed up for coverage without their knowledge or consent." Members of Congress have "express[ed] outrage with reports that agents and brokers are submitting plan changes and enrollments in the Federal marketplace without the consent of the people who rely on these plans."  And a recent think tank report contends that four to five million Americans are fraudulently enrolled in ACA plans.   "Unscrupulous brokers are certainly contributing to fraudulent enrollment and the enhanced direct enrollment feature of Heathcare.gov appears to be a problem. . . .  [A]nd reports indicate that many people have been recently removed from their plan and enrolled in another plan by brokers who earn commissions by doing so."

2.     Compiled from interviews with dozens of witnesses, including many of Defendants' former employees, this Amended Complaint attempts to cast a stronger light on the individuals and companies — each either based in South Florida or strongly tied to South Florida — that created this massive fraud, and to hold them accountable.

3.     Historically, the industry for selling ACA health insurance was an unappealing one. The reason was largely economic, as the cost to sell ACA plans was relatively high and the margins

— and thus the commissions — slim.  ACA did not draw much attention from the insurance sales industry, especially compared to other, more lucrative products like the Medicare Advantage products seen offered 24/7 on television and in social media ads.

4.      But in 2021, in the wake of COVID, Congress passed the American Rescue Plan Act ("ARPA").  ARPA increased the scope and availability of premiums for the very poor.  In particular, ARPA allowed a certain segment of Americans — those with household incomes between 100 and 150 percent of the federal poverty level — to pay *zero* in premiums.

5.      Also in 2021, CMS announced a new rule that would allow poor Americans to enroll in ACA plans *year-round* starting March 2022.  Previously, enrollments had been limited to a three-month open enrollment period (or "OEP") from November to January.

6.      These changes created an opportunity.  More than 40 million Americans live within 100 to 150 percent of the poverty line, and only about 15 million had ACA insurance at the time.

7.      Enter Brandon Bowsky, age 32.  Bowsky is a South Florida-raised high school dropout who has publicly recounted his days selling drugs, stealing Bitcoin, scamming retailers like Best Buy and Publix, recruiting actors for a porn website and running a video game scheme that made a lot of money "luring" other gamers into virtual rooms to steal their "loot" and sell it to black-market fencers.  Bowsky is also extremely bright.  He worked his way up the network of seedy, South Florida-based "mini-med" insurance agencies that scammed the country in the 2010s before cratering when one of their worst offenders, Simple Health Plans LLC, was raided by the FTC in 2019.

8.      By that time, Bowsky had begun to move into the "lead generation" business.  His company, Number One Prospecting LLC d/b/a Minerva Marketing ("Minerva"), generates leads by developing social media ads to drive potential customers to agencies in various industries,

including insurance, and by purchasing and "aggregating" leads from other advertisers or lead generators to sell to those potential customers.

9.      With his background in insurance and marketing, Bowsky saw the opportunity that the new laws created.  He saw the potential market of more than 40 million Americans.  He envisioned a new segment of the ACA sales industry that could *enroll* poor people in free health insurance rather than have to *sell* them health insurance.  He saw an industry where each agent could enroll 12 to 15 people a day — multiples of Medicare's typical one or two sales a day.  He imagined agents enrolling people in free health insurance within minutes.  He saw the potential for tremendous scale and unprecedented speed.  In a podcast earlier this year, Bowsky said:

> [There's n]o other product that you can enroll that many people that quickly. . . . One, the total addressable market is not as great.  Two, *you're not selling anything*. You're just enrolling somebody that needs a benefit that can qualify usually for a subsidy.  So if they're getting it for a discount or they're getting it for free, or low cost, no cost, whatever the situation may be, they're more likely to sign up . . . than something you have to sell.  So because there's no sales process, we don't have to . . . call them and qualify them.[1]

10.      Bowsky set out to build a bigger industry of ACA insurance agencies that would buy Minerva's leads and enroll poor Americans for little or no cost.  That, on its face, was a worthy endeavor.  But Bowsky could not do things honestly, and what he started became a sprawling RICO Enterprise that continues to victimize not only the poorest Americans, but also good insurance agents around the country.

11.      This RICO Enterprise begins with fraudulent ads that drive the leads that Minerva sells to insurance agents.  Bowsky through Minerva realized that the conversion rates for leads generated by "clean" ads — ads that simply invite consumers to sign up for an ACA plan — were relatively low.  These conversion rates failed to stoke significant demand for Minerva's leads by

---

[1]      Joe Naz Podcast No. 31, *From Dropout to Multi-Millionaire Genius: Brandon Bowsky's Wild Journey in Life & Marketing!* at 1:26:45 (Jan. 3, 2024) (emphasis added).

its agency clients (or "buyers").  But Bowsky figured out that certain "dirty" ads— ads that falsely

offered poor Americans free cash rewards — not only generated more leads but were converted

by Minerva's agency buyers at much higher rates than clean ads.

12.     These ads lure consumers — and in particular, America's poorest consumers —

with the false promise of hundreds and sometimes thousands of dollars per month in cash benefits

such as subsidy cash cards to pay for common expenses like rent, groceries and gas:



13.     Clicking these ads brings consumers to a landing page that asks a few qualifying

questions.  Minerva captures the answers, and if those answers suggest that the consumer may

qualify for a low- or no-cost ACA plan, then that consumer becomes an ACA "lead."  Choosing

from among a list of agencies that have already purchased batches of leads from it, Minerva

provides the consumer a phone number that directs him or her to the agency.

14.     This structure presents a problem, though.  Consumers believe they are being routed

to someone who will send them a free cash card, not enroll them in health insurance.  Drawing

from his experience as an agent, trainer and consultant in the South Florida mini-med industry, which relied on strict adherence to a uniform script, Bowsky trained current and prospective agency buyers on how to "handle" dirty leads. This training consisted of two main concepts for agents to follow. One, when the consumer calls, don't mention a cash card. Two, if the consumer brings up the cash card, "be vague" and suggest that the question is better answered later, by the insurance carrier.

15.    Armed with an effective "lure," Bowsky set out to show agencies what Minerva could do: generate endless ACA leads with a 35 percent conversion rate. He also set out to tell colleagues, friends, family and others about the profit potential of his leads, so that they would start their own agencies to buy leads from Minerva.

16.    One of Minerva's buyers of leads from misleading ads was Defendant TrueCoverage. Based in New Mexico but with its largest presence in South Florida, TrueCoverage was a natural fit for Bowsky's model. TrueCoverage already operated in the ACA space. Its affiliate, Defendant Speridian Technologies LLC ("Speridian Technologies"), had created two enhanced direct enrollment platforms (or "EDE Platforms") called Benefitalign and Inshura. These EDE Platforms gave TrueCoverage and other agencies in its downline[2] network direct access to the ACA Marketplace Exchange database (the "Marketplace" or "Exchange") maintained and facilitated by CMS. Using Benefitalign and Inshura, TrueCoverage and its downlines could enroll consumers in ACA health insurance without requiring them to visit www.healthcare.gov (or "Healthcare.gov"). The EDE Platforms allowed TrueCoverage and their downlines to enroll the maximum number of consumers in the shortest amount of time without much scrutiny. Defendant

---

[2]    A "downline" agency receives financing, oversight, training and support from its "upline" (also called a "managing general agent" or "MGA"). In return, an upline like TrueCoverage gets a portion of the downline's commissions for enrolling consumers in an ACA plan.

Garish Panicker maintains day-to-day control of TrueCoverage and Speridian Technologies, as well as Defendant Benefitalign LLC, all of which exist within the umbrella of Speridian Global Holdings LLC ("Speridian Global"), which is half-owned by Panicker.

17.     By summer of 2022, TrueCoverage had implemented Bowsky's enrollment model and was buying ads from Minerva.  From an office in Broward County, TrueCoverage's director of sales, Defendant Matthew Goldfuss ("Goldfuss"), oversaw and directed TrueCoverage's ACA enrollment efforts.  TrueCoverage, Panicker, Goldfuss and nearly everyone at TrueCoverage knew that the leads TrueCoverage was buying from Minerva (and later others) offered free cash cards instead of ACA health insurance.  TrueCoverage implemented a script designed to redirect consumers' questions about a cash card and enroll them within 10 minutes.

18.     TrueCoverage was adamant that its agents strive to enroll every consumer who called into a $0 health plan — *even those who didn't qualify for one*.  TrueCoverage trained its agents to coax callers into calculations of household income that fell within 100 to 150 percent of the federal poverty line.  If a caller's household income was too high to qualify, it trained agents to remove other family members' incomes from the application so that the caller's income fell within the range, a practice dubbed "Dual-Apping."  For many Americans, including Plaintiff Tiesha Foreman, these practices caused them to incur an IRS tax penalty for receiving greater subsidies than their actual incomes allowed.

19.     Even if the consumer decided not to voluntarily enroll — perhaps because, for example, they already had health insurance — TrueCoverage's scripted questions elicited personally identifiable information (or "PII") that TrueCoverage misused.  Each consumer's health insurance policy is associated with an agent of record (or "AOR") who has a national producer number (or "NPN").  Typically, this is the agent who brokered the consumer's original enrollment

or purchase of the policy.  Simply by obtaining the consumer's name, date of birth and zip code, TrueCoverage could access the Marketplace through Benefitalign and replace the consumer's AOR and NPN with those of a TrueCoverage agent.  Through these "AOR Swaps," TrueCoverage was essentially able to steal the consumer's policy without the knowledge or consent of the consumer or their original AOR.  This damaged consumers like Plaintiffs Conswallo Turner, Tiesha Foreman and Paula Langley, who incurred unreimbursed medical expenses because they made a claim on their old (unbeknownst to them) policy.  It also damaged agencies like Plaintiffs Navaquote LLC and WINN Insurance Agency LLC, whose commissions were basically stolen, and whose principals spent countless hours and resources to restore their status as AOR on the policies.  Bowsky and Minerva knowingly stoked the AOR- and plan-swapping activity by reselling consumers' leads to multiple buyers, who would promptly steal each other's policies.

20.    To further capture the enrollments driven by Minerva's leads, TrueCoverage began to grow its network of downline agencies.  One of TrueCoverage's downlines was run by Barachy Lucien ("Lucien"), a veteran of the mini-med industry.  Lucien's close friendship with another former Simple Health mini-med downline owner, Defendant Matt Herman, became the catalyst for the Enterprise's exponential growth.

21.    Like Bowsky, the 38-year-old Herman, whose alter ego as a social media influencer and hip-hop artist is "MoneyMatt305," came up in the South Florida mini-med industry.  He had made millions running a downline of Simple Health.  By July 2022, Herman found himself in a difficult situation.  In November of the previous year, Defendant Bain Capital Insurance L.P. ("Bain Insurance") had appointed him CEO of a brand new company, Defendant Enhance Health LLC ("Enhance Health").  Bain Insurance had $150 million in capital, and it wanted to create a

retail agency to sell Medicare products.  By July 2022, however, the market for those products had become costly and unprofitable, and Herman risked losing his job.

22.     His friend Lucien told him that the market for ACA plan enrollments was taking off.  Skeptical, Herman conducted a two-week beta test at Lucien's call center with 15 of Enhance Health worst-performing Medicare sales agents.   Lucien trained the agents on how to coax consumers into the 100 to 150 percentage target and split household incomes.  Over the course of the beta test, each agent successfully enrolled multiples of their daily Medicare sales.

23.     Now much more interested in the prospects of the new ACA enrollment model, Herman approached the source of Lucien's leads — Brandon Bowsky.  Herman and Bowsky knew each other well from their mini-meds days.  Herman had also helped facilitate the sale in 2019 of one of Bowsky's companies to (none other than) Bain Capital.  Bowsky told Herman everything about the new ACA model, including the kinds of ads being run to drive his leads and the scripts that were needed to capture enrollments.

24.     Enhance Health signed on and became the biggest buyer of Minerva's leads. Enhance Health also became the largest downline agency of TrueCoverage, which helped finance Enhance Health's enrollment efforts by buying Enhance Health's enrolled policies.  In doing so, TrueCoverage sought to capture commissions for the remaining life of those policies — commissions estimated to continue very profitably for an average of more than two years.  Enhance Health also used the EDE Platform developed by TrueCoverage's affiliate, Speridian Technologies, and Benefitalign profited from Enhance Health doing enrollments through the platform.

25.     Bowsky now had a $150 million company as a client, and his vision of an extremely lucrative market for his leads was becoming a reality.  Eight years removed from living out of his car, Bowsky recently said he has made $100 million marketing leads through Minerva.

26.     Like Lucien and TrueCoverage, Enhance Health embraced Bowsky's model.  It bought Minerva's deceptive cash-card leads.  It adopted uniform scripts designed to avoid discussing the cash cards and to vaguely reference the carriers' rewards cards if the consumer brought up cash cards.  Everyone at TrueCoverage and Enhance Health knew about the deceptive leads.  The companies' customer service department became inundated with angry callers complaining they had not yet received their cash cards.

27.     Like TrueCoverage, Enhance Health also engaged in AOR Swaps and Dual-Apping.  The company took AOR Swapping to the next level, providing spreadsheets to its employees containing hundreds of consumers' PII and instructing them to swap out AORs.  In 2023, UnitedHealthcare and other carriers became alarmed with the level of AOR Swapping.  UnitedHealthcare terminated Enhance Health.  Another carrier, Ambetter, addressed the issue by announcing in December 2023 an "Agent of Record Rule" that would lock in the AORs on its policies for a year, effective January 1, 2024.  This led to more than 200,000 AOR Swaps on December 31, 2023.

28.     No longer able to effectively AOR Swap, Enhance Health, TrueCoverage and their downlines resorted to a practice called "Twisting."  Exploiting a rule that allows policy change outside the OEP for qualifying life events such as a change of address, Enhance Health, TrueCoverage and their downlines accessed consumers' information through Benefitalign and/or Inshura, and made alterations allowing the agencies to change the consumer's insurance carrier or change the consumer's plan within the same carrier, all without the consumer's valid consent.

29.     One former Enhance Health supervisor recalls receiving a list of hundreds of consumers and being instructed to change plan levels without telling those consumers. He asked Herman about it, who told him that it was "like shooting fish in a barrel." Enhance Health received commissions for these switches, giving $5 of each commission to the agent who switched. TrueCoverage also engaged in Twisting.

30.     Bain Insurance knew what was going on at Enhance Health, and ultimately supported it. Bain Insurance's executives sat on Enhance Health's board of directors and were regularly on-site at Enhance Health's Sunrise offices. Bain Insurance's managing director, Jack Sun, was hands-on. Bain Insurance controlled the hiring of Enhance Health's C-Suite employees, and those executives reported back about what was happening. Bain Insurance's representatives asked Enhance Health's now-former head of customer service about the scheme, and she confirmed it to them. For Bain Insurance, Enhance Health was making a lot of money on ACA enrollments, and it was no secret that Bain Insurance intended to build and sell the company within one or two years. So rather than stop the fraudulent practices, Bain Insurance allowed them to continue. Bain Insurance instructed Enhance Health to liquidate the original Medicare sales group and focus almost exclusively on ACA. To continue to direct Enhance Health safely toward a future sale, Bain Insurance became a participant in the Enterprise.

31.     Into 2023, that Enterprise continued to grow. TrueCoverage began creating its own false cash card advertising. It opened up a marketing arm in India and a call center in Pakistan to do so. By 2024, TrueCoverage had approximately 50 downlines, each using its Benefitalign or Inshura EDE Platforms. This included Defendant Digital Media Solutions LLC d/b/a Protect Health ("Protect Health"). Protect Health bought Minerva's fraudulent ads and used rebuttal scripts. It also engaged in AOR Swaps, Twisting and Dual Apping. A former employee stated

that just recently, in May 2024, Protect Health employed an internal "Tango Team" to swap the AORs of 875 consumers. Another former Protect Health employee claims she was given a list of consumers' PII to access through Inshura and told to enroll those consumers for Protect Health. Protect Health told her that if consumers did not qualify for $0 health insurance, she must change their incomes to $0 and make them qualify — without talking to the customers. This $0 benchmark was important, because it reduced the chances Protect Health would get caught — consumers would never be alerted by unfamiliar premium charges, because there were no premiums. Notably, in an interview Herman stated that "97% of [Enhance Health's] members pay $0 a month in insurance premiums while obtaining the coverage they need."

32.     Enhance Health, too, created a large network of about 30 downlines, most of which also used Benefitalign or Inshura. Enhance Health's downlines included Defendant Net Health Affiliates Inc. ("NHA"). Like Enhance Health, NHA bought Minerva's leads. It used Enhance Health's scripts. Enhance Health heavily monitored NHA. In group chats it told NHA's employees which carriers to enroll customers in that day. NHA's agents told consumers that they worked for "Enhance Health enrollment center." Like Enhance Health, NHA engaged in AOR Swaps, Twisting and Dual Apping.

33.     In sum, this is a RICO Enterprise. It has damaged millions of the poorest Americans. It has devastated legitimate ACA agencies. It was ignited by Bowsky, dubbed the "King of ACA," who trained the Enterprise's participants and sold them leads arising from misleading ads. Bowsky states that "[v]irtually everybody in the [ACA] space that was doing it in a call center other than one company, I taught how to do it."[3] The Enterprise was accelerated by TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Harrison, Enhance Health, Herman,

---

[3]     Joe Naz Podcast No. 31 at 1:25:20

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Bain Insurance, the downline agencies and others that expanded the scheme's reach and developed and implemented AOR Swaps, Twisting and Dual Apping.

34.     Disturbingly, despite the attention brought to this issue since the filing of the lawsuit, the pattern of conduct seemingly continues.  An Enhance Health employee terminated just last week claims that Enhance Health continues to receive calls from consumers expecting cash cards, and to employ misleading scripts and enrollment practices.

35.     Consumer Plaintiffs, Agency Plaintiffs and the classes of victims they seek to represent have suffered damages and seek to hold Defendants accountable for their role in the Enterprise; for conspiring to violate the RICO Act; for aiding and abetting the Enterprise; and for aiding and abetting fraud and breaches of fiduciary duty.  Consumer Plaintiffs also seek to hold TrueCoverage, Enhance Health, Benefitalign, NHA and Protect Health accountable for their use of the consumer Plaintiffs' and class members' PII.

## II.     PARTIES, JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

36.     The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Classes who are citizens of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed classes.  This Court also has federal question subject matter jurisdiction pursuant to 18 U.S.C. § 1964.

### B.     Parties and Personal Jurisdiction

37.     Plaintiff Conswallo Turner is a resident and citizen of the state of Texas.  Turner is a "person" under 18 U.S.C. § 1964.

13

38.     Plaintiff <u>Tiesha Foreman</u> is a resident and citizen of the state of Georgia.  Foreman is a "person" under 18 U.S.C. § 1964.

39.     Plaintiff <u>Angelina Wells</u> is a resident and citizen of the state of Texas.  Wells is a "person" under 18 U.S.C. § 1964.

40.     Plaintiff <u>Veronica King</u> is a resident and citizen of the state of Georgia.  King is a "person" under 18 U.S.C. § 1964.

41.     Plaintiff <u>Paula Langley</u> is a resident and citizen of the state of Texas.  Mrs. Langley is a "person" under 18 U.S.C. § 1964.

42.     Plaintiff <u>NavaQuote, LLC</u> is a Delaware limited liability company with its principal place of business in the state of Georgia.  NavaQuote is a "person" under 18 U.S.C. § 1964.  NavaQuote's members are Callie Navrides and Peter Navrides, both residents and citizens of Georgia.

43.     Plaintiff <u>WINN Insurance Agency LLC</u> is a Florida limited liability company with its principal place of business in the state of South Carolina.  WINN is a "person" under 18 U.S.C. § 1964.  WINN's sole member is Marsha Broyer, a resident and citizen of South Carolina.

44.     Defendant <u>Enhance Health, LLC</u> is a Florida limited liability company with its principal place of business in Broward County, Florida.  Enhance Health is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Matthew Herman is Enhance Health's manager.

45.     Defendant <u>Matthew Herman</u> is a citizen and resident of Broward County, Florida.  He is the manager of Enhance Health and, during most of the relevant time period, was Enhance Health's Chief Executive Officer.  Herman is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.

46.     Defendant <u>Bain Capital Insurance L.P.</u> is a Delaware limited partnership with its principal place of business in Boston, Massachusetts.  Bain Insurance is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.

47.     This Court has specific personal jurisdiction over Bain Insurance pursuant to Section 48.193(1)(a), Fla. Stat.  Bain Insurance regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.  Bain Insurance owns and operates Enhance Health in Broward County, Florida.  It funds, among other operations, Enhance Health's call centers and employees.  Bain Insurance has officers and/or employees who work out of Enhance Health's Broward County offices.  And as further alleged in this Amended Complaint, Bain Insurance committed one or more tortious acts within Florida, including the aiding and abetting of Enhance Health's fraud and breaches of fiduciary duty.

48.     This Court also has general personal jurisdiction over Bain Insurance pursuant to Section 48.193(2), Fla. Stat.  Bain Insurance is engaged in substantial and not isolated activity within this state, as evidenced by Bain Insurance:

      a.  Operting and managing Florida-based Enhance Health, from which Bain Insurance has derived a considerable portion of its revenue during the relevant period;

      b.  Investing at least $150 million in Enhance Health and sending that money to Enhance Health in Florida for the purpose of financing Enhance Health's Florida-based operations;

      c.  Stationing Bain Insurance employees at Enhance Health's offices in Florida to oversee and manage Enhance Health's leadership and operations, including its

CASE NO. 0:24-cv-60591-DAMIAN/Valle

       enrollment and marketing operations;

d.   Hiring and firing Enhance Health's C-suite-level employees, including its enrollment and marketing leadership;

e.   Assigning Bain Insurance leadership to Enhance Health's board of directors; and/or

f.   Receiving repayments from Enhance Health in Florida of Enhance Health's financing debt to Bain Insurance.

49.    Defendant <u>TrueCoverage, LLC</u>, individually and to the extent it does business as "Inshura, LLC" is a New Mexico limited liability based in Albuquerque, New Mexico. TrueCoverage is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961. TrueCoverage's member is Girija Panicker, a citizen and resident of New Mexico.

50.    This Court has specific personal jurisdiction over TrueCoverage pursuant to Section 48.193(1)(a), Fla. Stat.  TrueCoverage regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.  TrueCoverage maintains large offices in Miramar, Deerfield Beach and Miami with hundreds of employees.  It is registered with the Florida Secretary of State's office to do business in Florida.  Its Florida registered agent is Matthew Goldfuss, a Florida resident.  True Coverage also caused injury to persons or property within Florida arising out of acts and omissions it took inside and outside the state while engaging in solicitation of, or service activities for, people within Florida.  Moreover, as further alleged in this Complaint, TrueCoverage committed one or more tortious acts within Florida.

51.    This Court also has general personal jurisdiction over TrueCoverage pursuant to Section 48.193(2), Fla. Stat.  TrueCoverage is engaged in substantial and not isolated activity

CASE NO. 0:24-cv-60591-DAMIAN/Valle

within this state.

    a.     From its offices in South Florida, TrueCoverage solicited and interacted with consumers in Florida and throughout the country via telephone, internet, text, email and mail.

    b.     It purchased fraudulent leads from a Florida-based company, Defendant Minerva.

    c.     TrueCoverage's agents, from offices in South Florida, made misrepresentations and omissions that induced Consumer Class members, including a substantial number of Florida consumers, to enroll in $0 ACA health insurance plans that they did not qualify for.

    d.     From its offices in South Florida, it engaged in AOR Swaps, Twisting and Dual Apps.

    e.     From its offices in South Florida, TrueCoverage obtained Consumer Class members' PII, and subsequently used that information to re-enroll Consumer Class members (thousands of whom were in Florida) into new or additional health insurance plan(s) without proper knowledge and consent.

    f.     From South Florida, TrueCoverage agents submitted Consumer Class members' health insurance applications to the ACA Marketplace.

    g.     TrueCoverage received commission payments to its offices in South Florida.

    h.     TrueCoverage wired commissions to its agents from its offices in South Florida.

    i.     TrueCoverage wired payments to downline agents, including Enhance

Health, in Florida.

j.       TrueCoverage entered into contracts in the State of Florida, including but not limited to contracts with agents that operated from TrueCoverage call centers located in its offices in South Florida.

k.       TrueCoverage provided customer service to Class Plaintiffs and class members from its offices in Florida.

l.       TrueCoverage trained its downline agencies in Florida.

m.       TrueCoverage sent enrollment documents to the Marketplace as well as documents and communications to Plaintiffs and class members from its offices in Florida.

n.       From its Florida offices, TrueCoverage paid advance payments to its downline agents to support the unlawful misconduct alleged herein.

52.      Defendant Speridian Technologies, LLC is a New Mexico limited liability with its principal place of business in Albuquerque, New Mexico.  Speridian Technologies is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Speridian Technologies' manager is Girish Panicker and its member is Hari Pillai, who are both residents and citizens of New Mexico.

53.      This Court has specific personal jurisdiction over Speridian Technologies pursuant to Section 48.193(1)(a), Fla. Stat.  Speridian Technologies regularly and systematically operates, conducts, engages in and carries on a business or business venture in in Florida.  Speridian Technologies is registered with the Florida Secretary of State's office to do business in Florida. As further alleged in this Amended Complaint, Speridian Technologies committed one or more tortious acts within Florida by controlling and financing the Florida operations of TrueCoverage

and Benefitalign, including but not limited to paying the salaries of TrueCoverage's agents in Broward and Miami-Dade counties, with knowledge that TrueCoverage and Benefitalign were committing a fraud.

54.     This Court also has general personal jurisdiction over Speridian Technologies pursuant to Section 48.193(2), Fla. Stat.  Speridian Technologies is engaged in substantial and not isolated activity within this state.

      a.     Speridian Technologies developed and provided access to the platform used by Florida-based companies, including Enhance Health, NHA and other Enhance Health downlines, as well as Protect Health and other True Coverage downlines, and companies operating in Florida, like True Coverage, to enroll and manage consumers in the ACA space, including a substantial percentage of more than 2.7 million Florida-based, low-income consumers who enrolled during the relevant period.

      b.     Speridian Technologies financed TrueCoverage's operations and growth in South Florida by paying advanced commissions as well as by paying the salaries of TrueCoverage's health insurance agents in Florida.  These financial arrangements were memorialized in loan agreements and employment agreements executed in Florida.

