## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CONSWALLO TURNER, TIESHA FOREMAN, ANGELINA WELLS, PAULA LANGLEY, VERONICA KING, NAVAQUOTE, LLC and WINN INSURANCE AGENCY, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ENHANCE HEALTH, LLC, TRUECOVERAGE, LLC, SPERIDIAN TECHNOLOGIES, LLC, BENEFITALIGN, LLC, NUMBER ONE PROSPECTING, LLC d/b/a MINERVA MARKETING, BAIN CAPITAL INSURANCE FUND L.P., DIGITAL MEDIA SOLUTIONS LLC, NET HEALTH AFFILIATES, INC., MATTHEW B. HERMAN, BRANDON BOWSKY, GIRISH PANICKER, AND MATTHEW GOLDFUSS.<br><br>Defendants. | Case No.: 0:24-cv-60591-MD |

## DEFENDANTS'[1] JOINT MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

---

[1] This Joint Motion to Dismiss is filed by Defendants Enhance Health, LLC ("Enhance"); TrueCoverage, LLC ("TrueCoverage"); Speridian Technologies, LLC ("Speridian"); Benefitalign LLC ("Benefitalign"); Girish Panicker; Matthew Goldfuss; Number One Prospecting, LLC d/b/a Minerva Marketing ("Minerva"); Net Health Affiliates, Inc. ("Net Health"); Matthew B. Herman; and Brandon Bowsky.  Unless otherwise indicated, references to "Defendants" in this Motion refer to this set of Defendants.

### TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................3

LEGAL STANDARD...........................................................................................................9

ARGUMENT ......................................................................................................................10

I.     THE AMENDED COMPLAINT SHOULD BE DISMISSED AS SHOTGUN...............10

II.    PLAINTIFFS' RICO CLAIMS FAIL ............................................................................11

       A.     Plaintiffs do not have statutory standing to pursue RICO claims..........................12

             1.     Plaintiffs fail to allege an injury to business or property ...........................13

                   (a)    The Consumer Plaintiffs do not identify any concrete injuries to business or property ......................................................14

                   (b)    The Agent Plaintiffs do not identify any concrete injuries to business or property .................................................................15

             2.     Plaintiffs fail to allege injuries "by reason of" the predicate offenses ......................................................................................................17

                   (a)    The Consumer Plaintiffs fail to demonstrate proximate cause .....................................................................................................19

                   (b)    The Agent Plaintiffs' claims are purely derivative .......................21

       B.     Plaintiffs fail to allege that an enterprise existed .................................................25

       C.     Plaintiffs fail to allege participation in operation or management of the enterprise..............................................................................................................31

       D.     Plaintiffs fail to allege two predicate acts of racketeering ....................................32

             1.     Plaintiffs' claim that Defendants used deceptive advertising does not satisfy Rule 9(b) and cannot support predicate acts of mail or wire fraud ..................................................................................................33

             2.     Plaintiffs' claim that Defendants obtained and misused their PII does not satisfy Rule 9(b) or support predicate acts of mail or wire fraud ..........................................................................................................38

       E.     Plaintiffs Fail To Allege A Pattern Of Racketeering Activity ..............................40

III.    PLAINTIFFS RICO CONSPIRACY CLAIMS FAIL .....................................................40

IV.    PLAINTIFFS' AIDING AND ABETTING RICO CLAIMS FAIL..................................43

V.     PLAINTIFFS LANGLEY AND FOREMAN LACK STANDING TO PURSUE THEIR COMMON LAW CLAIMS ................................................................................45

VI.    PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIMS FAIL..............................47

i

VII.    PLAINTIFFS' AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
        CLAIMS FAIL.................................................................................................................48

        A.      Plaintiffs fail to identify a duty owed by TrueCoverage, Enhance, or
                Herman.................................................................................................................49

        B.      Plaintiffs fail to allege actual knowledge, substantial assistance, or
                encouragement ..................................................................................................53

VIII.   PLAINTIFFS' NEGLIGENCE CLAIM FAILS.................................................................54

        A.      Defendants do not owe a statutory duty of care to Plaintiffs................................55

        B.      The web-broker agreements do not create a duty of care .....................................58

        C.      Plaintiffs have not plausibly pled a foreseeable zone of risk................................59

CONCLUSION....................................................................................................................................59

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Almanza v. United Airlines, Inc.*,
   851 F.3d 1060 (11th Cir. 2017) ..........................................................25, 26, 27, 29, 30, 41, 42

*Am. Dental v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ...........................................9, 11, 12, 25, 26, 32, 38, 41, 42, 45

*Am. United Life Ins. Co. v. Martin*,
   480 F.3d 1043 (11th Cir. 2007) ............................................................................................39

*Amarelis v. Notter Sch. of Culinary Arts, LLC*,
   No. 6:13-CV-54-ORL-31KRS, 2014 WL 5454387 (M.D. Fla. Oct. 27, 2014).......................19

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
   482 F.3d 1309 (11th Cir. 2007) ........................................................................................9, 32

*Anderson v. Smithfield Foods, Inc.*,
   207 F. Supp. 2d 1358 (M.D. Fla. 2002).................................................................................11

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006).................................................................................17, 21, 22, 23, 24

*Arencibia v. AGA Serv. Co.*,
   533 F. Supp. 3d 1180 (S.D. Fla. 2021) ..................................................................................32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................................9

*Beardmore v. Abbott*,
   218 So. 2d 807 (Fla. 3d DCA 1969) ................................................................................50, 51

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................9, 26, 29

*Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*,
   140 F.3d 898 (11th Cir. 1998) ...............................................................................................24

*Bowe v. Pub. Storage*,
   106 F. Supp. 3d 1252 (S.D. Fla. 2015) ..................................................................................14

*Boyle v. United States*,
   556 U.S. 938 (2009)................................................................................................................25

*Chaset v. Fleer/Skybox Int'l, LP*,
    300 F.3d 1083 (9th Cir. 2002) ............................................................................14

*Chi v. MasterCard Int'l, Inc.*,
    No. 1:14-CV-614, 2014 WL 5019917 (N.D. Ga. Oct. 7, 2014) ...............................44

*Ciminelli v. United States*,
    598 U.S. 306 (2023)..........................................................................................37

*Cisneros v. Petland, Inc.*,
    972 F.3d 1204 (11th Cir. 2020) ........................................................2, 11, 26, 32, 40

*Cleveland v. United States*,
    531 U.S. 12 (2000)............................................................................................37

*Cockrell v. Sparks*,
    510 F.3d 1307 (11th Cir. 2007) ...........................................................................59

*Codeventures, LLC v. Vital Motion Inc.*,
    No. 20-cv-21574, 2021 WL 1131531 (S.D. Fla. Mar. 24, 2021) .....................49, 53

*Connecticut Gen. Life Ins. Co. v. Mayberg*,
    No. 23-2cv-1461, 2024 WL 1931704 (S.D. Fla. Apr. 27, 2024).............................47

*Cox v. Adm'r U.S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) ........................................................................43, 44

*Cramer v. State of Fla.*,
    117 F.3d 1258 (11th Cir. 1997) ...........................................................................10

*Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    259 F. Supp. 3d 1344 (M.D. Fla. 2017).................................................................38

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ...........................................................................55

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001)................................................................................33

*Diamond Resorts Int'l v. Aaronson*,
    No. 6:17-cv-1394, 2018 WL 735627 (M.D. Fla. Jan. 26, 2018) .............................36

*Doe v. Sch. Bd. of Miami-Dade Cnty.*,
    403 F. Supp. 3d 1241 (S.D. Fla. 2019) .................................................................57

*Dorsey v. Reider*,
    139 So. 3d 860, 863 (Fla. 2014)..........................................................................55

*Dunkel v. Hedman*,
    No. 3:15-CV-948-J-34PDB, 2016 WL 4870502 (M.D. Fla. Aug. 17, 2016) ...................46, 47

*Edwards v. Prime, Inc.*,
    602 F.3d 1276 (11th Cir. 2010) .......................................................................................44

*Emess Cap., LLC v. Rothstein*,
    No. 10-cv-60882, 2011 WL 13214302 (S.D. Fla. Mar. 9, 2011) .....................................33, 43

*Fagan v. Central Bank of Cyprus*,
    No. 19-cv-80239, 2021 WL 2845034 (S.D. Fla. June 28, 2021).........................................43

*Feng v. Walsh*,
    No. 19-cv-24138, 2021 WL 8055449 (S.D. Fla. Dec. 21, 2021).........................................52

*Forbes v. Eagleson*,
    228 F.3d 471 (3d Cir. 2000).............................................................................................43

*Gov't Emp. Ins. Co. v. Martineau*,
    No. 8:19-CV-1382-MSS-SPF, 2020 WL 13661780 (M.D. Fla. Mar. 9, 2020)......................15

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
    341 F.3d 1292 (11th Cir. 2003) ...............................................................................21, 22, 24

*Gubala v. Time Warner Cable*,
    846 F.3d 909 (7th Cir. 2017) ...........................................................................................37

*Gyongyosi v. Miller*,
    80 So. 3d 1070 (Fla. 4th DCA 2012) ...............................................................................55

*Halpin v. Crist*,
    405 F. App'x 403 (11th Cir. 2010) ...................................................................................24

*Harris v. Orange, S.A.*,
    636 F. App'x 476 (11th Cir. 2015) .............................................................................17, 21

*Hogan v. Provident Life and Accident Ins. Co.*,
    665 F. Supp. 2d 1273 (M.D. Fla. 2009).......................................................................50, 51

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992).................................................................................12, 18, 22, 23

*Honig v. Kornfeld*,
    339 F. Supp. 3d 1323 (S.D. Fla. 2018) ........................................................................49, 53

*Insight Sec., Inc. v. Deutsche Bank Tr. Co. Ams.*,
    No. 21-12817, 2022 WL 2313980 (11th Cir. June 28, 2022).....................................54, 55, 59

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
    704 F.3d 927 (11th Cir. 2013) .......................................................................................58

*Ironworkers Local Union 69 v. AstraZeneca Pharms., LP*,
    634 F.3d 1352 (11th Cir. 2011) .....................................................................................12

*Jackson v. BellSouth Telecomms.*,
    372 F.3d 1250 (11th Cir. 2004) ................................................................................40, 42

*In re Jetblue Airways Corp. Privacy Litig.*,
    379 F. Supp. 2d 299 (E.D.N.Y. 2005) ...........................................................................37

*Johnson v. Badger Acquisition of Tampa LLC*,
    983 So. 2d 1175 (Fla. 2d DCA 2008) .............................................................................58

*Johnson v. Catamaran Health Sols., LLC*,
    687 F. App'x 825 (11th Cir. 2017) .............................................................49, 50, 51, 53

*Keeton v. Gynecare Worldwide*,
    No. 15-cv-20442, 2016 WL 2753866 (S.D. Fla. Jan. 29, 2016)................................13, 14, 16

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)........................................................................................................46

*Lamm v. State St. Bank & Tr. Co.*,
    889 F. Supp. 2d 1321 (S.D. Fla. 2012) ..........................................................................54

*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ..........................................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)........................................................................................................46

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) .........................................................................37

*Maitland v. Spectrum*,
    No. 3:17-cv-1232-J-20JBT, 2019 WL 13072397 (M.D. Fla. Aug. 22, 2019)........................15

*In re Managed Care*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) .............................................................25, 26, 29, 40

*In re Managed Care Litig.*,
    135 F. Supp. 2d 1253 (S.D. Fla. 2001) ..........................................................................44

*Marrero v. Benitez*,
    No. 1:17-CV-21026-UU, 2017 WL 7796341 (S.D. Fla. Aug. 3, 2017) ........................17, 19

*McCain v. Fla. Power Corp.*,
593 So. 2d 500 (Fla. 1992)..................................................................54

*Med. & Chiropractic Clinic, Inc. v. Oppenheim*,
981 F.3d 983 (11th Cir. 2020) ...............................................48, 49, 53

*Miccosukee Tribe of Indians of Fla. v. Cypress*,
814 F.3d 1202 (11th Cir. 2015) ...........................................................11

*In re Montagne*,
425 B.R. 111 (Bankr. D. Vt. 2009)......................................................47

*Moss v. Appel*,
718 So. 2d 199 (Fla. 4th DCA 1998) ...................................................50

*O'Donnell v. United States*,
736 F. App'x 828 (11th Cir. 2018) ................................................55, 59

*Omnipol, A.S. v. Multinational Def. Servs., LLC*,
32 F.4th 1298 (11th Cir. 2022) ............................................................25

*Parm v. Nat'l Bank of Cal.*,
242 F. Supp. 3d 1321 (N.D. Ga. 2017).................................................28

*Patel v. Catamaran Health Sols., LLC*,
No. 15-cv-61891, 2016 WL 5942475 (S.D. Fla. Jan. 14, 2016).............49, 50, 51, 57

*Platinum Ests., Inc. v. TD Bank, N.A.*,
No. 11-cv-60670, 2012 WL 760791 (S.D. Fla. Mar. 8, 2012) ..............47

*Ray v. Spirit Airlines*,
836 F.3d 1340 (11th Cir. 2016) ...............................................12, 19, 20

*Resnick v. AvMed, Inc.*,
693 F.3d 1317 (11th Cir. 2012) ...........................................................57

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)..............................................................................31

*Rocket Mortg., LLC v. Cito Mech. Design, Inc.*,
No. 23-10583, 2024 WL 2876933 (E.D. Mich. Apr. 22, 2024) ...........47

*Rolo v. City Investing Co. Liquidating Tr.*,
155 F.3d 644 (3d Cir. 1998)...........................................................43, 44

*Rosenfeld Gallery, LLC v. Truist Bank*,
No. 23-cv-20422, 2024 WL 836789 (S.D. Fla. Feb. 28, 2024) ............48

*Rusty115 Corp. v. Bank of Am., N.A.*,
No. 22-cv-22541, 2023 WL 6064518 (S.D. Fla. Sept. 18, 2023) ...................................47, 48

*Schmidt v. Multimedia Holdings Corp.*,
361 F. Supp. 2d 1346 (M.D. Fla. 2004) ...................................................................................37

*SIG, Inc. v. AT&T Dig. Life, Inc.*,
971 F. Supp. 2d 1178 (S.D. Fla. 2013) ...................................................................................35

*Simpson v. Sanderson Farms*,
744 F.3d 702 (11th Cir. 2014) ...........................................................................9, 13, 14, 15, 16

*Solomon v. Blue Cross and Blue Shield Ass'n*,
574 F. Supp. 1288 (S.D. Fla. 2008) .......................................................................................44

*Sterling Nat'l Mortg. Co. v. Infinite Title Sols., LLC*,
No. 10-cv-22147, 2011 WL 13220625 (S.D. Fla. Mar. 3, 2011) ............................................31

*Sturgill v. Lucas*,
292 So. 3d 462 (Fla. 2d DCA 2020) .......................................................................................59

*In re Takata Airbag Prods. Liab. Litigation*,
396 F. Supp. 3d 1101, 1158-60 (S.D. Fla. 2019)...........................................................12, 34, 39

*Thompson v. Home Depot, Inc.*,
No. 07-cv-1058 IEG, 2007 WL 2476603 (S.D. Cal. Sept. 18, 2007) ....................................37

*Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*,
991 F. Supp. 2d 1271 (S.D. Fla. 2014) ...................................................................................52

*Tolar v. Bradley Arant Boult Cummings, LLP*,
997 F.3d 1280 (11th Cir. 2021) ................................................................................................9

*Traditions Senior Mgmt., Inc. v. United Health Adm'rs, Inc.*,
No. 8:12-cv-2321, 2013 WL 3285419 (M.D. Fla. June 27, 2013) ..........................................50

*Trump v. Clinton*,
626 F. Supp. 3d 1264 (S.D. Fla. 2022) ......................................................................14, 15, 36

*Truthinadvertisingenforcers.com v. Dish Network, LLC*,
No. 8:16-CV-2366-T-33JSS, 2016 WL 7230955 (M.D. Fla. Dec. 14, 2016) .........................13

*United States v. Church*,
955 F.2d 688 (11th Cir. 1992) ................................................................................................41

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007)......................................................................................................36

*United States v. Takhalov*,
  827 F.3d 1307 (11th Cir. 2016) ............................................................35, 36

*United States v. Turkette*,
  452 U.S. 576 (1981)........................................................................................25

*United States v. Wall*,
  No. 20-10730, 2024 WL 4099978 (11th Cir. Sept. 6, 2024) ......................41