55.     Defendant Benefitalign, LLC is a New Mexico limited liability company with its principal place of business in Albuquerque, New Mexico.  Benefitalign is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Benefitalign's manager is Girish Panicker and its member is Hari Pillai, who are both residents and citizens of New Mexico.

56.     This Court has specific personal jurisdiction over Benefitalign pursuant to Section 48.193(1)(a), Fla. Stat.  Benefitalign regularly and systematically operates, conducts, engages in and carries on a business or business venture in in Florida.  Benefitalign is registered with the Florida Secretary of State's office to do business in Florida.  As further alleged in this Amended Complaint, Benefitalign committed one or more tortious acts within Florida by contracting with dozens of companies located in Broward and Miami-Dade counties to use its proprietary EDE Platform, with knowledge that those companies were using the EDE Platform to commit a fraud.

57.     This Court also has general personal jurisdiction over Benefitalign pursuant to Section 48.193(2), Fla. Stat.  Benefitalign is engaged in substantial and not isolated activity within this state.

a.      During the relevant period, Benefitalign provided access to its proprietary EDE Platform to dozens of Florida-based companies, including Defendants Enhance Health, NHA and Protect Health, to enroll and manage consumers in the ACA space, including a substantial percentage of more than 2.7 million Florida-based, low-income consumers who enrolled during the relevant period. Benefitalign generates a significant portion of its revenue from customers based in Florida.

b.      One of the companies Benefitalign contracts with is an affiliate, Defendant TrueCoverage, with multiple, large offices in South Florida from which agents access Benefitalign's EDE Platform to enroll consumers into ADA plans, and to conduct the AOR- and plan-switching alleged in this lawsuit.

58.     Defendant Girish Panicker is a resident and citizen of New Mexico.  Panicker is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable

"person" under 18 U.S.C. § 1961.  Panicker is manager of Defendant Speridian Technologies.  He is the manager and one of two members of Speridian Global, which is the parent entity of Defendants TrueCoverage and Speridian Technologies, as well as the parent entity of Defendant Benefitalign.  Panicker serves as Chairman of the Board of Speridian Technologies.  Panicker oversees and directs Speridian, TrueCoverage and Benefitalign.  During the relevant timeframe, he directed those companies' operations and growth, embracing a strategy that relied upon the creation and use of fraudulent leads to enroll consumers, including a substantial number of Florida customers, in ACA health plans, and to twist those plans and/or remove and replace agents of record.

59.    This Court has specific personal jurisdiction over Panicker pursuant to Section 48.193(1)(a), Fla. Stat.  Panicker regularly and systematically operates, conducts, engages in and carries on a business or business venture with substantial offices in Broward and Miami-Dade counties, TrueCoverage.  Panicker also caused injury to persons or property within Florida arising out of acts and omissions he took inside and outside the state while engaging in solicitation of ACA consumers within Florida.  Panicker committed one or more tortious acts within Florida, including aiding and abetting fraud and breach of fiduciary duty by instructing agents to twist consumers' ACA plans, including substantial numbers of consumers in Florida, and/or remove and replace agents of record, including agents in Florida.

60.    This Court also has general personal jurisdiction over Panicker pursuant to Section 48.193(2), Fla. Stat.  Panicker is engaged in substantial and not isolated activity within this state.  Panicker directs and manages businesses with significant operations in this state.  More than 2.7 million Floridians with incomes between 100 and 150 percent of the poverty level signed up for ACA plans since 2022, and Panicker's companies TrueCoverage, Speridian Technologies,

Benefitalign and Inshura were integral to the enrollment of a significant percentage of these low-income Floridians.  Panicker often travels to South Florida to manage TrueCoverage's South Florida offices.

61.     Defendant Matthew Goldfuss is a resident and citizen of Brevard County, Florida. Goldfuss is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Goldfuss is TrueCoverage's National Director: Individual and Medicare Sales.  Often from TrueCoverage's Broward County offices, Goldfuss oversees and directs the TrueCoverage ACA enrollment team and the misleading scripts that they used with consumers.

62.     Defendant Digital Media Solutions LLC d/b/a Protect Health is a Delaware limited liability company based in Pinellas County, Florida.  Protect Health is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Protect Health's call center operations interact daily and substantially with TrueCoverage's operations in Broward County, Florida.

63.     Defendant Net Health Affiliates, Inc. is a Florida corporation with its principal place of business in Miami-Dade County, Florida.  NHA is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Bruce Goldberg is Net Health's President and Kareem McLean is its Agent in Charge.

64.     Defendant Number One Prospecting LLC d/b/a Minerva Marketing is a Florida limited liability company with its principal place of business in Broward County, Florida.  Minerva is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Minerva's sole member and manager is Brandon Bowsky.

65.     Defendant Brandon Bowsky is a resident and citizen of Las Vegas, Clark County,

Nevada, and is the sole member and manager of Minerva, and also serves as its president.  Bowsky is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.

66.     This Court has specific personal jurisdiction over Bowsky pursuant to Section 48.193(1)(a), Fla. Stat.  Bowsky regularly and systematically operates, conducts, engages in and carries on a business or business venture in Broward County Florida, Minerva.  During most of the relevant time period, Bowsky was a citizen and resident of Broward County, Florida — and may still be.  Bowsky caused injury to persons or property within Florida arising out of acts and omissions he took inside and outside the state while engaging in solicitation of ACA consumers within Florida.  Bowsky committed one or more tortious acts within Florida, including aiding and abetting fraud and breach of fiduciary duty by consulting with downline agencies on how to solicit and enroll, through fraudulent means, ACA consumers, including many of the more than 2.7 million Floridians who have enrolled in ACA plans since 2022.  Bowsky maintains a business office in his former residence in Fort. Lauderdale, from which he often operates his businesses, including Minerva and a consulting business that consults fraudulent actors in the ACA space.

## C.    <u>Venue</u>

67.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because (i) a substantial part of the events or omissions giving rise to Class Plaintiffs' claims occurred in this District, and (ii) each of the Defendants' contacts with this District would be sufficient to subject them to personal jurisdiction in this District if this District were a separate State.  Defendants regularly and systematically operate, conduct, engage in and carry on a business or business venture in this District, and have generated significant revenue from consumers in this District.  Defendants committed one or more tortious acts within this District.  Defendants'

CASE NO. 0:24-cv-60591-DAMIAN/Valle

contacts within this District were substantial and not isolated.

### III.   RELEVANT NONPARTIES

#### A.   TrueCoverage Downlines

68.   <u>ACA Helpline LLC</u>.  ACA Helpline LLC is a downline agency of TrueCoverage. It is a Florida limited liability company formed in 2022, and its principal place of business is in Delray Beach, Florida.  Michael Zuckerberg is ACA Helpline LLC's Manager.

69.   <u>Axis Health Group, Inc.</u> ("Axis").  Axis is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2008, and its principal place of business is in Coral Springs, Florida.  Deborah King is Axis' President and Agent in Charge.

70.   <u>Compass Health Agency LLC d/b/a Atlantic Senior Benefits</u> ("Compass Health"). Compass Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Orlando, Florida.  Arthur Ramirez is Compass Health's Manager and Gustavo Fraga is its Agent in Charge.

71.   <u>Empire Marketing & Events LLC d/b/a HVO Insurance Services</u> ("HVO").  HVO is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Homestead, Florida.  Helen Valdez Obando and Miguelangel Marquez are HVO's Authorized Members.

72.   <u>Engage Health Insurance, LLC d/b/a Engage Direct</u> ("Engage Health").  Engage Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Pompano Beach, Florida.  Edward Lovell is Engage Health's Manager and its Agent in Charge.

73.   <u>Ensure Health Group Corporation and Barachy Lucien</u>.  Ensure Health Group Corporation is a Delaware corporation with a principal place of business in Plantation, Florida.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

According to the Florida Secretary of State's website, Barachy Lucien is the Vice President of Ensure Health Group.  Ensure Health Group is a downline agency of TrueCoverage and has a downline producer agreement with Protect Health and is involved in selling ACA health plans to class members.  Beginning in at least 2022, Barachy Lucien was involved in training TrueCoverage's and Enhance Health's agents on selling ACA health insurance plans through Speridian's EDE platform, Benefitalign.

74.     Every Health Group II LLC ("Every Health Group").  Every Health Group is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Fort Lauderdale, Florida.  Richard Troher is Every Health Group's Agent in Charge.

75.     Family Health First LLC ("Family Health").  Family Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Boca Raton, Florida.  Connor Thompson is its Manager and its Agent in Charge.

76.     The Healthcare Tutor, LLC ("Healthcare Tutor").  Healthcare Tutor is a downline agency of TrueCoverage.  It is an Oregon limited liability company formed in 2020, and its principal place of business is Portland, Oregon.  David Williams is Healthcare Tutor's Authorized Member.

77.     Health Coverage Helpers LLC ("HCH").  HCH is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in St. Petersburg, Florida.  Jarred Bock is its Authorized Member.

78.     Health Coverage Plus, Inc. ("HCP").  HCP is a downline agency of TrueCoverage. It is a Florida corporation formed in 2023, and its principal place of business is in Boca Raton, Florida.  Barbara Leeds is HCP's President.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

79.     Health Process Center Insurance Agency Inc ("Health Process").  Health Process is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2022, and its principal place of business is in Fort Lauderdale, Florida.  Paul Greenberg is its President and its Agent in Charge.

80.     Healthy Streets Healthcare Services Inc ("Healthy Streets").  Healthy Streets is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Hollywood, Florida.  Patrick Houser is Healthy Streets' President.

81.     Insurance Line One LLC ("Line One").   Line One is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2019, and its principal place of business is in Pompano Beach, Florida.  Kristian Baso is Line One's President and Agent in Charge.

82.     Licensed Insurance Advisors LLC ("LIA").   LIA is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2016, and its principal place of business is in Fort Lauderdale, Florida.  Jason McDowell is LIA's Manager and its Agent in Charge.

83.     Marcharmi Investments LLC d/b/a CContreras Insurance ("CContreras Insurance").  CContreras Insurance is a downline agency of TrueCoverage.  It is a fictitious entity formed in 2022, and its principal place of business is in Coconut Creek, Florida.  Charles Contreras is its Authorized Member and Agent in Charge.

84.     N & J Associates, Inc. ("N & J").  N & J is a downline agency of TrueCoverage.  It is a Florida corporation formed in 1996, and its principal place of business is in Parkland, Florida.  Jeri Hill-Billow is N & J's President, and David Robert Billow is its Vice President.

85.     No Cost ACA, LLC d/b/a NCA Insurance Group ("No Cost ACA").   NCA

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Insurance is a downline agency of TrueCoverage.  It is a Delaware limited liability company formed in 2023, and its principal place of business is in Boynton Beach, Florida.  Robert Ginberg is NCA Insurance's Manager and its Agent in Charge.

86.     No Cost ACA Dos, LLC d/b/a NCAD Insurance Group ("NCAD Insurance"). NCAD Insurance is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Boca Raton, Florida.  Robert Ginberg is NCAD Insurance's Manager and its Agent in Charge.

87.     Nsure Now Insurance Agency Inc ("Nsure Now").  Nsure Now is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Fort Lauderdale, Florida.  Paul Greenberg is its President and its Agent in Charge.

88.     Prince Health Group LLC ("Prince Health").  Prince Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Deerfield, Florida.  Victoria Casserino is its CEO and its Agent in Charge.

89.     Smart Care LLC.  Smart Care LLC is a downline agency of TrueCoverage.  It is an Ohio limited liability company formed in 2019, and its principal place of business is in Mason, Ohio.  Andrew Rathman is Smart Care LLC's Agent in Charge.

90.     SRA Healthcare Corp ("SRA").  SRA is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Virginia Gardens, Florida.  Randy Rojas, Mariam Anez, and Ysmael Sandoval are SRA's Authorized Members.

91.     TSO Insurance Group Inc ("TSO").  TSO is a downline agency of TrueCoverage. It is a Florida corporation formed in 2023, and its principal place of business is in Hollywood, Florida.  Trisha Perez is TSO's President and its Agent in Charge.

92.     Tobias & Associates LLC.  Tobias & Associates LLC is a downline agency of

CASE NO. 0:24-cv-60591-DAMIAN/Valle

TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Boca Raton, Florida.  Michael Tobias is its Manager, and William Cox is its Agent in Charge.

93.    United Branch Services, Inc. ("UBS").   UBS is a downline agency of TrueCoverage.  It is a Tennessee corporation formed in 2021, and its principal place of business is in Brentwood, Tennessee.  Gregory Loerzel is its Agent in Charge.

94.    Your Health Solutions Inc ("Your Health").  Your Health is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2013, and its principal place of business is in Naples, Florida.  Darlene Shaw is Your Health's President.

**B.    Enhance Health Downlines**

95.    Astra Health Group Inc ("Astra").  Astra is a downline agency of Enhance Health. It is a Florida corporation formed in 2022, and its principal place of business is in Coral Springs, Florida.  Brian Constantino is Astra's President and Nicole Barnes is its Secretary.

96.    Aventa Health LLC ("Aventa").  Aventa is a downline agency of Enhance Health. It is a Delaware limited liability company, and its principal place of business is in Coral Springs, Florida.  Alan Shihman is Aventa's Authorized Member and its Agent in Charge.

97.    Coverage Connected LLC.  Coverage Connected LLC is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Sunrise, Florida.  David Johnson is its Manager and Agent in Charge.

98.    Cypress Health Plans Inc. ("Cypress Health").   Cypress Health is a downline agency of Enhance Health.  It is a Florida corporation formed in 2010, and its principal place of business is in Aventura, Florida.  Bruce Goldberg is Cypress Health's President and Kareem McLean is its Agent in Charge.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

99.    <u>Drina Health Group Inc. d/b/a SRB Health Insurance</u> ("SRB").  SRB is a downline agency of Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Coral Springs, Florida.  Nicole Barnes is SRB's President and its Agent in Charge.

100.    <u>Easy Quote Health Insurance Agency, LLC</u> ("Easy Quote").  Easy Quote is a downline agency of Enhance Health.  It is a Delaware limited liability company formed in 2022, and its principal place of business is in Pompano Beach, Florida.  Jonathan Massa is Easy Quote's Agent in Charge.

101.    <u>Gasic Marketing Group, Inc. d/b/a IGD Insurance Agency</u> ("IGD").  IGD is a downline agency of Enhance Health.  It is a fictitious entity formed in 2024, and its principal place of business is in Coral Springs, Florida.  Nicole Barnes is its President, and Donovan Williams is its Vice President.

102.    <u>GLS Health LLC</u> ("GLS").  GLS is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Fort Lauderdale, Florida.  Ernesto Romero is GLS's Authorized Member and its Agent in Charge.

103.    <u>Healthcare Unlocked National LLC d/b/a Healthcare Unlocked ACA Plans</u> ("Healthcare Unlocked").  Healthcare Unlocked is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Sunrise, Florida.  Jason Lee is Healthcare Unlocked's Manager.

104.    <u>Health First Insurance Agency</u>.  Health First Insurance Agency is a health insurance agency that sells ACA health plans to class members. According to the Florida Department of Financial Service, Jonathan Massa is the agent in charge of Health First Insurance Agency, and until approximately March 5, 2024, was a downline agency of Enhance Health.  Health First Insurance Agency is involved in the selling of policies based on the fraudulent advertisements

described in the complaint.

105.    Health Insurance For All, Inc ("HIFA").  HIFA is a downline agency of Enhance Health.  It is a Florida corporation formed in 2013, and its principal place of business is in Fort Lauderdale, Florda.  Eric Nicholsberg is HIFA's President and Vincent Ferrara is its Agent in Charge.

106.    The Health Insurance Group Inc. ("HIG").  HIG is a downline agency of Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Coral Springs, Florida.  Antoinette Reynolds is HIG's President and Agent in Charge.

107.    Health Prime Insurance, Inc. ("Health Prime").  Health Prime is a downline agency of Enhance Health.  It is a Florida Corporation formed in 2020, and its principal place of business is in Pompano Beach, Florida.  Adam Awany is Health Prime's President, and Nathalia Awany is its Agent in Charge.

108.    Homebase Insurance Group LLC ("Homebase").  Homebase is a downline agency of Enhance Enhance Health.  Homebase is a Florida limited liability company formed in 2023, and its principal place of business is in Boca Raton, Florida.  Eric Nicholsberg is Homebase's Authorized Member and Vincent Ferrara is its Agent in Charge.

109.    Insure Hippo Inc. ("IHI").  IHI is a downline agency of Enhance Health.  It is a Florida corporation formed in 2020, and its principal place of business is in Coral Springs, Florida.  Steven Corona is IHI's President, and Jorge Izquierdo is its Agent in Charge.

110.    Jet Insurance Solutions Inc ("Jet").  Jet is a downline agency of Enhance Health.  It is a Florida corporation formed in 2022, and its principal place of business is in Boca Raton, Florida.  Jessica Maresca is Jet's President and its Agent in Charge.

111.    National Coverage Consulting, Inc. ("National Coverage").  National Coverage is

CASE NO. 0:24-cv-60591-DAMIAN/Valle

a downline agency of Enhance Health.  It is a Florida corporation formed in 2022, and its principal

place of business is in Coral Springs, Florida.  Michael Behrens is National Coverage's President.

112.   <u>National Health Insurance Group LLC</u> ("National Health").  National Health is a

downline agency of Enhance Health.  It is a Florida limited liability company formed in 2015, and

its principal place of business is in Fort Lauderdale, Florida.  Keon Rouse is National Health's

Vice President and its Agent in Charge.

113.   <u>Order & Progress Insurance Agency, Inc.</u> ("OPI").  OPI is a downline agency of

Enhance Health.  It is a Florida corporation formed in 2024, and its principal place of business is

in Deerfield Beach, Florida.  Jessica Kiser is OPI's President and its Agent in Charge.

114.   <u>OSS Benefits Group Inc d/b/a OSS Benefits Group Insurance Agency ("OSS").</u>

OSS is a downline agency of Enhance Health.  It is a Florida corporation formed in 2022, and its

principal place of business is in Coral Springs, Florida.  Lauryn Mignott is OSS's President.

115.   <u>OTM Coverage Inc d/b/a OTM Health Plans</u> ("OTM").  OTM is a downline agency

of Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business

is in Sunrise, Florida.  Michael Behren is OTM's Vice President and Caryse McDowell is its Agent

in Charge.

116.   <u>Overcome Health Insurance, Inc.</u> ("OHI").  OHI is a downline agency of Enhance

Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Miami,

Florida.  Collin Alford is OHI's President, and Colliysha Alford is its Vice President.

117.   <u>Positive Marketing LLC</u>.  Positive Marketing LLC is a downline agency of Enhance

Health.  It is a Florida limited liability company formed in 2021, and its principal place of business

is in Orlando Florida.  Crystal Roseman is Positive Marketing LLC's Agent in Charge.

118.   <u>Precision Health Group Inc</u> ("Precision").   Precision  is  a  downline  agency  of

31

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Coral Springs, Florida.  Nicole Barnes is Precision's President.

119.     Prime Healthcare Solutions Insurance Agency LLC ("Prime Healthcare").  Prime Healthcare is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Deerfield Beach, Florida.  Ryan Froio is Prime Health's Authorized Member and its Agent in Charge.

120.     Propel Health LLC d/b/a Propel Coverage Health Insurance ("Propel I").  Propel I is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Sunrise, Florida.  Michael Benitez Medina is Propel I's Owner and its Agent in Charge.

121.     Propel Health Insurance LLC ("Propel II").  Propel II is a downline agency of Enhance Health.  It is a Florida limited liability company formed in 2024, and its principal place of business is in Sunrise, Florida.  Michael Benitez Medina is Propel II's Registered Agent and David Johnson is its Agent in Charge.

122.     Smart Insurance IQ Inc.  Smart Insurance IQ Inc. is a downline agency of Enhance Health.  It is a Florida corporation formed in 2020, and its principal place of business is in Tamarac, Florida.  Brendon Thomas is Smart Insurance IQ Inc.'s President and its Agent in Charge.

123.     Sentinel One Health Inc ("Sentinel).  Sentinel is a downline agency of Enhance Health.  It is a Florida corporation formed in 2022, and its principal place of business is in Parkland, Florida.  Marcos Neves Rodrigues is Sentinel's President, and Brandon Byrd is its Agent in Charge.

124.     Smart Health Group, Inc. d/b/a Smart Insurance Group Inc. ("Smart Insurance").  Smart Insurance is a downline agency of Enhance Health.  It is a Florida corporation formed in

CASE NO. 0:24-cv-60591-DAMIAN/Valle

2023, and its principal place of business is in Weston, Florida.  Brendon Thomas is Smart Insurance's President and Lawrence Morris is its Agent in Charge.

125.    <u>Titan Home Guard Inc. f/k/a Titan Health Group d/b/a Titan Health Insurance Inc</u> ("Titan").  Titan is a downline agency of Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Pompano Beach, Florida.  Adam Awany is Titan's President and Nathalia Awany is its Vice President and Agent in Charge.

126.    <u>We Cover Health LLC</u> ("We Cover").  We Cover is a downline agency of Enhance Health.  It is a Florida corporation formed in 2023, and its principal place of business is in Sunrise, Florida.  Jeremy Hudson is We Cover's Manager.

**C.    The Enhanced Direct Enrollment ("EDE") Platforms**

127.    <u>JET Health Solutions</u>.  Like Benefitalign, JET Health Solutions is a CMS-approved, Phase 3 Enhanced Direct Enrollment provider.  It was purchased by Enhance Health in July 2023.  After the acquisition Enhance Health began enrolling class members, possibly including some of the Class Plaintiffs, into ACA plans through the newly acquired EDE platform.

128.    <u>Inshura</u>.  Inshura is owned and controlled by Speridian Technologies and/or TrueCoverage.  It is a CMS-approved, Phase 3 Enhanced Direct Enrollment platform.  Certain TrueCoverage downlines such as Protect Health use Inshura to enroll class members, including some of the Class Plaintiffs, into ACA plans through that EDE platform.

**D.    The Lead Generation Entities**

129.    <u>PolicyBind, LLC</u>.  PolicyBind, LLC is a Florida limited liability company with a principal place of business in Miami, Florida.  Upon information and belief, PolicyBind generated Leads from deceptive and fraudulent advertisements and sold them to TrueCoverage and/or Enhance Health.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

130.    <u>WeCall Media, Inc</u>.  Upon information and belief, WeCall generated leads from deceptive and fraudulent advertisements and sold them to TrueCoverage and/or Enhance Health.

131.    <u>My ACA, LLC</u>.  Upon information and belief, My ACA, LLC is related to WeCall Media.  My ACA sold leads to TrueCoverage and/or Enhance Health that were generated from the deceptive and fraudulent advertisements at issue.

132.    <u>ScaleUp Media</u>.  Upon information and belief, ScaleUp Media generated leads from deceptive and fraudulent advertisements and sold them to TrueCoverage and/or Enhance Health.

**E.      The Dialing Software Companies**

133.    <u>Retreaver</u>.  Retreaver is a Canadian software company based in Ontario, Canada.  According to its website, Retreaver is a cloud-based software that provides real-time, inbound call data by tagging, tracking and routing callers to agents.  Upon information and belief, Defendants Minerva and Bowsky use(d) Retreaver to tag, track and route incoming calls from class members who responded to the fraudulent and deceptive advertisements to Defendants' agents.  The Retreaver software was/is also used by Minerva and Bowsky to record the confidential phone calls between Enhance Health's agents and consumers without the knowledge and consent of members of the class.

134.    <u>Ringba</u>.  Ringba is an inbound call tracking and analytics platform for marketers, brands, and pay per call.  Ringba's software is used by lead generators to tag, track and route calls to agents.  Minerva used Ringba software to record calls between agents and consumers without consumers' knowledge.

135.    <u>Esotech d/b/a Total Leads Domination ("TLDCRM")</u>.  TLDCRM is a Florida corporation with its principal place of business located in Hialeah, Florida.  According to its website, TLDCRM provides, among other things, dialer services, lead management services and

data management services.  Throughout the class period, Enhance Health and TrueCoverage used the TLDCRM software for their CRM ("Customer Relationship Management") system.  They used TLDCRM, in part, to accept inbound calls at their call centers that were routed to them by software such as Retreaver throughout the Class Period.

136.    MME.    MME is a proprietary telephonic dialing/CRM system designed by Speridian Technologies.  MME was integrated into Inshura as well as Benefitalign.  MME allows for inbound and outbound text messaging and calls to and from consumers.  It was used by TrueCoverage and its downlines to market and communicate with consumers.

**F.**        **Others.**

137.    Messer Financial.    Messer Financial is an agency and field marketing organization (or "FMO") that acted as a bridge between insurance carriers and insurance agents and brokers throughout the country, including TrueCoverage, Enhance Health and many of their downlines.  Messer Financial obtained licenses to sell and distribute insurance products on a carrier-by-carrier basis.  Messer Financial contracted with TrueCoverage, Enhance Health and many of their downlines, allowing those agents and brokers to write policies for those carriers.

138.    Gabriel Harrison.    Harrison was the ACA enrollment manager at TrueCoverage's Deerfield Beach office and directed and oversaw agents who engaged in AOR Swaps, Twisting and Dual-Apps.

139.    Scott Savitt.    Savitt is a longtime friend of Herman who Herman installed as primary "Agent of Record" for all of Enhance Health.  At all relevant times, Savitt knew that Enhance Health was engaged in AOR Swaps, Twisting and Dual-Apps.

140.    Brad Shapiro.    Shapiro is another longtime friend of Herman who worked in marketing and customer service roles for Enhance Health and knew that Enhance Health was

engaged in AOR Swaps, Twisting and Dual-Apps.