*Verdejo v. HP Inc.*,
  No. 21-cv-20431, 2021 WL 5933727 (S.D. Fla. Nov. 7, 2011) ..................22

*Viridis Corp. v. TCA Global Credit Master Fund, LP*,
  155 F. Supp. 3d 1344 (S.D. Fla. 2015) .............................................10, 16, 20

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
  No. 03 Civ. 8606, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ...................2, 11

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
  792 F.3d 1313 (11th Cir. 2015) ....................................................................10, 54

*Worldspan Marine Inc v. Comerica Bank*,
  No. 18-cv-21924, 2019 WL 2267262 (S.D. Fla. Feb. 22, 2019) ...............13, 15, 16

*Youngblood-West v. Aflac, Inc.*,
  No. 4:18-CV-83, 2018 WL 10562576 (M.D. Ga. Nov. 9, 2018) .........................25

*Z Industries USA, LLC v. Circuitronix, LLC*,
  No. 17-cv-60727, 2017 WL 11718026 (S.D. Fla. Oct. 4, 2017) ........................46

*Zarrella v. Pac. Life Ins. Co.*,
  755 F. Supp. 2d 1218 (S.D. Fla. 2010) ............................................................57

**<u>Statutes</u>**

18 U.S.C. § 1961(5) .............................................................................................40

18 U.S.C. § 1962(c) ..........................................................................................8, 31

18 U.S.C. § 1962(d) ..............................................................................................8

18 U.S.C. § 1964.................................................................................................43

18 U.S.C. § 1964(c) .............................................................................................12

## <u>Other Authorities</u>

45 C.F.R. § 155.220 .................................................................................................53, 57

45 C.F.R. §§ 155.260 ....................................................................................................56

45 C.F.R. § 155.285 ................................................................................................56, 58

Federal Rule of Civil Procedure 8 .......................................................................2, 10, 11

Federal Rule of Civil Procedure 9(b)...................................2, 9, 11, 12, 32, 33, 35, 38, 39, 47, 52

Federal Rule of Civil Procedure 12(b)(6) .......................................................................9

## <u>INTRODUCTION</u>

Since its inception, the Affordable Care Act ("ACA") has aimed to expand access to health insurance coverage by making health insurance more affordable for the individuals who need it most.  In 2021, in response to the pandemic, Congress further expanded healthcare access by passing the American Rescue Plan Act ("ARPA"), which authorized 100% health insurance subsidies for individuals between 100 and 150% of the federal poverty levels.  Also in 2021, the Centers for Medicare and Medicaid Services ("CMS") announced a new rule allowing for year-round enrollment.  Through these actions, the federal government called for the insurance industry to expand access to coverage for historically underserved Americans.

Defendants Minerva, TrueCoverage, Enhance, and their executives responded to that call by adopting new measures to help lower-income Americans obtain subsidized health insurance and to create the robust health insurance market enshrined by the ACA.  In this litigation, however, Plaintiffs—a group of five individual consumers and two competing insurance agents—radically distort the legitimate, laudable business in which Defendants are engaged.  Plaintiffs' rambling and disjointed complaint inaccurately alleges that Defendants falsely advertised health plan benefits so as to obtain consumers' personally identifiable information ("PII") so that Defendants could tamper with consumer health insurance and capture additional commissions.  From this, Plaintiffs claim civil violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO")—a statute adopted to address organized crime—as well as fraud, breaches of fiduciary duty, and negligence under Florida common law.

Plaintiffs' allegations are facially flawed—and in many instances demonstrably false—as well as internally inconsistent and contradictory.  But even assuming their truth, they fail to state claims of actual unlawful conduct.  Plaintiffs' attempt to proceed under RICO means that the Amended Complaint is held to a higher pleading standard and particularized burdens.  For

1

example, because Plaintiffs have alleged RICO claims arising from mail and wire fraud predicate acts, they must meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  The Eleventh Circuit has repeatedly required courts to apply heightened scrutiny on RICO claims relying on mail and wire fraud predicate acts because these claims are subject to regular abuse and frequently used by plaintiffs to assert claims that, after closer examination, do not actually involve illegal activity.  For that reason, courts in this circuit and around the country have said that civil RICO claims are significantly disfavored and repeatedly dismissed these "sheep masquerading in wolves' clothing"[2]  That scrutiny is warranted here.

The Amended Complaint has the same flaws as other RICO complaints that courts in this circuit have dismissed.  It fails to name a single Plaintiff whose allegations demonstrate that they were a victim of the alleged scheme or suffered an injury cognizable under RICO.  No individual plaintiff alleges that she saw an ad generated by Minerva that promised a cash card, called Enhance or TrueCoverage, gave her PII to the sales agent, and subsequently had her health insurance altered in a way that caused monetary damages—all of which is required to state a valid claim.  In other words, no plaintiff alleges that any individual defendant committed a predicate act against them. The two agent plaintiffs likewise do not allege that they were a target of Defendants' alleged scheme, and neither specifies a single commission that they have lost as a result of it.  They are classic derivative plaintiffs who cannot individually state a claim.

The Amended Complaint also fails to assert cognizable legal theories for any of its common law claims or to meet even the basic pleading standards of Federal Rule of Civil Procedure 8.  The Amended Complaint is a shotgun pleading of the type that courts in this circuit

---

[2]  *E.g.*, *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606, 2004 WL 2187069, at *5 (S.D.N.Y. Sept. 29, 2004); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2020).

routinely dismiss.  It does not clearly state which claims are brought by which Plaintiff or what specific actions gave rise to particular claims, and Count 55 impermissibly reincorporates all allegations, making this a typical, and improper, shotgun complaint.  Two Plaintiffs lack standing to bring claims that, if they exist, belong solely to their husbands, and all Plaintiffs rely on fraud allegations that fail for the same reasons as their RICO claims.  Finally, all Plaintiffs fail to establish that Defendants owed fiduciary duties or duties of care to them.

The Amended Complaint should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND

Following the 2021 regulatory and statutory changes, Defendants answered the federal government's call to help low income Americans obtain affordable health insurance.  This required a multi-step process that involved engaging with underserved Americans, explaining their coverage options, and interfacing with the health insurance carriers.  Defendants TrueCoverage and Enhance are health insurance agents.  Am. Compl. ¶ 156.  As agents, they are intermediaries between health insurance carriers, consumers, and the federal government and use digital platforms to enroll consumers in health plans, including plans subsidized by ARPA's expansion of the ACA.  *Id.* ¶¶ 143-49.  Defendant Minerva, a health-insurance "lead generator," designs advertisements that encourage consumers to call TrueCoverage or Enhance.  *Id.* ¶¶ 175-81.  Minerva also pre-screens consumers to determine their eligibility for ACA health insurance.  *Id.* ¶¶ 184-85.  If the consumer is eligible, they are transferred to an agent.  *Id.*  According to the Amended Complaint, Defendant Speridian designed an enrollment platform that became Defendant Benefitalign, a separate company, and Benefitalign helps insurance agents link into the federal marketplace to more easily connect consumers with insurance plans.  *Id.* ¶ 198-200.  Each enrollment platform gathers PII from consumers who apply for a plan.  *Id.* ¶ 197.  Initially,

TrueCoverage and Enhance both used Benefitalign, but in November 2023, Enhance built its own platform, JET Health.  *Id.* ¶ 306.

The health insurance market is a for-profit industry that became particularly competitive in the wake of ARPA.  *Id.* ¶ 4, 163-66.  Health insurance agencies like TrueCoverage and Enhance make money through monthly recurring commission payments from the insurance carriers for each individual plan that their agents sell.  *Id.* ¶¶ 391, 402.  Defendants TrueCoverage and Enhance further engaged downlines (independent companies that sell health insurance products under the direction of a broker) and, when Enhance first started out in the industry, Enhance also acted as a downline of TrueCoverage.  *Id.* ¶¶ 24, 218.

After explaining this framework, the Amended Complaint makes repeated, inflammatory claims about Defendants' participation in this industry, without ever tying its allegations to specific instances of improper conduct by a particular Defendant.  The Amended Complaint alleges that Brandon Bowsky, Minerva's CEO, began generating ads for multiple companies to reach newly eligible consumers, *id.* ¶ 9, and then claims that these advertisements contained inaccurate representations about subsidies or cash cards, all of which were purportedly intended to lure customers to place a call about obtaining insurance.  *Id.* ¶ 12.  However, while the Amended Complaint includes several pictures of what it claims to be such advertisements, *e.g.*, *id.* ¶¶ 12, 183-84, those do not indicate that these ads were actually produced by Minerva.  Moreover, the Amended Complaint also acknowledges that health insurance carriers do in fact provide cash subsidies to their consumers as part of enrollment programs, *id.* ¶¶ 204, 233, meaning that a representation to that effect is not necessarily inaccurate.

The Amended Complaint alleges that TrueCoverage first bought ads from Minerva that offered cash cards instead of health insurance and then used leads from the ads to enroll consumers

in in ACA health insurance.  *Id.* ¶¶ 183-87.  It also alleges that Enhance, led by CEO Matthew Herman, began selling ACA health insurance plans after test training conducted at a TrueCoverage downline showed that ACA enrollments could be profitable.  *Id.* ¶ 215, 217.  The Amended Complaint does not allege that Enhance and TrueCoverage bought ads exclusively from Minerva; to the contrary, the Amended Complaint indicates that both companies bought ads from other lead generators.  *Id.* ¶¶ 129-32, 194-95.  It also alleges various interpersonal relationships among the Defendant companies' executives, but does not allege any coordination or agreement between the Defendants in furtherance of the alleged scheme, or that the scheme had specific targets for its purportedly fraudulent activity, both of which are required.  *E.g.*, *id.* ¶¶ 210, 213.

Similarly, the Amended Complaint alleges that TrueCoverage and Enhance required their sales agents and downlines, such as Net Health, to use call scripts designed to "coax" consumers into signing up for a health insurance plan, even when they did not qualify, and that deviations from the call scripts were punishable.  *Id.* ¶¶ 18, 22, 271.  However, despite the Amended Complaint's claim that the Defendants promised cash cards to convince customers to sign up for insurance plans, it also acknowledges (as it must) that Enhance "specifically instructed its agents not to mention the cash cards," and that, if the consumer raised the cash card on their own, the agent was required to explain health insurance carrier reward programs and to advise the consumer to contact the carrier for more information—which would be a truthful and accurate representation.  *Id.* ¶¶ 268-69.  Moreover, not a single plaintiff alleges that they were subject to a script that apparently based the solicitation on a promise of a cash card.

The Amended Complaint goes on to make several provocative allegations regarding TrueCoverage's and Enhance's purported use of consumers' PII.  *Id.* ¶ 273.  It alleges that, to generate commissions, TrueCoverage and Enhance would use PII to reenroll consumers into health

insurance plans through practices like agent-of-record ("AOR") swaps, twisting, and dual-applications "without valid consent," *id.* ¶ 28, but never alleges that Defendants coordinated these practices with each other, or that they shared profits from them. Likewise, the Amended Complaint primarily cites unnamed sources claiming Enhance and TrueCoverage instructed agents to generate mass enrollments using consumer PII, *e.g.*, *id.* ¶ 312, but never identifies specific consumers affected by these alleged mass enrollments.

The Amended Complaint identifies two classes of Plaintiffs. Five named Plaintiffs represent consumers who allegedly were subject to the RICO scheme (the "Consumer Plaintiffs"). *Id.* ¶¶ 37-41. As summarized below, the Amended Complaint broadly alleges that the Consumer Class were damaged when Defendants obtained their PII via ads and agent statements promising cash cards. *Id.* ¶¶ 331-83. However, no Consumer Plaintiff specifically alleges that they actually saw an ad run by any of the Defendants, and all but one Plaintiff fails to allege a direct conversation or interaction with any Defendant at all.

*Veronica King* alleges that Defendants switched her Agent of Record multiple times. *Id.* ¶¶ 333-34. However, she does not say how Defendants obtained her PII, that she saw a false advertisement, or that she ever spoke to any Defendant. *See id.* ¶¶ 331-44. She claims only unspecified damages from "loss of continuity of care," and "out-of-pocket costs spent attempting to deal with the issues created" from Defendants' alleged "twisting actions." *Id.* ¶ 344.

*Paula Langley* alleges that she and her husband "came across an ad promising a cash card" as they were searching for health insurance, and that her husband called the number listed on the ad and "was enrolled in a new plan." *Id.* ¶ 347. However, she does not allege who ran the ad, that her husband contacted any particular Defendant, or that any Defendant deceived him during a sales call. *See id.* Regarding damages, Plaintiff Langley alleges that she attended several doctors' visits

where she was told she did not have health insurance, *id.* ¶¶ 348-49, and that Defendants switched and twisted her health insurance "at least 22 times" and that she incurred unspecified "damages in the form of thousands of dollars in uncovered medical bills." *Id.* ¶¶ 352-53.

*Tiesha Foreman* alleges that her husband "responded to an online ad stating that he prequalified for a cash card" around December 9, 2022. *Id.* ¶ 355. She does not allege who ran the ad, let alone that it was a specific Defendant. She alleges that Enhance enrolled her family in a plan that they were not eligible for, causing them to pay additional taxes, and that Defendants repeatedly changed the health insurance plans without "valid consent." *Id.* ¶¶ 358-367. She claims "tax damages" associated with repayments of tax credits, "loss of benefits, unpaid medical expenses and uncovered medications," and that she "expended unnecessary time fixing these problems." *Id.* ¶ 369.

*Conswallo Turner* alleges that she "saw a Facebook ad promising a monthly cash card" and that "[s]he called the number on the ad," but does not say who ran the ad, that she contacted any particular Defendant, or what occurred during the call. *Id.* ¶ 371. Nevertheless, she claims that Defendants switched and altered her plan five times in December 2023 and she suffered unspecified damages from loss of coverage and resulting medical payments "for her son Joshua," higher deductibles and co-pays, and time and expenses incurred to correct the problems. *Id.* ¶ 372.

*Angelina Wells* alleges that her plan was switched many times and she suffered unspecified damages from loss of benefits and medications and having to expend unnecessary time fixing these problems. *Id.* ¶ 383. Plaintiff Wells does not say how Defendants obtained her PII, or that she saw a false advertisement or spoke to any Defendant at any point in time. *See id.* ¶¶ 374-83.

Two named Plaintiffs are agents who claim harm from losing their customers (the "Agent Plaintiffs"). *Id.* ¶¶ 42-43. The Agent Plaintiffs do not allege direct reliance on misrepresentations;

instead, they claim losses because Defendants allegedly used Consumer Plaintiffs' PII to switch consumers to Defendants' books. *Id.* ¶¶ 384-403. However, neither Agent Plaintiff identifies a specific commission that they lost as a result.

*NavaQuote* is a health insurance agency that styles itself as a competitor to Defendants Enhance and TrueCoverage. NavaQuote does not allege a specific commission that it has lost as a result of the alleged scheme. Instead, NavaQuote claims that, as a result of the RICO scheme, it has lost unspecified commissions, profits, "out-of-pocket costs relating to the time spent to investigate and address the problem," and "extra expenses associated with buying additional leads to replace lost clients." *Id.* ¶ 391.

*WINN Insurance Agency* is another similarly styled health insurance agency. WINN claims that it has lost more than 20 clients "for good" and has been removed over 100 times from various client policies. *Id.* ¶ 397. WINN alleges that Plaintiff Langley has been switched "no less than 20 times since February 2023," but does not say that it lost a commission as a result. *Id.* ¶ 400. Without ever identifying a specific client commission that it has lost as a result of the scheme, WINN nevertheless claims that, as a result of the RICO scheme, it has lost unspecified commissions and profits representing a "sizeable percentage of its income," "out-of-pocket costs relating to the time spent to investigate and address the problem" and "extra expenses associated with buying additional leads to replace lost clients." *Id.* ¶¶ 402-03.

Plaintiffs bring six claims against the moving Defendants. Counts 1, 2, 3, 4, 5, 6, 7, 9, and 10 claim substantive RICO violations under 18 U.S.C. § 1962(c). Counts 11, 12, 13, 14, 15, 17, 18, 20, 21, and 22 claim conspiracy to commit RICO violations under 18 U.S.C. § 1962(d). Counts 23, 24, 25, 26, 27, 29, 30, 32, 33, and 34 claim aiding and abetting a § 1962(c) RICO violation. Counts 35, 36, 37, 38, 39, 40, 41, 43, and 44 claim aiding and abetting fraud under Florida common

law.  Counts 45, 46, 47, 48, 49, 50, 51, 53, and 54 claim aiding and abetting breach of fiduciary duty under Florida common law.  Finally, Count 55 claims negligence, including by reference negligence per se, under Florida common law.