141.     <u>My Health Advisers, Inc., Gabriel Pasztor and Paola Fritz</u>.  My Health Advisers, Inc. is a Florida corporation created on April 18, 2019.  It has a principal place of business in Broward County, Florida.  My Health Advisers is an insurance agency located in Oakland Park, Florida.  According to records maintained by the Florida Department of Financial Services, Gabriel Pasztor is listed as the agent in charge of My Health Advisers, Inc.  Gabriel Pasztor is listed on the Florida Secretary of State's records as President of the company from August 26, 2022, to the present.  Upon information and belief, Gabriel Pasztor and his wife Paola Fritz are listed as AOR on many of ACA health plans sold to Plaintiffs and class members.  Gabriel Pasztor and his wife Paola Fritz have relevant information about the sale of the policies and the allegations related to AOR switching.

## IV.     <u>FACTUAL BACKGROUND</u>

142.     As a starting point, it is helpful to understand the ACA regulations that address how consumers, including Class Plaintiffs and class members, are enrolled into ACA plans, how Defendants fit into the regulatory framework and how Defendants violate those regulations.

## A.     <u>The ACA and How the Private Sector Became Involved in the Enrollment Process</u>

143.     The Patient Protection and Affordable Care Act ("ACA"), signed into law on March 23, 2010, was intended to reform aspects of the private health insurance market and expand the availability and affordability of health care coverage.  The ACA provides an opportunity for individuals who do not have group health insurance through their employer and are not on Medicare or public assistance programs such as Medicaid, to purchase individual health insurance each year.

144.     The ACA required the establishment of a health insurance marketplace in each state and the District of Columbia to assist individuals and small businesses in comparing, selecting and

enrolling in health plans offered by participating private issuers of qualified health plans.  CMS is responsible for overseeing the establishment of these marketplaces, including creating a federally facilitated marketplace ("FFM" or the "Marketplace") for states not establishing their own.  CMS was responsible for designing, developing and implementing the IT systems needed to support the Marketplace.  This included the creation of Healthcare.gov — the website that provides a consumer portal to the Marketplace — and related data systems supporting eligibility and enrollment.



145.    The Marketplace began accepting applications for consumer enrollment on October 1, 2013.  However, individuals attempting to access Healthcare.gov encountered numerous problems.  In response to these problems, CMS began seeking ways to incorporate the private sector into developing and integrating technology into the enrollment process.

### 1.      **The private sector enters the picture through "Direct Enrollment"**

146.    As an initial step, CMS created and allowed for a service called "Direct Enrollment" or "DE."  Direct Enrollment allows private insurance carriers of approved Qualified

Health Plans (or "QHPs") and private third-party "web-brokers" (online insurance agents) to enroll consumers through the Exchange, with or without the assistance of an agent or broker.  In this "classic" DE experience, consumers start at a carrier or web-broker's website and are redirected to Healthcare.gov to complete an eligibility application.  After completing the application, they are sent back to the issuer or web-broker's website to shop for and enroll in a plan.

147.    For the first few years, DE experienced technical challenges, in part because many consumers who attempted to enroll through carriers or web-brokers were dropping off in the middle of the process while being directed back and forth between Healthcare.gov and the carrier or web-broker's site.

**2.    Enhanced Direct Enrollment is introduced to expand and improve the private sector's enrollment efforts, but critics become concerned**

148.    To address the issue, in 2017 the Department of Human Health and Performance announced that the agency was considering creating an "Enhanced Direct Enrollment" (or "EDE") pathway.  EDE allows certain private entities, including insurance carriers and web-brokers, to directly enroll consumers into QHPs through the Exchange without redirecting consumers to Healthcare.gov.

149.    In November 2018, CMS issued a release that described the rollout of the EDE pathway as a partnership with the private sector to help make enrollment more user friendly.  CMS announced that the EDE program would allow the private sector to connect directly to Healthcare.gov and touted a "great new opportunity [for] the private sector to come up with innovative ways to create a uniquely tailored end-to-end user experience."

150.    But critics of the EDE pathway model foresaw problems.  They warned that giving the private sector such access to the Marketplace database could expose consumers to fraudulent schemes and misleading information on web-broker sites.  For example, on March 15, 2019, the

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Center on Budget and Policy Priorities published a report entitled "'Direct Enrollment' in Marketplace Coverage Lacks Protections for Consumers, Exposes Them to Harm — New 'Enhanced Direct Enrollment' Heightens Risks." The report warned that web-brokers, through the use of marketing technology, could use the database information to target and harm consumers.

151.    CMS released detailed guidance for entities wishing to implement the EDE pathway. These guidelines noted that entities would be allowed to implement one of three phase options of the technology, each successive phase allowing the entity to directly enroll a greater percentage of consumers. The highest and most stringent level, Phase 3, allows an entity to support all consumer applicants. Phase 3 requires the entity to sign a privacy and security agreement with CMS that contains important consumer protections. Among other things, these protections restrict how consumer PII can be created, collected, used and/or disclosed, and impose safeguards for safeguarding consumer PII.

152.    Benefitalign and Inshura are both Phase 3 EDE platforms. Jet Health is a Phase 3 EDE Platform purchased by Enhance Health in 2023 but not used by Enhance Health until November 2023. Each publicly touts the heightened security and privacy safeguards that need to be implemented to achieve Phase 3 status. For example, Speridian Technologies' website claims that Benefitalign has been audited by a third party for extensive security and privacy, is compliant with nearly 300 CMS security and privacy standards and has been reviewed, approved and audited by CMS.

153.    Benefitalign, Inshura and Jet Health are agent-facing EDE platforms, meaning that they are designed to be used by health insurance agents to enroll consumers in ACA health insurance plans on the Marketplace database:

**BENEFITALIGN** EDE SOLUTION
DATA INTERCHANGE WITH FFM MARKETPLACE



**B.     The ACA Imposes Important Regulatory Requirements
        That Defendants Violated**

154.    Before delving into the fraudulent advertisements, scripts, AOR Swaps and Twisting conducted by the RICO Enterprise, it is important to describe the regulatory environment that Defendants TrueCoverage, Speridian Technologies, Benefitalign, Enhance Health, Protect Health, NHA, the downlines, Minerva, Panicker, Goldfuss, Harrison, Herman and Bowsky exist in — and how those Defendants flouted its requirements and restrictions.  Viewed within this context, the Enterprise's actions directed toward consumers and agents becomes even clearer.

155.    These Defendants fall within three categories of entities described by the ACA regulations.

156.    TrueCoverage, Enhance Health, Protect Health, NHA, Goldfuss and the other downlines are each considered an "Agent or broker" because they are "licensed by the State as an agent, broker or insurance producer" pursuant to 45 CFR § 155.20.

157.    Speridian Technologies, TrueCoverage, Benefitalign and the relevant non-party EDE Platforms Inshura and JET Health is each a "Web-broker" under 45 CFR § 155.20.  A web-broker is an Exchange-registered individual or group of agents or brokers "that develops and hosts a non-Exchange website that interfaces with an Exchange to assist consumers with direct enrollment in QHPs offered through the Exchange . . . ."

158.    And Minerva, Bowsky, Herman and Panicker are considered "Non-Exchange entities," defined under 45 CFR § 155.260 to include those who are not part of the Exchange but who obtain and use consumers' PII.  They are "any individual or entity that (i) Gains access to personally identifiable information submitted to an Exchange; or (ii) Collects, uses, or discloses personally identifiable information gathered directly from applicants, qualified individuals, or enrollees while that individual or entity is performing functions agreed to with the Exchange."

159.    Because they are agents, brokers and/or web-brokers, ACA's regulations place "standards of conduct" on Defendants TrueCoverage, Speridian Technologies, Benefitalign, Enhance Health, Protect Health, NHA, Minerva, Panicker, Goldfuss and Bowsky.  Pursuant to 45 CFR § 155.220(j)(2), they must not deceive consumers.  They must "[p]rovide consumers with correct information, without omission of material fact, regarding the Federally-facilitated Exchanges, QHPs (ACA health insurance plans) offered through the Federally-facilitated Exchanges, and insurance affordability programs, and refrain from marketing or conduct that is misleading (including by having a direct enrollment website that HHS determines could mislead a consumer into believing they are visiting *HealthCare.gov*), coercive, or discriminates based on race, color, national origin, disability, age, or sex." (emphasis added).

160.    Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, these Defendants and relevant nonparties must execute an agreement that includes provisions binding them to comply with ACA's privacy and security standards and obligations and must also execute agreements with any downstream entities binding them to the same privacy and security standards.  *See* 45 CFR §§ 155.220(j)(2)(iv), 155.260(b)(2).

161.    As described in more detail in the sections below, these Defendants flouted the standards of conduct for agents, brokers and web-brokers outlined in 45 CFR § 155.220(j)(2).

CASE NO. 0:24-cv-60591-DAMIAN/Valle

They created, sold, purchased and/or financed the purchase of leads that deceived consumers into thinking they would receive cash cards or other cash benefits. They used or directed the use of misleading scripts to deflect questions about those cash benefits and engaged in twisting and AOR-swapping that harmed consumers.

162.     Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, all Defendants violated the regulations' security standards and obligations. Enhance Health and Herman never entered into a security agreement with non-Exchange entity Minerva or Bowsky and allowed them to record customer calls in breach of the security and privacy regulations. Enhance Health was a downline agent of TrueCoverage. TrueCoverage never caused Enhance Health to execute a security agreement.

**C.    An Opportunity Arises in 2022, When the Sale of ACA Plans to Low-Income Americans Is Allowed Year-Round**

163.     Prior to 2022, the private ACA health insurance industry was relatively modest. Compared to other insurance products, including Medicare Advantage, marketing costs were high, margins slim and commissions low. Time restraints placed on ACA enrollment did not help. Prior to March 2022, almost all ACA plan enrollments were limited to the three-month open enrollment period (or "OEP") between November and January. Once consumers purchased ACA plan(s) during the OEP, they were locked into that plan until the next OEP. Other than occasional and limited "special enrollment periods" (or "SEPs") between OEPs, ACA agencies had little to sell for most of the year.

164.     Things began to change in 2021 when, in the wake of COVID, Congress passed ARPA. Among other provisions, ARPA allowed consumers with household incomes between 100 and 150 percent of the federal poverty level to receive advance premium tax credits (or "APTCs") to cover the cost of the plan. APTCs are tax subsidies paid by the federal government directly to

CASE NO. 0:24-cv-60591-DAMIAN/Valle

insurance carriers to offset the cost of monthly health insurance premiums.  To qualify for APTCs, consumers must satisfy income requirements.  During the enrollment process, consumers' estimated household incomes are included on their Marketplace application.  They receive premium reductions throughout the year, which are paid by the federal government to insurance carriers to subsidize the cost of health insurance coverage.  At the end of the year, when consumers file their tax returns showing their actual household income, their final reconciled APTC is determined.  If the actual household income falls below the minimum threshold to qualify for the APTC or if it exceeds the estimated household income provided with their application, then the consumer  must repay to the IRS any excess APTCs received (the "Tax Penalty.")

165.    Also in 2021, the U.S. Department of Health & Human Services ("HHS") announced the creation of a new *year-round* SEP.  It was set to begin March 2022.  This new SEP allowed qualifying consumers to enroll in a $0 ACA plan any time of the year.

166.    These changes created a tremendous opportunity.  According to the U.S. Census Bureau, in 2022, approximately 40 million Americans under the age of 65 earned incomes within the target range for a $0 plan.

**D.**    **Bowsky Moves to Capitalize on This New Opportunity**



CASE NO. 0:24-cv-60591-DAMIAN/Valle

167.    In numerous public interviews given over the past year, [4] Brandon Bowsky describes himself as having grown up poor, dropped out of high school, sold drugs, stole hundreds of thousands of dollars in Bitcoin and worked as a talent recruiter for a porn site.  He has reminisced about devising ways as a kid to scam Best Buy out of televisions (lie and tell them the aspect ratio is off — they'll send you a second TV and not ask for the first one back) and Publix out of groceries (buy only BOGO items and return the second item later for cash).

168.    Bowsky says he became "famous" in gaming circles and "made a shit-ton of money" playing an online game called Runescape, employing a "fun" strategy of deceit and theft not dissimilar to the strategies he would later employ in the insurance and lead generation businesses:

> We kind of creat[ed] the concept of "luring." . . .  So basically you convince someone to go into an area where you can kill them under the pretense that you're not going to kill them, and you kill them.  But you know, you have to concoct a very believable story in an environment that seems safe, and then they get there and it's not.  [By killing them] you get their gold or whatever and then you sell all of that and liquidate it for real money later. . . .  There were other things we did that I'm not going to talk about on a podcast, but I made a lot of money off Runescape.  And then when Runescape had some changes . . . [to] the PVP area where you kill people to get their stuff it was like, you know, *this is no longer fun* . . . ."[5]

169.    Despite these endeavors, Bowsky says that by 2016 at the age of 24, he was living out of his car.  But then he joined the South Florida insurance industry.

---

[4]       *See* Fargo Talks Podcast, *Dropout to Multi-Millionaire by 31* (July 28, 2024); The Affiliate Marketing Show No. 4, *ACA Pay Per Call, Legal Risks of Paid Reviews, Trade Shows (Featuring Brandon Bowsky – CEO of Minerva Marketing)* (Jan. 6, 2024); Joe Naz Podcast No. 31, *From Dropout to Multi-Millionaire Genius: Brandon Bowsky's Wild Journey in Life & Marketing!* (Jan. 3, 2024).

[5]       Joe Naz Podcast No. 31, *From Dropout to Multi-Millionaire Genius: Brandon Bowsky's Wild Journey in Life & Marketing!* at 14:30 (Jan. 3, 2024).

170.    Just eight years later, he claims to have made $100 million, purchased homes in Ft. Lauderdale, Las Vegas, California and Hawaii, purchased 30 supercars and bought $1 million in clothes.

171.    Starting as an agent, he became a trainer and consultant and then an owner at some of South Florida's "mini-med" boiler rooms.  For at least the past decade or more, South Florida has been ground zero for multiple, nationwide health insurance scams.  These scams emanate from dozens of call centers, akin to the boiler rooms of the 1980s, clustered mostly in office parks around suburbs like Sunrise, Miramar, Coral Springs and Boca Raton.

172.    The most recent wave of scams occurred in the mid-2010s, when South Florida became the epicenter of the massive mini-med scheme.  The scheme was as simple as it was brazen: agencies in South Florida marketed "limited benefit indemnity plans" (or "mini-meds") to consumers around the country as major medical insurance plans.  Mini-meds are nothing close to major medical insurance, and the scam left hundreds of thousands of Americans uninsured despite paying hundreds of dollars in monthly premiums.  In late 2018, the FTC raided one of the largest of these boiler-room insurance agencies, Simple Health Plans LLC ("Simple Health").  Judge Darrin Gayles appointed Michael Goldberg as receiver, and Goldberg shut down the operation. *See FTC v. Simple Health Plans, LLC*, No. 19-10840 (S.D. Fla.).

173.    Simple Health's CEO, Steven Dorfman, now serves a 25-year prison sentence.  And the publicly traded company that financed Simple Health's operations, Health Insurance Innovations, Inc. (rebranded as "Benefytt Technologies"), paid $100 million to the FTC and $40 million to two classes of consumer victims.

174.    Simple Health had many downline agencies marketing mini-meds as "Obamacare" that shuttered quickly when Simple Health fell.  Bowsky operated one called America's Health

Advisors Insurance Agency LLC.  Herman operated another called Health Benefits Group LLC. Somewhere along the way, the two became friends.

175.    In 2019, looking to get into something new, Bowsky started a lead generation company, Minerva.  Originally created to sell his call center's excess leads to friends, Minerva eventually grew to sell leads to companies throughout the insurance industry, including ACA leads to TrueCoverage.

176.    By 2021, Minerva remained mostly a "side hustle."  Bowsky primarily operated a Medicare sales agency called Medigap Direct, which Bowsky co-owned with another of Herman's close business associates, Adam Awany.  With Herman's help, Bowsky and Awany sold that company in 2021 to Bain Capital.  The Certificate of Interested Persons filed by Enhance Health and Herman in this case lists Medigap Direct.  [D.E. 60].  Thus, Bowsky's former company appears to have a financial stake in this outcome of this lawsuit.

177.    In late 2021, when the government announced the new year-round SEP set to start in March 2022, Bowsky saw the opportunity.  Familiar with the high-volume call center business model for selling insurance products, Bowsky conceived of a high-volume lead generation business model to sell leads to ACA call centers.

178.    Indeed, Bowsky acknowledges that in the past few years it has been his goal to create an industry of ACA agencies to supply with leads.  He has consulted with numerous new and former agent colleagues and provided them with the model for setting up agencies to buy Minerva's leads and sell ACA plans.  This has earned him the moniker "King of ACA."

179.    In a separate lawsuit, Bowsky claims to be "the first to suggest to third party agencies that they consider entering into the ACA space to allow Americans to obtain health

CASE NO. 0:24-cv-60591-DAMIAN/Valle

insurance at low to no cost[,] and provided guidance to agencies on how to implement the 'call center model' for selling ACA health insurance policies."

180.   In a podcast, Bowsky said he did not charge agents for his guidance on how to set up their own ACA enrollment centers, knowing he would make money selling them leads:

> I kinda guided everyone for free and everyone thought I was crazy and was like "you should be charging for this" and I'm like, "Oh, I am, on the lead side." And so that's kinda how ACA became really big. I started getting more buyers into it. Everybody thought I was crazy for years, they were like "ACA, is that even a thing?"[6]

181.   Bowsky said that once he showed people the profit potential, they signed on: "A lot of people couldn't figure out how to make it profitable. So once we did that, and we convinced people that we could make a lot of money doing this, they were like, 'Oh, yeah, let's do it.'"[7]

**E.**     **Bowsky and Minerva Sell Leads to Agencies Based on Misleading "Cash Card" Ads**

182.   On its face, Bowsky's attempt to expand and grow a profitable private market for enrolling consumers into ACA plans seems a noble one. But as with many of Bowsky's past endeavors, there was a scam at its core.

183.   Minerva created and purchased leads generated by advertisements falsely representing to consumers that they could receive cash benefits, such as cash cards or stimulus checks ("stimmys"), to cover household expenses like groceries, medical bills and rent. Minerva then sold these leads to agencies like TrueCoverage, Enhance Health, Protect Health, NHA and the other downlines cultivated by Bowsky. Just a few examples of the types of advertisements used to generate these leads include:

---

[6]   The Affiliate Marketing Show No. 4, *ACA Pay Per Call, Legal Risks of Paid Reviews, Trade Shows (Featuring Brandon Bowsky – CEO of Minerva Marketing)* at 11:30 (Jan. 6, 2024).

[7]   Joe Naz Podcast No. 31 at 1:28:05.



184.    When customers clicked these advertisements or text messages, they were asked a couple of short questions, including whether the consumer earned less than a certain amount per year and whether they were on Medicaid.  While these questions were made to appear to relate to the consumer's qualifications for a cash benefit, these questions were actually posed to determine whether the consumer qualified for APTCs to pay for health insurance.  If the consumer's answers came close to qualifying him or her for APTCs, that consumer was brought to a landing page that told them they were "prequalified."   The landing pages continued to use language that misled consumers to believe they were applying for cash benefits that could be used for daily expenses:




CASE NO. 0:24-cv-60591-DAMIAN/Valle

185.    The landing pages contained toll-free phone numbers for consumers to call.  These phone numbers led to the agents of Enhance Health, TrueCoverage and/or their downlines.  The calls were routed through Minerva's routing software, Retreaver, which also recorded the confidential calls without Consumer Class Plaintiffs' and class members' consent.

186.    Minerva generated leads by creating its own advertisements and posting them on social media like Facebook, or by sending text messages directly to consumers.  Minerva also purchased leads from "affiliated" lead generators who created the advertisements.  Bowsky explained:

> So I'll run an ad, somebody will click that ad, or a partner will run an ad, an affiliate, somebody will click that ad, they'll go to a page, they'll fill out a brief quiz of a few questions, they'll be given a number to call based on the inputs.  So let's say they're not an ACA candidate, we still have stuff for them.  There's probably stuff that that demographic will be eligible for.  Let's say they are a candidate, here's a phone number to call.  So they call that phone number, they speak to an agent, six minutes later, 10 minutes later, 12 minutes later, whatever the situation, they have insurance.  And that starts effective the next month."[8]

187.    The advertisements created by Minerva were misleading cash card ads.  When one new buyer purchased some of Minerva's leads and began receiving calls from consumers, that agency quickly realized that the consumers were calling for cash benefits, not health insurance. The agency complained to Minerva's marketing director, Drake Lerma.  Lerma acknowledged in a text that Minerva created the advertisements generating the leads.  He told the agency it should nonetheless just enroll the consumers calling for cash cards — like other agencies were doing.  In other words, to quit complaining: "[T]he calls you're getting are ***internally generated*** and have a raw to sale rate of about 34%.  [W]e'll audit the calls of course, ***but agents are usually able to flip these consumers pretty easily and get them on a no cost plan***." (emphasis added).  (Incidentally,

---

[8]     Joe Naz Podcast No. 31 at 1:27:15.

Lerma's reference to auditing the calls confirms that Minerva was recording consumer calls in violation of ACA regulatory security and privacy policies).

188.    Minerva, Bowsky and Lerma's involvement in the cash card scheme, and their mission to teach agencies how to embrace and convert the cash card leads is evident in another group text exchange in 2023 between Bowsky, Lerma and other Minerva employees, including Matthew Melzer.   A potential buyer expressed interest in buying leads from Minerva but told Minerva he did not want cash card ads: "I don't want to take any social where the consumer is calling to get money from the government. I've been seeing that and canceling campaigns as soon as I hear it.  So let me know what you're working with and I can get this set up."

189.    Within Minerva's internal group chat, Melzer suggested that the buyer needed to be "schooled," and that without cash card leads, the buyer would not survive in the ACA space. Melzer announced that all consumers believe they're getting government money, then "laughed" at the concept of cash taking the form of a government subsidy:




CASE NO. 0:24-cv-60591-DAMIAN/Valle

190.    Underscoring the fraudulent leads' direct impact on causation, Lerma adds that if you ran only clean adds "no calls would come."  Bowsky offers to get on a call with the potential buyer, who he calls "retarded":



CASE NO. 0:24-cv-60591-DAMIAN/Valle

191.    Another Minerva group text exchange in 2023 shows i) that Minerva was selling fraudulent leads, ii) that those leads had a (favorable) 33 percent enrollment rate, iii) that Minerva had an "onboarding process" that trained its buyers "how to handle" those leads, and iv) that Bowsky                                    approved         of         all         of         it:

 

192.    Furthermore, one former Minerva employee stated that all of Minerva's leads stemmed from fraudulent cash card advertisements: "Over the course of my employment there, I learned that Minerva was selling leads that were generated from advertisements promising cash cards, subsidies, grocery and gas money and the like.  *I am not aware of any leads Minerva sold to its clients that did not stem from these advertisements*." (emphasis added).

193.    There is no question that Minerva sold fraudulent leads to TrueCoverage, Enhance Health and their downlines.  A former TrueCoverage agent stated that "Many of TrueCoverage's leads came from Minerva.  The word 'Minerva' would appear on our desktop when we received a call.  All of the Minerva calls were what we called 'cash card calls.'"

194.    Another former agent who worked at a call center believed to be a downline of Enhance Health stated that Minerva's name would show up on his computer monitor as the lead generator of calls that came in:

> [V]irtually all consumers who called were responding to an online advertisement and expected a cash card or cash subsidy. . . .  The TLD system, which was displayed on my monitor, identified the source of the online lead, and for each inbound call that I remember, Minerva Marketing was listed as the lead generator of the online ad.

195.    Another former agent who worked at Defendant NHA from July 2023 to April 2024 stated that about 95% of all inbound calls that came into her call center were based on the fraudulent cash card ads, and that "MNV" would appear on her monitor for a great many of the incoming calls.

**F.    TrueCoverage Buys Fraudulently Generated Leads From Minerva, and Also Creates Its Own**

196.    One of the first agencies that used Bowsky's model was TrueCoverage.  Of the Defendants, TrueCoverage has been in the ACA space the longest.  Since at least 2019, TrueCoverage has acted as an agency and FMO.

197.    The key to TrueCoverage's ability to enroll consumers into ACA plans was Benefitalign, the proprietary Phase 3 EDE platform that is fully integrated into CMS's Marketplace database.  Benefitalign provides TrueCoverage with access to virtually the entire Marketplace database, including highly confidential information about consumers such as social security numbers and confidential health and medical information.

198.    Benefitalign was developed by TrueCoverage's affiliate Speridian Technologies. Both TrueCoverage and Speridian Technologies are subsidiaries of Speridian Global Holdings LLC ("Speridian Global"), which is owned and controlled by Speridian Global's two managers, Garish Panicker and Hari Pillai.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

199.    In 2022, Speridian Technologies also developed a second Phase 3 EDE platform called Inshura, which was marketed primarily to third-party agencies, including but not limited to TrueCoverage's downlines, including Defendant Protect Health.   Inshura is a d/b/a of TrueCoverage.   TrueCoverage required its downlines to use its proprietary EDE platform(s), Inshura and/or Benefitalign, as their ACA enrollment platforms.   Inshura is owned by TrueCoverage.

200.    A diagram illustrating this general structure is below:



201.    Presented with this new opportunity, in early 2022 TrueCoverage and its downlines began to expand their operations to year-round levels.  TrueCoverage,  directed by Goldfuss, grew its sales force and South Florida became the nerve center that guided TrueCoverage's and ultimately Enhance Health's high volume ACA call center sales model.