## LEGAL STANDARD

To survive this motion to dismiss, the Amended Complaint must support the claims with "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1299-1300 (11th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v. Sanderson Farms*, 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).  Formulaic recitations of elements are insufficient, *Iqbal*, 556 U.S. at 678, as are "legal conclusions," "speculative" allegations, or mere "conclusory" statements.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557, 564 (2007).  If the allegations do not meet this standard, Rule 12(b)(6) directs dismissal of the claims.  *Tolar*, 997 F.3d at 1299-1300.

The Amended Complaint also asserts RICO predicate acts of mail and wire fraud, and a claim for aiding and abetting fraud, each of which is subject to "[a] heightened pleading standard" under Rule 9(b).  *Am. Dental v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).  The Eleventh Circuit construes this requirement strictly, and has required mail and wire fraud claims to "be pled with an increased level of specificity." *Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F.3d 1309, 1316 (11th Cir. 2007).  Under this precedent, the Amended Complaint must demonstrate "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental*, 605 F.3d at 1291 (citation omitted).  Where multiple defendants are sued, the complaint must likewise "contain

9

'specific allegations with respect to each defendant that are sufficient to inform each defendant of the nature of his alleged participation in the fraud.'" *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1362 (S.D. Fla. 2015) (citation omitted).

## ARGUMENT

## I.   THE AMENDED COMPLAINT SHOULD BE DISMISSED AS SHOTGUN

The Eleventh Circuit strictly prohibits and has repeatedly rejected complaints, like the Amended Complaint, that violate Rule 8(a)(2) because these "shotgun pleadings" fail to notify Defendants what exactly they are alleged to have done wrong. *E.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322 & n.12 (11th Cir. 2015); *Cramer v. State of Fla.*, 117 F.3d 1258, 1261 (11th Cir. 1997) (finding "rambling" pleading to be shotgun because it was "so disorganized and ambiguous that it [was] almost impossible to discern precisely" what the plaintiffs alleged).   Here, the Amended Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," and "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against"—two recognized violations of Rule 8(a)(2). *See Weiland*, 792 F.3d at 1322-23; *Cramer*, 117 F.3d at 1261.  Plaintiffs incorporate each others' allegations across counts, borrowing from the allegations of co-Plaintiffs and grouping Defendants without distinguishing their independent conduct.   The Amended Complaint requires Defendants to sift through 185 pages to figure out what each individual Plaintiff contends each individual Defendant did and how that conduct would form the basis for a claim by any individual Plaintiff against any particular Defendant.  Plaintiffs also fail to specify which of the twelve Defendants are responsible for the specific misconduct alleged, because they combine certain Defendants and accuse them of the same general misconduct.

The Amended Complaint is therefore an improper shotgun pleading.

## II.    PLAINTIFFS' RICO CLAIMS FAIL

The Eleventh Circuit has resolutely held that RICO claims should be closely scrutinized "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Cisneros*, 972 F.3d at 1216 (citation omitted). Because of the consequent "potential for abuse by civil litigants," *Anderson v. Smithfield Foods, Inc.*, 207 F. Supp. 2d 1358, 1360 (M.D. Fla. 2002), *aff'd*, 353 F.3d 912 (11th Cir. 2003) (citation omitted), the Eleventh Circuit has explained that RICO "cannot be invoked every time a group of people causes an injury," *Cisneros*, 972 F.3d at 1208. Courts therefore regularly caution against "putative RICO claims that are nothing more than sheep masquerading in wolves' clothing" because "the civil provisions of [RICO] are the most misused statutes in the federal corpus of law.'" *W. 79th St. Corp.*, 2004 WL 2187069, at *5. In *W. 79th St. Corp.*, the court "flush[ed] out [the] frivolous RICO allegations at an early stage of the litigation" because plaintiffs did not plead particularized facts supporting the use of the mails, the required two predicate offenses attributable to each defendant, and each defendant's fraudulent conduct or intent. *Id.* at *6-8.

RICO claims premised on mail and wire fraud are subject to both Rule 8 plausibility and "the heightened pleading standards of Rule 9(b)." *Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015). For this reason, plaintiffs are required to specifically allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud" with respect to the elements of wire and mail fraud, and each defendant's participation in the scheme. *Am. Dental*, 605 F.3d at 1291 (citation omitted). The Eleventh Circuit has applied particular skepticism to RICO claims based solely on predicate acts of mail and wire fraud. In *American Dental*, for example, the

11

Eleventh Circuit held that Rule 9(b) was not met because plaintiffs failed to identify a specific misrepresentation in any correspondence or explain how they were misled, and did not sufficiently allege that advertisements contained false statements.  605 F.3d at 1291-93.  Similarly, in *Wilson v. Everbank, N.A.*, the court found each aspect of the fraud pleading lacked particularity, noting especially a failure to "identify any lender-placed insurance communication that Plaintiffs actually received, let alone read."  No. 14-cv-22264, 2015 WL 1600549, at *4 (S.D. Fla. Apr. 9, 2015).  Likewise, in *In re Takata Airbag Products Liability Litigation*, this Court explained that mails and wires are subject to "routine use ... in business operations," and after closely scrutinizing the "otherwise routine business communications," the court found nothing to support fraud.  396 F. Supp. 3d 1101, 1158-60 (S.D. Fla. 2019) (citations omitted).

A.    Plaintiffs do not have statutory standing to pursue RICO claims

Under RICO's plain language, Plaintiffs must individually allege both: (1) injury to business or property; (2) "by reason of" the alleged predicate acts.  18 U.S.C. § 1964(c); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992).  These distinctive and "restrictive" statutory standing requirements reinforce that RICO is a specialized statute serving a limited purpose, not a catch-all that "provide[s] a federal cause of action and treble damages to every tort plaintiff."  *Ironworkers Local Union 69 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1361 (11th Cir. 2011) (citation omitted).  As a result, the "mere fact of having been misled does not ineluctably give rise to a RICO cause of action unless the act of misleading the plaintiffs" amounts to a RICO predicate and "actually caused them injury in their business or to their property that they would not otherwise have suffered."  *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349-50 (11th Cir. 2016).  Likewise, it is not sufficient to allege general financial damages resulting from the actions of multiple defendants; rather, "the Complaint should clearly identify the injury suffered and the

predicate acts from which the injury flowed." *Worldspan Marine Inc v. Comerica Bank*, No. 18-cv-21924, 2019 WL 2267262, at *6 (S.D. Fla. Feb. 22, 2019), *report and recommendation adopted*, No. 18-cv-21924, 2019 WL 2267258 (S.D. Fla. Mar. 14, 2019).

The Amended Complaint fails to adequately allege those critical threshold elements; it articulates an "injury at only the highest order of abstraction and with only conclusory assertions," and it fails to establish that any Plaintiff's injury is directly connected to the predicate acts. *See Simpson*, 744 F.3d at 709.

        1.     *Plaintiffs fail to allege an injury to business or property*

To establish an "injury" for purposes of RICO standing, a Plaintiff must show a "concrete financial loss." *Truthinadvertisingenforcers.com v. Dish Network, LLC*, 8:16-CV-2366-T-33JSS, 2016 WL 7230955, at *5 (M.D. Fla. Dec. 14, 2016) (citation omitted) ("To demonstrate injury for RICO purposes [on motion to dismiss], plaintiffs must show proof of concrete financial loss."). "Intangible property interest[s]," such as expectation interests like generic claims of lost expected proceeds, do not suffice. *Keeton v. Gynecare Worldwide*, 15-cv-20442, 2016 WL 2753866, at *3 (S.D. Fla. Jan. 29, 2016), *report and recommendation adopted sub nom. Keeton v. Johnson & Johnson*, 15-cv-20442, 2016 WL 2753667 (S.D. Fla. Mar. 31, 2016); *Simpson*, 744 F.3d at 709 ("[T]he plaintiffs have provided no direct evidence of lost profits."). Moreover, these injuries must be pled with "concrete facts or data"; conclusory assertions of harm are similarly inadequate. *Simpson*, 744 F.3d at 709. For example, in *Simpson*, the Eleventh Circuit affirmed an order dismissing a RICO complaint for failure to plead standing, as the plaintiffs' "bald assertion[s]" of losses of "millions of dollars" was "unsupported by any concrete facts or data" that permitted the plausible inference that the relevant wages were actually depressed. *Id.*

(a)    The Consumer Plaintiffs do not identify any concrete injuries to business or property

As an initial matter, the Consumer Plaintiffs are individuals who do not claim that they run a business that was injured by virtue of the predicate acts; they allege only injuries to property. "Intangible property interests," such as a loss of an interest the plaintiff expected to obtain, *Keeton*, 2016 WL 2753866, at *3, or "damage to reputation," *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1304 (S.D. Fla. 2022), do not represent "concrete financial losses" that support RICO standing. *See also Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086-87 (9th Cir. 2002) ("[M]ere injury to a valuable intangible property interest" is not a RICO injury).  Courts have consistently and correctly recognized that RICO requires more specific allegations of financial injury to survive a motion to dismiss.  *E.g.*, *Simpson*, 744 F.3d at 709, 712; *see also Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1267 (S.D. Fla. 2015) (dismissing RICO complaint where plaintiffs failed to provide evidence of increased access fees).

Plaintiffs King, Wells, Foreman, and Turner allege intangible losses: "continuity of care" or "coverage" (Plaintiffs King and Turner), "benefits" (Plaintiffs Foreman and Wells), and "time" (Plaintiffs Foreman, Turner, and Wells).  These injuries are neither concrete nor tied to any financial metric, and thus represent precisely the type of "intangible property interests" that do not establish RICO standing.

Plaintiffs King, Langley, Foreman, and Turner also claim damages for "out of pocket costs" (Plaintiff King), "uncovered medical bills" or "medications" and "higher deductibles and copays" (Plaintiffs Langley, Foreman, and Turner).  However, these Plaintiffs have failed to plead these claims with the specificity required to show a "concrete financial loss" because they make only generalized allegations and do not identify a single unpaid medical bill, a medical bill that was not covered due to a change in policy, a specific increased deductible, or amounts associated

14

with those alleged losses (*e.g.,* the amount that a deductible increased due to a predicate act).  *See, e.g.*, *Trump*, 626 F. Supp. 3d at 1304.  As a result, Plaintiffs' claims are akin to the "bald assertion of loss" the Eleventh Circuit found inadequate in *Simpson*.  744 F.3d at 712.  If such generalized allegations were sufficient, RICO standing could be established by any assertion that a plaintiff had to pay an undefined amount of money, which would be contrary to multiple Eleventh Circuit holdings.  *See, e.g.*, *id.*; *Worldspan*, 2019 WL 2267262, at *6.

For these reasons, the injuries claimed by Plaintiff King ("loss of continuity of care," and "out-of-pocket costs spent attempting to deal with the issues created" from Defendants' alleged "twisting actions"), Plaintiff Langley (damages in the form of "thousands of dollars in uncovered medical bills"), Plaintiff Turner (loss of coverage and resulting medical payments "for her son Joshua," higher deductibles and co-pays, and time and expense spent to correct the problems), Plaintiff Foreman ("loss of benefits, unpaid medical expenses and uncovered medications," and "expend[ing] unnecessary time fixing these problems"), and Plaintiff Wells (loss of benefits and medications, and having to expend unnecessary time fixing these problems) do not demonstrate the "concrete financial losses" that support RICO standing.

(b)  <u>The Agent Plaintiffs do not identify any concrete injuries to business or property</u>

The Agent Plaintiffs allege generalized expectancy injuries to their health insurance businesses, which are also insufficient: business injuries are equally subject to RICO's requirement of "concrete facts or data."  *Simpson*, 744 F.3d at 708-10.  For example, allegations that a business lost $340,000 establish a "concrete financial loss," *see Gov't Employees Ins. Co. v. Martineau*, 8:19-CV-1382-MSS-SPF, 2020 WL 13661780, at *7 (M.D. Fla. Mar. 9, 2020), but failure to "articulate how much [the plaintiff] was overcharged" does not.  *Maitland v. Spectrum*, No. 3:17-cv-1232-J-20JBT, 2019 WL 13072397, at *3 (M.D. Fla. Aug. 22, 2019).   Allegations of

15

anticipated future earnings also reflect expectancy interests that, without concrete details of how much Plaintiffs expected to earn, do not state a claim. *Simpson*, 744 F.3d at 709 (court was unable to "infer a gap" in wages after plaintiffs failed to provide "market data" supporting claim); *Keeton*, 2016 WL 2753866, at *3 (loss of expectation interest "is not, as a matter of law, the type of business or property injury that can support a finding of statutory standing under RICO").

The Agent Plaintiffs claim they lost "commissions," Am. Compl. ¶¶ 391, 402, but neither Agent Plaintiff has identified a specific commission that Defendants "poached." To the contrary, the Agent Plaintiffs actually say that they **successfully** retained the Plaintiff-Customers allegedly targeted by Defendants. *Id.* ¶¶ 350, 382, 390, 400. Plaintiff NavaQuote alleges only that TrueCoverage "attempted to poach" Plaintiff Wells, implying that the attempt was not successful. *Id.* ¶ 390. Plaintiff WINN's generic claim that she has lost "more than 20" clients "for good" does not identify those clients, claim that TrueCoverage or Enhance "poached" them, or connect their departures to a RICO predicate act. *Id.* ¶ 397; *see also id.* ¶ 387 (noting that Plaintiff NavaQuote has lost "23 [clients] to the AOR Swaps" but not identifying which clients). As a result, the Agent Plaintiffs' generic claim that they have been damaged "through a loss of commissions" (*id.* ¶¶ 391, 402) does not constitute the "concrete" loss necessary for RICO standing.

The remaining allegations suffer from the same critical weakness. "Loss of profits," "out-of-pocket costs" and "extra expenses associated with buying additional leads" or resisting the scheme reflect general statements of alleged financial damages that lack concreteness, and courts have dismissed similar claims on multiple occasions. *E.g.*, *Worldspan*, 2019 WL 2267262, at *6 (finding "general financial damages" allegation insufficient); *Viridis Corp.*, 155 F. Supp. 3d at 1357 (finding "business reputation and/or customer goodwill" allegation insufficient). Plaintiffs'

hypothetical examination of the Agent's profit margin for a family of four does not suffice because it is not tied to an actual commission that the Agents expected to receive.  Am. Compl. ¶ 396.

For these reasons, the Agent Plaintiffs' injuries (unspecified lost commissions, profits, "out-of-pocket costs" and "extra expenses associated with buying additional leads" or fighting back the scheme) do not demonstrate a concrete financial injury that establishes RICO standing.

2.    *Plaintiffs fail to allege injuries "by reason of" the predicate offenses*

In addition to establishing individual injuries, Plaintiffs must plausibly allege that Defendants' conduct directly caused each Plaintiff's injury.[3]  *Marrero v. Benitez*, No. 17-cv-2102, 2017 WL 7796341, at *6 (S.D. Fla. Aug. 3, 2017) (granting motion to dismiss because complaint that lumped Defendants together made it "impossible for this Court to ascertain injuries … without specifically identifying how each Defendant's conduct directly resulted in an injury to each specific Plaintiff").  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (affirming order dismissing complaint for failure to plead proximate cause where direct victim was not plaintiff, and plaintiff pled harms entirely distinct from the alleged RICO violation).  As the U.S. Supreme Court has repeatedly held, a link that "is too remote," "purely contingent," or 'indirec[t]'" is insufficient and consequently,

---

[3]  For purposes of a motion to dismiss, the Eleventh Circuit treats the proximate cause analysis and the statutory causation analysis as one.  *E.g.*, *Harris v. Orange, S.A.*, 636 F. App'x 476, 483 n.5 (11th Cir. 2015) ("A plaintiff who lacks standing to vindicate a derivative injury also will be unable to show proximate cause.").  In addition to the proximate cause analysis explained for purposes of standing, Plaintiffs fail to demonstrate proximate cause of injury as a result of the enterprise.  The Consumer Plaintiffs fail to plead facts which, if true, would show a connection between these alleged acts and the conduct of a RICO enterprise.  Rather, Plaintiffs have alleged conduct that each defendant undertook apart from the alleged enterprise and divorced from any allegedly fraudulent advertisement posted by an enterprise participant.  This failure is fatal, as Plaintiffs have failed to show that any particular plaintiff's injury was proximately caused by any action of an alleged RICO enterprise.  This Court should dismiss the RICO claims on that basis.

plaintiffs who plead injury that is purely derivative of harms to others do not show proximate cause. *Anza*, 547 U.S. at 457, 460-61 (internal quotation marks omitted).  To determine whether harm is indirect, courts examine the difficulty of ascertaining damages attributable to the violation, as well as the risk of multiple recoveries, with particular concern for any "directly injured victims [who] can generally be counted on to vindicate the law as private attorneys general" without the same difficulties. *Holmes,* 503 U.S. at 269-70.