202.    Even before March 2022, TrueCoverage had a marketing department that targeted consumers in the market for ACA plans through social media advertising, on platforms like Facebook and YouTube.  To execute its online marketing strategy, TrueCoverage both created and purchased leads.  For the former, it created advertisements and placed them with social media outlets, which would drive consumers to TrueCoverage's agents.  For the latter, it hired third-party

lead generation firms like Minerva to drive call volume using advertisements that were either created by the lead generation firms or from a marketer (or "publisher") hired by the lead generation firms.  When the new rules went into effect, TrueCoverage continued to buy leads from Minerva and Bowsky.

203.    After March 2022, TrueCoverage noticed that Minerva's leads drove more ACA enrollments than others: leads derived from advertisements that promised something for free, like cash.  TrueCoverage also noticed that many of the consumers were calling for cash rewards.

204.    So like Minerva, TrueCoverage's ads took the "future cash reward card" offers made by some carriers (to encourage insureds to earn cash rewards by taking proactive wellness steps over time, such as annual checkups) and made them seem like free cash.  Offers of a cash reward card of "up to $500" became a "$500 cash card" in TrueCoverage's advertisements. TrueCoverage also began using advertisements that conflated the subsidy paid by the federal government to insurance carriers and mispresented it as being paid directly to the consumer in cash or a cash card.

**G.    TrueCoverage Opens Overseas Operations to Create and Distribute Misleading Ads**

205.    Many of the fraudulent ads generating TrueCoverage's in-house leads emanated from TrueCoverage's overseas operations.  To save money on buying leads from third-party vendors such as Minerva, in late 2022 TrueCoverage and Speridian Technologies created a marketing group in Bangalore, India, to create and disseminate "free cash card" advertisements. Those ads were posted on social media and generated for use by TrueCoverage and its downlines.

206.    Some of the back office operations of Speridian Technologies, TrueCoverage, Benefitalign and Inshura, such as payroll, occurs in India.  In addition to their marketing group in Bangalore, TrueCoverage and Speridian Technologies operated call centers overseas in Pakistan

and Central America.  To save money on buying leads from third-party vendors, Bangalore created and disseminated deceptive "free cash card" advertisements and posted them on social media to generate leads in the United States for TrueCoverage and its downlines.  Workers at call centers in Pakistan or Central America contacted U.S. consumers and "warm-transferred" them to agents at TrueCoverage's U.S. call centers.  In the insurance sales industry, these individuals are referred to as "fronters."  Finally, TrueCoverage and/or Speridian Technologies extracted U.S. consumers' information, including PII, from the CMS Marketplace database using Speridian Technologies' EDE platform(s), Benefitalign and/Inshura.  The data was sent overseas to TrueCoverage and Speridian's operations in India and Pakistan to coordinate marketing campaigns targeting U.S. consumers.  (Notably, Speridian Technologies provides cybersecurity to federal and state entities and agencies in the U.S.).

207.    The success of the fraudulently sourced leads allowed TrueCoverage to expand its downline network. TrueCoverage advanced commissions to its downline agencies in return for payments from future commissions. In the past, the ACA industry had been too volatile to support longer-term advance commission financing because enrollments generally were limited to just three months, commissions were low and volumes of enrollments too small to support large call center operations.  The year-round SEP for low-income Americans and the explosion of fraudulent leads changed the advance commission financing landscape.

## H.    Enhance Health and Bain Insurance Join the Enterprise

208.    One of TrueCoverage's downlines, Ensure Health Group Corp. ("Ensure Health"), was operated by an agent named Barachy Lucien.  Lucien's connection to an old friend, Matt Herman, led to a new stage of exponential growth that would link Enhance Health, Bain Insurance and a quickly developing network of Enhance Health downlines to the Enterprise.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

209.     Herman had come up through the mini-med industry and made millions running a downline of Simple Health.  After the FTC shut down Simple Health, Herman pursued other endeavors — including a hip-hop label and a nightclub on Brickell Avenue — but by 2021 he remained in the insurance industry, as president of Corvantis, a company that provided back-end services to other insurance agencies in the mini-med space.  That is when he was recruited by Bain Insurance to lead them into the Medicare Advantage industry, an industry in which Herman had little previous experience.

210.     The Bain Insurance opportunity stemmed in part from Herman's relationship with Michael Lagalante.  Lagalante had previously worked at Federal Life Insurance Co., which provided life insurance products often packaged with the mini-med plans that Simple Health and Herman's company Health Insurance Group had marketed to consumers as Obamacare.  Lagalante joined Bain Insurance in August 2021.  Flush with investor capital to employ, Bain Insurance sought someone to lead a new retail sales agency for Medicare products.  Lagalante suggested Herman, who had recently helped facilitate Bain's purchase of Medigap from his friends Bowsky and Awany.

211.     On November 9, 2021, Bain Insurance launched Enhance Health with $150 million in capital.  Bain Insurance appointed Herman as Enhance Health's CEO.  So that Herman could devote his time to Enhance Health, Bain Insurance also bought Herman's company Corvantis for about $25 million.

212.     Enhance Health's foray into Medicare started with nearly 600 agents in its call center.  But things did not begin well.  Enhance Health struggled to sell Medicare products, and the company was losing hundreds of thousands of dollars per month.  Quickly, Bain Insurance hired and inserted a new chief revenue officer, William Luckert, to help turn the business around.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Bain Insurance appointed an executive in Boston to hold weekly meetings at Enhance Health's Sunrise offices to monitor Herman and Enhance Health.  A power struggle ensued between Herman and Luckert, and Herman found himself at risk of losing his job.

213.    That's when Barachy Lucien gave Herman some crucial insight.  Lucien and Herman go way back.  Lucien had started as a sales agent and team leader for one of Herman's companies and, by 2014, had an agency of his own.  In 2017, Herman and Lucien, who performs as the hip-hop artist "Barachi," started a company called Southern Music and Entertainment.  In 2020, they started a record label called Done Deal Records.  In 2023, Barachi collaborated with Herman, whose musical alter ego is "MoneyMatt305," on a hip-hop song called "Hate Us":



214.    By mid-2022, Lucien had one of TrueCoverage's most successful downlines, Ensure Health.  Lucien explained to Herman that with the new year-round SEP, the sale of ACA plans was a viable business for a high volume ACA call center model.

215.    Herman was intrigued.  For two weeks in July 2022, Herman brought 15 of Enhance Health's worst-performing agents to Lucien's call center for an ACA beta-test.  Lucien and his agency's other trainers taught these agents how to enroll consumers in ACA plans.  According to witnesses, Lucien's training instructed the agents with shady enrollment techniques.  For example, one witness has declared that:

We all went to Barachy Lucien's call center, where Lucien, his brother and a man named [Michael] Cugini trained everyone on the sale of ACA policies. Other trainers were Ervence Pierre, Eric Beecham and a person named Carl. Lucien's training instructed the agents to maximize enrollments through questionable means. For example, the ACA requires all family members' incomes to count toward eligibility requirements. If a family's collective income was too high to qualify, agents were trained to split family members into separate applications where each application contained a qualifying income. Agents were also instructed to avoid Platinum plans because it would be easier to enroll them in Bronze and [Silver] plans. Agents were instructed to coax nonqualifying callers into the qualifying range of incomes.

216. Herman came in frequently to monitor this training and the beta test's performance. Immediately and rather dramatically, these agents who had been unable to sell Medicare products were each selling seven to 10 ACA plans each day.

217. Based on these results, Bain Insurance and Herman quickly pivoted Enhance Health's resources away from Medicare toward the ACA space so that they could sell during the upcoming 2022 OEP, which was set to begin on November 1, 2022.

218. To ramp up as quickly as possible, Herman and TrueCoverage reached an agreement for Enhance Health to become a downline of TrueCoverage so that Enhance Health could quickly get appointed with health insurance carriers while also getting access to Speridian Technologies' Phase 3 EDE platform, Benefitalign. Access to CMS's Marketplace data and EDE enrollment through Benefitalign would accommodate Enhance Health's high-volume ACA business model and allow enrollments to grow quickly. As a thank you, Herman hired Lucien as an agent trainer and paid him $1,000 per training, an astronomical amount that can fairly be characterized as a kickback.

219. Almost immediately, Enhance Health became TrueCoverage's largest downline and started creating its own downline network of agencies run by Herman's friends, family and former associates. Bain Insurance saw the dramatic turnaround in Enhance Health's bottom line.

It phased out Enhance Health's Medicare call center, which was run by Herman's rival Luckert, and turned Enhance Health's full attention to ACA.

220.    Herman called on another friend, Brandon Bowsky, to take things to the next level. In the summer of 2022, fresh off of the successful beta-test at Lucien's office, Herman approached Bowsky about buying Minerva's leads.  At that time, TrueCoverage and its downlines were already purchasing leads from Bowsky's marketing firm, Minerva.  Bowsky claims that he (presumably with Herman) leveraged his past relationship with Bain and "advised them on a transition of the [Medicare] business into the ACA health insurance space."  Bain Insurance agreed, and Minerva essentially became Enhance Health's exclusive lead provider.

221.    ACA plan enrollments grew exponentially at that point.  Soon, TrueCoverage and Enhance Health were expanding rapidly, opening call centers, creating downlines and selling thousands of ACA plans daily.

222.    Bowsky's original vision had been realized.  To date, Minerva has sold tens and perhaps hundreds of millions of dollars in leads to agencies selling ACA plans, including TrueCoverage and Enhance Health.

## I.    TrueCoverage Knew About the Fraudulent Ads and Used the Volume of Leads Generated From Them to Recruit and Incentivize New Agents

223.    One former human resources manager states that while working at TrueCoverage from March 2023 to April 2024, consumers called in expecting the cash cards.  He affirms that TrueCoverage's executives knew exactly what was going on.  Rather than stop the practice, they promoted it:

> TrueCoverage and Speridian executives and management, including but not limited to Garish Panicker (President and Owner), Ashwini Despende (CEO), K.P. Hari (CFO), Matthew Goldfuss (National Sales Director), John Runkel (Sr. Director of Quality Assurance), Season Davis (Director of HR) knew that consumers were calling in response to the false advertisements promising cash

cards and implemented policies and practices that pressured and incentivized call center agents to enroll consumers into ACA plans based on the fraudulent ads.

224.    Goldfuss led TrueCoverage's fraudulent enrollment efforts.  According to the former H.R. manager, Goldfuss "was in charge of purchasing leads and drafting sales scripts and he knew that TrueCoverage was purchasing leads based on fraudulent advertisements and relied on those leads to drive consumers to call into our call centers.  The sales scripts were designed to be deceptive about the cash payouts being promised in the ads."

225.    Another former employee, Heather Cattaneo, worked in the Deerfield Beach office.  She states that "TrueCoverage and Speridian executives and management, including Matthew Goldfuss, National Sales Director, John Runkel, Sr. Director of Quality Assurance, and Gabriel Harrison, Regional Director, knew that consumers were calling in response to the false advertisements promising cash cards and they pressured agents to use them to enroll consumers into ACA plans."

226.    All Deerfield Beach agents participated in an officewide Microsoft Teams group chat.  On the chat, agents often complained about the cash card calls.  According to Cattaneo, Goldfuss and Harrison would tell agents "to stop complaining and they threatened to pull us off the sales floor."  For example, On October 6, 2023, Harrison scolded agents for complaining about the prevalence of ads falsely promising the cash cards.  He wrote, "NEXT PERSON WHO SAYS SOMETHING NEGATIVE IS OFF THE PHONES[.]"

227.    Goldfuss chimed in, adding that "If you have issues with it, speak to Gabe, we don't need toxicity spread to everyone," prompting Harrison to write "BUYERS ARE LIARS" and "If YOU dont WANT UNLIMITED FREE LEADS THEN COME SEE ME."

228.    On November 3, 2023, TrueCoverage's Senior Director of Quality Assurance, John Runkel, sent an email instructing agents not to bring up the cash cards, and telling them that they

CASE NO. 0:24-cv-60591-DAMIAN/Valle

"must be vague and <u>cannot give any specifics</u> about any rewards programs, under any circumstances":

**Cash Card Reminder**

John Runkel <john.runkel@speridian.com>
Fri 11/3/2023 1:16 PM
<u>Cash Card Reminder</u>

The customer must bring up the Cash Card to you first before you can engage in any general information.

You must be vague and <u>cannot give any specifics</u>, about any rewards program, under any circumstances.

Despite what ads are promoting, we must always encourage the customer to contact the insurance carrier for additional information about the **possibility** of additional benefits.

**John Runkel | Sr. Director Quality Assurance**
TrueCoverage LLC | 2400 Louisiana Blvd SE, Bldg. 3, Albuquerque, NM 87110
O: (505) 591-1327 |
Email: john.runkel@speridian.com | www.truecoverage.com

**truecoverage**
Insurance Marketplace

229.    If an agent told a consumer that the cash cards did not exist, that agent could be reprimanded by TrueCoverage's management for breaching company policy.   On January 26, 2024, Manager Kevin Hale overheard Cattaneo telling a consumer that they would not be receiving a cash card.  Hale told Cattaneo that he never wanted to hear her say that to a customer again.  Hale told her "sometimes you have to be the bad guy."  Cattaneo complained to Harrison, who told her to go to the Michelle Wilson in human resources, but nothing was done.

230.    TrueCoverage praised agents who followed the script and remained vague about the existence of the cash cards.  On January 30, 2024, Hale sent the following message to a group chat of Deerfield Beach agents, telling them that they should enroll consumers who ask "Where's my money?" and refrain from telling consumers they won't get a cash reward:

I've got agents like Adolfo with 20 deals today.  So if you have 5 or less, there actually may be some shame in your game. . . . <u>As always, [the] Where's my money? Folks should be sales.  I heard someone telling the client they don't get a check, WRONG! and the call went South from there. Read your rebuttals.</u>

(emphasis added).

231.    Goldfuss and Harrison instructed agents to enroll consumers in ACA plans even if they already had health insurance, regardless of whether it was appropriate for their needs.  For example, on November 20, 2023, Goldfuss sent a message on the group chat instructing agents that "For right now, <u>WE DO WANT YOU TO ENROLL EVERYONE</u> that comes your way. . . . <u>SO ENROLL THEM ALL!</u>"

232.    On December 15, 2023, Harrison sent an email to the agents stating, "Every call that comes in that line you are to enroll them[.]"

233.    Two days prior, on December 13, 2023, Runkel had sent an email to TrueCoverage's agents from his Speridian Technologies email address acknowledging that *"[w]e are misquoting subsidies and additional benefits. . . .* **We have been quoting to consumers that they are going to receive a 'subsidy card' in the mail to help pay for groceries, bills, rent and expenses."** (emphasis added).  Runkel explained that the subsidies were not cash benefits.  Rather, they were health insurance premium payments made directly from the government to the insurance carrier for the consumer's benefit.  Runkel also explained that while some carriers provided cash rewards (such as a gym membership or "$10 Subway card") for healthy activities, TrueCoverage had no authority to speak about additional benefits.  Finally, Runkel told TrueCoverage's agents that **"[t]he only thing we can do is follow our script and be vague."** (emphasis added).

234.    Runkel's email caused a stir among TrueCoverage's agents, some of whom were worried that they may not be paid commissions on their enrollments.  Harrison responded to

reassure his agents by essentially telling them to ignore Runkel's email because it was meant for other TrueCoverage call centers, not Deerfield Beach:

> That email was mainly directed to other centers not ours, we are the **TOP PRODUCERS**, if you are putting in your numbers then losing 1 sale or even 3 by the end of the week is not going to Affect you!!  Get with the Picture guys, everything is great and you all have been paid very well, plus we feed you, plus we give you Bonus for just doing your job, we give out cash spiffs to push you to hit numbers for your own Gain, we give out Prizes for those of you who Put in that extra work to be successful, Guys we pay out Huge checks and everyone knows it, why would we as a company  Harm your pay?  We are here to Help you all Become Fat and Happy With a Wheel Borrow full of **CASH**!

> Guys don't get stuck in your head, lets push forward and continue the success we have started and make next year an awesome year with a Big book of Business!

235.    Ultimately, consumer complaints to CMS brought regulatory scrutiny.  In a January 11, 2024, email, Goldfuss instructed agents not to speak with any government agent or CMS: "If you receive an email from CMS or a Department of Insurance from any particular state, **DO NOT RESPOND!**"

236.    In February 2024, TrueCoverage learned that the undersigned counsel had issued a press release asking the public for information about TrueCoverage's practices.  TrueCoverage turned off the flow of fraudulently generated leads coming from to its call centers.  On February 26, 2024, Goldfuss told agents that TrueCoverage had stopped using the fraudulent ads.  He acknowledged that the ads were deceptive and had been the cause of the company's high call volume:

> Good early evening team,

> Many of you are most likely wondering why call volume has dropped off over the past few weeks and especially so the past few days.  We have made a decision to have 0 tolerance policy with companies that are sending us ads that are either outright deceptive or could be misconstrued as misleading.  We have informed our lead partners of this policy and as a result this is why you are seeing call volumes decline.  The call volume will pick back up but before we begin that process we are committed to rooting out the bad ads and call volumes will most likely remain weak for most likely the next couple of weeks.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

There are other calls centers that don't care if they run bad ads and they are willing to take that risk. <u>If TrueCoverage wanted to we could easily open back up the spigots and have a lot more call volume but we are in this for the long-term.  We would rather do things the right way.</u>

We appreciate everyone's patience on the matter.

237.    Cattaneo confirms that call volume dropped dramatically in February 2024.  In January 2024, she received approximately 20 to 30 calls per day.  By the end of February 2024, she received only eight to 10 calls daily.

238.    But TrueCoverage "opened back up the spigots" in March 2024.  On March 5, 2024, a consumer sent Cattaneo a copy of the false advertisement that led that consumer to call TrueCoverage that day:



239.    Other agents also corroborated TrueCoverage's use of fraudulently generated leads. One said, "I would estimate that 99% of my callers were responding to an online advertisement and expected a cash card or other cash subsidy."  He also confirmed using the misleading rebuttal script: "We would tell the callers that the packet would come in the mail 7-10 business days, and if they had any questions they could reach out to the carrier."

240.     TrueCoverage's success in driving enrollments from fraudulent advertising helped the company recruit agents.  The former H.R. manager stated that he "was instructed to tell new hires that one of the benefits of working at TrueCoverage was they did not have to cold call consumers because there was an unlimited supply of consumers calling in and as an agent, they could start their careers in sales making large amounts in commissions."  He told new agents that "given our technology and call volumes, sales would be easy and more in line with 'order taking' as opposed to selling ACA plans."

241.     TrueCoverage agents who leaned into the scheme did very well.  TrueCoverage's highest producing agents were in the company's Florida call centers and made approximately $20,000 to $24,000 in commissions each month.  TrueCoverage used these figures in its recruitment pitch to new agents.

242.     TrueCoverage's Florida call centers collectively had the most agents in the company.  The Deerfield Beach call center was the largest, if not one of the largest TrueCoverage call centers.  The agents who worked in Florida received heavily incentivized compensation and commission schedules that were highest in the company.

243.     Still, the pressure to mislead consumers hit some agents hard.  The former H.R. manager stated that many enrollment agents complained about what TrueCoverage asked them to do:

> A consistent complaint that I received from sales agents was that they did not feel comfortable having to mislead consumers.  I also saw similar complaints on occasion on the Microsoft Teams group chats for the New Mexico call center.  Each call center has its own Microsoft Teams chat groups.  Over two dozen different sales agents came to me with these complaints and showed me the false advertisements that consumers who called in were showing them.  In or around November - December 2023, two different agents quit because they did not feel comfortable lying to consumers.  I documented their complaints in the employment files and specifically noted it in their exit interviews.  I also notified my supervisor, Season Davis, the human resources director for TrueCoverage, and she did nothing.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**J.**       **TrueCoverage's Downlines, Including Protect Health, Also Use Fraudulent Leads**

244.     Agents who worked at TrueCoverage downlines also had similar stories.   One former Protect Health agent stated that the "vast majority of calls that I received were from consumers that were expecting to receive cash cards promising them thousands of dollars per month that could be used for groceries, rent, etc."  He said that "When consumers were transferred to live agents like me, we were required by Protect Health in a sales script to first ask whether they were calling in about the [$6,400] benefit."

245.     Another former Protect Health agent explained her experience at Protect Health and stated that almost all consumers calling into Protect Health sought cash cards:

> The company used a dialing system called Convoso and a CRM/enrollment platform called Inshura. When a warm transfer came to me from a fronter, my screen would state "ACA DMS."  When a consumer called in directly in response an online advertisement, my screen would identify the phone number of the consumer.  Regardless of whether the calls that I fielded were from fronters or inbound calls from consumers responding to an online ad, virtually every consumer was expecting to receive a cash card worth thousands of dollars a month that they could use to pay for personal expenses such as groceries, rent, etc.

> Based on my experience fielding these calls, the consumers were misled by the fronters and online advertisements because the cash card did not exist, and the money being promised was actually a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance.  Consumers who called thought that they were prequalified for these benefits, which was not true.

> [Protect Health] knew that these consumers were misled by the fronters and false advertisements. We were instructed to lie to these consumers and lead them to believe that the insurance carrier would send them the cash card after they enrolled in the health insurance plan. We were also instructed to tell customers that they would need to call the phone number on the back of their health insurance card to receive the cash card.

246.     Protect Health used TrueCoverage's EDE platform, Inshura, and TrueCoverage's proprietary dialing system MME, which was integrated into Inshura as well as Benefitalign.  MME is a telephonic dialing/CRM system that was designed by Speridian Technologies.  MME allows

for inbound and outbound text messaging and calls to and from consumers.  It was used by TrueCoverage and its downlines to market and communicate with consumers.

247.   TrueCoverage also trained Protect Health agents.  For example, an agent who worked at both TrueCoverage and Protect Health corroborates Cattaneo's experience at TrueCoverage.  The agent was terminated by TrueCoverage on or about February 1, 2024.  But a few days later. TrueCoverage referred him to Protect Health, which hired him.  When he started at Protect Health, the agent's initial training was conducted by Harrison of TrueCoverage.  The agent stated that "[b]ecause I had previously complained to TrueCoverage about its deceptive sales practices and TrueCoverage was clearly controlling [Protect Health]'s sales practices, I was concerned that [Protect Health] would be engaging in the same type of misconduct."  During the training session, the agent "posted a question on the Microsoft Teams Q&A chat asking whether Protect Health going to be using the same type of misleading advertisements to lure in customers. Gabriel Harrison did not respond.

## K.   Enhance Health Also Used Leads From Cash Card Ads to Mislead Consumers

248.   Like the management and employees at TrueCoverage and its downlines, management and employees at Enhance Health and its downlines knew that the calls they were receiving emanated from leads generated by fraudulent ads.  One former Enhance Health agent stated that "at least 9 out of 10" calls were from consumers "expecting to receive a cash card that promised to pay them thousands of dollars per month that could be used to pay for groceries, rent, etc."

249.   Another Enhance Health agent shared a similar experience fielding "cash card calls."  The agent and others in the office knew "these advertisements were false and misleading

because the money being promised was actually a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance."

250.    Enhance Health actively sought out leads generated from cash card ads.  One lead generation vendor sold leads to Enhance Health in the second half of 2023.  Enhance Health's marketing department, including Mark Schuler, complained often that the vendor's leads did not generate enrollments because they were not generated by cash card ads.

**L.    <u>Enhance Health Controlled Its Downlines, Including NHA</u>**

251.    Enhance Health controlled its downlines, which engaged in the same misconduct. A former agent of Defendant NHA recalled that about 95 percent of inbound calls came from consumers seeking cash cards for groceries, rent or gas.

252.    Enhance Health monitored and directed the enrollment efforts of NHA, which operated out of the building next door to Enhance Health's in Sunrise.  NHA's manager, Ervence Pierre, sent daily screenshots to a group text of NHA agents relaying Enhance Health's instructions for the day.  One of those screenshots depicted a text sent to Pierre from Juan Collado of Enhance Health.  Collado's text shows Enhance Health was monitoring NHA's enrollment calls, criticizing NHA's agent for losing a sale by not "explain[ing] that if you approved for a health plan you will then also get a spending card from the carrier for everyday needs yes sir":

CASE NO. 0:24-cv-60591-DAMIAN/Valle



253.     Enhance Health also instructed its downlines to use the company's scripts.   The former agent stated:

> The sales scripts that we were required to follow encouraged us to be vague about the cash card and we were instructed to tell customers that they would need to contact the carrier and ask them about the reward programs they offer.

254.     Enhance Health allowed NHA to hold itself out to consumers as being Enhance Health.   Former NHA agents recalled being required to answer inbound calls "Good morning. I am a licensed insurance agent . . . with Enhance Health enrollment center."

255.     Enhance Health even dictated which carriers and plans its downlines had to sell before ever speaking with consumers, likely so that Enhance would hit enrollment bonuses with certain carriers.   Examples of Enhance Health's placement instructions are found in the following

texts.  The top text also shows that Matt Herman was monitoring these downline enrollments "very closely":





256.    For consumers, this strategy meant they would be placed in predetermined plans without regard for whether those plans best suited them.  These conflicts of interest were not disclosed to consumers during the calls.

257.    Enhance Health also controlled which leads NHA received from lead generators like Minerva.

**M.      TrueCoverage, Enhance Health and the Downlines Use Uniform Scripts to Support the Misleading Advertisements**

258.    Because consumers thought they were calling in for free cash cards and not health insurance, TrueCoverage, Enhance Health and their downlines trained agents to use scripts designed to deflect questions about the cash cards.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

1.     **TrueCoverage pressured agents to use uniform scripts to lie to consumers**

259.     TrueCoverage's script was created to work seamlessly with the landing page from a misleading advertisement.  It begins with a question that references the landing page: "Fantastic, and you saw that prequalified result that led you to us?  Great!"  From there, the script asks just a few more simple questions designed to verify the consumer's qualifications for an ACA insurance plan: current healthcare coverage, name, date of birth, zip code, marital status, dependents and "anticipated" income.