Courts have repeatedly dismissed RICO claims because the claimed injury is too indirect. For example, in *Hemi Group, LLC v. City of New York*, the Supreme Court rejected New York City's RICO claim that alleged an out-of-state cigarette retailer caused New York City to lose tax revenues because it did not provide New York State with information about in-state customers. 559 U.S. 1, 4-5 (2010).  There, the Supreme Court found lack of proximate cause because residents' failure to pay City taxes—and not the retailer's failure to report—was the direct cause of the City's injury.  *Id.* at 10-11.  Further, in *O'Malley v. O'Neill*, the Eleventh Circuit held that plaintiffs' injury derived from their refusal to participate in a mail fraud scheme, not "by reason of" the mail fraud scheme itself.  887 F.2d 1557, 1561 (11 Cir. 1989).  In each case, the court established that (1) it would be difficult, if not impossible, to apportion damages where the plaintiff's injuries flowed from sources outside of the alleged enterprise, and (2) there was a viable potential plaintiff who did not suffer the same problems with respect to apportioning damages.

The Amended Complaint alleges a two-part scheme: (1) the use of false advertisements to deceive consumers into providing their PII to an insurance agent, and then (2) that certain Enhance and TrueCoverage agents used that PII to manipulate Plaintiffs' healthcare plans.  Even assuming Plaintiffs properly pled predicate acts (and they did not, *see infra* at Section II.C), Plaintiffs fail to demonstrate that the scheme proximately caused their claimed harms because each has failed to

allege a direct causal connection between their injury and either part of the alleged scheme. Plaintiffs' general statements do not connect their supposed harms to any Defendant's actions.

(a)      The Consumer Plaintiffs fail to demonstrate proximate cause

Each Consumer Plaintiff fails to allege injury "by reason of" Defendants' supposed predicate acts because each fails to plead how any Defendant directly caused her injury. *See Ray*, 836 F.3d at 1351 (affirming order dismissing complaint for failure to plead proximate cause); *Amarelis v. Notter Sch. of Culinary Arts, LLC*, No. 6:13-CV-54-ORL-31KRS, 2014 WL 5454387, at *6 (M.D. Fla. Oct. 27, 2014) (dismissing complaint for failure to individually plead proximate cause).  Plaintiffs offer only general assertions that "agents," who for the most part are unidentified by name or employer, changed their health insurance but never tie any Defendant to their injuries. The three Plaintiffs who allege that they saw a false advertisement do not further claim that Minerva—the only lead-generator Defendant[4]—generated the advertisement. *E.g.*, Am. Compl. ¶¶ 341, 355, 371.  To the contrary, the Amended Complaint allows for the inference that Plaintiffs saw ads from a different lead generator because it fails to allege that Minerva generated all of the ads for TrueCoverage and Enhance. *Id.* ¶¶ 194-95 (Minerva's signifier "would appear on her monitor for *a great many* of the incoming calls") (emphasis added); *id.* ¶ 220 ("Minerva *essentially* became Enhance Health's exclusive lead provider," but stopping short of claiming actual exclusivity) (emphasis added).  The Amended Complaint's failure to distinguish between the Defendants or to state definitively how each Defendant caused each Plaintiff's individualized harm does not satisfy the proximate cause standard. *Marrero*, 2017 WL 7796341, at *6.

---

[4]   Defendants note that the original Complaint [ECF No. 1] contained an Exhibit 1 that named numerous lead generators who are *not* Minerva.  That exhibit is conspicuously absent from the Amended Complaint, although the Amended Complaint contains allegations of a more limited set of lead generators in paragraphs 129-32.

The Consumer Plaintiffs also fail to support their proximate cause allegations with respect to any aspect of the alleged scheme.

*The Allegedly False Advertisements.*  Plaintiffs King, Wells, Turner, and Langley do not allege that they relied on a misrepresentation that came from any of the Defendants.  As a result, they cannot plausibly allege that their injury occurred "by reason of" Defendants' false advertisements.  *Ray*, 836 F.3d 1349-50.  Plaintiffs King and Wells do not allege that they saw an advertisement or that they spoke to any Defendant regarding a cash card.  Consequently, they cannot claim harm flowing from any specific reference to "cash cards."  Although Plaintiffs Turner and Langley allege that they saw a "cash card" advertisement, called the number, and provided PII, *id.* ¶¶ 371, 347, neither claims that Defendant Minerva generated the ad, or that they spoke to an Enhance or TrueCoverage agent, *id.*, meaning that their injuries did not necessarily occur "by reason of" a predicate act committed by a Defendant.

Plaintiff Foreman claims specific tax losses that she suffered after her husband called TrueCoverage and discussed a cash card with the agent.  *E.g.*, Am. Compl. ¶ 369.  Assuming that these losses are cognizable under RICO, her husband is equally subject to the tax payments and could bring his own action (and is better suited to do so, as he is the one who allegedly relied on the misrepresentation).  *See Virdis Corp.*, 155 F. Supp. 3d at 1355 (recognizing the need to avoid double recoveries in RICO cases).

*The Alleged PII Misuse.*  No Consumer Plaintiff alleges that she relied on misrepresentations or omissions regarding PII, and therefore, they do not establish that any PII-related injuries occurred "by reason of" Defendants' use of PII.  *Ray*, 836 F.3d 1349-50.  Although Plaintiffs Turner, Foreman, and Langley claim that they viewed an advertisement, they do not claim that they provided their PII to a Defendant in order to receive a cash card.  Plaintiffs Foreman

and Langley do allege that a conversation occurred with their husbands, but likewise neither Plaintiff claims that their husbands disclosed their PII in order to get a cash card.  The Amended Complaint makes no allegations about Defendants' PII-related misrepresentations and omissions to any Consumer Plaintiff and therefore fails to establish proximate cause.

(b)   <u>The Agent Plaintiffs' claims are purely derivative</u>

The Agent Plaintiffs fail to establish proximate cause for two reasons: the Agents do not claim that they have suffered a harm that is directly attributable to Defendants' alleged actions, and they have not plausibly claimed that they (and not the Consumer Plaintiffs) were the target of the fraud.  Since the Agent class cannot show the alleged conduct was "aimed primarily" at them, either in harm or in purpose, they fail to plead proximate cause.  *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003).

"A party whose injuries result merely from the misfortunes visited upon a third person by the defendant's acts lacks standing to pursue a claim under RICO."  *Id.* (quotation omitted).  Courts consider "the motivating principles animating the injury requirements in RICO cases" when determining whether an injury is direct, specifically: "(1) reducing the difficulty in ascertaining the amount of damages attributable to the RICO violation as distinct from other independent factors and (2) reducing the risk of duplicative recoveries."  *Harris*, 636 F. App'x at 483 (explaining that shareholder's injuries were indirect because permitting suit would advance neither principle).  On the first factor, difficulties determining "accurately the proportionate reduction in [the Agent Plaintiffs'] value attributable to the defendants' conduct as opposed to factors like market conditions, poor business practices, or failure to anticipate developments in the financial markets" are a strong indicator of derivative, as opposed to direct, injury.  *Id.*  On the second, courts consider the existence of "immediate victims of an alleged RICO violation [who] can be expected to vindicate the laws by pursuing their own claims" to be an equally strong indicator of

21

derivative injury.  *Anza*, 547 U.S. at 460 (citation omitted).  An injury is more likely to be indirect where adjudicating a direct victim's claim would be "relatively straightforward."  *Id.*

Competitor plaintiffs pose particular issues to recovery because businesses "lose and gain customers for many reasons."  *Id.* at 459.  In *Anza*, the Supreme Court rejected a competitor's RICO claim where the competitor claimed that the defendant decreased its prices for cash-paying customers to "gain sales and market share," with the result that the plaintiff lost sales.  *Id.* at 435- 54.  The Supreme Court determined that the direct victim of the conduct was the State of New York, which "was being defrauded and [] lost tax revenue as a result."  *Id.* at 458.  The Court reasoned that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," and that the plaintiff's "lost sales could have resulted from factors other than" the alleged predicate acts.  *Id.*  The "complex assessment to establish" losses associated with the alleged RICO violation therefore weighed against finding a direct link.  *Id.* at 459.  Further, the Court recognized that the direct victim—the State of New York—could "be expected to pursue appropriate remedies" in a "relatively straightforward" adjudication compared to adjudicating the plaintiff's injuries.  *Id.*

First, as pled, the Agent Plaintiffs' claimed injuries explicitly derive from injuries to the Consumer Plaintiffs.  *Holmes*, 503 U.S. at 268-69.  The Agents root their claims for lost commissions, profits, and out-of-pocket costs in the misrepresentations and omissions allegedly made to *consumers,* not to the Agent Plaintiffs themselves.  Am. Compl. ¶¶ 391, 402.  The Agents do not plead any injuries independent from injuries to the consumers; the Agents' injuries are one step removed.  *See, e.g.*, *Green Leaf Nursey*, 341 F.3d at 1307 (finding no proximate cause where defendants' conduct of hiding and falsifying evidence in several lawsuits was aimed primarily at third-party litigants, not plaintiff); *Verdejo v. HP Inc.*, No. 21-cv-20431, 2021 WL 5933727 (S.D.

Fla. Nov. 7, 2011) (reasoning that because "[a]s alleged, the racketeering scheme targeted" only one corporation, another corporation's use of funds to pay defendants' extortion demand "does not constitute a direct injury" to the non-extorted corporation). The Agents represent the quintessential derivative party that cannot allege individual proximate cause.

The Amended Complaint's allegations about the competitive marketplace demonstrate the tenuous ties between the Agent Plaintiffs' injuries and the predicate acts because it would be impossible to apportion recoveries. *Anza*, 547 U.S. at 459. As in *Anza*, the Agent Plaintiffs do not allege that only the named Defendants caused their alleged harms. *E.g.*, Am. Compl. ¶ 389 ("Navaquote has determined that TrueCoverage and Enhance Health agents ***are among*** the biggest offenders.") (emphasis added); *id.* ¶ 398 (same, as to WINN); *id.* ¶ 397 ("***[O]ther [unnamed] agencies*** are removing [Broyer] as AOR without consent") (emphasis added). The Agent Plaintiffs generally allege customer losses and do not even attempt to separate injuries caused by Defendants from injuries caused by other market actors. *See, e.g.*, Am. Compl. ¶¶ 389, 397-98. Moreover, the Amended Complaint acknowledges that the ACA market was in high demand, lucrative, and very competitive, raising the plausible inference that the Agents could have lost consumers purely due to standard market competition. *Id.* ¶¶ 165-66, 221. On its face, the Amended Complaint offers no way to determine which losses were due to the alleged RICO scheme versus the market.

An obvious plaintiff exists to vindicate injuries from this alleged fraud: consumers, if any, who have been subject to the alleged misrepresentations or omissions ***and*** consequently suffered a concrete financial loss. *Holmes*, 503 U.S. at 269-70. An injured consumer could demonstrate specific financial injuries associated with alleged fraud by specific Defendants and avoid the issues that come with parsing lost consumers to different agencies and which were attributable to

Defendants' conduct as opposed to the Agent Plaintiffs' own failures or broader market conditions. *Anza*, 547 U.S. at 459. Permitting the Agent Plaintiffs to advance their claims in the manner they are currently pled creates an unacceptable "risk of duplicative recoveries." *Id.*

Second, the Agent Plaintiffs further demonstrate their lack of a direct injury by failing to plead that they were the target of the alleged fraud; the Eleventh Circuit has upheld the dismissal of numerous RICO claims on this basis. *E.g.*, *Halpin v. Crist*, 405 F. App'x 403, 406 (11th Cir. 2010) (affirming order dismissing RICO claim because State of Florida, not plaintiffs, "was the intended target of the fraudulent scheme"); *Hemi*, 559 U.S. at 13 n.1 (noting that allegations suggested "alleged fraud was aimed at Hemi's competitors" and explaining that "*Anza* teaches that the competitors' injuries in such a case are too attenuated to state a RICO claim"); *see also Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 908 (11th Cir. 1998) (holding that creditor plaintiffs lacked RICO standing "because the alleged diversion of [corporation's] revenues had too derivative an effect" on creditors).

Simply "claiming that the defendant's aim was to increase market share at a competitor's expense" will not suffice to demonstrate that the competitor was a target. *Anza*, 547 U.S. at 460. Indeed, the "directness inquiry is not a question of specific intent," but instead a question of alleged conduct was "aimed primarily" at the plaintiff. *Green Leaf Nursery*, 341 F.3d at 1307 (citations omitted). The Amended Complaint lacks any allegation that Defendants targeted Agent Plaintiffs as market competitors, and instead alleges only that Defendants sought to "artificially and exponentially grow the newly developing, year-round industry for low-income ACA health insurance, and to use fraudulent means to exploit and capture as much of that industry as possible, as quickly as possible, for monetary gain." Am. Compl. ¶¶ 405, 414 ("The activity created a larger industry, greater market share within that industry, and profits."). Assuming that there was a

24

"target" of the scheme, it would necessarily be consumers and not agents.  *See Am. Dental*, 605 F.3d at 1293-96; *Youngblood-West v. Aflac, Inc.*, No. 4:18-CV-83, 2018 WL 10562576, at *9 (M.D. Ga. Nov. 9, 2018) (finding that defendants' misconduct was directed at plaintiff's "husband by forcing him to resign with the specific intent of injuring her," meaning plaintiff's claims did "not satisfy RICO's proximate cause requirements because Defendants' conduct was aimed primarily at a third party—Plaintiff's husband—not Plaintiff herself").  It is also implausible that the Defendants targeted the Agent Plaintiffs: they are not competitors because, as stated in the Amended Complaint, they service different clienteles and operate at different levels in the market. *Compare* Am. Compl. ¶¶ 387, 395 (describing NavaQuote's and WINN's alleged business models and market segments) *with id.* ¶¶ 31, 32 (describing Defendants' alleged business models and market segments).

>    B.    Plaintiffs fail to allege that an enterprise existed

Plaintiffs have alleged that Defendants operated as an "associated-in-fact" enterprise, which is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1309 (11th Cir. 2022) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  The associated-in-fact enterprise must have at least three "structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (internal quotation marks omitted) (quoting *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009)).

The Eleventh Circuit has established that an associated-in-fact enterprise must function as an on-going, continuing unit and not merely on a self-interested, *ad hoc* basis, particularly when it is rooted in commercial relationships.  *See Omnipol*, 32 F.4th at 1309; *In re Managed Care*, 298

F. Supp. 2d 1259, 1273-74 (S.D. Fla. 2003) (quotation omitted).  Because parties may legally operate "for their own gain and benefit," this court has required Plaintiffs to plead facts that "dispel[] the notion" that the agreements were for a legitimate purpose.  *In re Managed Care*, 298 F. Supp. 2d at 1274 (quotation omitted).  Neither a "generally shared interest in making money" nor parallel business conduct is sufficient; rather, "a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular course of criminal conduct."  *Cisneros*, 972 F.3d at 1211-12 (citations omitted).

The Eleventh Circuit's reasoning in *American Dental v. Cigna* and *Almanza v. United Airlines* is instructive.  In *American Dental*, plaintiff dentists alleged that defendant insurance companies agreed to reduce payments to plaintiffs through systematic "bundling" and "downcoding," citing "parallel actions taken by Defendants, from which they … argue[d] the existence of an agreement may be inferred."  *See Am. Dental*, 605 F.3d at 1283.  The court concluded that "allegations of parallel conduct, accompanied by nothing more than a bare assertion" of agreement do not demonstrate an enterprise particularly where there is "an 'obvious alternative explanation' for each of the collective actions alleged that suggests lawful, independent conduct."  *Id.* at 1294-95 (quoting *Twombly*, 550 U.S. at 568).  Plaintiffs' failure to plead acts that were "inconsistent with the independent pursuit of … economic self-interest" permitted a plausible inference "of rational independent action," meriting dismissing the complaint.  *Id*. at 1295.  The Court took this further in *Almanza*, where the Eleventh Circuit upheld an order dismissing plaintiffs' claims because the absence of plausible allegations suggesting an agreement required the Court to "assume that the parallel conduct exhibited by Defendants is just as consistent with independent action (including independent action by actors who are conscious of what the other actors are doing) as it is with an agreement to commit a racketeering scheme."  851 F.3d at 1074.