260.     If the consumer referenced the cash benefits he or she had seen in the advertisement and landing page, TrueCoverage provided its agents with another script — a rebuttal script — to guide them.  The rebuttal script instructed the agent to quickly deflect the consumer's question about a cash card.  For example:

**Online Ad Rebuttals**
**REBUTTALS TO CASH CARDS AND $$ QUESTION**
**They say—I am calling about the cash card?**
**Rebuttal**: Yes, you may qualify for additional benefits with eligible plans.  Let us start the qualification process to find the plan that fits your needs, what is your zip code?

261.     Another purpose for the scripts was to quickly enroll consumers into ACA health insurance in less than 10 minutes, an extremely fast pace.  Because ACA plans pay smaller commissions, volume was key to the success of the business model.

262.     TrueCoverage told its agents that failure to follow the scripts was grounds for termination.

263.     Heather Cattaneo, who worked for TrueCoverage and Speridian Technologies from September 2023 to March 2024, stated that "[t]he sales scripts that TrueCoverage required us to follow misled consumers about the cash cards being promised."  She said TrueCoverage made

agents use rebuttal scripts that "required us to be vague about the cash card" and to contact the carrier about the reward programs they offer.

### 2.   Enhance Health used uniform scripts as well

264.   Enhance Health also incorporated scripts aimed to qualify consumers for a full, $0 APTC regardless of their income, to deflect consumers' attention away from the advertised cash subsidies and benefits and quickly sign them up.  In fact, TrueCoverage's agent manager Harrison saw one of Enhance Health's scripts and told an agent that TrueCoverage used the same-type of scripts as Enhance Health.

265.   One Enhance Health script, the "Enhanced outside of OEP script," starts off by suggestively telling the consumer exactly what income range they need to qualify, and encouraging them to "guess" within that range: "Will you make under 20K for 2022? . . .  I ask because in order to qualify for a subsidy your income would need to be $14k-19k-minimum) and since this is only based on what you think you could possibly make this Year in 2022, *it's really just a Guess*." (emphasis added).

266.   For those who don't "guess" within the qualifying income range, the script continues. instructing agents to slowly emphasize the other triggers that would allow Enhance Health to write a policy under the new law — triggers as simple as a change of address:

> **SEP**
> (IF 20K OR OVER GET A SEP!!!!!!)
> **Read Very Slowly>>**   If you can say **YES…..** (EMPHASIZE) to **ANY** (EMPHASIZE) of the following questions…. You may qualify for a **$0 Dollar Per Month** Plan Today!  Ok?
>
> - Have you Lost Health Insurance Coverage?
> - Have you been Denied Medicaid?
> - Did you have a change of income or Loss of Job?
> - Have you Moved to another address?
> - Are you retired?
>
> So far it looks like you may be eligible. . . .

267.    The problem with leading consumers into these alternative qualifiers is that Enhance Health's script does not also tell these consumers — who did not qualify under the income requirements — that they will likely face a Tax Penalty at the end of the year for enrolling in a "$0 Dollar Per Month Plan."

268.    At some point, possibly due to consumer complaints about not receiving any cash cards, Enhance Health's scripts specifically instructed its agents not to mention the cash cards: "You are prohibited from mentioning rewards programs unless asked by the consumer."  The reason was simple.  Enhance Health did not want to overtly disabuse consumers of the notion that they would be receiving a cash card, for example the $6,400 monthly cash card for groceries, rent and gas that Enhance Health knew was driving consumers to their agents.

269.    Like TrueCoverage, Enhance Health provided its agents with things to say if the consumer brought up cash cards.  The script said, "IF ASKED you are only allowed to respond with the permitted statements."  The permitted statements contained language that suggested to consumers that the promised cash rewards were something that they could address later with the insurance carrier:

**PERMITTED (ONLY WHEN ASKED FIRST)**

<u>Plans that include Carrier Rewards</u>

*Some insurers may offer programs that reward members of the plan for taking specified health-related actions after enrolling in the plan.  These programs are not offered by every insurer and you will need to speak with the insurer directly once you become a member to learn more about those programs' specific terms and conditions.  These rewards programs are not given in exchange for enrolling in the plan.*

270.    One former Enhance Health agent stated that "the sales scripts required us to be vague about the cash card and told us to tell consumers that any benefits would come in the mail

after the insurance policy was issued and that they would need to contact the carrier and ask them about the reward programs they offer."

271.    Enhance Health reprimanded its agents for going off-script.  For instance, one agent was reprimanded in January 2023 by her direct supervisor, Xavier Williams, "for not following the script and for explaining that the cash card being promised in the advertisement that the consumer saw was not real."

272.    The combination of fraudulent leads on the front-end and misleading scripts by the agents drove massive ACA enrollments by Enhance Health.  In a March 29, 2024, article entitled "Enhance Health: Helping Hundreds of Thousands of Americans Find Health Insurance Coverage Every Year," Herman proclaimed that "Enhance Health is the largest enroller of ACA plans in the country — we help hundreds of thousands of Americans find health insurance coverage every year."  Herman also noted that nearly all of Enhance Health's clients are low-income Americans, stating "97% of our members pay $0 a month in insurance premiums while obtaining the coverage they need."

273.    As for Class Plaintiffs and class members, they justifiably relied on the advertisements and the statements and omissions made in the scripts.  The misleading nature of the advertisements and scripts caused them to enroll and/or provide their PII.

**N.    TrueCoverage, Enhance Health and Their Downlines Engage
        in Twisting, AOR Swaps and Dual Apps**

274.    Enhance Health, TrueCoverage, Protect Health, NHA and the downlines engaged in hundreds of thousands of AOR Swaps to steal other agents' commissions.  Using the Benefitalign and Inshura platforms, they created large spreadsheet lists of consumer names, dates of birth and zip codes.  They provided those spreadsheets to agents and instructed the agents to

access the EDE Platforms and change the consumers' AOR without telling the client or providing informed consent.

275.    In doing so, they immediately captured the monthly commissions of agents like NavaQuote and Broyer who had originally worked with the consumers directly to sign them up.

276.    A former Enhance Health employee recounts being provided a list of consumer names to swap into new healthcare plans without their knowledge:

> [D]uring my employment with Enhance Health, I (and others) was given a spreadsheet of 500-800 names and told to log into Benefitalign and change consumers' health insurance without contacting them.  If they were in one carrier's Silver plan, we were told to change them to another carrier's Silver plan. If they were in a Bronze plan, we were told to change them to another carrier's Bronze plan.  Customers weren't notified we were doing this.  Enhance Health would be given a commission for each plan switched, and would give us $5 per application.

277.    Herman told this employee during the 2022 OEP that these swaps were "like shooting fish in a barrel."

278.    Another former Enhance Health employee who worked in Enhance Health's customer service department said that the swaps became so prevalent that Enhance Health created a "Switch Plan Team" of customer service representatives.  Enhance Health gave those representatives large lists of consumers to enroll and/or switch, and held competitions to see who could do it the fastest.  One representative won a company-sponsored competition by switching 138 policies in one hour.

279.    An agent in Florida reported during the 2022 OEP that a single Enhance Health agent — Netisha Fung — had replaced his NPN with hers on the accounts of more than 145 of his clients without ever speaking with those clients.

280.    TrueCoverage engaged in AOR switching as well.  A former agent states that the company gave him lists and instructed him to "switch the health plans of consumers who already had ACA plans regardless of whether it was appropriate for the consumer."  TrueCoverage trained

its agents to distinguish between policies in which a TrueCoverage agent already was the AOR, and those that were not. For the former, the switching agent was instructed to change the consumer's plan, not the AOR. They accomplished this by making a clerical change to the existing customer's application — such as changing the address — which allowed the agent to change the consumer's existing plan. This was done without telling the consumer. For the latter, the agent was instructed to simply change the AOR and leave the consumer's existing plan untouched. Either method generated a new commission stream for TrueCoverage — the former by creating a new plan, the latter by stealing a commission.

281. TrueCoverage's downlines also took part. Matthew Ginberg of No Cost ACA stole at least 57 of one Florida-based agent's customers.

282. One former employee in Protect Health's "research department" recounted being given a list of 875 consumers to swap to Protect Health. He was also tasked with researching Protect Health policies that had been recently cancelled. Cancellations were sent to a "Tango Team" that accessed Inshura to recapture them. The Tango Team swapped the former customers' AORs back to Protect Health. So that consumers were not alerted, the Tango Team changed the incomes on the consumers' applications to ensure that they had a $0 premium. That way, the consumer would not be alerted to the change by a new charge or bill.

283. Another former Protect Health employee who worked on the Tango Team confirmed the former research department employee's testimony. She said she was instructed to do the switching by manager, John Asherl.

284. The volume of switching quickly became so great that TrueCoverage began to run out of AORs to use for replacements. TrueCoverage was concerned that if CMS saw one of its agents as the AOR on thousands of polices, CMS would investigate. So TrueCoverage began to

offer its agents payments of $4,000 to $5,000 in exchange for using the agents' NPNs on policies those agents did not write.  This allowed TrueCoverage to expand the pool of NPNs with which to engage in switching and to avoid drawing attention to what it was doing.  Sometimes if an agent declined the offer, TrueCoverage would use that agent's NPN to do AOR Swaps anyway, without the agent's knowledge.

285.    Enhance Health had the same concern and also paid its agents to use their NPNs to make AOR swaps.  Enhance Health also used some employees' NPNs without their knowledge. One former customer service representative who did not perform agent functions but had a license declined the company's offer of payment to use his license, but found out after he left Enhance Health that the company was using it without his knowledge or consent.

286.    These actions exemplify the scale of the AOR- and plan-swapping.  TrueCoverage and Enhance Health were swapping at such a rate that they needed more and more NPNs to handle the volume, and would go as far as using an agent's NPN without authorization to accomplish it.

287.    This swapping was crucial to TrueCoverage, Enhance Health, Protect Health, NHA and the downlines.  It allowed them to essentially churn insurance policies, changing consumers' policies from carrier to carrier or policy to policy to collect new, or regain old, commissions.

288.    The swapping activities generated revenues and padded agent commissions and executives' bonuses.  Just as importantly, it concealed from carriers the high ACA cancellation rates by consumers who became upset when they received no cash card.

289.    Eventually the switching became so prevalent that carriers took notice. UnitedHealthcare terminated Enhance Health's ability to write policies for the insurer when customer complaints alerted UnitedHealthcare to the switching.  It also terminated Enhance

Health's agents from the UnitedHealthcare system.  Upon information and belief, Enhance Health was also terminated by Cigna and Aetna.

290.    On December 6, 2023, Ambetter created an "Agent of Record Rule" to address the switching.  The rule locked in the AORs on its policies for a year, effective January 1, 2024.  This led to more than 200,000 AOR Swaps on December 31, 2023.

291.    As managers of their respective companies, Panicker, Goldfuss and Herman directed, knew of and/or learned of the switching and did nothing to stop it.  To the contrary, each promoted it.

292.    Bain Insurance also knew about the swapping, either before or at the time that one of Enhance Health's largest carrier relationships, UnitedHealthcare, terminated Enhance Health for swapping.  The termination had a significant impact on Enhance Health's business.  Bain Insurance's executives who directed Enhance Health's operations, including its managing director, Jack Sun, knew and/or learned about the swapping, as did Bain Insurance's representative(s) on Enhance Health's board of directors.  Bain Insurance also knew about Ambetter's Agent of Record Rule, and that it stemmed from swapping activities that Enhance Health was a part of.  Despite this knowledge, Bain Insurance continued to capitalize Enhance Health, and to support and manage its operations.

293.    Brandon Bowsky and Minerva also knew about the switching.  They promoted it by reselling leads.  For example, Minerva would sell a lead to one agency, which would enroll the consumer, then Minerva would sell the same consumer's lead to another agency, which would swap the consumer's AOR or plan.  The same lead could be resold again and again, resulting in multiple additional swaps.  This partially explains why some consumers endured 20 or more policy changes in a short period of time.

294.    On February 26, 2024, CMS published a notice acknowledging the swapping problem.  The first three bullet points outlined the issue:

- CMS has identified instances of consumers being enrolled into an unwanted plan.

- This action, referred to as an Unauthorized Plan Switch (UPS), results in the consumer's desired policy being cancelled or terminated.

- Many consumers are unaware of the switch until they attempt to use the desired policy to see a doctor or fill a prescription and are denied.

295.    On July 19, 2024, CMS issued a "Statement on System Changes to Stop Unauthorized Agent and Broker Marketplace Activity."  The statement announced that CMS would immediately begin requiring unassociated or "new" brokers to conduct a three-way call with the consumer and the Marketplace in order to switch a policy's agent of record.

296.    Enhance Health, TrueCoverage, Protect Health, NHA and their downline agents also engaged in the creation of dual applications, or "Dual-Apping."  In this scenario, they left a consumer's original plan in place, but submitted a new application — a dual policy — for that consumer without the consumer's knowledge or consent.  This created a new policy and a new commission.  Sometimes, this Dual-Apping was achieved by splitting up a family plan; for example, by submitting an application and creating a separate policy for a husband, leaving the wife and children on the original plan.

297.    These schemes hurt consumers in multiple ways.  Some consumers were signed up into twisted or dual plans that they do not qualify for.  The APTCs they received, sometimes unknowingly, caused a Tax Penalty at the end of the year.  Some were put into plans that their doctors are not a part of.  Or the new plans had higher deductibles or copays.

**O.**    **Bain Insurance Knew About and Allowed the Fraudulent Leads and Switching**

298.    Bain Insurance knew what was going on at Enhance Health, and ultimately supported it.  Enhance Health was Bain Insurance's idea.  With more than $1 billion to invest in the insurance industry, in 2021 Bain Insurance sought to get into retail Medicare Advantage sales, which at the time featured significant profitability.  Bain Insurance created Enhance Health in November 2021, capitalized it with $150 million and installed the then-35-year-old Herman as CEO.

299.    Bain Insurance controlled Enhance Health.  Its managing director, Jack Sun, was very hands on.  Bain Insurance executives were frequently at Enhance Health's headquarters in Sunrise.  Bain Insurance installed an executive on Enhance Health's board of directors.  Bain Insurance chose and installed Enhance Health's C-Suite executives.

300.    When Enhance Health almost immediately began taking heavy losses from the Medicare Advantage business, it hired and installed a CFO, William Luckert, to be the company's de facto leader.  When Herman learned of ACA's potential after speaking with Lucien and Bowsky, he and Bowsky went to Bain Insurance and Sun to convince Bain Insurance of ACA's promise.  Once it saw the initial results of Enhance Health's ACA efforts, Bain Insurance allowed Enhance Health to pivot the resources Bain Insurance had given Enhance Health, and redirect them to ACA.

301.    Bain Insurance quickly came to learn that the success of Enhance Health's ACA efforts came from leads supplied by Bowsky and Minerva that falsely promised cash benefits.  Bain Insurance received complaints from Enhance Health's managers, including a manager of the customer service department, about the high volume of consumer complaints resulting from the scheme.

302.    Bain Insurance also learned about Enhance Health's plan- and AOR-switching scheme.  Bain Insurance asked the former customer service manager to show them evidence of this, and she did.

303.    Bain Insurance installed lawyers at Enhance Health's Sunrise offices to monitor Enhance Health's activities.

304.    But Bain Insurance did not stop these practices because they generated tremendous amounts of profits for Enhance Health, which Bain Insurance and its partners owned.  Enhance Health was enrolling thousands of consumers each week and quickly selling those contracts for cash.

305.    The revenue these practices generated laid the groundwork for a quick sale of Enhance Health.  It was an open secret that Bain Insurance intended to sell Enhance Health within one or two years.  Enhance Health gave shares of the company to its executives, and Herman told one of them, "we're going to sell this place in one or two years."

306.    To increase Enhance Health's profitability and its attractiveness for potential buyers, Bain Insurance bankrolled Enhance Health's purchase of Jet Health, an EDE Platform, in July 2023.  When Enhance Health transferred to Jet Health's platform in November 2023, it instantly became more profitable, no longer having to pay Speridian for the use of Benefitalign. This purchase occurred well after Bain Insurance learned that Enhance Health's ACA model was built around leads generated from fraudulent ads and AOR-swapping and plan-switching.

307.    Bain Insurance continued to direct Herman and Enhance Health.  Upon information and belief, Bain Insurance was nearing a sale of Enhance Health when this lawsuit was filed.

P.     **TrueCoverage, Enhance Health, Protect Health and NHA**
       **Had a Fiduciary Relationship to the Class**

308.   Consumers, including Class Plaintiffs and class members, relied on TrueCoverage, Enhance Health, Protect Health, NHA and the downlines for assistance and protection.   The consumers targeted in this scheme include our country's most poor and vulnerable.

309.   Consumers trusted that they were being enrolled into health insurance that was appropriate for their needs.   The agencies knew and encouraged that reliance and trust.   Enhance Health's scripts stated, "I'm here to help you understand and explore your health insurance options under the Affordable Care Act."   TrueCoverage's Call Flow Guidelines required agents to "choose the best plan that fits customers' needs and provide plan details, like deductibles, copays, prescriptions, preventative care, and other services that are on the plan."

310.   TrueCoverage, Enhance Health, Protect Health, NHA and the downlines purposely created a special, fiduciary relationship with its customers, including Class Plaintiffs and class members.   Their scripts directed the agents to investigate a customer's insurance needs by asking a series of personal questions.

311.   The scripts led Plaintiffs and Class Members to believe that the agents would determine the health plan that was best suited to meet their needs.   For example, Enhance Health's script states that agents should ask if a consumer is looking for "anything specific in the plan, premium cost, doctor, or prescription that is covered?"   The scripts also led Plaintiffs and Class Members to believe that they would be receiving some form of cash card from the carriers after enrollment.

312.   The scripts also solicited consent from Plaintiffs and Class Members to access their confidential health and PII on the federal Marketplace database.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

313.    To further engender trust, the scripts reinforced their expertise and agents' commitment to being trustworthy.  For example, Enhance Health's closing script stated:

> Again, thank you for choosing Enhance Health to assist you with your health insurance needs.  We appreciate your trust and we're committed to providing you with the best service possible.  Have a great day!"

314.    By encouraging and engaging their customers, including Class Plaintiffs and class members, in a special, fiduciary relationship, TrueCoverage, Enhance Health, Protect Health and NHA triggered a duty to advise consumers, including Class Plaintiffs and class members, prudently about their coverage needs.  That included a duty not to mislead them.

315.    This fiduciary duty is also memorialized in the CMS regulations applicable to the sale of ACA plans.  45 CFR 220(j)(2) states that agents of TrueCoverage, Enhance Health Protect Health, NHA and the downlines have an obligation to provide consumers with accurate information:

> ***Standards of conduct.*** An individual or entity described in <u>paragraph (j)(1)</u> of this section must—
>
> (i) <u>Provide consumers with correct information, without omission of material fact, regarding the Federally-facilitated Exchanges, QHPs offered through the Federally-facilitated Exchanges, and insurance affordability programs, and refrain from marketing or conduct that is misleading</u> (including by having a direct enrollment website that HHS determines could mislead a consumer into believing they are visiting *HealthCare.gov*), coercive, or discriminates based on race, color, national origin, disability, age, or sex (which includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes)

316.    TrueCoverage, Enhance Health, Protect Health, NHA and the downlines breached their fiduciary duties by placing Plaintiffs and Class Members in policies that were unsuitable and/or that they did not qualify for.  They breached their fiduciary duties by switching Plaintiffs' and Class Members' plans and agents of record without prior notice or consent.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## Q.   **Thousands of Consumers Have Complained About the Scheme**

317.   TrueCoverage's online reviews contain numerous testimonials from consumers describing their experience with the schemes:

> I received this insurance through a $6,400 subsidy that was offered. I received an insurance with 0 deductible but my doctor or therapist does not accept that insurance.
>
> -Maria
>
> I think that you shouldn't act like people are getting money to get people to get coverage through your agency.  Also shouldn't tell people you're on health.gov because I found nothing on health.gov about truecoverage.
>
> -Sarah L.
>
> On November 30th I called and signed up for the $6,400 subsidy. THEIR WEBSITE said it was to help pay for gas, bills, utilities. I even asked the lady and texted her and she said YES, ITS TO PAY FOR ANYTHING. I was told it would be in 30 days. 30 days later I call back (she would never respond to text when I asked about it) and the guy said that she forgot to finish last step and that it ($6,400)would be in in ***** days but they'd make sure it was sent in next week. Never received it. All a huge scam.
>
> -Shane K
>
> On November 30th 2023, I was calling for the stimulus package the government was offering, and the number I was provided sent me to this company. I was told by ******** ****** that I was going to be getting a stimulus package of $1730.54 monthly to cover gas, groceries, and bills. I was also getting a medical coverage from ***** effective Jan. 1 2024 with a $0 premium. I was told that this was from the Stimulus program to help the middle class stuck in the middle financially and medically, and we took the offer and I had to provide the SSN for my ENTIRE family to be Automatically qualified. I told her my children already had medical coverage from ********** and she said it was fine. We signed up due to the prior knowledge presented to us, and after a few days I became skeptical and reached out to ******** on December 11th 2023 to clarify what we were getting and the call was automatically sent to voice-mail. I called the business number and was told that the information presented to us was NOT accurate, and I immediately went to cancel my policy. My concern is my family's personal information (SSN

CASE NO. 0:24-cv-60591-DAMIAN/Valle

most importantly) is in their system and im worried for potential fraud due to already being misled and lied to.

-"Initial Complaint" 12/11/23

This company is advertising $6400 for individual that need assistance with health coverage. Once I reached out they tried to sell me a low cost health coverage. I am complaining because they are using foul advertising practices. I'm sure this is just the tip of the iceberg. Stop them now!!!

-Initial Complaint 10/30/23

Falsely advertising a savings benefit card that you can use to purchase groceries or pay rent get gas. However I never received it and the agent has not responded to any of my calls or messages. I specifically signed up for this for this card only

-Initial Complaint 9/26/23

318.     Other putative class members had similar experiences with Enhance Health:

They say you qualify for 0 copay and 0 on prescriptions, but they also said that you qualified for the benefit card to help pay groceries, rent, and Bill's. But only sign you up for the insurance. Then when you call they say that you need to check your perks and rewards and find out that they only give surveys for 25to50 dollars prepaid visa. That you have to wait 5to10 days to receive. Now I don't know about you but I don't know any person that food bills rent comes to 50 dollars. They told all those lies to get you to sign up for insurance. Now I want to know what else they hiding. I will find out stay posted

-Robbie Torres Rivera

Never received anything but spam calls.  You are only giving your info to be sold off.  Please don't call these scammers don't give ur info. You are not getting any subsidy card or health insurance at all.

-Philemon Blevins

So I signed up because it offer me a $550 subsidy that I would get each month to put towards food groceries and other thing so I received the insurance card but not the subsidy card so when I call to check on it I was informed that the $550 goes towards the cost of your insurance plan and you will not receive a subsidy to do as you would like… it's all a scam and is not explained to u in detail.. so don't sign up thinking you will get a subsidy card to do as you please because you won't… you have to earn rewards to get any cash

CASE NO. 0:24-cv-60591-DAMIAN/Valle

benefits.. I will keep the insurance because it's affordable but this is so misleading

     -Wyshieka Thompson

This place steals your information, cancels your current healthcare plan then enrolls you in a plan without your consent or knowledge. I have heard many people have the same issue with someone stealing their information and being signed up for terrible healthcare plans and they have all ended with Enhance Health. When I attempted to call the company and find out how they got my information I was transferred multiple times and laughed at.

     -Nicole

I got a plan thru AmBetter. But what was misleading was that I was told by an Enhance Health service representative, as well as the advertising, that I will be receiving money on a card to spend on healthy groceries. This is a lie. Why they tell people that, I dunno, it's just a stupid tax credit. That's not gonna help me, I make $9,000 a year and pay no taxes and get nothing back. I got patched thru to AmBetter after giving a ear full to the Enhance Health representative, they were not so nice that time, and he just wanted to get rid of me. After giving another ear full to the AmBetter representative, she apologized profusely and said she deals with about 15 to 20 cals everyday with people like me. Well, duh, you people are misrepresenting what your offering. I reported it to the FCC and the Fraud Government website. It's ridiculous, they use YouTube and Facebook and put all these pictures of groceries and even the representative when I signed up said that. Very scummy and scammy. I don't appreciate being lied to, I was actually in need of healthy food cause I am poor, thanks for getting my hopes up and crushing them. That's very uncool. Screw you people. Look at the corporate double speak with the reply they gave me. I would NEVER call you people ever again. If I need anything at all, I will call AmBetter, my actual insurance provider. Your just a broker agent and signed me up. Now go away and go lie to someone else. We the people are sick of scumbags like you that pray on the hopes and mislead people. Your words mean nothing to me, just more lies.

     -"Account Removed"

Ad said I would get amazing health plan and $540/m card for expenses for things like groceries but after signing up I was given a bottom of the barrel (bronze with 10k deductable, literally worst plan I've ever seen) and no expense card. I am considering sueing.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

-Justin McPharison

Not sure if I got the right information, I got connected to them through and add that featured Oprah,and it stated that they were giving $1,300.00 cash per month for signing up. All a scam.No one can answer my question, insurance company says it was a scam.

-Carlos Marin

Gave me HIGH deductibles, and no mention of the $1000+ government check that I should qualify for (according to ad - that draws you in). So.. I believe I've been scammed!

-LauraT

My complaint is that what was advertised to me and spoken to me over the phone during my conversation was filled with lies and deceptive information.I was told that I would be getting $402 each month to be used however I wanted to use it. On anything I wanted to use it on, like bills, food, gas, clothes... But after getting my paperwork in the mail and reading it , it clearly states that the $402 can only be used towards the cost of the insurance they set up for me. For co-pays and visits. Nothing else can it be used for. I was lied to and mislead the whole conversation. I would of never ever had them set this up if I would of known this and now I have to come out of my pocket and switch my insurance and pay for premiums again. Thanks for a whole lot of wasted time and ********* that I really can't afford to spend.