The Court rejected Plaintiffs' argument that alleged unlawful parallel conduct "provide[d] the further factual enhancement needed to support a plausible inference of an agreement." *Id.* at 1070.

Here, to begin, Plaintiffs improperly lump Defendants into an "enterprise" based solely upon arm's length transactions and parallel business conduct. The Amended Complaint does not adequately plead that Defendants shared a common fraudulent purpose. Plaintiffs claim that the enterprise's "purpose" was "to artificially and exponentially grow the newly developing, year-round industry for low-income ACA health insurance, and to use fraudulent means to exploit and capture as much of that industry as possible, as quickly as possible, for monetary gain." Am. Compl. ¶ 405. This single conclusory allegation, which generally asserts the alleged "enterprise" sought to grow its industry—a goal of every company—through fraudulent means and that is unsupported by any specific allegation of an actual shared purpose, is not enough.

Plaintiffs also fail to show that Defendants functioned as a "continuing unit," as opposed to individual entities engaged in parallel conduct. Plaintiffs' attempt to lump Defendants into an "enterprise" rests in part on allegations of ordinary, arms-length transactions among companies participating in the same industry. For example, Plaintiffs allege that TrueCoverage (1) provided "training" and "scripts" to other brokerages, (2) purchased "leads" from lead generators, (3) "created" certain "downline" agencies, (4) referred agents to downline agencies, and (5) "financed" other brokerages by purchasing policies from them or paying them advanced commissions. *Id.* ¶¶ 247, 406(c). None of these allegations plausibly allege that TrueCoverage joined a "continuing unit" with a common "purpose" to obtain customers through "fraudulent means." Plaintiffs do not identify which portion of TrueCoverage's "training" or "scripts" were "fraudulent," or that any training or script caused any other Defendant to engage in fraud. They do not explain how a brokerage merely purchasing leads from a "lead generator" amounts to a

"common purpose" to commit fraud.  Plaintiffs also fail to explain what they mean by their allegation that TrueCoverage "created" downline agencies—and even if they had, they fail to allege that the mere "creation" of an entity reflects a shared purpose to commit fraud.  Plaintiffs mistake arms-length "purchases" of insurance policies with "financing" of downline agencies, and in any event, they do not plausibly claim any link between the alleged "financing" and an agreement to commit fraud.

Plaintiffs try to claim that TrueCoverage and Enhance "knew" that they were buying leads arising from "false" or "fraudulent" ads posted by lead generators using "cash card" references in the ads, *see, e.g.*, *id.* ¶¶ 205-06, but these conclusory allegations show that, at most, TrueCoverage and Enhance knew callers may have seen ads that referenced cash cards.  However, as Plaintiffs themselves acknowledge, many insurance carriers offer "future cash reward card[s]" to their customers.  *Id.* ¶ 204.  Therefore, a mere reference to a "cash card" does not render the ad false or fraudulent, and as a result does not  indicate a "common purpose" with other Defendants to enroll customers through "fraudulent means."

Regarding Enhance, Plaintiffs' "non-conclusory allegations are more consistent with [Enhance] conducting its own business initiatives" than joining together with co-Defendants to form a RICO enterprise.  *Parm v. Nat'l Bank of California*, 242 F. Supp. 3d 1321, 1347 (N.D. Ga. 2017).  Plaintiffs allege that Enhance (1) received training for agents on "how to enroll consumers in ACA plans," Am. Compl. ¶ 215, (2) "used the same-type of scripts" as TrueCoverage, *id.* ¶ 264, (3) purchased leads from lead generators, *id.* ¶ 24, and (4) created downline agencies, *id.* ¶ 32.  As with TrueCoverage, none of these allegations establish that Enhance did anything other than act in its own legitimate business interests.  Indeed, all of Plaintiffs' allegations regarding Enhance's formation show only actions that are "just as much in line with a wide swath of rational and

competitive business strategy unilaterally prompted by common perceptions of the market," *Twombly*, 550 U.S. at 554, and consequently do not establish the enterprise requirement under RICO, *Almanza*, 851 F.3d at 1069. At best, Plaintiffs' allegations show parallel business conduct and engagement in a competitive, capitalist industry, from which a court cannot infer an enterprise. *Id.* at 1068.

As to Herman, the allegations are particularly tenuous. His only alleged involvement is through his role at Enhance, but the allegations relating to his company's involvement do not state a claim against him personally. Moreover, Herman's alleged engagement with TrueCoverage and Minerva is best understood as taken for his company's "own gain or benefit [through] commercial relationships." *In re Managed Care*, 298 F. Supp. 2d at 1274 (quotation omitted). Without allegations of specific agreement, "an account of [Herman's] commercial efforts stays in neutral territory." *Almanza*, 851 F.3d at 1068 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs' allegations as to Defendants Speridian and Benefitalign are even more attenuated. They allege only that Speridian created two platforms that allow agencies to access the ACA Marketplace, Am. Compl. ¶¶ 16, 199, 406(d), including Benefitalign, *id.* ¶¶ 16, 198, and that some agencies used those platforms to engage in wrongdoing, *id.* ¶ 205. Allowing agencies to access the ACA Marketplace is, however, the very purpose of the platform. Plaintiffs do not plausibly allege that either Speridian or Benefitalign took any action that allowed any other Defendant to engage in wrongdoing. Instead, they allege only that some parties chose to engage in certain conduct while using the platforms. That is not enough to infer that either Speridian or Benefitalign joined other Defendants in a common purpose to commit fraud.

Finally, Plaintiffs' only allegations of Minerva's and Bowsky's participation in the supposed enterprise are that Bowsky directed the enterprise through his ownership interest in

Minerva and that Minerva both created its own fraudulent ads and bought and sold fraudulent ads to other entities, including Enhance and TrueCoverage. *Am. Compl.* ¶ 406(a)-(b). Again, even if these allegations are accepted as true, they demonstrate nothing more than Minerva's desire to profit in its own business; Minerva's involvement stops at the purchase and sale of leads to other entities. The allegations of Bowsky's connections in the industry—without more—fail to support his individual participation in the enterprise. *See id.* ¶¶ 183, 220.

In short, rattling off a list of ordinary business transactions among parties representing a given industry and claiming a resulting "fraud" does not satisfy the Plaintiffs' burden to plead a shared a common purpose to defraud consumers.

Second, Plaintiffs' allegations of parallel "AOR Swaps," "Twisting," and "Dual Apping" do not state an enterprise because they do not establish that the Defendants had a shared purpose or operated as a "continuing unit." *Almanza*, 851 F.3d at 1068. Because parallel conduct can "just as easily indicate independent action as it can collusion," the Eleventh Circuit has made clear that allegations of similar conduct are insufficient to allege the existence of an enterprise. *See id.*, 851 F.3d at 1068 (internal quotation marks omitted). Rather, further factual enhancement, such as reasons to infer an agreement between diverse defendants, is required. *Id.* Plaintiffs do not explain how their allegations that Defendants were working at cross purposes to steal each other's policies square with their allegation that Defendants were working together as part of a common enterprise. Plaintiffs allege, for instance, that Defendants Bowsky and Minerva "knowingly stoked the AOR- and plan-swapping activity by reselling consumers' leads to multiple buyers, who would promptly steal each other's policies." Am. Compl. ¶ 19. Plaintiffs allege that Defendants TrueCoverage and Enhance were among those buyers. *See, e.g., id.* ¶ 183. Plaintiffs ignore that these allegations plausibly suggest Defendants were, in fact, twisting policies that belonged to each other. With

their allegations that similarly situated insurance agents chose to engage in similar misconduct, Plaintiffs have merely alleged parallel conduct, and not a RICO enterprise.

Plaintiffs' allegations reflect the reality that some health insurance agents, operating in the same market with similar incentives, might engage in parallel conduct; every commission-based insurance agent naturally has an incentive to maximize sales and competition between them is not a shared enterprise.  For these reasons, Plaintiffs have failed to allege a RICO enterprise.

C.  <u>Plaintiffs fail to allege participation in operation or management of the enterprise</u>

In addition to their failure to plead the existence of an enterprise that Defendants operated or managed,  Plaintiffs have failed to allege that each Defendant did anything more than direct its own affairs.  RICO liability attaches only to those who have some part in directing "the '***enterprise's*** affairs,' not just their ***own*** affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)) (emphases in original).  "This means the plaintiff must provide concrete 'factual allegations as to ***how*** [each of the] individual Defendants played a part in directing the affairs of the enterprise.'"  *Sterling Nat'l Mortg. Co. v. Infinite Title Sols., LLC*, No. 10-cv-22147, 2011 WL 13220625, at *5 (S.D. Fla. Mar. 3, 2011) (quotation omitted) (alterations and emphasis in original), *report and recommendation adopted* 2011 WL 1222168 (S.D. Fla. Mar. 31, 2011).  Here, setting aside conclusory allegations, Plaintiffs allege that Enhance directed the actions of the alleged enterprise through its relationships with downlines.  *See, e.g.*, Am. Compl. ¶ 255.  This is nothing more than "innocuous behavior," *Sterling Nat'l*, 2011 WL 13220625, at *10, given the relationship between the Enhance and its downlines, as Plaintiffs acknowledge in their own definition of "downline," *see* Am. Compl. ¶ 16 n.2 (a "downline" is an agency that "receives financing, oversight, training and support from its 'upline'").  As explained, the fact that other Defendants may have also had downlines merely shows parallel business conduct and fails to satisfy the operation and management test.

31

D.      Plaintiffs fail to allege two predicate acts of racketeering

"In order to prove a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show *at least two racketeering predicates*[.]."  *Am. Dental*, 605 F.3d at 1290-91 (emphasis added) (citation omitted)  As the Eleventh Circuit reiterated in *Ambrosia Coal*, 482 F.3d at 1317, Plaintiffs are required to allege that *each individual defendant* committed two predicate acts.  482 F.3d at 1317; *Am. Dental*, 605 F.3d at 1290-91 ("The plaintiff must allege facts with respect to each defendant's participation in the fraud.").  Notably, the Amended Complaint does not allege that Herman, Panicker, Goldfuss, or Bowsky committed any predicate acts whatsoever.

Moreover, predicate acts of mail and wire fraud "merit particular scrutiny" and must be pled to the heightened standard of Rule 9(b).  *Wilson*, 2015 WL 1600549, at *2.  Scrutiny is essential "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."  *Cisneros*, 972 F.3d at 1216 (citation omitted).  To establish these predicate acts, Plaintiffs must allege: (i) the existence of a scheme to defraud, (ii) the object of that scheme was to get money or property; (iii) the defendant knowingly or intentionally participated in that scheme with specific intent to defraud; (iv) the mails or wires were used in furtherance of that scheme.  *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1193 (S.D. Fla. 2021) (citation omitted) (granting motion to dismiss) (citation omitted).  "In the Eleventh Circuit, a scheme to defraud requires proof of material misrepresentations or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence."  *Id.* at 1192.  Plaintiffs must also allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendant gained by the alleged fraud."  *Am. Dental*, 605 F.3d at 1291 (citation omitted).

Plaintiffs' proffer a two-part scheme that purportedly involved predicate acts.[5]  *First*, Plaintiffs allege that Minerva sold Enhance and TrueCoverage leads generated from misleading ads that referred to "cash cards," and that Enhance and TrueCoverage employed "scripts" to deflect inquiries about the cash cards.  Am. Compl. ¶¶ 193, 247, 406(c).  But references to "cash cards" do not imply fraud because, as Plaintiffs admit, insurance carriers do legitimately offer "cash cards" and in any event, no Plaintiff alleges that she saw or relied on an ad generated by Minerva or that a TrueCoverage or Enhance agent made a false statement during a phone conversation.  *Id.* ¶ 204.  *Second*, Plaintiffs allege repeated misuse of their PII, but no Plaintiff alleges that that they disclosed their PII in response to any misrepresentations or omissions made by any Defendant. Rule 9(b) is plainly not satisfied here.

As an initial matter, Plaintiffs plead only conclusory allegations regarding use of the mails for any aspect of the scheme—and none that specifically connect any individual Defendant's use of mail to any individual Plaintiff.  *Id.* ¶ 408.  The wire fraud claims fare no better because, as pled, the Amended Complaint does not meet the particularity requirements of Rule 9(b), nor demonstrate an intent to defraud Plaintiffs out of money or property.

1.    *Plaintiffs' claim that Defendants used deceptive advertising does not satisfy Rule 9(b) and cannot support predicate acts of mail or wire fraud*

Plaintiffs' allegations that Defendants used deceptive advertising to induce them to sign up for health insurance fail for four independent reasons.

---

[5]   Neither of the Agent Plaintiffs allege any misrepresentations were made to them at all. Further, the Agent Plaintiffs necessarily support their RICO claims by relying on the misrepresentations made to the Consumer Plaintiffs, and therefore their claims must also fail as derivative. *E.g.*, *Emess Cap., LLC v. Rothstein*, No. 10-cv-60882, 2011 WL 13214302, at *4 (S.D. Fla. Mar. 9, 2011), *report and recommendation adopted*, 2011 WL 13214308 (S.D. Fla. Dec. 21, 2011); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

First (and again), Plaintiffs' allegations of affirmative misrepresentations are insufficient. Plaintiffs King, Wells, Turner, and Langley[6] do not allege that any Defendant made any misrepresentation about any "cash cards" or other rewards.  *See, e.g.*, *In re Takata Airbag Prods. Liab.*, 396 F. Supp. 3d at 1160 (dismissing RICO fraud complaint where complaint lacked "a single quote, from a single communication on a specific date, between any specific personnel at FCA or Volkswagen, with Takata personnel, with federal regulators, or with the public").  Additionally, Plaintiffs King and Wells do not claim that they ever saw any relevant advertisements at all, let alone that they saw a misrepresentation in an advertisement.  *See* Am. Compl. ¶¶ 331-33, 373-75. Similarly, neither Plaintiff King nor Wells alleges that they ever spoke with any Defendant at any time.  Because the Amended Complaint claims that the misrepresentations were made via advertisements and in phone conversations with consumers, no Defendant could have made a misrepresentation to Plaintiffs King or Wells.

Plaintiff Turner claims that she saw an ad "promising a cash card to pay monthly expenses" and that she subsequently placed a call to "the number on the ad," but she does not allege that her call reached any Defendant, that she spoke to an employee or agent of any Defendant during the call, nor what was said on that call beyond the bare allegation that she provided her PII.  *See id.* ¶ 371.  Plaintiff Langley alleges that the Langleys saw an ad promising "a cash card," her husband (not her) called the number listed, and that they were enrolled in a new health insurance plan.  *See id.* at ¶¶ 346-47.  She does not allege that her husband called or spoke with any Defendant, nor that any Defendant made a misrepresentation to her husband during the call.  Because Plaintiffs Langley and Turner do not specify who they called, what was said during the call, and with whom

---

[6]   As discussed, neither Plaintiff Langley nor Foreman can state a claim on behalf of their husbands who were allegedly the ones who saw the purportedly false advertisements and placed the calls for health insurance.  *Id.* at ¶¶ 347, 355.

Plaintiffs spoke, their claims do not comply with Rule 9(b).  *See, e.g.*, *SIG, Inc. v. AT&T Dig. Life, Inc.*, 971 F. Supp. 2d 1178, 1197-98 (S.D. Fla. 2013) (dismissing misrepresentation claim because plaintiffs did not "attribute [the false statements] to the individuals who made them" nor "identify the time, place, or content of any false representations").  All Plaintiffs also fail to allege that the advertisement was made or generated by any Defendant.  *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1234 (S.D. Fla. 2017) (dismissing RICO complaint because predicate act allegations did not specify the "who," "when," "where," or "how" and did not define each defendant's role).

Plaintiff Foreman alleges that her husband responded to an ad in December 2022, and that he then spoke to someone affiliated with TrueCoverage who mischaracterized the federal tax credit.  Am. Compl. ¶ 355.  To the extent this states a claim, she does not allege any contact with, misrepresentation made by, or any facts connecting this agent's conduct to any other Defendant.