-"Initial Complaint" 7/23/23

I signed up with healthcare coverage through a licensed agent. That same day my information was stolen and I was registered in a different plan without my authorization or knowledge. The date of the incident is November 7th, 2023. The insurance company is Enhance Health, the agent attached to the policy is ******************************** and his license number is *******

-"Initial Complaint" 11/28/23

This company is able to change and cancel insurance on the marketplace without the owners permission. My insurance was canceled unsuspectedly and when I called to find out why I was told that this company had put me down on their insurance and canceled my marketplace insurance when I did not ask them to. I called this company three times to find out how they were able to cancel my insurance and they hung up on me all three times.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

-"Initial Complaint" 11/03/23

I have never heard of this company before today. An insurance agent by the name of ****** Madame **** (NPN ********) affiliated with this company somehow got a hold of my personal information and submitted a health insurance application without my knowledge or consent. ****** Madame **** then proceeded to enroll me into a BlueCross BlueShield plan, again without my knowledge or consent. I have no idea who this insurance agent is or how they obtained my information. I received notice from Healthcare.gov that an application was submitted, after which I received an email from Enhance Health with a reference number and this agent's name stating my eligibility verification was completed.I don't know if this Company is in the business of submitting fraudulent insurance applications or if this agent acted independently. A complaint has been filed with the state ********** of **********

-"Initial Complaint" 9/11/23

Healthcare coverage got changed without consent!

-"Initial Complaint" 8/16/23

**R.    Defendants' Actions Caused Injury to Plaintiffs and the Class**

319.    Leads generated by fraudulent ads directly influenced consumers to call in and provide their PII.  Those who enrolled were calling to get a cash card.

320.    For example, when the undersigned issued a press release about an investigation into TrueCoverage's practices, TrueCoverage reduced its purchases of the fraudulent leads and call volumes went down immediately.   Harrison's February 26, 2024, email to agents acknowledges this.

321.    A manager in TrueCoverage's Albuquerque office told one agent who complained about the ads, "without these ads they wouldn't call in."

322.    And a former Enhance Health employee stated that when this lawsuit was filed, cash card calls "tightened up" and call volumes went down.

323.    In addition, when this lawsuit was filed on April 12, 2024, numerous downline

agencies of TrueCoverage and Enhance Health shuttered almost instantly, including Health First Insurance Agency, which bought its leads from Minerva and closed on April 18.

324.    The PII generated from the cash card leads allowed Defendants to engage in the swapping activities that have become epidemic.  A June 2024 report by a policy thinktank called paragon Health Institute titled "The Great Obamacare Enrollment Fraud" discovered that in nine states, the number of enrollments in $0 ACA plans exceeds the number of residents who qualify for them.  "The problem is particularly acute in Florida, where we estimate there are four times a many enrollees reporting income in that range as meet legal requirements."  The report attributes the problem to brokers using PII to enroll consumers and capture commissions:

> Unscrupulous brokers are certainly contributing to fraudulent enrollment and the enhanced direct enrollment feature of Healthcare.gov appears to be a problem *Brokers just need a person's name, date of birth, and address to enroll them in coverage, and reports indicate that many people have been recently removed from their plan and enrolled in another plan by brokers who earn commissions by doing so.*

(emphasis added).

325.    The report also posits that the problem is caused by "counseling of income manipulation by outside entities [ie., unscrupulous agents] aware of the program rules."

326.    On May 6, 2024, just three weeks after this lawsuit was filed, CMS issued a "Statement on Agent and Broker Marketplace Activity, Update," confirming that it "received approximately 40,000 complaints of unauthorized plan switches in the first three months of 2024," as well as "approximately 50,000 complaints of unauthorized enrollments . . . ."

327.    The scheme has also gotten the attention of Congress.  On May 20, 2024, Oregon senator Ron Wyden wrote a letter to CMS "to express my outrage with reports that agents and brokers and submitting plan changes and enrollments in the Federal marketplace without the consent of the people who rely on these plans."

CASE NO. 0:24-cv-60591-DAMIAN/Valle

328.    On June 28, 2024, three house committees, the Committee on Energy and Commerce, the Committee on Ways and Means and the Committee on the Judiciary sent a joint letter to the Comptroller General of the United States requesting information about the "astonishing level of improper, and potentially fraudulent, behavior in Obamacare markets."

329.    And on July 8, 2024, Senator Chuck Grassley wrote a letter to HHS and CMS seeking information about the nature and extent of the scheme.

**S.**    **Victims Included the Class Plaintiffs**

330.    The scheme described above was applied to Class Plaintiffs, including consumers and agents.

**1.**    **The Consumer Class Plaintiffs**

331.    Veronica King.  King is 53 years old and lives in Warner Robins, Georgia.  Since 2011, King has used agent Marsha Broyer of WINN Insurance to help her navigate and purchase health insurance.

332.    On or about November 30, 2023, Broyer consulted with King and enrolled her into a health plan that met her needs.

333.    In a three-month period from November 30, 2023, to February 25, 2024, at least eight other agents switched themselves as AOR on King's health plan and changed when them without King's valid consent.

334.    At least six of the eight switches were done by Enhance Health or downlines of TrueCoverage.

335.    On November 30, 2023, which is the same day that Broyer enrolled King into her policy, agent Christhian Crevoisier with Ensure Health Group, a downline of TrueCoverage, canceled the original policy and enrolled King into another health plan.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

336.    On December 12, 2023, Ms. King's application was accessed and switched to Matthew Ginberg, who became King's AOR without her valid consent.  Matthew Ginberg is an agent of No Cost ACA, LLC, which is a downline of TrueCoverage.

337.    On or about December 19, 2023, Broyer discovered that the plan had been switched and she reenrolled King back into the original health plan. Broyer also reported the misconduct to CMS.

338.    On December 22, 2023, Enhance Health agent, Anpherny Simpson, accessed King's account and became King's AOR without her valid consent.

339.    On December 30, 2023, Marsha Broyer discovered the illegal switch and again switched the policy back and listed herself as AOR on Ms. King's policy.

340.    On December 31, 2023, New Year's Eve at 11:59 p.m., Ms. King's account was again accessed and switched to TrueCoverage downline agent Matthew Ginberg as AOR. The health plan that Veronica was enrolled in was Ambetter. Upon information and belief. Ginberg switched himself to be the AOR because the prior month on December 6, 2023, Ambetter announced that the agent listed as AOR as of 1/1/2024 would receive the commission for all of the 2024 plan year even if the AOR was subsequently switched.

341.    Broyer discovered the Ginberg switch and switched herself back as AOR on or about January 6, 2024.

342.    And on February 25, 2024, Enhance Health agent Ryan Rossien became King's AOR without her valid consent.

343.    That same day, Ms. King's application accessed again and Alexis Vanella, another agent with TrueCoverage downline, No Cost ACA, switched and lists herself as AOR on the policy.

344.    As a result of these twisting actions, King has been damaged including loss of continuity of care resulting from the agent of record and enrollment into additional health plans, and out-of-pocket costs spent attempting to deal with the issues created.

345.    Paula Langley. Mrs. Langley lives in Texas and suffers from serious health conditions.  She suffered a heart attack and uses a pacemaker to alleviate a chronic heart condition.  Mrs. Langley works as an office manager at a pest control company.  She and her husband, Lee, live in an extended-stay hotel.

346.    In 2022, Mrs. Langleys health insurance provider notified her that it would not renew her plan for 2023, prompting her and her husband to search the internet for new health insurance plans.

347.    While searching for the right health insurance to cover Mrs. Langley's heart condition, the Langleys came across an ad promising a cash card.  Mr. Langley called the number listed on the ad and was enrolled in a new plan effective February 1, 2023.

348.    However, the Langleys never received a cash card and instead the couple began to receive new health insurance cards from different carriers almost immediately following her enrollment in this plan.  During several of her visits to the doctor, she presented her health insurance information but was told that she did not have health insurance or that she did not have the plan she thought she did.

349.    In one such instance, on or around March 29, 2024, Mrs. Langley sought to renew her prescription medication for her heart condition with her doctor and presented her health insurance information.  However, the doctor told Mrs. Langley that she did not have any health insurance.

350.    In a panic, Mrs. Langley called a friend who referred her to Plaintiff WINN

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Insurance Agency and spoke with agent Marsha Broyer.  Broyer enrolled Mrs. Langley in a health insurance plan to cover her from April 1, 2024 through the end of 2024.

351.    Following a review of her plan history, Broyer discovered that Mrs. Langley was the target of persistent twisting by TrueCoverage, Enhance, and/or their downlines.

352.    For example, from February 1, 2023 through April 2024, when Class Plaintiff WINN agency and Marsha Broyer helped her, Mrs. Langley had her health insurance plan changed at least 22 times without her valid consent.  Some examples of this twisting by TrueCoverage, Enhance, and/or their downlines are as follows:

a.    March 2023: ACA Helpline, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Frederick Bock as AOR;

b.    May 2023: ACA Helpline, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Frederick Bock as AOR.

c.    June 2023: Enhance Health switches Mrs. Langley's plan and carrier, and adds McCarteney Wood Pierre-Louis as AOR;

d.    December 2023: Ensure Health Group, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Christhian Crevoisier as AOR;

e.    December 2023: No Cost ACA Insurance, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Matthew Ginberg as AOR;

f.    January 2024: No Cost ACA Insurance, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Matthew Ginberg as AOR;

353.    A more complete chronology of all the switching and twisting done to Mrs. Langley is attached as **Exhibit 1**.  As a result of the unauthorized switching and twisting of policies and agents of record described herein, Mrs. Langley has incurred damages in the form of thousands of dollars in uncovered medical bills.

354.    <u>Tiesha Foreman</u>.  Foreman is 50 years old and lives in Douglasville, Georgia.

355.    In or around December 9, 2022, Mrs. Foreman's husband, Larry Foreman, responded to an online ad stating that he prequalified for a cash card.  He spoke with a TrueCoverage agent who enrolled him (but not Mrs. Foreman or their child) into an Oscar Health Plan.  Upon information and belief, the agent led Mr. Foreman to believe that he would receive a cash card and $0 health insurance by falsely mischaracterizing that the advanced premium tax credit ("APTC"), which is paid by the government to the insurance carrier, would be paid to Mr. Foreman in the form of a cash card.

356.    To qualify Mr. Foreman for the tax credit, TrueCoverage underreported the family's household income.  Specifically, TrueCoverage did not include Tiesha Foreman's income in the household income calculation.  Mrs. Foreman is an accountant that makes approximately $95,000 per year, an income amount that disqualified her and her family from receiving the APTC.

357.    The following year, the Foremans received a 1095-A showing that that the Oscar policy was only in effect from January 1, 2023, to January 31, 2023 (one month), and that the Foremans owed the IRS approximately $871 for the APTC that it paid to Oscar Health.

358.    On or about February 13, 2023, TrueCoverage agent Marius Boncea re-enrolled Mr. Foreman (but not his wife or child) into a second health insurance policy issued by Cigna HealthCare of Georgia.  Mr. Foreman does not recall ever agreeing to enroll into this policy.  Once again, TrueCoverage underreported the Foremans' household income to qualify Mr. Foreman for

the APTC, even though the Foremans' household income was too high to qualify for the subsidy.

359.    The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from March 1, 2023, to April 30, 2023 (two months), and that the Foremans owed the IRS approximately $1,741.76 for the APTC that it paid to Cigna.

360.    In April 2023, Mrs. Foreman was unaware that her husband had responded to the online ad and had been enrolled in multiple policies in the months prior.  At that time, the Foremans' oldest son was removed as a dependent on their income taxes, which qualified as the event that allowed the Foremans to enroll in an ACA plan outside the standard open enrollment period.  As a result, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace to provide health insurance coverage for the remainder of 2023.

361.    On or around October 17, 2023, TrueCoverage agent Hans Mardy enrolled Mrs. Foreman into a Cigna plan without valid consent. The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from November 1, 2023, to November 30, 2023 (one month), and that the Foremans owed the IRS approximately $1,793.32 for the APTC that it paid to Cigna.

362.    On or about October 26, 2023, Mr. Foreman was switched into an Ambetter health by another agent, Gabriel Pasztor.

363.    A couple of weeks later, on November 4, 2023, another agent believed to be affiliated with TrueCoverage, Christopher Morales, submitted another application without the Foremans' valid consent.

364.    In December 2023, during the Open Enrollment Period, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace, to

provide health insurance coverage for 2024, effective January 1, 2024.

365.    On January 22, 2024, Foreman learned that the Oscar coverage that she purchased in December 2023 had been cancelled.  She called the Marketplace and learned that without her knowledge or consent, Pasztor submitted a health insurance application on her behalf.

366.    In addition, on or about February 22, 2024, Enhance Health enrolled Mr. Foreman into an Ambetter health insurance plan without his valid consent.

367.    As a result of this switching of plans, the Foremans were left without health insurance in 2024 and incurred uncovered medical expenses.

368.    At this point, Mrs. Foreman sought help from Callie Navrides and NavaQuote. Navrides and Mrs. Foreman spent a significant amount of time attempting to unwind the problem through the Marketplace.  It is still ongoing.

369.    As a result of these actions, Mrs. Foreman suffered significant damages, including tax damages, loss of benefits, unpaid medical expenses and uncovered medications.  Mrs. Foreman has also suffered damage by having to expend unnecessary time fixing these problems.

370.    <u>Conswallo Turner</u>.  Turner is 52 years old and lives in Orange, Texas, with her son, Joshua Janice.  In late 2023, she started looking for health insurance.  With the help of Callie Navrides at NavaQuote, on December 9, 2023, Turner applied for a UnitedHealthcare Gold plan through the Healthcare marketplace.  The application was approved, and the policy was set to go into effect on January 1, 2024.

371.    Shortly thereafter, Turner saw a Facebook ad promising a monthly cash card to pay household expenses.  She called the number on the ad and provided her name, date of birth and state of residence.  Armed with this information, agents switched Turner's plan and her AOR no less than five times in a span of weeks in December 2023 without her valid consent.  This included

CASE NO. 0:24-cv-60591-DAMIAN/Valle

agent Daniel Pojoga of Enhance Health, who without Turner's valid consent switched Turner to a Blue Advantage Gold HMO in December 2023 that did not include Turner's son, Joshua.

372.    As a result of these actions, Turner has been damaged including but not limited to the loss of coverage and resulting medical payments for her son Joshua and higher deductibles and co-pays than the policy sold to her by NavaQuote. In addition, Plaintiff suffered damages resulting from the time and expense she has spent trying to correct the problems caused by the unlawful conduct.

373.    <u>Angelina Wells</u>.  Wells is 53 years old and a resident of Texas.

374.    In or around January 22, 2024, Wells contacted NavaQuote and expressed concern to Callie Navrides that she had been enrolled in health insurance policies that did not meet her needs without her consent.

375.    Specifically, Wells stated that she learned that she had a United Healthcare plan but that the plan did not her meet needs.   Wells stated that she did not recall enrolling into the health plan at all.

376.    In response, Navrides researched the issue on Healthsherpa and learned that Wells had been switched at least three times to different policies between November 2023 and January 22, 2024.

377.    Specifically, Navrides learned that Wells was switched into a Cigna Bronze plan by TrueCoverage agent Maurice Thrower, and then switched again into a United Healthcare plan by another agent, Gabriel Pasztor.

378.    In an effort to help Wells and get her enrolled into a policy that met her needs, on or about January 22, 2024, Navrides enrolled Wells into a Cigna Connect Gold Enhanced Diabetes Care plan, which would ensure that Wells' diabetes treatment and medication(s) would be covered

CASE NO. 0:24-cv-60591-DAMIAN/Valle

in an affordable way.

379.    Four days later, on January 26, 2024, TrueCoverage removed Navrides as AOR and replaced her with one of its downline agents, Francisco Umana, and then enrolled Wells into an Ambetter Everyday Gold plan.  TrueCoverage did so without Wells' valid consent.  The change caused Wells' Cigna Connect Gold Enhanced Diabetes Care plan to be canceled.

380.    On February 22, 2024, Wells received an unsolicited text message from TrueCoverage thanking her for enrolling into another Cigna health plan.   Wells does not recall consenting to enroll in another Cigna plan other than the one sold to her by Navrides.

381.    On March 18, 2024, Wells contacted Navrides and expressed concern that the pharmacy told her that her Cigna plan sold by Navrides had been cancelled and that her diabetes medication had a $50 copay.

382.    After learning about these issues, Navrides and Wells spent a significant amount of time unwinding the problem through the Marketplace.  Ultimately, they were able to reinstate the Cigna Connect Gold Enhanced Diabetes Care plan originally sold by Callie Navrides.

383.    As a result of these actions, Wells has been damaged.  Wells suffered significant damages including loss of benefits and medication.   Wells also suffered damage by having to expend unnecessary time fixing these problems.

**2.**     **The Agent Class Plaintiffs**

384.    <u>NavaQuote LLC</u>.  NavaQuote LLC is a small, family-owned and -operated insurance agency based in Augusta, Georgia.  NavaQuote was founded by the husband-and-wife team of Peter and Callie Navrides.  It specializes in health, life and Medicare insurance products.  Callie Navrides serves as the company's principal agent.  Peter Navrides leverages his background in software, marketing and technology to help grow the agency.

385.     NavaQuote takes pride in seeking to develop long-term relationships with its clients through trust and open communication.  To accomplish this, the Navarides commit themselves to the highest ethical standards and to providing expert guidance to help clients make informed insurance decisions.

386.     NavaQuote expends significant resources to market its services online and maintain an online presence, including its website.  The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of ACA health plans.  When NavaQuote sells an insurance policy through the Marketplace, Callie Navrides becomes listed as AOR and NavaQuote receives a monthly commission.

387.     Since the agency opened in October 2023, NavaQuote sold approximately 50 health plans to consumer, but lost 23 to the AOR Swaps.  Through continued and laborious researching, as well as frequent communication with their clients, the Navrides have determined that other agencies are removing Callie Navrides as AOR without the consent or knowledge of either NavaQuote or its clients.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Navrides as AOR, those agents are essentially stealing or poaching NavaQuote's clients — and its commissions.

388.     Each time a client is poached, Callie Navrides must spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent. The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the

CASE NO. 0:24-cv-60591-DAMIAN/Valle

reestablishment of Navrides' status as AOR.

389.    Through its investigation, which has been difficult, laborious and costly — not only in terms of lost time that could have been used to help more clients and generate more commissions, but also out-of-pocket costs expended through these efforts — NavaQuote has determined that TrueCoverage and Enhance Health agents are among the biggest offenders.

390.    As just a few examples, Enhance Health agent Daniel Pojoga poached NavaQuote client Conswallo Turner.  TrueCoverage agents including Francisco Umana and Maurice Thrower attempted to poach Angelina Wells from NavaQuote.

391.    The actions of TrueCoverage and Enhance Health have damaged NavaQuote through a loss of commissions.  It may take weeks for Healthcare.gov to reinstate Callie Navrides as agent of record.  If the calendar rolls into a new month during that period, she does not receive that month's commission.  It goes to the poacher.  NavaQuote has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional leads to replace lost clients.

392.    Because of TrueCoverage and Enhance Health's actions, NavaQuote intends to pivot away from sales of health insurance plans in the Marketplace.

393.    WINN Insurance Agency.  Marsha Broyer, who is licensed to sell insurance in 13 states, owns WINN Insurance Agency LLC.  Broyer's mission is to do what is right for her clients by providing the best service and the best health insurance products.  Broyer was one of only a handful of the thousands of licensed health insurance agents in the U.S. to be invited to participate in the 2023 CMS Agent and Broker Summit and provide feedback to the government.

394.    Broyer experienced first-hand the importance of comprehensive medical insurance.  In 2003, Broyer lost sight in her right eye.  Doctors discovered a brain tumor.  Fortunately, the

tumor was treated with gamma knife technology and Broyer regained her eyesight.  But because she had inadequate insurance, Broyer was left with tens of thousands of dollars in medical bills and had no choice but to file for bankruptcy.  This experience informs every interaction she has with her clients and potential clients.

395.  With the help of a $94,000 SBA loan, Broyer started WINN in October 2021. Working seven days a week, within a year she had developed 350 customers, largely through client referrals.

396.  WINN expends significant resources to market its services, including the creation and maintenance of a website and the purchase of exclusive leads, which cost $100 each.  The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of insurance policies.  When WINN sells an insurance policy through the Marketplace, Broyer becomes listed as AOR and receives a monthly sales commission of approximately $30 per month per member for each application.  So if a family of four is on a single application, WINN receives $1,440/year for that policy ($30 x 4 = $120 for 12 months).

397.  Since the beginning of 2023, Broyer has been removed as AOR more than 100 times from her clients' policies and replaced by agents that have no relationship to her.  More than 20 of those clients have been lost for good.  Through continued and laborious researching, as well as frequent communication with their clients, Broyer has determined that other agencies are removing her as AOR without consent.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Broyer as AOR, those agents are essentially stealing or poaching WINN's clients — and its commissions.

398.  Through Broyer's investigation, which has been difficult, laborious and costly — not only in terms of lost time that could have been used to help more clients and generate more

commissions, but also out-of-pocket costs expended through these efforts — WINN has determined that TrueCoverage and Enhance Health's agents are among the biggest offenders.

399.    Each time a client is poached, Broyer is forced to spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent.  The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the reestablishment of Broyer's status as AOR.

400.    And then, in all likelihood, Broyer must repeat this process all over again, because the switching occurs over and over.  One of WINN's clients, Langley, who is a 59-year-old with a pacemaker and a heart condition, has been switched no less than 20 times since February 2023.

401.    In all, Broyer estimates that she spends about 1/3 of her time dealing with this scheme.

402.    The actions of TrueCoverage and Enhance Health have damaged WINN through a loss of commissions.  It may take weeks for Healthcare.gov to reinstate Broyer as AOR.  If the calendar rolls into a new month during that period, WINN does not receive that month's commission.  It goes to the poaching agent.  WINN has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional leads to replace lost clients.

403.    Because of TrueCoverage and Enhance Health's actions, WINN has lost a sizeable percentage of its income.

# V.     RICO ALLEGATIONS

## A.     The Enterprise

404.     **The entities and individuals constituting the Enterprise include** Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Protect Health, NHA, Herman, Bain Insurance, Minerva and Bowsky.   It also includes relevant nonparties Harrison; the downlines and their principals; Inshura; JET Health Solutions; MME; PolicyBind; WeCall Media; MyACA; ScaleUp Media; Retreaver; Ringba; Savitt; Shapiro; and the Enhance Health downlines.

## B.     Allegations Relating to Violations of 1962(c)

405.     **The Enterprise's purpose** was to artificially and exponentially grow the newly developing, year-round industry for low-income ACA health insurance, and to use fraudulent means to exploit and capture as much of that industry as possible, as quickly as possible, for monetary gain.

406.     Defendants **conducted or participated, directly or indirectly, in the conduct of the affairs** of the Enterprise as follows:

a.     Bowsky directed the operations or management of the Enterprise through his ownership, membership and direction of Defendant Minerva, which controlled and routed the fraudulent leads distributed to TrueCoverage, Enhance Health and the downlines. Bowsky conceived of the industry derived from leads generated from fraudulent ads, promoted and assisted the creation of downlines and buyers, and sold and resold leads through his company Minerva.

b.     Minerva directed the Enterprise's affairs by becoming the largest purveyor of fraudulent leads to the Enterprise.  Minerva both created its own fraudulent advertising and

purchased it from other marketing companies and/or lead generators.  Through the use of Ringba and Retreaver dialing software, Minerva directed the fraudulently generated calls to the Enterprise, including TrueCoverage, Enhance Health and the downlines.  Minerva recorded and stored consumer calls for use by the Enterprise's customer service functions.

c.      <u>TrueCoverage</u> directed the Enterprise's affairs in numerous ways.  It acted as the upline agency for its downlines (which until early 2023, included Enhance Health and the Enhance Health downlines).  TrueCoverage not only obtained and misused Plaintiffs' and Class Members' PII itself, TrueCoverage created the downline structure of entities that expanded the sales capabilities of the Enterprise.  It recruited agents and placed them with the downlines, including Protect Health.  TrueCoverage facilitated the downlines' relationships with insurers, including the facilitation of the downlines' relationships with field market organizations (FMOs) like Messer Financial that allowed those downlines to immediately sell ACA insurance policies.  To many of the downlines, TrueCoverage provided key financing through the use of advanced commissions and/or prepaid commissions called "heap deals."  And to many if not all of the downlines, TrueCoverage provided training.  TrueCoverage facilitated the downlines' use of EDE Platforms Benefitalign and Inshura to access the Healthcare Marketplace.  TrueCoverage directed and monitored the downlines' fraudulent marketing and sales activities.  It provided fraudulent scripts to the downlines and/or consulted with the downlines on the fraudulent scripts used by the downlines.  It accounted for, audited and distributed commissions to the downlines for AOR Swaps and Twists, and received payments from the downlines.  TrueCoverage purchased fraudulent leads from Minerva and other fraudulent lead vendors.  It directed the downlines to do the same.  And beginning in mid-2022, TrueCoverage set

CASE NO. 0:24-cv-60591-DAMIAN/Valle

up call centers in India and Pakistan.  Those foreign call centers "fronted" consumer calls to TrueCoverage and the downlines.  TrueCoverage also produced its own fraudulent advertising and leads in India and distributed those leads to its agents and the downlines. TrueCoverage shared the Healthcare Marketplace data of U.S. consumers, including Plaintiffs and Class Members, with its operations in India and Pakistan in violation of CMS regulations.

d.      Speridian created, provided, directed, managed and maintained the Enterprise's technology platforms, including Benefitalign and Inshura, which allowed TrueCoverage and the downlines to access the Healthcare Marketplace.  Until mid-2023 when Enhance Health purchased its own platform, JET Health Solutions, Speridian provided, directed and managed the technology platforms used by Enhance Health and the Enhance Health downlines.  Speridian also entered into employment agreements with TrueCoverage agents and paid them a salary.

e.      Benefitalign provided, directed, managed and maintained the Enterprise's EDE platform Benefitalign, and provided TrueCoverage and the downlines with access to the Healthcare Marketplace.  Until late 2023 when Enhance Health began using its own platform, Benefitalign provided access to the Marketplace to Enhance Health and its downlines.

f.      Panicker directed the operations or management of the Enterprise through his ownership, membership and direction of Defendants TrueCoverage and Speridian, as well as the EDE Platforms Benefitalign and Inshura.  He directed the creatin of a downline network that included Enhance Health.

g.      Goldfuss directed the operations or management of the Enterprise by managing and

106

directing the fraudulent marketing and sales efforts of TrueCoverage and its downlines, and by incorporating and using leads generated by fraudulent ads, including ads purchased from Minerva.

h.     Enhance Health directed the Enterprise's affairs by becoming by far the largest TrueCoverage downline, much larger than even TrueCoverage.  Enhance Health obtained and misused Plaintiffs' and Class Members' PII.  It became the largest purchaser of Minerva's fraudulently generated leads.  It also directed the Enterprise's affairs by creating and directing its own downline structure of entities that expanded the Enterprise's reach dramatically.  These downlines typically included family, long-term friends or celebrity friends of Herman whom Herman could control.  Enhance Health recruited agents and placed them with the downlines, including for example Defendant NHA.  Enhance Health facilitated the downlines' relationships with insurers, including the facilitation of the downlines' relationships with field market organizations (FMOs) like Messer Financial that allowed those downlines to immediately sell ACA insurance policies.  To many if not all of the downlines, Enhance Health provided key financing through the use of advanced commissions and/or prepaid commissions called "heap deals."  And to many if not all of the downlines, Enhance Health provided training.  Shortly before the 2022 OEP, Enhance Health facilitated the downlines' use of JET Health Solutions' EDE Platform to access the Healthcare Marketplace.  Enhance Health directed and monitored the downlines' fraudulent marketing and sales activities.  It provided fraudulent scripts to the downlines and/or consulted with the downlines on the fraudulent scripts used by the downlines.  It accounted for, audited and distributed commissions to the downlines for AOR Swaps and Twists, and received payments from the downlines.  Enhance Health purchased fraudulent

CASE NO. 0:24-cv-60591-DAMIAN/Valle

leads from Minerva and other fraudulent lead vendors.  It directed the downlines to do the same.

i.      Herman directed the operations or management of the Enterprise through his ownership, membership and direction of Defendant Enhance Health.  He connected Enhance to TrueCoverage and Minerva.

j.      Bain Insurance directed the Enterprise's affairs by providing Enhance Health with $150 million to grow the operations of Enhance Health and by extension its downlines and the Enterprise.  Bain Insurance through its executives worked closely with Enhance Health and Herman, and participated in the direction of all aspects of Enhance Health's business, including its sales, marketing and customer service functions.