Second, there are no allegations suggesting that the object of the allegedly false advertisements was to defraud any person (Plaintiff or otherwise) out of money or property, which is an essential element of federal mail and wire fraud.  *Wilson*, 2015 WL 1600549, at *2.  Wire fraud requires allegations of intent to harm a person as a result of a scheme to defraud; a "trick" alone does not suffice.  *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016).  In *Takhalov*, the Eleventh Circuit considered whether a "scheme or artifice to defraud" under the wire fraud statute encompassed both a scheme to "deceive" and a scheme to "defraud."  The court concluded that "a "scheme to defraud," as that phrase is used in the wire fraud statute, "refers only to those schemes in which a defendant lies about the nature of the bargain itself."  *Id.*  The court recognized that there is "a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an

essential element of the bargain—which do violate the mail and wire fraud statutes."[7]  *Id.* at 1314

(quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)); *Trump*, 626 F. Supp. 3d at 1304

(dismissing complaint where, *inter alia*, plaintiff did "not allege that an object of the dishonesty

was to obtain money or property").  The *Takhalov* court ultimately reasoned that the defendants

lacked specific intent to commit wire fraud based on evidence that their deception—"a scheme to

trick patrons to come into a bar"—could not constitute wire fraud absent evidence of intent to

defraud the victims out of money or property.  *Takhalov*, 827 F.3d at 1319.

Here, Plaintiffs claim that Defendants intended the advertisements to induce Plaintiffs to

call Defendants to discuss enrolling in a health insurance plan.  *E.g.*, Am. Compl. ¶¶ 273, 405-06,

410.  However, a marketing lead is not itself money or property, and there is no allegation (except

a single conclusory reference to the "receipt by wire of money … from Consumer Class Plaintiffs,"

Am. Compl. ¶ 409) that Defendants intended to acquire any money or property *from any Plaintiff*

by way of such advertisements.  Thus, even accepting that Defendants' alleged references to cash

cards (which, again, some insurance carriers do offer) may have been *deceptive*, they do not even

approach *fraudulent* within the meaning of the mail or wire fraud statutes.  *See Takhalov*, 827 F.3d

at 1307 (acknowledging that "[a] jury cannot convict a defendant of wire fraud ... based on

misrepresentations amounting only to a deceit").

In fact, the Amended Complaint appears to allege that the object of the advertisements was

to obtain Plaintiffs' PII.  However, PII is not "property" within the meaning of the wire fraud

statute, which protects only those rights that "had long been recognized as property when the wire

---

[7]  This logic has other applications in law.  *See, e.g.*, *Diamond Resorts Int'l v. Aaronson*, No. 6:17-cv-1394, 2018 WL 735627, at *5 (M.D. Fla. Jan. 26, 2018) (arbitration demands that "reprised … falsehoods contained in" advertising were not scheme to defraud because they "simply led to Plaintiffs engaging in subsequent arbitrations that might not have otherwise occurred") (citing *Takhalov*, 827 F.3d at 1313).

fraud statute was enacted." *Ciminelli v. United States*, 598 U.S. 306, 314 (2023) (quotation omitted).  Under the statute, "[i]t does not suffice ... that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland v. United States*, 531 U.S. 12, 15 (2000).  An individual's personally identifying information is not that individual's "property" within the meaning of the wire fraud statute because it has not been traditionally protected as such and has no intrinsic economic value in that person's hands.  *Id.*; *Ciminelli*, 598 U.S. at 314.

Following this principle and in a variety of circumstances, courts have consistently rejected the proposition that personal information comprises property.  *See, e.g.*, *Schmidt v. Multimedia Holdings Corp.*, 361 F. Supp. 2d 1346, 1356 (M.D. Fla. 2004) ("The interest associated with one's personal information . . . is not a property right.") (Driver's Privacy Protection Act claim); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012) ("[T]he weight of authority holds that a plaintiff's personal information does not constitute property.") (conversion claim) (collecting cases); *Thompson v. Home Depot, Inc.*, No. 07-cv-1058 IEG, 2007 WL 2476603 (S.D. Cal. Sept. 18, 2007) (personal information not property) (California unfair competition law); *In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("There is likewise no support for the proposition that an individual passenger's personal information has or had any compensable value in the economy at large.") (breach of contract and trespass claims).  Even assuming that PII would count as "property," the alleged scheme involves no "deprivation" of any personal information because each Plaintiff continues to enjoy equal access to that information.  *Cf. Gubala v. Time Warner Cable*, 846 F.3d 909, 913 (7th Cir. 2017) (rejecting as "gibberish" argument that PII has economic value because defendant "did not take plaintiff's personal information away from him; he still has it (unless he tore up his birth certificate, credit

37

card information, etc.); he hasn't been deprived of anything").  Thus, as a matter of law, Plaintiffs

cannot state a claim for relief predicated on Defendants seeking to obtain their PII.

        2.    *Plaintiffs' claim that Defendants obtained and misused their PII does not satisfy Rule 9(b) or support predicate acts of mail or wire fraud*

Plaintiffs' claim that Defendants misused customer PII to manipulate their healthcare plans

fails to allege the predicate act of wire fraud.  Plaintiffs fail to allege a single misrepresentation

made by any Defendant to any Plaintiff with respect to this scheme (either in an Internet

advertisement or over the phone).  *See, e.g.*, *Am. Dental*, 605 F.3d at 1291-92 (affirming order

dismissing complaint where Plaintiffs "d[id] not point to a single specific misrepresentation by

Defendants").  As discussed, only two of the five Plaintiffs allege any conversation with a health

insurance agent at all (Plaintiffs Langley and Foreman's husbands), and only one (Plaintiff

Foreman) alleges the conversation was with an agent employed by a Defendant (TrueCoverage).

Am. Compl. ¶¶ 347, 355.  Plaintiffs conspicuously omit allegations that any misrepresentations or

omissions were made with respect to their PII during those conversations.  *Id.* ¶¶ 347, 351.

Plaintiffs' failure to specifically allege that any Defendant made any misrepresentations relating

to PII means that this claim is not pled sufficiently.  *See, e.g.*, *Crawford's Auto Ctr., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 259 F. Supp. 3d 1344, 1357 (M.D. Fla. 2017) ("Plaintiffs have again

failed to set out the communications, much less to point to specific misrepresentations [and thus]

have again failed to state a fraud-based RICO claim.").  Plaintiffs do not satisfy Rule 9(b).

Plaintiffs imply that the fraud lies in Defendants' intentional omissions that the agents

would use customer PII to switch their health insurance plans in the future.  That theory likewise

fails to satisfy Rule 9(b).  *E.g.*, Am. Compl. ¶ 273.  First, the Amended Complaint contains only

conclusory allegations about PII-related omissions, none of which explain what was omitted and

from where.[8]   To the extent Plaintiffs supply any allegations regarding Defendants' omissions, those are limited to cash cards.  *E.g.*, *id.* ¶ 268.  Second, omissions are actionable only where the defendant had a duty to disclose.  *See, e.g.*, *Am. United Life Ins. Co. v. Martin*, 480 F.3d 1043, 1065 (11th Cir. 2007) (affirming order dismissing RICO claims because plaintiff failed to plead that defendants had duty to disclose allegedly omitted information).  Plaintiffs fail to allege any facts supporting a duty of disclosure here. *See infra* at Section VII.  Indeed, Plaintiffs' claim verges on implausible because Plaintiffs seemingly acknowledge that they each consented to permit one or more Defendants to submit insurance applications on their behalf but then allege—without explanation—that the consent was somehow not "valid."  *E.g.*, Am. Compl. ¶¶ 312, 333, 352, 361, 379.  If Plaintiffs consented to Defendants' use of their PII to enroll them in health insurance, then it is not plausible that Defendants used Plaintiffs' PII in precisely that way without consent.

Instead of pleading with particularity, Plaintiffs appear to assume that their assorted broad allegations about the industry and purported scheme make up for what their individual claims lack.  *Compare id.* ¶¶ 1-35 *and id.* ¶¶ 142-329 (allegations about industry as a whole) *with id.* ¶¶ 331-83 (Consumer Class Plaintiffs) *and id.* ¶¶ 384-403 (Agent Class Plaintiffs).  But simply "assum[ing] these communications are fraud-based" without "additional details explaining how these … communications constitute fraud" does not satisfy Rule 9(b).  *In re Takata Airbag Prods. Liab.*, 396 F. Supp. 3d at 1159-60.  For this reason, Plaintiffs have not established that either scheme supports predicate acts of mail or wire fraud as to any of the Defendants.

---

[8]  *E.g.*, Am. Compl. ¶¶ 50-51(c), 59, 66-67, 273, 439, 453, 467, 480, 494, 508, 522, 536, 550, 564, 686-87, 694-95, 702-03, 710-11, 718-19, 726-27, 734-35, 742-43, 750-51, 758-59.

E.    Plaintiffs Fail To Allege A Pattern Of Racketeering Activity

"To prove a pattern of racketeering activity," Plaintiffs must establish "ongoing criminal activity," specifically, at least two related predicate acts that pose a threat of continued criminal activity as to each Defendant. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264-65 (11th Cir. 2004). First, because Plaintiffs have not alleged facts supporting at least two actionable mail or wire fraud claims against each Defendant, Plaintiffs have necessarily failed to allege individual patterns of racketeering activity. The only allegation conceivably supporting the commission of any predicate act is the conclusory assertion, unsupported by a description of actual deceptive conduct, that a TrueCoverage agent led Mr. Foreman to believe that he would receive his health-insurance subsidy in the form of a cash card. Assuming that is actionable as wire fraud (it is not), it represents a single act, which does not form a pattern. *See id.* at 1265; 18 U.S.C. § 1961(5). To the extent that Plaintiffs rely on the ensuing switches and swaps of Plaintiff Foreman's health insurance plans to establish a pattern, "independently chargeable instances of mail or wire fraud cannot constitute a 'pattern of racketeering activity' when they arise from a single transaction." *Cisneros*, 972 F.3d at 1216 (rejecting pattern where plaintiff identified five acts, all of which derived from the first). Plaintiffs therefore cannot establish a "pattern of racketeering activity."

*        *        *

Plaintiffs have failed to state RICO claims against each Defendant and cannot, as a matter of law, vindicate RICO claims alleging that Defendants sought to obtain PII. ‼

III.   **PLAINTIFFS RICO CONSPIRACY CLAIMS FAIL**

A RICO conspiracy requires that the individual defendants either (1) agreed to the "overall objective" of the conspiracy or (2) "agreed personally to commit two predicate acts." *In re*

*Managed Care*, 298 F. Supp. 2d at 1280-81 (quoting *United States v. Church*, 955 F.2d 688, 694 (11th Cir. 1992).  Plaintiffs have not alleged facts to establish either.

The Eleventh Circuit's reasoning in *American Dental* and *Almanza* is once again instructive, as the Court's analysis of parallel conduct applies equally to a "meeting of the minds" as it does to enterprise.  *See Am. Dental*, 605 F.3d at 1296.  In both cases, the Court recognized that conspiracy requires more than "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy."  *Id.* at 1294-95; *see Almanza*, 851 F.3d at 1068.  Indeed, "[i]n the absence of any allegation plausibly suggesting a meeting of the minds, [the Court] must assume that the parallel conduct exhibited by Defendants is just as consistent with independent action (including independent action by actors who are conscious of what the other actors are doing) as it is with an agreement to commit a racketeering scheme."  *Almanza,* 851 F.3d at 1074.

Here, where there is no plausible allegation suggesting a meeting of the minds, the only logical conclusion is that Defendants acted independently.  As discussed, Plaintiffs have not alleged facts which, if true, would show that Defendants acted with a common purpose—much less under an *agreement*—to engage in the alleged enterprise's objective of enrolling health-insurance customers through "fraudulent means."  Instead, Plaintiffs rely on innocuous business connections like providing training and scripts, purchasing leads, and referring agents, Am. Compl. ¶¶ 247, 406, combined with parallel allegations of fraud, like "dual apping," *id.* ¶¶ 410, 415.  The added allegation that the ad-buying Defendants knew that some ads referenced "cash cards" does not support inferences of an agreement to commit fraud either, as Plaintiffs admit that many insurance carriers do properly offer cash cards to their customers.  *Id.* ¶ 204; *see United States v. Wall*, No. 20-10730, 2024 WL 4099978, at *6 (11th Cir. Sept. 6, 2024) ("An agreement on an overall objective may be proven 'by circumstantial evidence showing that each defendant must

*necessarily have known* that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.'") (emphasis added) (quotation omitted).  For this reason, a reference to cash cards does not indicate that any defendant "must necessarily have known" that others were part of a RICO conspiracy.

Allegations of parallel misconduct—such as "AOR Swaps," "Twisting," and "Dual Apping"—do not, standing alone, sufficiently allege a meeting of the minds.  *See, e.g.*, *Almanza*, 851 F.3d at 1070.  *See supra* at Section III.  Plaintiffs have not pled any facts that exclude the possibility that some sales agents, operating in the same market with similar incentives, could engage in parallel misconduct without entering into an agreement to do so.  "There is an obvious alternative explanation:" a collection of competing brokerages engaging in the alleged misconduct would be stealing customers from one another, not supporting each other.  *See id.* at 1071.

Plaintiffs have also failed to establish that Defendants "agreed to commit two predicate acts."  *Am. Dental*, 605 F.3d at 1293.  Plaintiffs have made no allegation that any party agreed to commit any predicate act in furtherance of any conspiracy.  Instead, Plaintiffs merely point to transactions in furtherance of legitimate businesses (i.e. selling health insurance), coupled with mere allegations of parallel misconduct—but Plaintiffs' effort to spin these otherwise legitimate activities into an agreement to commit RICO "predicate acts" is unavailing.  *See id.* at 1293, 1296. Moreover, agreeing to obtain PII is not a predicate offense under RICO, *see supra* at 36-37, and "parties cannot be found guilty of conspiring to commit an act that is not itself against the law." *Jackson*, 372 F.3d at 1269.  Plaintiffs' "RICO conspiracy [claims] add[] nothing" to their deficient substantive RICO allegations other than conclusory allegations of agreement.[9]  *Id.*

---

[9]  *See, e.g.*, Am. Compl. ¶¶ 567, 568, 572, 573, 577, 578, 581, 582, 586, 587, 591, 592, 596, 597, 601, 602, 607, 608, 612, 613, 617, 618, 622, 623 (alleging, in Counts 11 through 22, that

Plaintiffs have failed to state a claim for conspiracy to violate RICO.

## IV.   PLAINTIFFS' AIDING AND ABETTING RICO CLAIMS FAIL

Plaintiffs claim that all Defendants aided and abetted the substantive RICO violations. These claims should be dismissed for four independent reasons.

First, this Court should decline to recognize a cause of action for aiding and abetting racketeering under RICO because neither 18 U.S.C. § 1962 nor § 1964 contains any "indication that Congress intended to impose private civil aiding and abetting liability under RICO." *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 657 (3d Cir. 1998), *abrogation on other grounds recognized by Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000).  In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, the Supreme Court recognized that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."  511 U.S. 164, 177, 182 (1994) (declining to create a private cause of action for civil aider and abettor liability for violations of section 10(b) of the Securities Exchange Act of 1934).  Courts in this district have since relied on this reasoning to reject claims for aiding and abetting racketeering under RICO.  *E.g.*, *Emess Cap., LLC*, 2011 WL 13214302, at *5; *Fagan v. Central Bank of Cyprus*, No. 19-cv-80239, 2021 WL 2845034, at *8 (S.D. Fla. June 28, 2021) (compiling cases), *report and recommendation adopted*, 2021 WL 2915109 (S.D. Fla. July 12, 2021).[10]  The same reasoning applies here.

---

Defendants "agreed and conspired to violate" 1962(c); that Defendants "committed predicate acts knowing those acts were part of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a" RICO conspiracy.).

[10]   The Eleventh Circuit has not directly addressed whether civil liability for aiding and abetting RICO exists after *Central Bank* and its prior decisions no longer control.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994) (issued two weeks

Second, because Plaintiffs have failed to adequately plead a substantive RICO violation, they cannot succeed on an aiding and abetting theory.  *See, e.g.*, *Solomon v. Blue Cross and Blue Shield Ass'n*, 574 F. Supp. 1288, 1293-94 (S.D. Fla. 2008) (dismissing claim because "[a]iding and abetting in the violation of RICO ... requires pleading of the two predicate acts").

Third, Plaintiffs have not adequately alleged that "(1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provided the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation."  *Cox*, 17 F. 3d at 1410.  The Eleventh Circuit has found that "simply stating that defendants 'aided and abetted,' without more, is not sufficient to survive a motion to dismiss." *Chi v. MasterCard Int'l, Inc.*, No. 1:14-CV-614, 2014 WL 5019917, at *3 (N.D. Ga. Oct. 7, 2014) (granting motion to dismiss where plaintiffs "allege[d] no additional facts to support their aiding and abetting claim"); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010) ("The mere use of the words ... 'aiding and abetting' without any more explanation of the grounds of the plaintiffs' entitlement to relief is insufficient.").