407.   **The Enterprise engaged in a pattern of racketeering activity**.  Defendants TrueCoverage, Speridian, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials by **wire and/or email** for the purpose of executing the scheme.  The materials that Defendants sent or caused to be sent include but were not limited to tens of thousands if not hundreds of thousands of social media advertisements, text messages and enrollment packets containing membership cards and customer service-related letters.  Defendants also transmitted (or routed) or caused to be transmitted by wire hundreds of thousands of consumer calls to the agencies comprising the Enterprise.  Minerva and Bowsky also received and monitored hundreds of thousands of consumer calls via wire.

408.   Defendants TrueCoverage, Speridian, Panicker, Goldfuss, Enhance Health, Herman and Bain Insurance violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received, materials **via U.S. mail or commercial interstate carriers** for the purpose of

CASE NO. 0:24-cv-60591-DAMIAN/Valle

executing the scheme.  The materials that Defendants TrueCoverage, Speridian, Panicker, Goldfuss, Enhance Health, Herman and Bain Insurance sent or caused to be sent include but were not limited to tens of thousands if not hundreds of thousands of enrollment packets containing membership cards, and customer service-related letters.

409.   Throughout its existence, the Enterprise engaged in, and its activities affected, **interstate commerce**.  The Enterprise involved commercial activities across state lines, including marketing campaigns, phone and internet solicitations and the solicitation and receipt by wire of money and PII from Consumer Class Plaintiffs and class members across the country.

410.   Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky **had knowledge of the essential nature of the scheme**.  They knew that false advertisements were being used to lure consumers to enroll in ACA healthcare plans, misuse PII and capture commissions.  They knew about the use of PII to perpetrate AOR Swaps, Twisting and Dual Apps.  Despite that knowledge, Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky committed the predicate acts of wire and mail fraud described above.

411.   Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky **each has an ascertainable structure** separate and apart from the pattern of racketeering activity in which they engaged.  The Enterprise is separate and distinct from Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky.  Defendants TrueCoverage, Speridian, Enhance Health, Bain Insurance and Minerva each has aspects of their respective businesses that are not fraudulent or involved with the scheme alleged in this lawsuit.

412.    Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky committed or caused to be committed hundreds of thousands of racketeering acts.  The **racketeering acts were not isolated, but rather were related** in that they had the same or similar purposes and results, participants, victims and methods of commission.  Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky were able to commit the racketeering offenses because of their respective positions in the Enterprise and/or their involvement or control over the Enterprise's affairs.

413.    Further, the **racketeering acts were continuous**, occurring on a regular (daily) basis throughout a time period beginning in 2022 through the present.  The racketeering activity threatens to extend into the future.  For example, upon the undersigned's January 2024 press release regarding an investigation into TrueCoverage's activities, TrueCoverage sent many of its agents to downlines, ostensibly to reduce the financial impact of any lawsuit directed at TrueCoverage and allow the scheme to continue.  And upon the filing of this lawsuit in April 2024, Enhance Health and Herman opened at least one new downline as other downlines closed in reaction to the public scrutiny.  A recently terminated employees claims that Enhance Health continues to use the fraudulently generated leads.

414.    Defendants TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Enhance Health, Herman, Bain Insurance, Minerva and Bowsky **benefited from the pattern of racketeering activity**.  It lured consumers to provide their PII and sign them up for ACA healthcare plans that could then be AOR Swapped, Twisted or Dual Apped for money.  The activity created a larger industry, greater market share within that industry, and profits.

# VI.    CLASS ACTION ALLEGATIONS

415.    Class Plaintiffs bring this lawsuit as a class action on behalf of themselves and all

others similarly situated as members of the proposed Classes described as follows:

**Consumer Class**.    Each individual who, within the applicable statutes of
limitations:

(i)    responded to an advertisement falsely offering cash benefits that
resulted in the individual being enrolled in an ACA policy through
TrueCoverage, Enhance Health, Protect Health, NHA, their agents and/or
subagents;

(ii)    had an existing ACA policy's agent of record changed by
TrueCoverage, Enhance Health, Protect Health, NHA, their agents and/or
subagents; and/or

(iii)    had an existing ACA policy's carrier or plan level changed by
TrueCoverage, Enhance Health, Protect Health, NHA, their agents and/or
subagents.

**Agent Class**.    Each insurance agent with a national provider number who, within the
applicable statutes of limitations, was removed or replaced as "agent of record" on a
consumer's ACA policy by TrueCoverage, Enhance Health, Protect Health.

**Data Breach Class 1**.    Within the applicable statutes of limitations, each individual
residing in the United States whose personal identifiable information was compromised in
an incident or breach, as those terms are defined by OMB M-17-12 and OMB M-18-2,
from the CMS Marketplace database through the EDE platforms BenefitAlign, Inshura
and/or Jet Health.

**Data Breach Class 2**.    Within the applicable statutes of limitations, each individual
residing in the United States whose phone call(s) was recorded by Defendants without valid
consent.

416.    The Customer Class is represented by Turner, King, Wells and Foreman.  The

Agent Class is represented by NavaQuote and Broyer.

417.    Excluded from the Classes are TrueCoverage, Enhance Health, Speridian, Minerva,

their agents and/or subagents, and their directors, officers, employees or independent contractors.

418.    This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the

numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

419.   <u>Numerosity</u>.   The members of the Classes are so numerous that joinder of all members is impracticable.   The Customer Class exceeds the numerosity requirement because hundreds of thousands of consumers have been victimized by the scheme.   The false ads that created leads to TrueCoverage, Enhance Health and their downlines resulted in hundreds of thousands of enrollments by class members.   As for the Agent Class, the CMS reported that 74,100 Marketplace-registered agents and brokers assisted on nearly 5.5 million consumers enrolled in 2023 OEP alone.

420.   <u>Commonality</u>.   There are numerous questions of fact or law that are common to Class Plaintiffs and all the members of the Classes.   Common issues of fact and law predominate over any issues unique to individual class members.   Issues that are common to all class members include, but are not limited to the following:

a.   Whether Defendants, their agents and/or subagents engaged in a scheme to buy and utilize leads generated from advertisements that falsely offered consumers cash benefits;

b.   Whether Defendants, their agents and/or subagents engaged in, directed or helped cause AOL Swaps, Twisting and/or Dual-Apps;

c.   Whether Defendants, their agents and/or subagents obtained Class Plaintiffs' and class members' PII without their knowledge and used it to enroll them in an ACA policy;

d.   Whether Defendants directed, operated and/or managed the scheme;

e.   Whether Defendants violated 18 U.S.C. § 1962(c) or (d);

    f.   Whether Defendants violated a duty to prevent Class Plaintiffs' and class members' PII from unlawfully being accessed, collected, used or disclosed;

    g.   Whether Class Plaintiffs and class members suffered damages; and

    h.   Whether Class Plaintiffs and class members are entitled to treble damages, punitive damages, attorneys' fees and/or expenses.

421.    <u>Typicality</u>.  Turner, King, Wells and Foreman have claims that are typical of the members of the Consumer Class in that they received a false advertisement that caused them to purchase an ACA plan from TrueCoverage, Enhance Health, their agents and/or subagents. Turner, King, Wells and Foreman were all the victim of AOL Swaps, Twisting and/or Dual Apps. NavaQuote and Broyer have claims that are typical of the members of the Agent Class.  Each was damaged when they were removed as AOR on their clients' ACA health insurance plans. Furthermore, the claims of the Classes arise under legal theories that apply to Class Plaintiffs and all other class members within those respective Classes.

422.    <u>Adequacy of Representation</u>.  Class Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Class Plaintiffs do not have claims that are unique to Class Plaintiffs and not the other class members within their respective Classes, nor are there defenses unique to Class Plaintiffs that could undermine the efficient resolution of the claims of the Classes.  Further, Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.  There is no hostility between Class Plaintiffs and the unnamed class members.  Class Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

423.    <u>Predominance</u>.  Common questions of law and fact predominate over questions affecting only individual class members.  The only individual issues likely to arise will be the

amount of damages recovered by each class member, the calculation of which does not bar certification.

424.    <u>Superiority</u>.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.  The damages sought by Class Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

425.    <u>Manageability</u>.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

426.    <u>Ascertainability</u>.   Class members are readily ascertainable.   Some or all of Defendants keep detailed electronic records that show, among other information, the false advertisements, the names of those who responded to the false advertisements and the names and transaction histories of class members whose plan or AOR status was changed by one or more Defendants.

**<u>COUNT 1</u>**
**(Violation of RICO § 1962(c) Against TrueCoverage)**

427.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

428.    The Enterprise engages in, and its activities affect, interstate commerce.

429.    Defendant TrueCoverage is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

430.   TrueCoverage is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

431.   The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

432.   TrueCoverage has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that TrueCoverage has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

433.   TrueCoverage has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

434.   TrueCoverage knows about and directs these activities.

435.   TrueCoverage obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

436.   Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of TrueCoverage's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

437.   Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of TrueCoverage's violations of 18 U.S.C. § 1962, including loss of

commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

438.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of TrueCoverage.

439.    TrueCoverage knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

440.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 2
### (Violation of RICO § 1962(c) Against Speridian Technologies)

441.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

442.    The Enterprise engages in, and its activities affect, interstate commerce.

443.    Defendant Speridian is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

444.    Speridian is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5),

comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

445.   The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

446.   Speridian has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Speridian has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

447.   Speridian has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

448.   Speridian knows about and directs these activities.

449.   Speridian obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

450.   Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Speridian's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

451.   Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Speridian's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

452.     Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Speridian.

453.     Speridian knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

454.     Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Speridian awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 3</u>
### (Violation of RICO § 1962(c) Against Benefitalign)

455.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

456.     The Enterprise engages in, and its activities affect, interstate commerce.

457.     Defendant Benefitalign is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

458.     Benefitalign is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

459.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

460.    Benefitalign has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Benefitalign has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

461.    Benefitalign has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

462.    Benefitalign knows about and directs these activities.

463.    Benefitalign obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

464.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Benefitalign's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

465.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Benefitalign's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

466.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Benefitalign.

467.    Benefitalign knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## **COUNT 4**
### **(Violation of RICO § 1962(c) Against Panicker)**

468.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

469.    The Enterprise engages in, and its activities affect, interstate commerce.

470.    Defendant Panicker is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

471.    Panicker is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

472.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

473.    Panicker has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Panicker has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

474.    Panicker has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

475.    Panicker knows about and directs these activities.

476.    Panicker obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

477.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Panicker's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

478.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Panicker's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

479.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Panicker.

480.    Panicker knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

481.     Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 5
### (Violation of RICO § 1962(c) Against Goldfuss)

482.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

483.     The Enterprise engages in, and its activities affect, interstate commerce.

484.     Defendant Goldfuss is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

485.     Goldfuss is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

486.     The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

487.     Goldfuss has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10

years.  The multiple acts of racketeering activity that Goldfuss has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

488.    Goldfuss has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

489.    Goldfuss knows about and directs these activities.

490.    Goldfuss obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

491.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Goldfuss' violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

492.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Goldfuss' violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

493.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Goldfuss.

494.    Goldfuss knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

495.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class

Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 6
### (Violation of RICO § 1962(c) Against Enhance Health)

496.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 44, 68-194, 207-315 and 317-425 as if fully set forth herein.

497.    The Enterprise engages in, and its activities affect, interstate commerce.

498.    Defendant Enhance Health is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

499.    Enhance Health is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

500.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

501.    Enhance Health has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Enhance Health has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

502.    Enhance Health has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

503.    Enhance Health knows about and directs these activities.

504.    Enhance Health obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

505.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Enhance Health's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

506.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Enhance Health's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

507.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Enhance Health.

508.    Enhance Health knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

509.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Enhance Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 7
### (Violation of RICO § 1962(c) Against Herman)

510.   Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 45, 68-140, 162-194, 207-315 and 317-425 as if fully set forth herein.

511.   The Enterprise engages in, and its activities affect, interstate commerce.

512.   Defendant Herman is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

513.   Herman is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

514.   The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

515.   Herman has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Herman has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

516.   Herman has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and

perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

517.    Herman knows about and directs these activities.

518.    Herman obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

519.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Herman's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

520.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Herman's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

521.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Herman.

522.    Herman knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

523.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Herman awarding actual damages, treble

damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 8
### (Violation of RICO § 1962(c) Against Bain Insurance)

524.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 46-48, 68-194, 207-315 and 317-425 as if fully set forth herein.

525.    The Enterprise engages in, and its activities affect, interstate commerce.

526.    Defendant Bain Insurance is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

527.    Bain Insurance is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

528.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

529.    Bain Insurance has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Bain Insurance has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

530.    Bain Insurance has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

531.    Bain Insurance knows about and directs these activities.

532.    Bain Insurance obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

533.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Bain Insurance's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

534.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Bain Insurance's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

535.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Bain Insurance.

536.    Bain Insurance knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

537.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Bain Insurance awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**COUNT 9**
**(Violation of RICO § 1962(c) Against Minerva)**

538.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 64, 68-203, 207-425 as if fully set forth herein.

539.     The Enterprise engages in, and its activities affect, interstate commerce.

540.     Defendant Minerva is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

541.     Minerva is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

542.     The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

543.     Minerva has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Minerva has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

544.     Minerva has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

545.     Minerva knows about and directs these activities.

546.     Minerva obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

547.     Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Minerva's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

548.     Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Minerva's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

549.     Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Minerva.

550.     Minerva knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

551.     Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Minerva awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 10</u>
### (Violation of RICO § 1962(c) Against Bowsky)

552.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 65-66, 68-203 and 207-425 as if fully set forth herein.

553.    The Enterprise engages in, and its activities affect, interstate commerce.

554.    Defendant Bowsky is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

555.    Bowsky is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

556.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

557.    Bowsky has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Bowsky has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

558.    Bowsky has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

559.    Bowsky knows about and directs these activities.

560.    Bowsky obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

561.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Bowsky's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

562.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Bowsky's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

563.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Bowsky.

564.    Bowsky knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

565.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Bowsky awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

### <u>COUNT 11</u>
**(Section 1962(d) RICO Conspiracy Against TrueCoverage)**

566.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

567.    TrueCoverage agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, TrueCoverage conspired with others within the Enterprise, including but not necessarily limited to its downlines, Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

568.    With knowledge of the essential nature of the scheme, TrueCoverage committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

569.    TrueCoverage agreed that others within the Enterprise, including but not necessarily limited to including its downlines, Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

570.    As a direct and proximate result of TrueCoverage's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## <u>COUNT 12</u>
### (Section 1962(d) RICO Conspiracy Against Speridian Technologies)

571.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

572.    Speridian agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Speridian conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

573.    With knowledge of the essential nature of the scheme, Speridian committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

574.    Speridian agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

575.    As a direct and proximate result of Speridian's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Speridian awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 13</u>
### (Section 1962(d) RICO Conspiracy Against Benefitalign)

576.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

577.    Benefitalign agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Benefitalign conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Speridian, Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

578.    With knowledge of the essential nature of the scheme, Benefitalign committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

579.    Benefitalign agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

 As a direct and proximate result of Benefitalign's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

### <u>COUNT 14</u>
**(Section 1962(d) RICO Conspiracy Against Panicker)**

580.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

581.    Panicker agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Panicker conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

582.    With knowledge of the essential nature of the scheme, Panicker committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

583.    Panicker agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

584.    As a direct and proximate result of Panicker's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 15</u>
### (Section 1962(d) RICO Conspiracy Against Goldfuss)

585.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

586.     Goldfuss agreed and conspired to violate 18 U.S.C. § 1962(c).   Specifically, Goldfuss conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

587.     With knowledge of the essential nature of the scheme, Goldfuss committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.   That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

588.     Goldfuss agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

589.     As a direct and proximate result of Goldfuss's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## <u>COUNT 16</u>
### (Section 1962(d) RICO Conspiracy Against Protect Health)

590.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 62, 68-203 and 207-425 as if fully set forth herein.

591.     Protect Health agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Protect Health conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

592.     With knowledge of the essential nature of the scheme, Protect Health committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

593.     Protect Health agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, Minerva and their respective principals, would commit other predicate acts as well.

594.     As a direct and proximate result of Protect Health's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Protect Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 17</u>
### (Section 1962(d) RICO Conspiracy Against Enhance Health)

595.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 44, 68-194, 207-315 and 317-425 as if fully set forth herein.

596.    Enhance Health agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Enhance Health conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, Enhance Health's downlines, Bain Insurance, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

597.    With knowledge of the essential nature of the scheme, Enhance Health committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

598.    Enhance Health agreed that others within the Enterprise, including but not necessarily limited to including TrueCoverage, Enhance Health's downlines, Bain Insurance, Minerva and their respective principals, would commit other predicate acts as well.

599.    As a direct and proximate result of Enhance Health's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Enhance Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## <u>COUNT 18</u>
### (Section 1962(d) RICO Conspiracy Against Herman)

600.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 45, 68-140, 162-194, 207-315 and 317-425 as if fully set forth herein.

601.    Herman agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Herman conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, Enhance Health's downlines, Bain Insurance, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

602.    With knowledge of the essential nature of the scheme, Herman committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

603.    Herman agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, Enhance Health's downlines, Bain Insurance, Minerva and their respective principals, would commit other predicate acts as well.

604.    As a direct and proximate result of Herman's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

605.    WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Herman awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 19</u>
### (Section 1962(d) RICO Conspiracy Against Bain Insurance)

606.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 46-48, 68-194, 207-315 and 317-425 as if fully set forth herein.

607.     Bain Insurance agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Bain Insurance conspired with others within the Enterprise, including but not necessarily limited to Enhance Health, its downlines, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

608.     With knowledge of the essential nature of the scheme, Bain Insurance committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

609.     Bain Insurance agreed that others within the Enterprise, including but not necessarily limited to Enhance Health, its downlines, Minerva and their respective principals, would commit other predicate acts as well.

610.     As a direct and proximate result of Bain Insurance's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Bain Insurance awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

<u>**COUNT 20**</u>
**(Section 1962(d) RICO Conspiracy Against Net Health)**

611.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 63, 68-194, 207-296 and 307-315 as if fully set forth herein.

612.     Net Health agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Net Health conspired with others within the Enterprise, including but not necessarily limited to Enhance Health, Minerva and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

613.     With knowledge of the essential nature of the scheme, Net Health committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

614.     Net Health agreed that others within the Enterprise, including but not necessarily limited to Enhance Health, Minerva and their respective principals, would commit other predicate acts as well.

615.     As a direct and proximate result of Net Health's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Net Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## <u>COUNT 21</u>
### (Section 1962(d) RICO Conspiracy Against Minerva)

616.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 64, 68-203, 207-425 as if fully set forth herein.

617.     Minerva agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Minerva conspired with others within the Enterprise, including but not necessarily limited to True Coverage, Enhance Health, their downlines and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

618.     With knowledge of the essential nature of the scheme, Minerva committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

619.     Minerva agreed that others within the Enterprise, including but not necessarily limited to True Coverage, Enhance Health, their downlines and their respective principals, would commit other predicate acts as well.

620.     As a direct and proximate result of Minerva's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Minerva awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 22</u>
### (Section 1962(d) RICO Conspiracy Against Bowsky)

621.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 65-66, 68-203 and 207-425 as if fully set forth herein.

622.    Bowsky agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Bowsky conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, Enhance Health, their downlines their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

623.    With knowledge of the essential nature of the scheme, Bowsky committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

624.    Bowsky agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, Enhance Health, their downlines their respective principals, would commit other predicate acts as well.

625.    As a direct and proximate result of Bowsky's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Bowsky awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

<u>**COUNT 23**</u>
**(Aiding and Abetting a Violation of RICO Section 1962(c) Against TrueCoverage)**

626.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

627.     TrueCoverage aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

628.     TrueCoverage had knowledge of the scheme and provided substantial assistance toward its commission.

629.     TrueCoverage substantially benefited from its participation in the scheme, including but not limited to monetarily.

630.     As a direct and proximate result of TrueCoverage aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 24</u>
**(Aiding and Abetting a Violation of RICO Section 1962(c) Against Speridian Technologies)**

631.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

632.     Speridian aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

633.     Speridian had knowledge of the scheme and provided substantial assistance toward its commission.

634.     Speridian substantially benefited from its participation in the scheme, including but not limited to monetarily.

635.     As a direct and proximate result of Speridian aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Speridian awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 25
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Benefitalign)

636.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

637.    Benefitalign aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

638.    Benefitalign had knowledge of the scheme and provided substantial assistance toward its commission.

639.    Benefitalign substantially benefited from its participation in the scheme, including but not limited to monetarily.

As a direct and proximate result of Benefitalign aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 26
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Panicker)

640.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

641.     Panicker aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

642.     Panicker had knowledge of the scheme and provided substantial assistance toward its commission.

643.     Panicker substantially benefited from participation in the scheme, including but not limited to monetarily.

644.     As a direct and proximate result of Panicker aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 27</u>
### (Aiding and Abetting a Violation of RICO Section 1962V(c) Against Goldfuss)

645.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

646.     Goldfuss aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to

improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

647.    Goldfuss had knowledge of the scheme and provided substantial assistance toward its commission.

648.    Goldfuss substantially benefited from participation in the scheme, including but not limited to monetarily.

649.    As a direct and proximate result of Goldfuss aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

### <u>COUNT 28</u>
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Protect Health)

650.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 62, 68-203 and 207-425 as if fully set forth herein.

651.    Protect Health aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

652.    Protect Health had knowledge of the scheme and provided substantial assistance toward its commission.

653.     Protect Health substantially benefited from participation in the scheme, including but not limited to monetarily.

654.     As a direct and proximate result of Protect Health aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Protect Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 29
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Enhance Health)

655.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 44, 68-194, 207-315 and 317-425 as if fully set forth herein.

656.     Enhance Health aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

657.     Enhance Health had knowledge of the scheme and provided substantial assistance toward its commission.

658.     Enhance Health substantially benefited from participation in the scheme, including but not limited to monetarily.

659.    As a direct and proximate result of Enhance Health aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Enhance Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 30
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Herman)

660.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 45, 68-140, 162-194, 207-315 and 317-425 as if fully set forth herein.

661.    Herman aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

662.    Herman had knowledge of the scheme and provided substantial assistance toward its commission.

663.    Herman substantially benefited from participation in the scheme, including but not limited to monetarily.

664.    As a direct and proximate result of Herman aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Herman awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## **COUNT 31**
### **(Aiding and Abetting a Violation of RICO Section 1962(c) Against Bain Insurance)**

665.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 46-48, 68-194, 207-315 and 317-425 as if fully set forth herein.

666.    Bain Insurance aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

667.    Bain Insurance had knowledge of the scheme and provided substantial assistance toward its commission.

668.    Bain Insurance substantially benefited from participation in the scheme, including but not limited to monetarily.

669.    As a direct and proximate result of Bain Insurance aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Bain Insurance awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 32
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Net Health)

670.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 63, 68-194, 207-296 and 307-315 as if fully set forth herein.