The Amended Complaint offers only conclusory allegations of knowledge and assistance that do not support aiding and abetting liability as to each Defendant.  Allegations, such as those that "Herman directed, knew of and/or learned of the [AOR] switching and did nothing to stop it," Am. Compl. ¶ 291, monitored certain enrollments by Enhance downlines, *id.* ¶ 255, or purchased Minerva's leads, *id.* ¶ 220, are insufficient to establish knowledge of the principal violations, especially because Plaintiffs allege that Herman "came in frequently to monitor" beta test training

---

before the Supreme Court's decision in *Central Bank*); *see also In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1267 (S.D. Fla. 2001) (noting that *Cox* relied on subsequently abrogated caselaw). The Supreme Court's analysis in *Central Bank* "controls [the] construction of the civil RICO provision]" here.  *Rolo*, 155 F. 3d at 656.

for agents but do not allege that this training involved misrepresentations regarding cash cards or any misuse of PII, *id.* ¶¶ 215-16.  Likewise, allegations that Enhance's knowledge regarding the source of the customer calls, *id.* ¶¶ 248-50, fail to plausibly allege knowledge that the advertisements were fraudulent.  Even if Plaintiffs alleged Herman knew about the underlying violations, they have failed to establish his substantial assistance by purchasing leads or by facilitating the legitimate transition of Enhance's business model from selling Medicare products to ACA plans.  *Id.* ¶¶ 215-17, 220.  Similarly, allegations that Bowsky and Minerva "knowingly stoked" the other Defendants' misconduct does not plausibly establish abettor liability, *id.* ¶ 19, and alleging that TrueCoverage provided training, showed scripts, or referred agents to Enhance, or that all Defendants "knew" that Minerva was selling leads resulting from "misleading" ads does not plausibly allege that awareness of any wide-ranging scheme to dupe consumers.  *See id.* ¶¶ 17, 26, 33, 224-25, 248-49, 410.  These conclusory allegations are not enough.

Finally, Plaintiffs do not plead any allegations of knowing involvement and substantial assistance separate and apart from those supporting the substantive RICO allegations.  *See supra* at Section III.B; *see also Am. Dental*, 605 F.3d at 1296 n.7 ("We conclude that the district court properly dismissed [aiding and abetting RICO] claims for the same reasons that it dismissed the section 1962(c) and section 1962(d) claims.").  An aiding and abetting RICO claim must identify allegations of aiding and abetting distinct from the substantive RICO allegations; here, there are none.

Plaintiffs have failed to state an aiding and abetting RICO claim.

## V.    PLAINTIFFS LANGLEY AND FOREMAN LACK STANDING TO PURSUE THEIR COMMON LAW CLAIMS

Prudential standing encompasses "three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized

grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks and citations omitted. Under this requirement, plaintiffs "generally must assert [their] own legal rights and interests," not the "legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks and citation omitted).

Courts have applied this rule to preclude spouses from asserting a claim of fraudulent misrepresentation where the actual misrepresentation was made to the other spouse. *Dunkel v. Hedman*, 3:15-CV-948-J-34PDB, 2016 WL 4870502, at *9 (M.D. Fla. Aug. 17, 2016), *report and recommendation adopted,* 3:15-CV-948-J-34PDB, 2016 WL 4765739 (M.D. Fla. Sept. 13, 2016). In *Dunkel*, the court rejected a fraudulent misrepresentation claim asserted by a wife based on a misrepresentation made to her husband because the wife's claim rested "solely on her husband's rights and interests," not her own. *Id.* Florida courts have also independently precluded claims "based on reliance on the part of others." *Z Industries USA, LLC v. Circuitronix, LLC*, No. 17-cv-60727, 2017 WL 11718026, at *6 (S.D. Fla. Oct. 4, 2017) (internal quotation marks and citation omitted) (dismissing fraud claim for lack of standing because "[i]t is well-established Florida law that fraud is a personal tort that cannot be assigned to any other party").

Plaintiffs Foreman and Langley have failed to satisfy these requirements because they seek to assert common law claims that, under Florida law, rightfully belong to their husbands. Mr. Foreman—not Mrs. Foreman—"responded to" the purportedly misleading advertisement and spoke with TrueCoverage regarding the cash card. Am. Compl. ¶ 355. Plaintiff Langley alleges that "Mr. Langley"—not Mrs. Langley—"called the number listed on the ad" that promised a cash card. *Id.* ¶ 347. Because these Plaintiffs allege that their husbands were the purported subjects of

any misrepresentations or omissions, any injuries occurred solely to them.  As a result, these Plaintiffs do not have standing to allege their fraudulent misrepresentation claims because the "alleged fraudulent conduct was directed at [their husbands], ... not at [Plaintiffs], making the fraud-based claims" their husbands' "to bring."[11]  *Dunkel*, 2016 WL 4870502, at *4.

## VI.   PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIMS FAIL

To proceed with a common law aiding and abetting fraud claim, Plaintiffs must plead "(1) the existence of the underlying fraud, (2) the defendant's knowledge of the fraud, and (3) the defendant provided substantial assistance to the commission of the fraud." *Connecticut Gen. Life Ins. Co. v. Mayberg*, No. 23-cv-21461, 2024 WL 1931704, at *11 (S.D. Fla. Apr. 27, 2024), *report and recommendation adopted*, 2024 WL 2846403 (S.D. Fla. June 5, 2024).  For many reasons already discussed, Plaintiffs have failed to plead these elements.

First, as explained previously, Plaintiffs have failed to plead that any Defendant committed an underlying fraud, especially under the standard of Rule 9(b).  *See supra* at Section II.C.

Second, Plaintiffs fail to plausibly plead that Defendants had actual knowledge of any underlying fraud.  When pleading knowledge generally, "the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Rusty115 Corp. v. Bank of Am., N.A.*, No. 22-cv-22541, 2023 WL 6064518, at *6 (S.D. Fla. Sept. 18, 2023) (internal quotation marks and citation

---

[11]   Courts have found in other contexts that family members cannot assert claims that rightfully belong to another member. *See In re Montagne*, 425 B.R. 111, 133 (Bankr. D. Vt. 2009) (dismissing wife's breach of contract claim for lack of prudential standing where wife did not sign the contract at issue; her husband did); *Rocket Mortg., LLC v. Cito Mech. Design, Inc.*, No. 23-10583, 2024 WL 2876933, at *5-6 (E.D. Mich. Apr. 22, 2024), *report and recommendation adopted*, 2024 WL 2290580 (E.D. Mich. May 21, 2024) (dismissing for lack of prudential standing where plaintiff did not allege misrepresentations were made to her in her individual capacity, but rather to her broker commission).

omitted).  "[R]ed flags or aroused suspicions do not constitute actual awareness."  *Platinum Ests., Inc. v. TD Bank, N.A.*, No. 11-cv-60670, 2012 WL 760791, at *3-4 (S.D. Fla. Mar. 8, 2012) (finding plaintiffs did not plausibly allege actual knowledge because they merely adduced facts showing that bank was on notice or "should have known" about fraud).  As discussed, however, Plaintiffs only generally allege Defendants' knowledge here.  *See, e.g.*, Am. Compl. ¶¶ 17, 223-26.  Plaintiffs plead, at most, that some Defendants knew that some advertisements referenced "cash cards."  *See id.* ¶¶ 223, 225-26.  But because, as Plaintiffs admit, some insurance carriers do offer cash cards (*see supra* at 5, 28), knowledge of these references cannot "give rise to a strong inference of actual knowledge" of fraud.  *Rusty115 Corp.*, 2023 WL 6064518, at *6.

Finally, Plaintiffs have not plausibly alleged that any Defendant provided substantial assistance to any underlying fraud, as opposed to with legitimate tasks.  *Rosenfeld Gallery, LLC v. Truist Bank*, No. 23-cv-20422, 2024 WL 836789, at *5 (S.D. Fla. Feb. 28, 2024).  Here, as discussed, Plaintiffs allege only ordinary, arms-length transactions among the Defendants, such as providing training, purchasing leads, and referring agents.  *See supra* at Section II.B, Section III. Plaintiffs do not allege that any of those transactions assisted *fraud*, as opposed to the core, legitimate act of selling health insurance to low-income consumers.

Plaintiffs fail to state a common law aiding and abetting fraud claim.

## VII.   PLAINTIFFS' AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY CLAIMS FAIL

To establish aiding and abetting breach of fiduciary duty under Florida law, Plaintiffs must allege "(1) a fiduciary duty on the part of the primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of the breach by the alleged aider and abettor, and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing."  *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 990 (11th Cir. 2020) (internal quotation marks and citation omitted).

As to the primary wrongdoer, Plaintiffs must allege "the existence of a fiduciary duty, a breach of that duty, and that the plaintiff's damages were proximately caused by the breach." *Id.* at 989 (citation omitted). "Knowledge" means ***actual knowledge***, not constructive knowledge or "red flags indicat[ing] a defendant should have known of the breach." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1343 (S.D. Fla. 2018) (quotation omitted). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur" and requires a showing of proximate cause. *Codeventures, LLC v. Vital Motion Inc.*, No. 20-cv-21574, 2021 WL 1131531, at *5 (S.D. Fla. Mar. 24, 2021). Conclusory allegations of substantial assistance are insufficient. *Honig*, 339 F. Supp. 3d at 1344.

A.     Plaintiffs fail to identify a duty owed by TrueCoverage, Enhance, or Herman

The Amended Complaint's allegations are internally inconsistent regarding the existence of a fiduciary duty. Plaintiffs allege that TrueCoverage, Enhance, and their "downlines" owed fiduciary duties to the Class Plaintiffs. Am. Compl. ¶¶ 308-10, 314. This is the only source of a fiduciary duty alleged under each claim for aiding and abetting breach of fiduciary duty against TrueCoverage, Enhance, and Herman. *See id.* ¶¶ 766, 806, 814. However, the *aiding and abetting* claim is brought against TrueCoverage, Enhance, and Herman—the alleged primary wrongdoers. *See id.* Because TrueCoverage, Enhance, and Herman cannot aid and abet their own breach of fiduciary duty even if all other elements are satisfied, this claim fails against these Defendants.

Because TrueCoverage Enhance, and Herman do not owe common-law fiduciary duties to the Class Plaintiffs, Minerva and Bowsky cannot be held liable for aiding and abetting breach of a non-existent fiduciary duty. "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Patel v. Catamaran Health Sols., LLC*, No. 15-cv-61891, 2016 WL 5942475, at *10 (S.D. Fla. Jan. 14, 2016) (quotation omitted); *see also Johnson v. Catamaran*

49

*Health Sols., LLC*, 687 F. App'x 825, 830-31 (11th Cir. 2017).  But in an arm's-length transaction, "there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered."  *Patel*, 2016 WL 5942475, at *10 (quotation omitted).  "Thus, the plaintiff must allege both ***that the plaintiff placed trust in the defendant*** and that the defendant accepted that trust."  *Hogan v. Provident Life and Accident Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009) (emphasis added).

Consistent with this fact-specific analysis, Florida courts recognizing a fiduciary relationship between insurance brokers and insureds have emphasized the insured client's reliance during the transaction at issue.  *See, e.g.*, *Beardmore v. Abbott*, 218 So. 2d 807, 808-09 (Fla. 3d DCA 1969) (fiduciary relationship existed where client "reposed trust and confidence in his insurance counselor"); *Moss v. Appel*, 718 So. 2d 199, 200-01 (Fla. 4th DCA 1998), *abrogated on other grounds by Wachovia Ins. Servs., Inc. v. Toomey*, 994 So. 2d 980, 990 (Fla. 2008) (fiduciary relationship existed where broker "still had a consulting relationship with the plaintiffs," and clients acted "[a]t defendants' recommendation"); *Traditions Senior Mgmt., Inc. v. United Health Adm'rs, Inc.*, No. 8:12-cv-2321, 2013 WL 3285419, at *2 (M.D. Fla. June 27, 2013) (plaintiff sufficiently alleged breach of fiduciary duty against insurance broker where plaintiff "trusted and sought advice from [the defendant] for seven years, and [the defendant] was personally responsible for disbursing and handling $4 million paid by [the plaintiff]").

In contrast, courts have consistently rejected the existence of a fiduciary duty where, as here, plaintiffs failed to allege such trust and reliance.  For example, in *Johnson*, plaintiff insureds alleged a fiduciary duty existed solely because the defendant "acted as an insurance broker."  687 F. App'x at 831.  The Eleventh Circuit rejected this argument, reasoning that the plaintiffs "never mentioned any 'degree of dependency' on [defendant] or any 'degree of undertaking' by

[defendant] to 'advise, counsel, and protect' them." *Id.* (quotation omitted). "Instead, they alleged only that [defendant] solicited, marketed, collected premiums and administered" the programs to the plaintiffs. *Id.* (internal quotation marks omitted). These allegations were insufficient to plead a fiduciary relationship under Florida law. *Id.* Similarly, in *Patel*, the court concluded no fiduciary relationship existed where plaintiffs failed to plead "any allegations from which a duty could be implied by [d]efendants undertaking to advise and protect the [p]laintiffs." 2016 WL 5942475, at *10 (dismissing claim for breach of fiduciary duty where plaintiffs alleged defendants "acted as insurance brokers," created a scheme "offer[ing] two insurance products packaged together as one insurance policy," and collected "grossly excessive and totally unreasonable premiums" that "outmatched any benefit provided by it to customers").

Here, there are no factually supported allegations that Defendants TrueCoverage, Enhance, and Herman undertook the duty to advise, counsel, and protect the Class Plaintiffs and that the Class Plaintiffs depended on that protection. *See Johnson*, 687 F. App'x at 831. Even if TrueCoverage and Enhance were *acting* as insurance brokers, the specific facts alleged confirm that Plaintiffs' relationships with Defendants contained no advising or dependency.[12] *See id.* In fact, Plaintiffs specifically fail to allege that they "reposed trust and confidence" in any Defendant. *See Beardmore*, 218 So.2d at 808-09; *see also* Am. Compl. ¶ 332 (King spoke with and enrolled through Broyer, not any Defendant); *id.* ¶ 374 (Wells was enrolled "without her consent" and only learned of the enrollment after the fact); *id.* ¶ 347 (Mr. Langley called "the number listed on the ad" to enroll without identifying any Defendant); *id.* ¶ 361 (Foreman was enrolled "without [her] valid consent"); *id.* ¶ 355, 358 (alleging that Foreman's husband spoke with and was enrolled by

---

[12]   Plaintiffs do not allege an express fiduciary relationship "created by contract or legal proceedings" and thus must allege facts showing that such relationship was implied. *See Hogan*, 665 F. Supp. 2d at 1287.

TrueCoverage); *id.* ¶ 371 (Turner "called the number on the ad" and provided information, but did not identify any representations made on the call).   Plaintiffs cannot establish a fiduciary relationship by relying on hypothetical interactions between Plaintiffs and Defendants.   Simply quoting the contents of scripts is insufficient absent an allegation that any Plaintiff actually placed "trust" in any Defendant.  *See id*. ¶¶ 309-12 (reciting and explaining scripts).

For the same reasons, Plaintiffs also fail to plead a "special relationship" that would require a duty to disclose.  *See Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1281, 1284 (S.D. Fla. 2014).  An insurance broker has "no duty to advise clients about their insurance needs" unless the insurance broker "encourages and engages in a 'special relationship' with its client, thereby triggering an enhanced duty of care to advise the client about the amount of coverage prudently needed to meet its complete insurance needs."  *Id.* at 1280-81 (collecting cases).  Six considerations are relevant to this "special relationship":

> (1) representations by the broker about its expertise; (2) representations by the broker about the breadth of the coverage obtained; (3) the length and depth of the relationship; (4) the extent of the broker's involvement in the client's decision making about its insurance needs; (5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services.

*Id.* at 1281.  Here, Plaintiffs fail to allege that any conversations occurred between any Plaintiff and any Defendant that would satisfy these considerations at all, let alone to withstand scrutiny under Rule 9(b).  *See Feng v. Walsh*, Case. No. 19-cv-24138, 2021 WL 8055449, at *9 (S.D. Fla. Dec. 21, 2021), *report and recommendation adopted*, 2022 WL 669198 (S.D. Fla. Mar. 7, 2022) ("[A] breach of fiduciary duty claim must meet the heightened pleading requirements of Rule 9(b) 'to the extent it relies on grounds sounding in fraud.'") (citation omitted); Am. Compl. ¶ 314 (alleging a fiduciary duty not to mislead the Consumer Plaintiffs).