671.     Net Health aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

672.     Net Health had knowledge of the scheme and provided substantial assistance toward its commission.

673.     Net Health substantially benefited from participation in the scheme, including but not limited to monetarily.

674.     As a direct and proximate result of Net Health aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Net Health awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 33
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Minerva)

675.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 64, 68-203, 207-425 as if fully set forth herein.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

676.     Minerva aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

677.     Minerva had knowledge of the scheme and provided substantial assistance toward its commission.

678.     Minerva substantially benefited from participation in the scheme, including but not limited to monetarily.

679.     As a direct and proximate result of Minerva aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Minerva awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 34
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Bowsky)

680.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 65-66, 68-203 and 207-425 as if fully set forth herein.

681.     Bowsky aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to

improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

682.    Bowsky had knowledge of the scheme and provided substantial assistance toward its commission.

683.    Bowsky substantially benefited from participation in the scheme, including but not limited to monetarily.

684.    As a direct and proximate result of Bowsky aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Bowsky awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 35</u>
### (Aiding and Abetting Fraud Against TrueCoverage)

685.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

686.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

687.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

688.     TrueCoverage knew about and/or discovered the fraud.

689.     Despite this knowledge, True Coverage substantially assisted in the fraud.

690.     In connection with providing substantial and material assistance to the fraud, TrueCoverage knew its role in the scheme and knowingly acted in assisting.

691.     TrueCoverage substantially benefited from participation in the scheme, including but not limited to monetarily.

692.     As a direct and proximate result of TrueCoverage's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of TrueCoverage's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against TrueCoverage for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 36
### (Aiding and Abetting Fraud Against Speridian Technologies)

693.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

694.     As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

695.     Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

696.    Speridian knew about and/or discovered the fraud.

697.    Despite this knowledge, Speridian substantially assisted in the fraud.

698.    In connection with providing substantial and material assistance to the fraud, Speridian knew its role in the scheme and knowingly acted in assisting.

699.    Speridian substantially benefited from participation in the scheme, including but not limited to monetarily.

700.    As a direct and proximate result of Speridian's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

**COUNT 37**
**(Aiding and Abetting Fraud Against Benefitalign)**

701.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

702.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

703.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

704.    Benefitalign knew about and/or discovered the fraud.

705.    Despite this knowledge, Benefitalign substantially assisted in the fraud.

706.    In connection with providing substantial and material assistance to the fraud, Speridian knew its role in the scheme and knowingly acted in assisting.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

707.     Benefitalign substantially benefited from participation in the scheme, including but not limited to monetarily.

708.     As a direct and proximate result of Benefitalign's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Benefitalign for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 38
### (Aiding and Abetting Fraud Against Panicker)

709.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

710.     As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

711.     Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

712.     Panicker knew about and/or discovered the fraud.

713.     Despite this knowledge, Panicker substantially assisted in the fraud.

714.     In connection with providing substantial and material assistance to the fraud, Panicker knew his role in the scheme and knowingly acted in assisting.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

715.    Panicker substantially benefited from participation in the scheme, including but not limited to monetarily.

716.    As a direct and proximate result of Panicker's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Panicker's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Panicker for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 39
### (Aiding and Abetting Fraud Against Goldfuss)

717.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

718.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

719.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

720.    Goldfuss knew about and/or discovered the fraud.

721.    Despite this knowledge, Goldfuss substantially assisted in the fraud.

722.    In connection with providing substantial and material assistance to the fraud, Goldfuss knew his role in the scheme and knowingly acted in assisting.

723.    Goldfuss substantially benefited from participation in the scheme, including but not limited to monetarily.

724.    As a direct and proximate result of Goldfuss' aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Goldfuss' profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Goldfuss for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

**COUNT 40**
**(Aiding and Abetting Fraud Against Enhance Health)**

725.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 44, 68-194, 207-315 and 317-425 as if fully set forth herein.

726.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

727.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

728.    Enhance Health knew about and/or discovered the fraud.

729.    Despite this knowledge, Enhance Health substantially assisted in the fraud.

730.    In connection with providing substantial and material assistance to the fraud, Enhance Health knew its role in the scheme and knowingly acted in assisting.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

731.    Enhance Health substantially benefited from participation in the scheme, including but not limited to monetarily.

732.    As a direct and proximate result of Enhance Health's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Enhance Health's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Enhance Health for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 41
### (Aiding and Abetting Fraud Against Herman)

733.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 45, 68-140, 162-194, 207-315 and 317-425 as if fully set forth herein.

734.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

735.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

736.    Herman knew about and/or discovered the fraud.

737.    Despite this knowledge, Herman substantially assisted in the fraud.

738.    In connection with providing substantial and material assistance to the fraud, Herman knew his role in the scheme and knowingly acted in assisting.

739.    Herman substantially benefited from participation in the scheme, including but not limited to monetarily.

740.    As a direct and proximate result of Herman's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Herman's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Herman for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 42
### (Aiding and Abetting Fraud Against Bain Insurance)

741.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 46-48, 68-194, 207-315 and 317-425 as if fully set forth herein.

742.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

743.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

744.    Bain Insurance knew about and/or discovered the fraud.

745.    Despite this knowledge, Bain Insurance substantially assisted in the fraud.

746.    In connection with providing substantial and material assistance to the fraud, Bain Insurance knew its role in the scheme and knowingly acted in assisting.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

747.    Bain Insurance substantially benefited from participation in the scheme, including but not limited to monetarily.

748.    As a direct and proximate result of Bain Insurance's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Bain Insurance's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Bain Insurance for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

**COUNT 43**
**(Aiding and Abetting Fraud Against Minerva)**

749.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 64, 68-203, 207-425 as if fully set forth herein.

750.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

751.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

752.    Minerva knew about and/or discovered the fraud.

753.    Despite this knowledge, Minerva substantially assisted in the fraud.

754.    In connection with providing substantial and material assistance to the fraud, Minerva knew its role in the scheme and knowingly acted in assisting.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

755.    Minerva substantially benefited from participation in the scheme, including but not limited to monetarily.

756.    As a direct and proximate result of Minerva's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Minerva's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Minerva for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 44
### (Aiding and Abetting Fraud Against Bowsky)

757.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 65-66, 68-203 and 207-425 as if fully set forth herein.

758.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

759.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

760.    Bowsky knew about and/or discovered the fraud.

761.    Despite this knowledge, Bowsky substantially assisted in the fraud.

762.    In connection with providing substantial and material assistance to the fraud, Bowsky knew his role in the scheme and knowingly acted in assisting.

763.    Bowsky substantially benefited from participation in the scheme, including but not limited to monetarily.

764.    As a direct and proximate result of Bowsky's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Bowsky's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Bowsky for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 45
### (Aiding and Abetting a Breach of Fiduciary Duty Against TrueCoverage)

765.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

766.    The downlines, Enhance Health and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

767.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

768.    TrueCoverage knew about these fiduciary duties.

769.    TrueCoverage knew that these fiduciary duties were being breached.

770.    Despite this knowledge, TrueCoverage substantially assisted in the breach of fiduciary duties.

771.    And TrueCoverage substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

772.    As a direct and proximate result of TrueCoverage's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of TrueCoverage's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against TrueCoverage for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 46
### (Aiding and Abetting a Breach of Fiduciary Duty Against Speridian Technologies)

773.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

774.    TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

775.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

776.    Speridian knew about these fiduciary duties.

777.    Speridian knew that these fiduciary duties were being breached.

778.    Despite this knowledge, Speridian substantially assisted in the breach of fiduciary duties.

779.     And Speridian substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

780.     As a direct and proximate result of Speridian's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Speridian for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 47
**(Aiding and Abetting a Breach of Fiduciary Duty Against Benefitalign)**

781.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

782.     TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

783.     As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

784.     Benefitalign knew about these fiduciary duties.

785.     Benefitalign knew that these fiduciary duties were being breached.

786.     Despite this knowledge, Benefitalign substantially assisted in the breach of fiduciary duties.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

787.     And Benefitalign substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

788.     As a direct and proximate result of Benefitalign's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Benefitalign's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Benefitalign for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 48
### (Aiding and Abetting a Breach of Fiduciary Duty Against Panicker)

789.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

790.     TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

791.     As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

792.     Panicker knew about these fiduciary duties.

793.     Panicker knew that these fiduciary duties were being breached.

794.     Despite this knowledge, Panicker substantially assisted in the breach of fiduciary duties.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

795.    And Panicker substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

796.    As a direct and proximate result of Panicker's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Panicker's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Panicker for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 49
### (Aiding and Abetting a Breach of Fiduciary Duty Against Goldfuss)

797.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

798.    TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

799.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

800.    Goldfuss knew about these fiduciary duties.

801.    Goldfuss knew that these fiduciary duties were being breached.

802.    Despite this knowledge, Goldfuss substantially assisted in the breach of fiduciary duties.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

803.    And Goldfuss substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

804.    As a direct and proximate result of Goldfuss' aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Goldfuss' profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Goldfuss for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

**COUNT 50**
**(Aiding and Abetting a Breach of Fiduciary Duty Against Enhance Health)**

805.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 44, 68-194, 207-315 and 317-425 as if fully set forth herein.

806.    TrueCoverage, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

807.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

808.    Enhance Health knew about these fiduciary duties.

809.    Enhance Health knew that these fiduciary duties were being breached.

810.    Despite this knowledge, Enhance Health substantially assisted in the breach of fiduciary duties.

811.    And Enhance Health substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

812.    As a direct and proximate result of Enhance Health's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Enhance Health's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Enhance Health for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### **COUNT 51**
**(Aiding and Abetting a Breach of Fiduciary Duty Against Herman)**

813.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 45, 68-140, 162-194, 207-315 and 317-425 as if fully set forth herein.

814.    TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

815.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

816.    Herman knew about these fiduciary duties.

817.    Herman knew that these fiduciary duties were being breached.

818.    Despite this knowledge, Herman substantially assisted in the breach of fiduciary duties.

819.    And Herman substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

820.    As a direct and proximate result of Herman's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Herman's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Herman for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 52
**(Aiding and Abetting a Breach of Fiduciary Duty Against Bain Insurance)**

821.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 46-48, 68-194, 207-315 and 317-425 as if fully set forth herein.

822.    Enhance Health, its downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

823.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

824.    Bain Insurance knew about these fiduciary duties.

825.    Bain Insurance knew that these fiduciary duties were being breached.

826.    Despite this knowledge, Bain Insurance substantially assisted in the breach of fiduciary duties.

827.    And Bain Insurance substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

828.    As a direct and proximate result of Bain Insurance's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Bain Insurance's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Bain Insurance for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 53
**(Aiding and Abetting a Breach of Fiduciary Duty Against Minerva)**

829.    Class Plaintiffs incorporate the allegations of paragraphs 1 through ___ as if fully set forth herein.

830.    TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

831.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

832.    Minerva knew about these fiduciary duties.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

833.    Minerva knew that these fiduciary duties were being breached.

834.    Despite this knowledge, Minerva substantially assisted in the breach of fiduciary duties.

835.    And Minerva substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

836.    As a direct and proximate result of Minerva's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Minerva's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Minerva for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 54
**(Aiding and Abetting a Breach of Fiduciary Duty Against Bowsky)**

837.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 65-66, 68-203 and 207-425 as if fully set forth herein.

838.    TrueCoverage, Enhance Health, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

839.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

840.    Bowsky knew about these fiduciary duties.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

841.  Bowsky knew that these fiduciary duties were being breached.

842.  Despite this knowledge, Bowsky substantially assisted in the breach of fiduciary duties.

843.  And Bowsky substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

844.  As a direct and proximate result of Bowsky's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Bowsky's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Bowsky for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 55
### (Negligence Against All Defendants Except Bain Insurance)

845.  Plaintiffs restate and reallege Paragraphs 1 through 425 as if fully set forth herein.

846.  Federal agencies, including the United States Department of Health and Human Services (HHS) and CMS, are required to have policies in place to prepare for and respond to breaches of personally identifiable information ("PII").

847.  On or about January 17, 2017, the Executive Office of the President, Office of Management and Budget ("OMB") issued OMB M-17-12, which sets forth the policies and procedures for HHS and CMS to prepare and respond to a breach of the CMS Marketplace database, which is a Federal Information System.  See OMB M-17-12 at 8.

848.  Pursuant to OMB M-17-12, consumers' data contained in the CMS Marketplace database falls within the definition of Federal Information, i.e. information created, collected,

processed, maintained, disseminated, disclosed, or disposed of by or for the Federal Government, in any medium or form. *Id*., see also Glossary at 47.

849.    "Federal Information" includes consumers' "Personally Identifiable Information" ("PII") contained in the CMS Marketplace database.

850.    Pursuant to OMB M-17-12, PII is defined as "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual." *Id.*

851.    Pursuant to OMB M-17-12, a "Breach" is defined as "the loss of control, compromise, <u>unauthorized disclosure</u>, unauthorized acquisition, or any similar occurrence where (1) <u>a person other than an authorized user accesses or potentially accesses personally identifiable information</u> or (2) <u>an authorized user accesses personally identifiable information for an other than authorized purpose</u>." *Id*. (emphasis added).

852.    Pursuant to OMB M-17-12, an "Incident" means an occurrence that (1) actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality, or availability of information or an information system; or (2) constitutes a violation of imminent threat of violation of law, security policies, security procedures, or acceptable use policies."

853.    OMB M-18-2 further defines a breach as "a type of incident and <u>constitutes a major incident</u> when it involves <u>personally identifiable information (PII) that, if exfiltrated, modified, deleted, or otherwise compromised, is likely to result in demonstrable harm to</u> the national security interests, foreign relations, or <u>economy of the United States</u>, or to the <u>public confidence</u>, civil liberties, or <u>public health and safety of the American people</u>." (emphasis added).

854.    In determining whether a breach or incident constitutes a "major incident," DHS and CMS are directed in OMB M-18-2 to access each breach on a case-by-case basis, the

memorandum states that "<u>an unauthorized modification of, unauthorized deletion of, unauthorized exfiltration of, or unauthorized access to 100,000 or more individuals' PII</u> automatically constitutes a "major breach." (emphasis added).

855.    Defendants TrueCoverage, Enhance Health, Protect Health, NHA, their downlines and agents used the BenefitAlign, Inshura, and Jet Health EDE platforms to access Plaintiffs' and class members' PII on the CMS Marketplace database without authorization or for an other than authorized purpose, i.e. AOR Swaps, Twisting and Dual Apps.

856.    In addition, Defendants TrueCoverage, Enhance Health, Protect Health, NHA, their downlines and agents allowed Bowsky and Minerva to record and collect Plaintiffs' and class members' PII in the confidential phone conversations between agents and consumers without authorization or for an other than authorized purpose.

857.    Each instance of Defendants engaging in AOR Swapping, Twisting and Dual App or otherwise accessing Plaintiffs' and class members' PII without authorization of for an other than authorized purpose through the BenefitAlign, Inshura and Jet Health EDE platforms constitutes a "breach" and "incident" pursuant to OMB M-18-2 and OMB M-17-12 as defined above.

858.    In addition, instances in which Bowsky and Minerva recorded and collected Plaintiffs' and class members' confidential phone conversations between agents and consumers and obtained their PII without authorization or for an other than authorized purpose constitutes a "breach" and "incident" pursuant to OMB M-18-2 and OMB M-17-12 as defined above.

859.    Also, as alleged above, TrueCoverage and/or Speridian Technologies extracted U.S. consumers' information, including PII, from the CMS Marketplace database using Speridian Technologies' EDE platform(s) Benefitalign and/Inshura.  The data was sent overseas to

CASE NO. 0:24-cv-60591-DAMIAN/Valle

TrueCoverage and Speridian Technologies' operations in India and Pakistan to coordinate marketing campaigns targeting U.S. consumers.

860.     This type of breach constitutes a major incident because it involves unauthorized access to 100,000 or more individuals' personally identifiable information (PII) that, if exfiltrated, modified, deleted, or otherwise compromised, is likely to result in demonstrable harm to the national security interests, foreign relations, or economy of the United States, or to the public confidence, civil liberties, or public health and safety of the American people." (emphasis added).

861.     CMS has acknowledged that the type of misconduct alleged herein constitutes unauthorized activity.  For example, in an April 12, 2024 public statement, CMS acknowledges that unauthorized activity was occurring.

> CMS is evaluating all regulatory, operational, and technological options to prevent unauthorized activity. CMS' technical teams are rapidly evaluating options for additional system controls to help block unauthorized or fraudulent activity in the near term. In the longer term, CMS will also evaluate options for system changes to help curtail unauthorized and fraudulent activities without creating roadblocks for consumers to obtain the coverage they need.

862.     On May 6, 2024, CMS released another public statement related to authorized plan switching:

> CMS remains committed to protecting consumers in the Marketplaces to ensure they are enrolled in the plan of their choosing and to terminate brokers who defraud consumers. We are taking stronger actions given very concerning activity by some agents and brokers related to unauthorized plan switches and unauthorized enrollments—where a consumer was switched from their selected plan into a new one or signed up for coverage without their knowledge or consent.

863.     On July 19, 2024, CMS again acknowledged the problem and publicly stated:

> The Centers for Medicare & Medicaid Services (CMS) is committed to protecting consumers from bad actors and ensuring the program integrity of the Federally-facilitated Marketplace (FFM). That's why CMS is taking additional action to address increases in unauthorized changes in consumers' enrollments by agents and brokers. Starting on July 19, 2024, CMS will block an agent or broker from making changes to a consumer's FFM enrollment unless the agent is already associated with the consumer's enrollment. Today's new steps build on CMS' previous work

CASE NO. 0:24-cv-60591-DAMIAN/Valle

to protect consumers on the FFM by suspending and terminating agents and brokers who perform unauthorized Marketplace activity.

864.    Defendants Speridian Technologies and TrueCoverage and their EDE platforms, Benefitalign and Inshura, as web-brokers under the ACA regulations, entered into agreement(s) with CMS governing the way each is required to operate under federal regulations, including provisions related to protecting Consumer Class Plaintiffs' and class members' PII from unlawful dissemination.

865.    In addition, CMS's agreement with BenefitAlign, Jet Health and Inshura expressly prohibit data from going overseas. Upon information and belief the EDE Agreement states:

> a.    <u>Access to the FFEs and SBE-FPs</u>. EDE Entity; its Downstream and Delegated Entities, including downstream Agents/Brokers; and its assignees or subcontractors—including, employees, developers, agents, representatives, or contractors—<u>cannot remotely connect or transmit data to the FFE, SBE-FP or its testing environments, nor remotely connect or transmit data to EDE Entity's systems that maintain connections to the FFE, SBE-FP or its testing environments, from locations outside of the United States of America</u> or its territories, embassies, or military installations. This includes any such connection through virtual private networks (VPNs). (Emphasis added).

866.    Defendant BenefitAlign breached its duties under this provision when it extracted U.S. consumers' information, including PII, from the CMS Marketplace database using Speridian Technologies' EDE platform(s) Benefitalign and/Inshura and sent it to or from overseas to TrueCoverage and Speridian Technologies' operations in India and Pakistan to coordinate marketing campaigns targeting U.S. consumers.

867.    CMS's standard web-broker agreement with Speridian Technologies, TrueCoverage, Benefitalign and Inshura required those entities to comply with, among other things, all regulations related to preventing Consumer Class Plaintiffs' and class members' PII from being collected, accessed and/or disclosed to any downline persons or entities, including

agents, brokers and non-exchange entities such as Enhance Health and the lead generation firm Minerva, without informed consent from Consumer Class Plaintiffs and class members.

868.    Federal regulations promulgated under the ACA also impose duties to ensure that all Exchange privacy and security standards implemented were consistent with the following principles: PII should be created, collected, used and/or disclosed only to the extent necessary to accomplish a specified purpose or purposes(s).  *See* 45 CFR 155.260(a)(3)(v).

869.    These regulations, which are designed to protect consumers' PII from unlawful disclosure, also apply to agents and brokers that are downline of Speridian Technologies and TrueCoverage, such as Enhance Health.  For example, 45 CFR 155.220(j)(2)(iv) requires all web-brokers, agents and brokers to protect Consumer Class Plaintiffs' and class members' PII.  That duty also extends to Minerva, Bowsky and Herman, who fall within the definition of a non-exchange entity.  *See* 45 CFR § 155.260(b)(3).

870.    In addition, Defendants TrueCoverage, Speridian Technologies and Enhance Health were required to enter into contracts with Minerva, Bowsky and Herman that included provisions that included, among other things, (i) a description of the functions to be performed by the non-Exchange entity, (ii) language binding the non-Exchange entity to comply with the privacy and security standards and obligations adopted in accordance with 45 CFR § 155.260(b)(3) and (iii) language requiring the non-Exchange entities, Minerva, Bowsky and Herman, to bind any other downstream entities, including but not limited to other lead generation firms that Defendants purchased leads from, to the same privacy and security standards and obligations to which the non-Exchange entity has agreed in its contract or agreement with the Exchange.  *See* 45 CFR 155.260(b)(2).

CASE NO. 0:24-cv-60591-DAMIAN/Valle

871.    Upon information and belief, TrueCoverage, Speridian Technologies and Enhance Health did not enter into such an agreement with Bowsky and Minerva, and if they did, Bowsky and Minerva did not comply with their obligations to protect Consumer Class Plaintiffs' and class members' PII from being disclosed.

872.    For example, each lead that is generated by lead generation firms, including but not limited to Minerva, is routed to TrueCoverage, Enhance Health and/or their downline agencies and agents.  Those agencies receive the calls from consumers through routing software that is under the sole control of the lead generating entity such as Minerva.

873.    Minerva and Bowsky used the routing software, Retreaver, to forward leads to TrueCoverage and Enhance Health.  The purpose of the routing software is to route the incoming calls from consumers to the agency that purchased the Lead.  The routed call received by TrueCoverage, Enhance Health and their downline agencies is first received by their dialing software.  Then the call is routed to the appropriate call center and individual agent.  During the Class Period, Enhance Health and TrueCoverage used Total Leads Domination (TLD) as their dialer software.

874.    Importantly, Defendants' routing software (Retreaver) and dialer software (TLD) records the confidential calls between consumers and the agents for Enhance Health, TrueCoverage and their downlines at the same time, without consent of Consumer Class Plaintiffs and class members.

875.    Upon information and belief, the other lead generation firms used by Defendants to obtain leads also use routing software that records the confidential calls between consumers and the agents for Enhance Health, TrueCoverage and their downlines at the same time without consent of Consumer Class Plaintiffs and class members.

876.    Once the calls are recorded by the lead generation firms, Speridian Technologies ,

TrueCoverage and Enhance Health permitted Minerva and Bowsky to retain the recordings of the

calls between consumers and TrueCoverage and Enhance Health agents.   These calls contain

confidential PII, including social security numbers and personal medical information, and Minerva

and Bowsky have been permitted to retain custody of the recorded calls for their own business

purposes without consent of Consumer Class Plaintiffs and class members.  This conduct violates

the terms of the web-broker agreements and federal regulations described above.

877.    Minerva  and  Bowsky,  as  well  as  the  other  lead  generation  firms  used  by

Defendants, fall within the definition of non-exchange entities pursuant to 45 CFR 155.260(b)(1)

because they: (i) gain access to personally identifiable information submitted to an Exchange; or

(ii) collect, use, or disclose personally identifiable information gathered directly from applicants,

qualified individuals, or enrollees while that individual or entity is performing functions agreed to

with the Exchange.

878.    The  purpose  of  web-broker  agreements  and  the  above  federal  regulations  is  to

protect consumers like Consumer Class Plaintiffs and class members by providing that each QHP

issuer that uses a provider network must ensure that the provider network consisting of in-network

healthcare providers, as available to all enrollees, meet certain standards, including but not limited

to requiring QHP issuers to publish an up-to-date, accurate and complete provider directory.

879.    Consumer  Class  Plaintiffs  and  class  members  were  harmed  as  a  result  of

Defendants' violations of the agreement(s) and federal regulations cited above.   The harm includes

but may not be limited to:

    a.   unauthorized use of the Consumer Class Plaintiffs' and class members' PII, resulting in harm including but not limited to unauthorized AOL Swaps, Twisting and/or Dual Apps;

    b.   theft of the Consumer Class Plaintiffs and class members' personal, financial and confidential medical information;

    c.   costs associated with the detection and prevention of the Consumer Class Plaintiffs and class members' identity theft and unauthorized use of the Consumer Plaintiffs and class members' PII;

    d.   the imminent and certainly impending injury flowing from the substantial risk of potential fraud and identify theft posed to the Consumer Class Plaintiffs and class members by their PII being placed in the hands of criminals on the Internet black market; and

    e.   the loss of the Consumer Class Plaintiffs' and class members' privacy.

880.    Consumer Class Plaintiffs and class members fall within the class of persons that the web-broker agreement and federal regulations were intended to protect.

881.    The harm or injury suffered by the Consumer Class Plaintiffs and class members as a result of Defendants' violation of the obligations contained in the web-broker agreement and applicable federal regulations was foreseeable and as a result, Defendants owed a duty to Class Plaintiffs and class members.

882.    Defendants' violations are capable of having a causal connection between it and the damage or injury inflicted.

WHEREFORE, Consumer Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants (except Bain Insurance)

CASE NO. 0:24-cv-60591-DAMIAN/Valle

that awards damages, interest and/or such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Class Plaintiffs hereby demand a trial by jury on all allowable claims and forms of relief.

Dated: August 16, 2024

Respectfully submitted,

By: /s/ *Jason K. Kellogg*
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Secondary email: ame@lklsg.com
Victoria J. Wilson
Florida Bar No. 92157
Primary email: vjw@lklsg.com
Secondary email: service@lklsg.com
Peter J. Sitaras
Florida Bar No. 1039141
Primary email: pjs@lklsg.com
Secondary email: acd@lklsg.com
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: /s/ *Jason R. Doss*
Jason R. Doss
Florida Bar No. 0569496
Primary email: jasondoss@dossfirm.com
1827 Powers Ferry Road Southeast
Atlanta, Georgia 30339
Telephone: (770) 578-1314
Facsimile: (770) 578-1302

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 16, 2024, a true and correct copy of the foregoing was filed via CM/ECF and served upon parties registered with CM/ECF in this case.

By: /s/ *Jason Kellogg*