Plaintiffs also cannot claim a duty based on Defendants' purported violation of a CMS regulation. *See* Am. Compl. ¶ 315 (quoting 45 C.F.R. § 155.220(j)(2)(i)). A claim for breach of fiduciary duty cannot be premised on "violations of statutes that contain neither express nor implied private rights of action." *See Johnson*, 687 F. App'x at 831. Here, where neither the CMS regulation nor any other alleged source of a duty allows Plaintiffs to bring a private cause of action against any Defendant for the claims alleged, no fiduciary duty exists.

Plaintiffs cannot establish the existence of a fiduciary duty owed by the primary wrongdoer—a necessary element of aiding and abetting breach of fiduciary duty—and thus that claim fails. *See Med. & Chiropractic Clinic, Inc.*, 981 F.3d at 990. Minerva and Bowsky cannot have aided and abetted a breach of a duty that does not exist.

B.     Plaintiffs fail to allege actual knowledge, substantial assistance, or encouragement

Even assuming an underlying breach of fiduciary duty, Plaintiffs have failed to plausibly allege that Defendants had actual knowledge of the underlying breach, offered substantial assistance, or encouraged the wrongdoing. As with Plaintiffs' allegations of RICO enterprise and conspiracy, which Defendants incorporate here by reference, Plaintiffs fail to allege anything but independent misconduct. *See supra* at Section II.B, Section III. As to Minerva and Bowsky, the Amended Complaint makes clear that Minerva simply generates leads and sometimes purchases leads from other companies to sell, and, because Minerva's participation in the alleged scheme ended when it sold the leads, Minerva thus cannot have actual knowledge of what happens with the leads or consumers after the leads are sold to other entities. *See, e.g.*, Am. Compl. ¶¶ 8, 175, 177, 186; *see Honig*, 339 F. Supp. 3d at 1343. Likewise, the Amended Complaint does not plausibly allege that Minerva and Bowsky failed to act when they had an affirmative duty to do so. Further, as the alleged aiders/abetters, Minerva and Bowsky's actions did not proximately cause any underlying breach. *See Codeventures*, 2021 WL 1131531, at *5. Lead sales do not

"foreseeably and substantially cause[] the specific injury that [allegedly] occurred": AOR swapping, twisting, and dual-apping.  *See McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992); *see* Am. Compl. ¶ 410.  Thus, Minerva and Bowsky cannot be held liable for aiding and abetting breach of fiduciary duty.

Similarly, Plaintiffs do not allege that Herman or Enhance had actual knowledge of or substantially assisted any Defendant's underlying breach; rather, the allegations support competition between TrueCoverage and Enhance.  *See, e.g.*, Am. Compl. ¶ 156 (Enhance and TrueCoverage are licensed agents); *id*. ¶¶ 259-73 (describing different scripts used by each entity); *id*. ¶ 280 (TrueCoverage agents were instructed to distinguish between policies on which a TrueCoverage agent already was the agent of record and those that listed other entities).  Even so, Plaintiffs fail to allege an independent duty to disclose that would give rise to aiding and abetting liability.  *See Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1333 (S.D. Fla. 2012) (substantial assistance "cannot be established where, as here, [defendant] had no duty to disclose").

Plaintiffs fail to state a claim for aiding and abetting breach of fiduciary duty.

## VIII.  PLAINTIFFS' NEGLIGENCE CLAIM FAILS[13]

To establish negligence under Florida law, Plaintiffs must plausibly allege that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm."  *Insight Sec., Inc. v. Deutsche Bank Tr. Co. Ams.*, No. 21-12817, 2022 WL

---

[13]  Plaintiffs' negligence claim improperly incorporates all 425 general factual allegations that are common to all claims, regardless of whether those allegations are actually relevant to negligence.  This is a quintessential shotgun pleading.  *See Weiland*, 792 F.3d at 1322 & n.12 (explaining that shotgun pleadings are "guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action").  Even if the Court does not construe the entire Amended Complaint as a shotgun pleading, the negligence count is a shotgun count and should be dismissed for this reason, among others.

2313980, at *3 (11th Cir. June 28, 2022) (quotation omitted).  The existence of a duty is a threshold legal question.  *See id.* at * 4 (quotation omitted).  "Florida law recognizes four sources of duties of care: (1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case."  *Id.* (quotation omitted).

"The existence of a common law duty flowing from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged."  *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014).  "Foreseeability" requires the court to evaluate "whether the type of negligent act involved in a particular case has so frequently previously resulted in the same type of injury or harm that 'in the field of human experience' the same type of result may be expected again."  *O'Donnell v. United States*, 736 F. App'x 828, 832 (11th Cir. 2018) (quotation omitted).  "The absence of a foreseeable zone of risk means that the law imposes no legal duty on a defendant, and therefore defeats a negligence claim."  *Gyongyosi v. Miller*, 80 So. 3d 1070, 1078 (Fla. 4th DCA 2012) (quotation omitted).

A.    Defendants do not owe a statutory duty of care to Plaintiffs

Plaintiffs appear to allege that the Office of Management and Budget ("OMB") guidance documents OMB M-17-12 and OMB M-18-02 create a duty (together, the "OMB Memoranda).  Am. Compl. ¶¶ 857-58.  However, even Plaintiffs concede that the OMB Memoranda apply solely to federal agencies the Department of Health and Human Services ("HHS") and Centers for Medicare & Medicaid Services ("CMS").  *Id.* ¶¶ 846-47.  Indeed, when read, nothing within those documents was intended to nor creates a duty for Defendants to comply with.[14]  *See* Ex. 1 (OMB

___

[14] The Court may consider the OMB Memoranda in ruling on this Motion to Dismiss because Plaintiffs have made the Memoranda central to their claims and the authenticity of the Memoranda is undisputed.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

55

MEMORANDUM M-18-02, FISCAL YEAR 2017-2018 GUIDANCE ON FEDERAL INFORMATION SECURITY AND PRIVACY MANAGEMENT REQUIREMENTS 1 (2017)); Ex. 2 (OMB MEMORANDUM M-17-12, PREPARING FOR AND RESPONDING TO A BREACH OF PERSONALLY IDENTIFIABLE INFORMATION 1 (2017)). OMB M-18-02 "describes the processes for Federal agencies to report to OMB and, where applicable, the Department of Homeland Security." Ex. 1 at 1. OMB M-17-12 sets forth the "minimum requirements that agencies shall follow when responding to a breach." Ex. 2 at 2. OMB M-17-12 also "sets forth the policy for Federal agencies to prepare for and respond to a breach of personally identifiable information (PII)" and is "intended to promote consistency in the way agencies prepare for and respond to a breach by requiring common standards and processes." *Id.* at 1. OMB M-17-12 also expressly *negates* Plaintiffs' negligence claim by declaring that it "does not create any right or benefit, substantive or procedural, enforceable at law or in equity against the United States, or any of its departments, agencies, entities, officers, employees, or agents, *or any other person*." *Id.* at 37 (emphasis added). Thus, the OMB Memoranda do not create a duty that Plaintiffs can enforce.

ACA's federal regulations governing non-Exchange entities likewise fail to establish a legal duty that runs from Defendants to Plaintiffs. Am. Compl. ¶ 868; *see* 45 C.F.R. §§ 155.260, 155.220 (2024). These regulations allow only HHS or the Office of Inspector General to bring an enforcement action, not a private party. *See* 45 C.F.R. § 155.285(g) (2024). Section 155.285 provides that HHS "may impose civil money penalties" on an agent, broker, web broker, or other non-Exchange entity as defined in 45 C.F.R. § 155.260(b) if HHS "reasonably determines that a person has engaged in one or more" of the enumerated actions, including the "knowing and willful use or disclosure of information" in violation of the ACA. *See* 45 C.F.R. § 155.285(a)(1)(i)–(iii). Further, HHS and CMS do not regulate lead generators like Minerva and Bowsky, and the

Amended Complaint does not allege that these Defendants had any role in the actual sale or negotiation between AORs and consumers whom these regulations are meant to protect.

Plaintiffs' implied "negligence per se" standard also fails to establish a duty.  Am. Compl. ¶ 878, 880.  Negligence per se actions require "a plaintiff to show 'violation of a statute which establishes a duty to take precautions to protect a particular class of persons from a particularly injury or type of injury.'"  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) (quotation omitted).  Where, as here, a particular statute or regulation does not regulate *the defendant's* particular behavior, the negligence per se claim fails.  *See id.* at 1329 ("[Florida Statutes] Section 395.3025 does not purport to regulate AvMed's behavior, and so AvMed's failure to comply with the statute cannot serve as a basis for a negligence *per se* claim.").  The regulation alleged to form the basis of the negligence claim must create an enforceable private cause of action for the regulation to create a duty of care.  *See Doe v. Sch. Bd. of Miami-Dade Cnty.*, 403 F. Supp. 3d 1241, 1268, 1269 (S.D. Fla. 2019) (dismissing with prejudice negligence per se claim based on defendants' violation of a Florida statute that did not expressly or impliedly create a cause of action for damage, because that statute could not create a duty owed to plaintiff); *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1229 (S.D. Fla. 2010) (dismissing with prejudice negligence per se claim based on violations of statutory subsections that did not create a private cause of action "because the legislature has not demonstrated an intent to create a private cause of action under these sections"); *Patel*, 2016 WL 5942475, at *7-8 (dismissing complaint with prejudice because insurance statutes and administrative codes allegedly incorporated into contracts did not create a private cause of action that could form the basis of breach of contract).

None of those sources create a private cause of action that Plaintiffs may enforce against any Defendant.  *See* 45 C.F.R. § 155.220(k) (enumerating available relief, but not a private right

of action); *id.* §155.260(g) (listing civil penalties "consistent with the bases and process for imposing civil penalties specified at § 155.285"); *id.* § 155.285(a)(1)(i) (providing only that HHS may impose civil money penalties for certain violations, but not a private right of action).

  B. <u>The web-broker agreements do not create a duty of care</u>

  The Amended Complaint claims that Plaintiffs are third-party beneficiaries of the web-broker agreements between CMS and Speridian Technologies and TrueCoverage  and their EDE platforms, Benefitalign and Inshura, and that this somehow creates a duty of care between Defendants and Plaintiffs.  *See* Am. Compl. ¶ 867. Plaintiffs further claim these agreements govern "the way each [entity] is required to operate under federal regulations," including in protecting Plaintiffs' PII from unlawful dissemination. *Id.* ¶¶ 865-67.  However, "[t]hird parties to government contracts are generally assumed to be incidental beneficiaries," rather than intended beneficiaries.  *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir. 2013) (internal quotation marks and citation omitted); *see also Bochese v. town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005) (under Florida law, "incidental beneficiaries, have no enforceable rights under a contract").  A contract between the defendant and a non-party— especially where the plaintiff is not a third-party beneficiary—cannot create a duty of care for a negligence claim. *See, e.g.*, *Johnson v. Badger Acquisition of Tampa LLC*, 983 So. 2d 1175, 1188 (Fla. 2d DCA 2008) ("In the absence of a legislatively created duty of care, we cannot enhance the [defendant's] contractual obligations to the [other contracting party] into a legal duty owed to [the third party plaintiff].").  To the extent that Plaintiffs seek to vindicate the federal government's rights under these agreements, they have no standing to do so.

C.    <u>Plaintiffs have not plausibly pled a foreseeable zone of risk</u>

The Amended Complaint skims past the duty that may be created by a foreseeable zone of risk, Am. Compl. ¶ 881, but even if properly pled (it is not) that allegation would fail. Foreseeability requires a factual inquiry into "whether the defendant's conduct foreseeably created a broader zone of risk that poses a general threat of harm to others." *See Sturgill v. Lucas*, 292 So.3d 462 (Fla. 2d DCA 2020) (quotation omitted).  Even accepting the negligence allegations as true, Defendants' conduct does not create a foreseeable zone of risk that poses a general threat of harm to Plaintiffs for the specific misconduct alleged. *See Insight Secs., Inc.*, 2022 WL 2313980, at *4 (internal quotation marks and citation omitted).  Stated differently, even if Defendants' conduct violates the OMB memoranda, web-broker agreements, or federal regulations, Defendants' conduct is not the *type* of negligent act that has "so frequently previously resulted in the same type of injury or harm" such that the same type of result would be expected again. *See O'Donnell*, 736 F. App'x 832.  For example, as to TrueCoverage and Enhance, Plaintiffs allege that these Defendants accessed Plaintiffs' and other class members' PII on the CMS Marketplace without authorization and that they allowed Minerva and Bowsky to record and collect PII on confidential recorded calls without authorization.  Am. Compl. ¶¶ 855-56. TrueCoverage and Speridian also allegedly transmitted the PII overseas "to coordinate marketing campaigns targeting U.S. consumers." *Id.* ¶ 859.  None of the alleged misconduct creates a foreseeable zone of risk as to the specific harm that Plaintiffs suffered.

Plaintiffs fail to plausibly allege a claim for negligence.

<b><u>CONCLUSION</u></b>

For these reasons, Defendants respectfully request that the Amended Complaint be dismissed with prejudice.  Amendment would be futile because the facts alleged in the already-once-amended Complaint do not satisfy the elements of these claims as a matter of law. *See, e.g.*,

*Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  Alternatively, Defendants respectfully request that all claims be dismissed for failure to state a claim upon which relief can be granted.

<u>**Local Rule 7.1(b) Request for Hearing**</u>

The undersigned respectfully request a hearing to be held on this Motion because a hearing would assist the Court in evaluating Defendants' arguments and the applicable case law.  Although a motion to dismiss can frequently be decided on the papers, oral argument by the parties will concisely present the parties' positions.  Given the length of the Amended Complaint, the number of Defendants, and the nature of Defendants' arguments, Defendants request a total of one hour for the hearing.


Dated: September 30, 2024                    Respectfully submitted,

By: */s/ Olga M. Vieira*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Samuel G. Williamson (FBN: 1033817)
Olga M. Vieira  (FBN: 29783)
Laura N. Ferguson  (FBN: 1047701)
2601 South Bayshore Dr., Suite 1550
Miami, FL 33133
Telephone: (305) 496-2988
samwilliamson@quinnemanuel.com
olgavieira@quinnemanuel.com
lauraferguson@quinnemanuel.com

*Attorneys for Enhance Health LLC, and
Matthew B. Heman*


By: */s/ Amy E. Richardson*

DEVINE GOODMAN & RASCO, LLP
2800 Ponce de Leon Blvd., Suite 1400
Coral Gables, FL 33134
Tel.:  305-374-8200
grasco@devinegoodman.com

Guy A. Rasco, Esq. (F.B.N.: 727520)
And of Counsel (*pro hac vice forthcoming*)
Amy E. Richardson, Esq.
HWG, LLP
333 Fayetteville Street, Suite 1500
Raleigh, NC 27601

Patrick P. O'Donnell, Esq.
Walter E. Anderson, Esq.
HWG, LLP
1919 M. Street N.W., Suite 800
Washington, D.C. 20036

*Attorneys for TrueCoverage, LLC;
Benefitalign, LLC; Speridian Technologies,
LLC; Girish Panicker; and Matthew Goldfuss*

By: */s/ Ryan H. Lehrer*

TRIPP SCOTT, P.A.
110 S.E. 6th Street, 15th Floor
Fort Lauderdale, Florida  33301
Telephone:  (954) 525-7500

RYAN H. LEHRER, ESQ. (FBN: 0084423)
(rhl@trippscott.com; sxc@trippscott.com;
cab@trippscott.com; eservice@trippscott.com)
SETH J. DONAHOE, ESQ. (FBN: 1004133)
(sjd@trippscott.com; sgc@trippscott.com)
JENNIFER   H.   WAHBA,   ESQ.   (FBN:
1010093)
(jmh@trippscott.com; jam@trippscott.com)

*Attorneys  for  Defendants  Number  One
Prospecting,  LLC  d/b/a  Minerva  Marketing,
and Brandon Bowsky*


By: */s/ Timothy A. Kolaya*

STUMPHAUZER KOLAYA
NADLER & SLOMAN, PLLC
2 South Biscayne Blvd., Suite 1600
Miami, Florida 33131
Telephone: (305) 614-1400

Timothy A. Kolaya, Esq. (FBN 056140)
tkolaya@sknlaw.com

*Attorneys for Net Health Affiliates, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed by

CM/ECF on September 30, 2024.

By: */s/ Olga M. Vieira*
Olga M. Vieira  (FBN: 29783)