UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(FT. LAUDERDALE DIVISION)

CASE NO. 0:24-CV-60591-MD

CONSWALLOW TURNER, ET AL.,                Ft. Lauderdale, Florida

        PLAINTIFFS,                      October 16, 2024
                                Wednesday
    VS.

ENHANCE HEALTH, LLC., ET AL.              Scheduled for 11:30 a.m.
                                11:43 a.m. to 1:15 p.m.
        DEFENDANTS.
                                Pages  1 - 69

------------------------------------------------------------

STATUS CONFERENCE

BEFORE THE HONORABLE MELISSA DAMIAN
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:          JASON KENNETH KELLOGG, ESQ.
                             Levine Kellogg Lehman
                             Schneider & Grossman
                             201 S. Biscayne Boulevard
                             Miami Center - 22nd Floor
                             Miami, Florida  33131


                             JASON RYAN DOSS, ESQ.
                             127 Church Street - Suite 220
                             Marietta, Georgia  30060

(APPEARANCES CONTINUED):

FOR THE DEFENDANTS         SAMUEL GATES WILLIAMSON, ESQ.
ENHANCE HEALTH AND         Quinn Emanuel Urquhart Sullivan
MATTHEW HERMAN:            2601 South Bayshore Drive
                          Miami, Florida  33133

                          OLGA M. VIEIRA, ESQ.
                          Quinn Emanuel Urquhart Sullivan
                          2525 Ponce de Leon Boulevard
                          9th Floor
                          Coral Gables, Florida  33134

FOR THE DEFENDANT          JOHN MICHAEL ROBINSON, ESQ.
BAIN CAPITAL INSURANCE     Kirkland & Ellis, LLP
FUND, L.P.:               333 West Wolf Point Plaza
                          Chicago, Illinois  60654

FOR THE DEFENDANTS         AMY E. RICHARDSON, ESQ.
TRUECOVERAGE, CARIBBEAN    HWG, LLP
TECHNOLOGIES,             333 Fayetteville Street
BENEFITALIGN, MATTHEW     Suite 1500
GOLDFUSS AND              Raleigh, North Carolina  27601
GARISH PANICKER:

FOR THE DEFENDANTS         RYAN H. LEHRER, ESQ.
BRANDON BOWSKY AND         SETH J. DONAHOE, ESQ.
NUMBER ONE PROSPECTING     JENNIFER HELMY WAHBA, ESQ.
D/B/A MINERVA MARKETING:   Tripp Scott, P.A.
                          110 S.E. 6th Street - 15th Floor
                          Ft. Lauderdale, Florida  33301

FOR THE DEFENDANT          TIMOTHY ANDREW KOLAYA, ESQ.
NET HEALTH AFFILIATES:     Stumphauzer Kolaya
                          Nadler & Sloman, PLLC
                          2 S. Biscayne Boulevard
                          Suite 1600
                          Miami, Florida  33131

STENOGRAPHICALLY
REPORTED BY:
                          GLENDA M. POWERS, RPR, CRR, FPR
                          Official Court Reporter
                          United States District Court
                          400 North Miami Avenue
                          Miami, Florida  33128

(Call to the order of the Court:)

COURTROOM DEPUTY:   Court is now in session.

In the United States District Court in and for the Southern District of Florida; the Honorable Judge Melissa Damian presiding.

Calling Case Number 24-CV-60591-Damian, Turner, et al versus Enhance Health, LLC, et al.

Counsel, please state your appearances, beginning with the plaintiff.

MR. KELLOGG:   Good morning, Judge Damian.

Jason Kellogg, and with me is my colleague Jason Doss on behalf of the plaintiffs.

THE COURT:   Good morning to you.   If this comes down to a vote, you're not going to do well.   Good morning to you.

Okay, let's see.   We will go in order here for the defendants.

MR. WILLIAMSON:   Good morning, Your Honor.

Sam Williamson and Olga Vieira here for Quinn Emanuel on behalf of Enhance Health and Matthew Herman.

MR. ROBINSON:   Your Honor, John Robinson from Kirkland & Ellis on behalf of Bain Capital Insurance.

THE COURT:   Okay.   Good morning.

MS. RICHARDSON:   Amy Richardson from HWG on behalf of TrueCoverage, Caribbean Technologies, Benefitalign, Mr. Goldfuss and Mr. Panicker.

THE COURT: Okay. Good morning.

MR. LEHRER: Good morning, Your Honor.

Ryan Lehrer and Seth Donahoe, as well as Jennifer Wahba, on behalf of Brandon Bowsky and Number One Prospecting, D/B/A Minerva Marketing.

MR. KOLAYA: And good morning, last but not least, Timothy Kolaya on behalf of Net Health Affiliates.

THE COURT: All right, good morning to you. And then, I guess, friends and family back there.

All right, everybody be seated.

So, I've taken a little time with the pleadings that we have so far and the motion to dismiss that we have so far, but a couple things. Obviously, there's a lot going on, so I wanted to have everybody come in here to talk a little bit about the motion to stay.

I know we're awaiting responses, the motion to dismiss -- we have another motion to dismiss coming, when's that due?

MR. ROBINSON: That's today, that would be Bain's.

THE COURT: Okay. And when's the response to the first one due?

MR. KELLOGG: That will be October 30th.

THE COURT: We have a little -- you know, you're not even that close to full briefing on the motion to dismiss.

Let me just hear -- I mean, I've read through the

complaint, it's kind of complicated, but I think I get it. Tell me a little bit about your -- why you think you're going to survive enough -- let's just say, you know, maybe you won't survive everything on this, let's just say there's going to be some pleading problems, but I want to hear a little bit about the RICO allegations.

I'm not here to argue your motion to dismiss, but I'm here to determine whether we should just be briefing these motions to dismiss, deciding these motions to dismiss and holding off on discovery.  So the reason I'm asking about, in particular, the RICO allegations is what you need to develop through discovery and why it has to happen now.

MR. KELLOGG:  Right.  So, first of all, our RICO claims and our common law aiding and abetting claims, the factual bases for those two claims overlap quite a bit.

So we emphasize in our response in the motion to stay that they've really focused on RICO, but we have these other claims that allege a scheme.  It allege -- so we need to know more -- we need to know more -- we know a lot because we've gotten a lot of information from a lot of people, but we need to do targeted discovery on what was this scheme, how these folks interacted exactly.  We have a pretty good idea.

Our allegations say that Minerva basically started this idea.  TrueCoverage bought into it, it worked, Enhance joined it.  Enhance was a downline of TrueCoverage.

Then they expanded to a network of downlines, so you can see the kind of pattern of a traditional RICO enterprise, the way they're working together.

And so, what was the scheme, what did they know about it? -- Goes important to both the common law claims and the RICO claims; and then, what did they do about it? How did this play out over the last two-plus years?

So it's not just the RICO claims I think that we are entitled to discovery -- or need to continue discovery for, but also the common law claims.

We were going to kind of split up our presentation, and I think part of your question which is why do we need it now goes to the prejudice element of the motion to stay.

And Mr. Doss is prepared to talk about that. I think it's important. I think you need to hear what we found out recently, as in the last 24 hours, what's going on and why stopping discovery now is a bad idea.

As far as RICO, really the only thing that they attack is RICO standing, right. And so, what is RICO standing? We need to show Article III standing, which is an injury in fact, all of our plaintiffs allege that they were injured by this scheme monetarily. Our agents allege commissions, lost profits; our consumers, out-of-pocket expenses.

And we have to show traceability through Article III.

And this scheme that was created, however the

plaintiffs come into it, they eventually -- our allegations show they eventually get to Enhance Health, TrueCoverage. Somebody at Enhance Health, TrueCoverage either switches them or takes the calls, and the scheme itself is basically the same, that causes the injury in fact in traceability even.

As to RICO standing, we have to show an injury to business and property.  There's a big overlap there.  It's a little more direct, but our allegations we think lay out a pretty detailed -- this is really an initial pleading, because it wasn't tested before, but really lays out in some pretty extensive detail what this scheme was.

But as to the issue of why it's important that we keep going on discovery, if you don't mind, I'm going to let Mr. Doss just speak a few minutes on the prejudice part of this.

THE COURT:  Which is fine.  And when you do that, tell me what you -- I know there's a bunch of discovery and motions -- subpoena-related motions out there, I think I may have even heard them by Judge Valle, but you might be able to resolve some of them today.

Please tell me what you've done so far, also, because that's discussed in their motion, more in the context of -- we've already gotten off schedule here, guys, or at least the parties have -- but I am also curious what has happened so far because I think it's relevant to, you know, to putting the

brakes on, you know, how far you've already driven before you put the brakes put on.  Go ahead, you tell me what you were already going to tell me about why you were putting the brakes on now.

MR. KELLOGG:  Actually, but just one point on that because you asked the question how far we've gone in discovery.

With regard to TrueCoverage and Enhance Health, we have sent them a request for production, three requests.  Three requests is all we asked for so far.

THE COURT:  You tell me why we need this discovery now, is that Mr. Doss?

MR. KELLOGG:  Yeah, but just one point on that because you asked the question how far we've gone in discovery.

With regard to TrueCoverage and Enhance Health, we have sent them a request for production three requests.  Three requests is all we asked for, so far, because we think we've got --

THE COURT:  You mean three individual requests or three sets?

MR. KELLOGG:  One request for production.  One set of three requests.  The document preservation letters that they sent to downline after this lawsuit was filed -- that should be pretty easy; document sufficient to show who your downlines are.  We assume there would be a list, a phone list, a contact list of their downlines, and then text messages with agents

about -- and then we'd list kind of some of the bad things that we alleged that they did.

And what that's about is, back in June we found that the Enhance Health's marketing department had been communicating with its downlines through texts; so they would create, you know, texts like you would create with your friend, create like a little group, and that's how they would communicate with downlines.

THE COURT: When you say "downlines," who are you talking about?

MR. KELLOGG: Yeah, so -- look, let's take Enhance Health as an example. Enhance Health is an agency, it's got agents who take calls and help people enroll into healthcare.

THE COURT: Right.

MR. KELLOGG: But in addition to that, we allege Enhance Health and TrueCoverage set up downline agencies --

THE COURT: So when you're talking about the downlines, are you talking about the agencies or individuals?

MR. KELLOGG: Agencies, yeah.

THE COURT: Okay.

MR. KELLOGG: And so those downline agencies are trained by Enhance and TrueCoverage. They are monitored by Enhance and TrueCoverage, and they send portions of their commissions up to Enhance and to TrueCoverage.

In fact, Enhance started as a downline of TrueCoverage

and then became very big and now has created its own kind of subset of downlines.

So, anyway, there was this text -- it was a group text of nine people, and it was called -- the group text was called NHA/EH, which was Net Health Affiliates, which is Mr. Kolaya's client, and Enhance Health.

And the text basically instructs the marketing manager of Enhance telling NHA the downlines who are on this text -- hey -- especially if they are listening to the calls and that the downlines' agents are not saying it right.

They're saying -- this is Juan Coala (phonetic) is the marketing manager says:  The agent needed to explain that if you approve for a health plan, you will then also get a spending card from the carrier for everyday needs.

Yes, sir.

But that comes from the health insurance company. She would have never lost the --

THE COURT:  How do you have that?

MR. KELLOGG:  How do we have this?  We got it from witnesses, yeah.  So people have called us.  Agents have called us.  Former agents have called us to say -- some of them are good people who know what was going on.

Some of them may be people who are trying to get ahead of things they were involved in, but we're getting information from people, which is why there's many complaints, it's

barely -- so we --

THE COURT:  So you sent the one request for production which encompasses three documents -- separate document requests?

MR. KELLOGG:  Right.

THE COURT:  What else have you done in discovery so far?

MR. KELLOGG:  We've done interrogatory requests, one document request, one set of three, tell us your uplines, tell us your downlines, and then one other.

And then, as far as the subpoenas that we've sent out, I think Mr. Doss can expound on that, but primarily we have been focused on getting subpoenas out to third parties.

THE COURT:  And when you sent the request for production and the interrogatories, do they go to all the defendants or only like to the top of the food chain?

MR. KELLOGG:  Enhance and TrueCoverage.

THE COURT:  Who are really at this point the top of the food chain?

MR. KELLOGG:  We would argue that those two and Minerva.

THE COURT:  So, Mr. Doss, tell me a little bit about what's happening in discovery and what you need in discovery.

MR. DOSS:  Sure.  So, basically, the reason that we would be prejudiced by a stay is that information is coming in

from people who were formerly with these companies.

We call Paul Daily, a former agent with information, and we need to be able to follow-up on that information through subpoenas through non-parties, in particular, because a lot of business practices that -- you know, we've been drinking from a fire hose for about nine months with information coming in, processing things.

And a lot of the business practices were sloppy, using personal single phone texts, where former people no longer worked there but the evidence is in their possession.  It's not in the possession, custody and control of the defendants anymore, and it's being destroyed.

So, for example, Minerva's former manager, Drake Lerma, no longer works for Minerva.  We sent him preservation letters -- we sent out over 200 preservation letters, by the way -- and he called back and said I deleted my text messages after I quit.  And those are really, really important.

And we cite to the text messages in the complaint from other former people that worked at Minerva who said there wasn't an ad that was run that wasn't fraudulent.

So there's evidence there that's important as direct evidence and we need to be able to preserve it.

Number one, the fraudulent scheme that we're alleging is ongoing, and our plaintiffs and class members are continuing to suffer harm.  Yesterday I received a call from Marsha

Broyer.  Marsha Broyer is a plaintiff.  Her agency is called Winn Insurance Agency.  Her client is Veronica King, who's a consumer from Georgia who was caught up in this -- in this scheme.

MR. KELLOGG:  And also a plaintiff.

MR. DOSS:  And also a plaintiff in the case.

Ms. King received a letter over the weekend from Ambetter saying your policy has been canceled.  She had no idea why, why that happened.  So she called Ms. Broyer, her agent, yesterday, and Ms. Broyer spent hours trying to figure out why the thing was canceled.

And I've got affidavits that were filed last night, as soon as I could, I'm possibly flying down from Atlanta and drafting declarations.  But the two declarations are important.

I have copies if you need them, but we did file them as soon as we could last night.

Veronica King says that she received notice this weekend that Ambetter said that my health insurance was canceled.  She says I'm very confused because I did not authorize a cancellation.

I have a doctor's appointment this Thursday and I need my coverage to pay the cost of treatment.  Without insurance, the out-of-pocket expenses will be hundreds of dollars, which I cannot afford.

She also says without health insurance there is a

substantial risk that I will suffer imminent future harm -- which goes directly to the standing issue.

THE COURT:  But why does that -- so, is that -- jump ahead for me here, why was it canceled?

MR. DOSS:  We figured it out, yeah.  We figured it out. It was because of TrueCoverage's downline.  No-Cost ACA was one of them.  Ms. Broyer was able to contact HealthSherpa -- that's the enrollment platform she uses to get information.

Ms. Broyer provided a declaration as well, which talks about the fact that based on her initial research -- and this is talking to HealthSherpa, CMS -- that's the Center for Medicare Medicaid Services -- basically, what happened was, a person named Matthew Ginberg -- he's an agent with No-Cost ACA -- logged in through HealthSherpa and he ended up pulling Veronica's policy.

He then canceled that policy in October.

And so without talking to -- Ms. King has never spoken to Mr. Ginberg at all, and he ended up canceling her policy. Why did he do that?

I think that based on what we know, after we filed our complaint -- CMS has done a lot of changes -- they've made a lot of changes.  They've actually extended TrueCoverage's Benefitalign to be able to do business.  But they require now -- because the switching was such a bad problem, they were firing agents -- if a person has an existing policy and has

another agent of record that's listed, they require a three-way call with CMS with the consumer and the agent on the phone to make sure that this is not an unlawful switch.

What I believe Mr. Ginberg did, cancel it so there would be no policy and he intends to come back and then re-enroll Ms. King into a new policy without having to call CMS.  He's trying to work the system.

That's what we believe is going on.

THE COURT:  Is that part of the scheme?

MR. DOSS:  That's part of the scheme.

Mr. Ginberg is a prolific AOR switching.  And when I say "AOR," I mean agent of record.  When these transactions happen -- it's not easy for us -- it's taken months just for us to figure it out.  They're very sophisticated.

Every time there's a switch, someone -- let's say they change their income or change their address and go into the CMS database and do that, they put their name or somebody affiliated with their agency as the agent of record.

And why do they do that is because the carrier -- the insurance carrier would then know who to pay the commission to.

So we have -- and I can show examples, we do attach it to the complaint -- Paula Langley is one of our plaintiffs.

Exhibit 1 to our complaint has, basically, a list of -- it looks like this -- I have copies of the list if you want to see it -- but if you go down, you can see the switching that

happened every month.   She was switched over 20 times in a matter of a few months.   She has no idea who these people are, but the agent of record was on here -- and we were able to go back and figure out who the agent of record was -- and this one was Frederick Bach.

We know Frederick Bach through our research works for downline of TrueCoverage called ACA Health Line.   We were able to then pinpoint and trace it back to TrueCoverage, the switches.

So when we talk about standing -- this is not like a victimless crime here, if you cancel someone's insurance; if they go to the doctor and they have to come out-of-pocket, or they can't get treatment, that's a real harm, injury in fact.

And we're able to trace this back to these agencies, and it's taken us months of very detailed work to figure this out.   And so if you follow Ms. Langley's story through this, you'll see a number of switches and a number of them have Enhance Health as one of the agents of record, or TrueCoverage's downline, like Insure Health Group is one, Mr. Ginberg is involved with Ms. Langley as well, she's in Texas -- you know, Ms. King is in Georgia -- despite the fact that they live in separate states, they have the same actors here who are affecting their health insurance.

And so Mr. Ginberg is part of this.   And we have an actual subpoena out right now to No-Cost ACA asking for

information about him and the switching -- it's, I think, due this week.  We need that information, because it's -- number one, now that we know he's continuing to do this and our clients are suffering actual harm as a result; so if it stays in place, what happens to that subpoena -- what if No-Cost ACA doesn't respond to it, we're going to have problems, we need to be able to go and get it from them.

THE COURT:  So, I mean, are you needing the subpoenas to stop the conduct that you're alleging?

I mean, it sounds to me like you're almost taking on the role of, you know, some enforcement agency here and using the subpoenas to sort of alert everybody, Hey, we're on to you, give us all the information and maybe scare them but --

MR. DOSS:  The contacts of Ms. King, for example, she's actually being harmed as we speak, so it's not just -- we're not on a crusade here.  We're trying to protect our client.

THE COURT:  This, I understand.  I just -- I mean, it sounds like you could be going on forever, like every time you -- how big do you think your potential, you know, the "all others similarly situated," how big of a -- I'll call it a class -- how big do you think that they are?

MR. DOSS:  I suspect there's hundreds of thousands.

THE COURT:  And I mean, and how many people then would need to be subpoenaed to account -- are you going to try and account for everybody who's come across, these hundreds of

thousands of victims?

MR. DOSS: It's not that big of a universe. I'm just calling them bad guys, generally. The universe is not that large, actually, and so the work we have done already is actually going to narrow the scope of discovery significantly. We are able to do targeted subpoenas of non-parties based on the information that we have learned.

So, for example, you know, the No-Cost ACA, we know that they're involved. We have a subpoena out to them, and we will be able to get to the bottom of it.

There's other subpoenas that have been issued.

Another concern we've got is preservation of evidence and potential spoliation. We had already filed a motion for expedited discovery that we had a hearing set in August with Judge Valle, because the 26(f) conferences -- before we actually had to file a motion to compel the 26(f) conferences, which the Court granted -- we basically said here's the request and we attached the same requests Mr. Kellogg was describing for the limited discovery to preserve evidence.

Those were the same requests that were sent to them after the 26(f) conferences. So our understanding was we would cancel the hearing so that we could then go forward and serve these discovery requests, get the limited information that we're seeking and now we are able to stay the whole thing, so that's --

THE COURT:  I think it's one thing if you're getting the limited information that you're seeing in the direct party discovery request.  It's another thing when there are exceedingly endless subpoenas.  I mean, that's what I'm not understanding is, where is the end of the non-party subpoenas?

MR. DOSS:  The non-party subpoenas -- we have served folks who we know have information.

So, for example, Monica Reed is somebody, she's the former bookkeeper of Minerva.  She has the Quick Books files.  Those Quick Books files -- it's all in the court record, we briefed this issue, they've moved to quash the subpoena.

She produced the information.  We said we won't look at it.  So they provided an affidavit.  We provided an affidavit for Monica Reed.

Basically, it has a general ledger that Minerva has which shows the leads, who they bought them from and who they sold them to during the entire time period.  That streamlines things tremendously if we can get that information, and we can then do targeted ones --

THE COURT:  She left the company and she took the Quick Books with her?

MR. DOSS:  She didn't take them with her.  She was an outside bookkeeper, and the company -- I don't know what opposing sides say -- but basically, their position is she doesn't have authority to have that information, but the

problem is -- it's goes to the sloppiness of what I was suggesting earlier -- her office is the principal place of business of Minerva, so for the last several years bank records were being mailed to her -- and it's all in the affidavit she provided -- she said, hey, you didn't change your mailing address, and they didn't, so she's got all this information now.

So, you know, that information cuts through a ton of work. We don't want two terabytes of data. We are very, very targeted in what we know, what we're doing, and what we're asking for. If we can keep the information we already have, we're already way ahead of the game and we won't need to serve a whole bunch more non-party subpoenas.

THE COURT: So do you need the information from the discovery for purposes of responding to the motion to dismiss, or are you able to do that without all this information that you're still -- and by the way -- hold on.

Did you get responses to the request for production of interrogatories or is that a subject of a motion?

MR. KELLOGG: Not from the defendant TrueCoverage and Enhance Health, no.

THE COURT: Is that --

MR. KELLOGG: Both -- I think Enhance Health answered with objections, and I think TrueCoverage sent us a form basically saying until this stay is solved.

THE COURT:  So then do you need the information you're seeking in discovery for purposes of responding to the motion to dismiss?

MR. KELLOGG:  We intend to respond to the motion to dismiss at the end of the month.  There is a subpoena out to a company called T-L-D, Total Lead Domination.  It is a software company that was used by TrueCoverage, Enhance Health, Minerva downlines.  It's a dialing software and a dialing company.

And we sent them a subpoena once we got the motion to dismiss talking about things like standing, asking them to run our clients' numbers against their data to see if our clients did call in or were called -- however it works -- and they're not going to produce anything to us about the confidentiality agreement in place, but they confirmed to us that there were hits on our numbers.

So that would be something that would potentially be helpful if we wanted to, for example, give, frankly, the high level of detail they say we're required to give.

When did we call?  Who did we call into?  We have tried to allege a scheme -- at the center of it, it's Minerva, TrueCoverage and Enhance, those three companies have touched all of our plaintiffs.

Our plaintiffs have also been touched by Downlines of those three defendants, and we think that's enough to get past the motion to dismiss.  But something like that, TLD, would be

very helpful and down the road we would ask TLD for all the data.  That's going to make things very interesting.

We don't need to subpoena every Downline if we've got some data that a data scientist can look at and parse out who was involved with this.

THE COURT:  And so then your prejudice -- back to your prejudice, it's not that you can't respond to the motion to dismiss, it would help you respond to your motion to dismiss, it's not that you're unable to respond without the information; your prejudice is people will continue to be harmed if you don't have the information, and I think you were also saying stuff will get lost or destroyed?

MR. DOSS:  And we have evidence already of spoliation -- instead of us just shooting off accusations without -- we have declarations which we filed with the Court where TrueCoverage, Gabriel Harrison, the manager of the Deerfield Beach Call Center admits to two witnesses that he destroyed the evidence that we're seeking, and that was in --

THE COURT:  Destroyed it after receiving preservation or a notice of --

MR. DOSS:  Yeah.  That's why we filed our motion for expedited discovery.  We've got these affidavits from these witnesses who heard this guy tell them this, and so we took action.  We're trying to protect the evidence that's there.

Another concern we've got in terms of preservation of

evidence is that you will see that CMS suspended Benefitalign and TrueCoverage.  Benefitalign and TrueCoverage are related entities, and Benefitalign is like the enrollment platform they use.

So, CMS -- and we attached the suspension notice from CMS to our motion -- suspended them for two reasons:

Number one, based in part on our allegations of our lawsuit, on that, expressly decided in that suspension notice.

Number two, they're being -- they're suspected of transferring data from CMS' marketplace database using their Benefitalign software overseas, the fact that they're in India.

And the fact that there's evidence potentially overseas gives us concern about their -- whether they're going to preserve the evidence or not.

So we're going to be -- we know what we're doing.  We are not on a fishing expedition.  To the extent we are, we are spear fishing, we're not casting wide nets here, and we have asked for very targeted subpoenas for the people that we know for a fact have the information that we're asking for because we've spoken to them, they've called us.

And so if we can get just the information that we've already obtained and keep it, like Minerva stuff.

And also, Paul Montgomery, there was a motion filed this morning for protective order.  Paul Montgomery is the former marketing director or whatever of TrueCoverage.  He

left.  He has e-mails that I think will demonstrate that information -- customers' P.I.I. was being e-mailed on spreadsheets from India to the United States, and they were using information like that to target consumers to perpetrate fraudulent scheme.

So this is a lot of information, I understand, Judge. The complaint is -- I will speak for myself -- the most detailed complaint that we've ever done, and it's because we have so many witnesses who've come forward and exposed what's going on here.

So, you know -- I don't know if Mr. Kellogg has anything else -- that's why we need to go forward.

THE COURT:  Okay.  So let me hear from the defendant.

Obviously, I've read your motion and this is not an uncommon -- you know, a motion to stay in a case this complex is not unusual.

So tell me, I guess we're starting with you, Mr. Robinson, and knowing that I've already read your motion, so tell me a little bit about what's happening on your end.

MR. ROBINSON:  Sure.  Thank you, Your Honor.

I think I'll probably speak for us in a general sense, and then if you have specific questions about any specific defendant, then my colleagues can handle those.

I think, Your Honor, what we're seeing here is that these guys filed a complaint that was not ready for prime time.

It didn't meet all legal obligations it had to meet to go forward.

THE COURT:  The original complaint or --

MR. ROBINSON:  Good point.  Both complaints, the original complaint that took over four months to file a new complaint, and then the amended complaint also did not satisfy the legal obligations.  The second complaint.

There's a reason that Rule 9(b) exists.  If you look at the Eleventh Circuit opinion in Friedlander versus Nims, the reason that Rule 9(b) exists is to prevent unnecessary discovery in fraud cases.

And the reason that RICO pleading standards are high -- as again submitted by the Eleventh Circuit -- is to prevent unnecessary discovery in an often abused statute, which is how the Eleventh Circuit describes the RICO statute.

And when you look at the many Southern District of Florida cases that granted stays in these circumstances they talk about judicial efficiency.  And efficiency for the parties and for the Court of not having unnecessary discovery when parts of the case or the entire case could go away.

And when you look at this case, Your Honor, obviously, it's a very large complaint.  It's 185 pages with 55 counts, and 882 paragraphs, 12 defendants, 74 relevant non-parties in there that --

THE COURT:  You've read it, I see.

MR. ROBINSON:  Yes, we've spent a lot of time with this.  As the Court -- this district has repeatedly observed, even a small portion of that going away will materially alter the scope of discovery in this case.

THE COURT:  That's actually where I'm a little fixated here because -- and I've only had the opportunity to read your main motion to dismiss.  I feel like all of the claims are sort of overlapping.  They're all based on the same general scheme -- you know, maybe some people are different, but how -- I mean, what if some of the -- even if the RICO claims are dismissed and they're just left with their common law claims, isn't it the same discovery?

MR. ROBINSON:  No, I don't think it is, Your Honor.

But on that, there are specific -- in our motion to dismiss there are arguments against each one of those areas, so the RICO claim have a lot of problems.  But what they said was actually not correct.  We do attack every count in that complaint and each of them suffers some significant legal deficiencies, which is what again the courts have focused on in this case, significant facial, legal deficiencies.

For example, negligence, they don't allege a specific duty; fiduciary, breach of a fiduciary duty, they don't allege where a fiduciary duty would have come from.

They had four months plus to re-plead -- I would assume, these are smart guys -- that they would have pled those

things if they had them to plead.  And so that's what we should not be engaging in discovery on that kind of claim until the Court had determined that those claims will actually go forward.  And again, that's what we see in complicated cases like this over and over again.

And just to be clear, we're not talking about highly targeted discovery.

Obviously, they've sent a lot of subpoenas out.

THE COURT:  Right.

MR. ROBINSON:  You can make three RFPs extremely broad. And when they talk about asking for text messages, they're asking for every text message from Enhance with all of its downlines regarding agent training, compliance, leads, leads, that's the entire relationship is, you know, leads.  So those are extremely broad requests, and that's why it's such a burden for us to respond to it.

And in terms of their prejudice, Your Honor, they're supposed to show up with this information when they file a RICO or fraud complaint, they're supposed to have it when they get here.  So that's the problem with the prejudice argument they're making, is they were supposed to already be at this stage when they filed the complaint alleging these particular areas of misconduct.

When they're talking about the text messages between Enhance and its downlines, that's the first we've heard of

that, Your Honor.  Today in this courtroom is the first time we've heard about that.

THE COURT:  Except they sent you a request for production about it.

MR. ROBINSON:  That was a different request for production.

THE COURT:  Okay.

MR. ROBINSON:  So again, Your Honor, we're talking about an extremely broad discovery here.  And again, on legal bases, they don't allege -- for example, when Mr. Doss was talking about someone -- Miss King talked to someone and somehow got connected with one of these carriers.

Your Honor, someone and somehow are doing a lot of work in that sentence.  Like they have to say who she talked to, they have to say how she ended up arriving at a carrier, what that pattern of fraud was -- which they have not done, that's their obligation to do.

Again, that's the pleading standard they have to meet and 9(b) is in place to protect defendants against unnecessary discovery in this case and protect the Court against having unnecessary discovery disputes brought before it.

Looking at Ms. King's affidavit that was filed last night, we -- honestly, from my perspective, it actually buttresses our arguments.  They talk about Mr. Ginberg -- in her affidavit Ms. King says she has no idea who Mr. Ginberg is.

So when they're talking about a misrepresentation that was made, she doesn't allege misrepresentation.

So again, this is not curing the problems that they're describing.  It is describing a circumstance that they then want to just say we're responsible for.

But if you look, I think Your Honor -- we cited the Boger versus Jaffe case from the Middle District of Florida, similar fact pattern involving several different statutes, but there the Court said you can't just allege environmental circumstance that's the problem and then just say the defendants are connected with this.

You actually have to plead with particularity the defendants ties to that to satisfy the Rule 9(b) obligation. And so that's what again they've haven't done here, Your Honor, and why discovery should not continue while -- until they can actually make their case.

THE COURT:  So, I guess -- I mean, I'm trying to figure out if there's a way that this should happen without halting everything all together -- I mean, and again, I haven't spent the time really diving into the details, I did what I had to do, which is really a peak at the motion to dismiss.

It just -- it seems like the case is not going to go away.  Maybe it will, though.  There's a lot of allegations in there.  There's a lot of facts pled in that complaint.

Are they sufficient to satisfy Rule 9 and to sustain a

RICO claim -- which is hard to do, you know, we'll see.

But my point being, they've got some pretty solid factual allegations when, you know, taken in the light most favorable to the plaintiff, with every reasonable inference drawn in favor of the plaintiff, even though they have to satisfy Rule 9 as to most of their counts, I don't see the whole thing going away on a motion to dismiss.

There may be some pleading deficiencies, maybe with every single one of their counts needs to be fixed, I think they've already pretty much said they'll probably be coming up with another pleading.

Having read your motion to dismiss, again at the peak level, a lot of the challenges are pleading deficiencies, you know, I guess, that there are as a matter of law type challenges.

My point being in saying all that -- I'm kind of speaking out loud -- is that I just know that you're going to make this whole case go away at the motion to dismiss stage, you know, I think a lot of what you're challenging can be fixed.

So then that doesn't mean -- even if we know the case will probably survive dismissal -- your point in your papers and even today is -- yeah, but a lot can change, which means a lot can change with discovery, which is kind of how I started, which is, what changes with discovery.

Let's assume this complaint in some way, shape, or form is going to survive, they do have allegations here.

How do we save the Court or the parties from the unnecessary expense of unnecessary discovery, you know, can you -- what should go forward, what shouldn't go forward? That's where I'm having difficulty.  That's what I was trying to figure out coming in here, was -- and why I asked what's already been going on -- why not let them proceed while the Court proceeds with considering these motions, which, you know, frankly, it's going to take awhile.  It's not going to be fully briefed for awhile, you know.

I'm doing pretty well with the 200 and whatever cases that were graciously gifted to me by my colleagues, but I'm not, you know, that -- I have a little delay, I have a little backlog here, it's going to be a while before I can get you an order on something like these motions to dismiss in this type of case.  That's a huge delay.

So I'm inclined, at least walking in here, at least I'm inclined to say maybe we can figure out a way to proceed with some discovery, basic discovery that will address, you know, across the board even if some claims are dismissed -- and I, you know, I'm curious if there's any way for you -- the burden is really on the plaintiff to identify what that would be, but I would want to hear from you and your co-defendants how that could happen, if at all.

MR. ROBINSON:  Sure, Your Honor, and thank you for that.  I, as always, appreciate the care you've taken with this issue.  A few reactions.  At one level, Your Honor, my reaction is if they think they can re-plead, then let them re-plead.  Let's see what new they come up with.  Obviously, there's a lot of defendants here.  If even one defendant doesn't get included in the re-plea, that's a significant item for them and significantly limits the discovery for them, obviously.

THE COURT:  It doesn't, because even if they're dismissed as a defendant, aren't they going to end up getting non-party subpoenas for the same information?  Because they've already been alleged to be tied up in this whole thing.

MR. ROBINSON:  I guess I would say there's a difference in receiving a subpoena like that as a third party and receiving as a defendant is, I think, we'd all rather be in the third party category than the defendant category.

THE COURT:  Right.

MR. ROBINSON:  But I don't think it's going to be as easy to solve as they think it's going to be to solve, because I think they would have solved it already if it was such an easy thing.  They had four months to solve these problems and they didn't.

But that said, Your Honor, I wanted to engage --  I guess one idea might be to limit discovery at this stage to the named plaintiffs, just interactions with the named plaintiffs.

It's interesting, you know, I'm hearing Mr. Doss talk about Mr. Langley.  We have tried to check on these books. I mean, from Enhance's perspective, Mr. Langley fully consented to all of his interactions with Enhance, and he's reported to that effect on the reported phone calls.

THE COURT:  He's a victim, like a consumer?

MR. ROBINSON:  He is -- he is the husband of one of the named plaintiffs, so, you know.  Mrs. Langley is one of the named plaintiffs alleging that her husband was subject to misrepresentations.  There are standing issues right there that we think warrants serious consideration by the Court.  But even if they can get past that, Mr. Langley fully contended to his interactions with Enhance Health.

So I do think that potentially if we can jointly interact with the plaintiffs about the named plaintiffs and their -- the circumstances under which they received healthcare coverage and whether it was or wasn't switched under what circumstances, that might move the ball forward.

I think it could even potentially set up, you know, a better evaluation of the merits of their case from the plaintiffs' side, perhaps refer them to mediation or something like that.  So that may be one idea.  But the current -- as currently constructed, there are no guardrails on what they're asking for, you know.

We don't think what they've asked for is targeted, but

even if it is, there's nothing stopping them for asking for much more as they walk out of here today. And I think that's the kind of protection we're looking for as we consider these issues, given the weakness of the complaint, and in my biased opinion the fact that they're going to make significant changes to it, at a minimum, you know, as the case goes forward.

THE COURT: I don't know that you are narrowing things for your benefit if we limit it to just the named plaintiff, as the named plaintiff is going to ask the same question -- is going to ask for the same information, right, I mean --

MR. ROBINSON: Meaning communications with the plaintiffs and the named plaintiffs' own policies. Not -- so they ask for all communications with the downlines of agent training about the named plaintiffs.

And that would be a way -- these are the people that they have posited to the Court and. The defendants as the wrong individuals. That would be a very logical way to evaluate and strengthen their case, based on interactions with those named individuals and the policies.

And if we go that route I think that could lead to productive conversation between the plaintiffs and the defendants about whether there is any there, there in their case, which, I think, actually, they might see there's not really as much as they think there is.

THE COURT: And -- I mean that is kind of how we do it

in class actions, you know, in phased collective actions, we start with the named plaintiff and then broaden from there. Do the named -- I have to assume -- I actually did check for this and now I can't remember it.  Each of the named plaintiffs is linked with each of the named defendants.

I know you say no, but --

MR. ROBINSON:   No.

THE COURT:   -- but technically they would be under their theory of the case, because if, you know, one of these individuals, you know, got a policy through someone downline, eventually, if their theory comes up -- it ends at Enhance or Minerva at some point.  So in their view, each one of the plaintiffs at some point touches or is affected by one of these defendants' things.

MR. ROBINSON:   It's quite attenuated here.

THE COURT:   No, and that's your whole point, and that's why we have a motion to dismiss because -- um -- so, I mean, I think it's a valid proposition or proposal.  I mean, what happens -- because then it's different.  Then it's not a fishing expedition.

Then it's the spear fishing that you're talking about, right.  You've named specific individuals and some entities aligned with these specific individuals who are the basis for, you know, you know their specific harms and your theory being there's all these others who have been likewise harmed in the

same way, what if we narrowed your discovery to just the allegations based on the named plaintiffs for now, I think that's still going to get you a lot of information.

For example, by the theory that I just explained, each one of those plaintiffs is going to need to know the downlines because then they're going to need to know the trail that affected them.

I don't think the defendants would be getting out of producing information regarding the downline. They just may not get the whole universe of information which could go on endlessly and forever and ever. I think the universe is pretty big on the defendants' side.

Anyway, I'm -- what if I -- I'm kind of splitting the baby if I do that, I get it, but I'm not inclined to halt this whole thing because of the fact that it's going to take a while to fully brief this and get you an order on the motion to dismiss.

So what if we narrowed discovery on just the named plaintiffs and did sort of a phasing?

MR. KELLOGG:  I think -- and I'll let Mr. Doss weigh in, too, but I think that is going to create more problems, because whatever discovery we serve on the named defendants is going to be objected to.  I think all of this discovery, we already have guardrails in place.  Those guardrails are Magistrate Judge Valle and possibly you.

If we are asking for things that go far afield of the allegations -- the core fraud that we allege that touches on all of our claims, if we go beyond that, we're going to hear about it, but we need to -- for example, TLD, holding the information that not only touches upon what our plaintiffs called in for, but everybody else, having that data and starting to analyze it is going to be helpful.

Maybe there will be an amended complaint some day. Maybe we can incorporate some of that in because it strengthens everything.  I think limiting it to just discovery relating to plaintiffs is going to be tough to work through, because it gives them the ability to object to basically anything we ask for.

THE COURT:  So, for example, you send the subpoena to TLD and then you ask them to run a check for -- I'm assuming, you know, Mr. Turner, Ms. Forman, Ms. Wells, Ms. Langley, you know -- hits on their information.

It's going to give you presumably some hits, that's going to sustain your claim that they were directly contacted or, you know, there was a direct communication or link between those plaintiffs and these downlines, entities and people.

I think that gets you a lot of information.

MR. KELLOGG:  I think it gets us a lot of information relating to kind of the core of our complaint as it relates to the plaintiffs' individual situations, but there is still -- as

you said -- this kind of broad allegations of a fraud here and we should be able to at least look into some of those broader issues.  It's a very hard thing to dismiss a common law aiding and abetting claim, especially, as you said, one that we have alleged with such detail.

Breach of fiduciary duty, page 93 -- or sorry -- page 84 of our complaint, two pages full of fiduciary duty. Those things are all part and parcel of the same overall fraud.

And I heard Mr. Williamson go outside of the four corners and talk about Mr. Langley.  Well, you know, that would be interesting information to have, but at the end of the day Mr. Langley is related to only one of the plaintiffs, so...

THE COURT:  It is Paul Langley or Paula Langley?

MR. DOSS:  Paula Langley.  The wife is the plaintiff, Your Honor.  Mr. Langley is the one that actually received the misrepresentation.

THE COURT:  I got you.  I got you.  Okay.

MR. DOSS:  And what we heard, Ms. Langley's policy was canceled, so she suffered harm --

THE COURT:  Right, okay.  As was -- that's why I was pulling back up your declaration.  It's Ms. King, right?

MR. DOSS:  That's right, yes.  If someone goes in and cancels your policy, you're injured, and if they don't talk to you about it, that proves our point, there is no misrepresentation.  They're going in -- it's also like identity

theft and canceling her policy without talking to her, getting her approval.

The other issue is the issue of bifurcation. Bifurcation doesn't mean the first stage is just plaintiffs. Bifurcation, typically, is class discovery versus merits discovery. Class discovery is broader than just the plaintiffs.

If we're going to go forward with our case in discovery, it cannot be limited just to the plaintiffs, that will prejudice us. We have to be able to prove class certification, that the class was harmed and that the scheme caused the damage to the class. That is -- and we have still a couple other RICO classes. That means merit and class discovery are intertwined, the issues are intertwined.

We're going to need the data for the other complaint -- for the other folks who are victims in this -- so that are expert can go in and say on a class-wide basis this is what happened, here's the fraud that happened, it caused the damages, and it's why it should be certified. It's never been listed only to the plaintiffs.

I understand the Court is trying to split the baby to an extent, but at the end of the day, we need the information. And we're not on a fishing expedition. Our complaint is very detailed, and we have many counts. I don't think that even if they prevailed at some point on the motion to dismiss -- it

won't be for the whole case -- as the Court said, in the full case the discovery is and we need to be able to do that for the reasons already said.

THE COURT:  So I'm just looking at your -- sorry -- I mean it's from -- we've got pictures.  Hold on.

MR. DOSS:  Also, the text message that Mr. Kellogg cited earlier is in the complaint.

THE COURT:  Right, I see them.  I was looking for class -- there's class allegations on --

MR. KELLOGG:  They are at one page, 111.

THE COURT:  So I think that class discovery is a little bit different so maybe when I say "phases," I wasn't talking about class discovery, I was actually talking about initial class rep or named plaintiff discovery for purposes of -- I mean, that would really be to survive dismissal, you know -- yes?

MR. ROBINSON:  That class certification, that stuff, that's if they survive the motion to dismiss.

THE COURT:  Right.  Right.

MR. ROBINSON:  We're a long way for them getting to that stage.

THE COURT:  I know, that's what I'm saying.  It would be -- I think named plaintiff discovery is what helped you survive a motion to dismiss, which they're already responding to a motion at this to -- I think what plain narrative

discovery helps you to survive what a motion to dismiss -- which they're already responding to the motion to dismiss at this point -- but let's say I find that some of the claims should be dismissed or everything needs to be cleaned up and I give some direction why, pleading-wise, the named plaintiff discovery is going to help do that.

I just -- you know, I'm trying to -- I am trying to split the baby here because, again, this is going to languish if we don't let some of it go forward.  I'm kind of optimistic that having some discovery may help, who knows, maybe it will narrow some of the allegations.  Some of the allegations in the complaint are very broad.

I think the word "three" things are appropriate here, and I feel getting the names on behalf of the named plaintiffs, there's going to be named plaintiff discovery.

But we deal with that, that's not unusual.  So I am inclined to kind of take a middle road here and permit discovery to proceed on just the named plaintiff.

And so, when we talk about subpoenas that ask for extremely broad information, or when we talked about discovery requests, he gave very broad information.

I think some of this can be narrowed.

I did have a question, though.  What's with the document preservation letters as well?  Meaning you want document preservation letters that you sent, you want them as

well?

So, Judge, just for clarification, so the way I'm understanding it, you only need one plaintiff to survive.

If that plaintiff -- when we week, I think some of this could be preservation.

When you say document preservation letters that you sent, you want them from them?

MR. KELLOGG:   No.   The defendant that said they sent document preservation letters as well.

THE COURT:   Oh, okay, as opposed to knowing about the litigation?

MR. KELLOGG:   Yes.

THE COURT:   Okay.

MR. KELLOGG:   Judge, just for clarification, so the way I'm understanding this, we only need one plaintiff to survive. If that plaintiff -- if it was just the extent --

THE COURT:   Not really.   Not really.   I don't think you could survive against all of the -- maybe you could survive against Enhance, right.

MR. KELLOGG:   You're right, I understand what you're saying, for each of the defendants, you're saying.

But that defendant -- let's just say it was one defendant and one plaintiff.   We would still be attempting to prove a broader fraud that affected our plaintiff.

So I just want to be clear, it sounds like what you're

saying, this is not limited to discovery that helps us prove the standing issue --

THE COURT:  Right.

MR. KELLOGG:  -- or that they only get to do a deposition of our class plaintiffs.  It is something that we need to be able to tie to our plaintiffs and that might include broader discovery about the fraud.

THE COURT:  It is going to -- I think it is.  But when we talk about, for example, LD -- the Domination, what's it called, the --

MR. KELLOGG:  TLD.

THE COURT:  I love that name.  For example, when we talk about that subpoena, rather than looking at it from the perspective of every time somebody from -- anybody that the defendants dealt with appears in their -- they appear in their call logs, I guess -- I'm picturing like a boiler room, you know -- how about every time any of the information regarding the named plaintiffs comes up in their system.  I mean, I don't understand necessarily exactly who, they're the lead generators, I'm assuming they're calling.

MR. ROBINSON:  I can probably speak to that.  So the dialing system is used by the agency.  It routes the lead call into the person at the call center who talks to them on the phone so there's a record that TLD has in reporting the calls.

THE COURT:  Okay.  Okay.

MR. ROBINSON:  Just so the Court is clear, we haven't asked for anything broader than that, and we don't have an intention right now to do that.

Where this is going to run into problems and we're going to be right back here again is like the Minerva subpoena or the Paul Montgomery statement.  And Minerva shows the leads possible where Minerva bought their leads from -- which we need to be able know, are those the fraudulent leads or not, and then who they sold the leads to.

THE COURT:  Well-- the leads or the plaintiff?

MR. ROBINSON:  The consumer, it's not going to be specific to our plaintiffs.  It won't be.  It will be Enhance purchased a million dollars of leads this week.  Okay.

From who did they buy the leads from?

It's from Minerva.

Who did Minerva get the lead from?

It's more complicated than that.  And that type of evidence is not going to be just specific to our plaintiffs even though it's relevant to our claims.

THE COURT:  It's relevant to your big, overall scheme and is going to be necessary should your scheme survive the initial leading challenges, and eventually I think you're going to be there.

But I think the point is those are huge universes of information that if this case is narrowed down -- listen, no

matter how it's narrowed down, I think that's going to be relevant probably from what you're telling me.

But I think that everybody should be focusing their attention on narrowing down -- or dealing with the challenges to the pleadings and dealing with -- at a certain point you're going to have to identify all of these class members, right, that's different. I just -- I don't want the whole thing to hold, but I don't think you're entitled at this point to that huge universe of information that you're going to need to sustain your claims going forward in the case.

I'd like to just keep this -- let you verify what happened with your named plaintiffs, because presumably each one of them touched some part of the scheme otherwise, right, you wouldn't be able to file the motion to dismiss.

And, you know, we're going to run into problems, I get it, you guys are going to fight about whether it's relevant to have just named plaintiffs or not. But again, that's very common.

So, you know, you're going to have to re-craft your discovery requests and your subpoenas to make sure there's a reason why they're related to your named plaintiffs.

It's not uncommon to completely stay discovery in a case like this. So I think you take the win, take your discovery -- your limited discovery that I'm getting you.

Let me just ask quickly because I know there's some

things hanging out there with Judge Valle.

The motion for protective order by Brandon Bowsky -- I did not look at these motions. He's one of the defendants. Because I'm curious, if I'm limiting the discovery here, can we obviate or get rid of some of these motions that are pending on the discovery side?

MR. DONAHOE: Your Honor, if I may, Seth Donahoe with Tripp Scott, on behalf of Plaintiffs Minerva Marketing and Brandon Bowsky. I think you're referring to document entry 81, which is the motion to quash --

THE COURT: Yes.

MR. DONAHOE: -- Monica Reed's subpoena that's been mentioned a couple times today by plaintiffs' counsel and, you know, we're trying as a collective defendant to channel it a little bit, we don't want to jump up every time we see something that is not accurate.

But they didn't seek documents sufficient to show, you know, Brandon Bowsky or Minerva Marketing bought and sold leads from and to. They went to a former bookkeeper who had not been employed by our client for over two years and they got tax returns, bank statements, entire Quick Books files, W-2s of non-party employees, W-2s of, you know, former employees, business tax receipts, insurance policies, things that we said, guys, you have engagement letters with law firms.

This is not something the plaintiffs need to determine

who we bought and sold leads to or from.   One, that could be solved in party discovery.

And if you're looking to determine, as Your Court has been -- Your Honor's been focused on, whether or not Minerva even touched any of the consumer class plaintiffs, why not just ask us?  Give us your plaintiffs' phone numbers, tell us whether or not you want to know whether they actually saw one of Minerva's ads or one of Minerva's lead vendor's ads, and we can start there, right, because if you want to take one of these class plaintiffs -- punitive class plaintiffs and determine whether they can state a cause of action, not only against Minerva but any of the other defendants, you're going to have to show that we interacted with these class plaintiffs in some way, we interacted with these particular plaintiffs.

Well, Your Honor, we didn't interact with all the class plaintiffs; and the ones we did, it didn't happen the way the plaintiffs are saying.

THE COURT:   Wait.   Remind me again, you are on behalf of?

MR. DONAHOE:   Minerva Marketing.

THE COURT:   (Inaudible)?

MR. DONAHOE:   Yes, Your Honor.

So I think Your Honor is already on the track that we were discussing, I think makes a lot of sense, interactions with the class plaintiffs.   That will ferret out whether or not

these actual plaintiffs were injured at all by any one of the defendants, and if so, who and whether or not the plaintiffs allegations are actually meritorious, in terms of what they believe happened.

Those types of interactions are sufficiently limited -- at least in Minerva's case, I don't want to speak for all defendants -- that's sufficient for us.

So Monica Reed's subpoena, which is Docket Entry 81, I think needs to be quashed. I think the defendants needs to be directed or -- excuse me -- plaintiffs' counsel needs to be directed to delete the documents that they improperly received from Monica Reed without review. That was the original tentative agreement.

I don't know if they still did not review those documents, but I don't think I heard anything today from Your Honor indicating plaintiffs should be rifling through tax returns, bank statements, and all kinds of things like that.

THE COURT: So who would be in a position to go through that and figure out what is relevant?

MR. DONAHOE: We received it. We attached an index to the actual subpoena; that was part of our motion to quash and alternative to limit the scope. We didn't find anything in there to be properly discoverable.

I think it's just the nature of the documents they got are overbroad for the proper reasoning they think that it's

relevant.  They state that they want to know who we bought and sold leads from, serve a document sufficient to show, if we're at that stage of discovery.

Right now, we're just talking about, did these plaintiffs interact with our clients?

Service and RFP.  Did you at any point in time process or receive a call or a phone number that is associated with, and they need to provide us with the phone number, and I think it could be done under the TLD system of the consumer class plaintiffs?

They don't need an entire Quick Books file with every expense, payroll, W-2 in order to determine whether or not their plaintiff have, in fact, seen a Minerva ad or been sold as a lead by whoever had called and whatever they generated.

So that index, we don't think any of it is actually relevant.  We think it's all overbroad.  81-2 -- 3, excuse me. There was an error in the mergings of where the declaration starts, it goes into the index and then the declaration ends, but was supposed to be before the index, the last part of it. Okay.  If you don't mind, I'm going to take a very quick break 'cause -- child care issue, apparently.  Hold on one sec. Sorry, I'm going to step out for one second because my daughter is trying to reach me.  We will take a five-minute recess because then I want to resolve this hearing.

COURTROOM DEPUTY:  All rise.  Court is in recess.

(Recess taken from 12:56 p.m. to 1:06 p.m.)

COURTROOM DEPUTY:   All rise.

THE COURT:   Be seated.   Sorry about that, better to take care of that, so now I can wrap this up.

MR. ROBINSON:   Your Honor, on the motions to quash, we would propose, why don't we just meet and confer with plaintiffs and we'll sort of try and see what we can hash out and maybe put them on abeyance until we've had a chance to meet and confer and come back -- and depending on what's existing after that process in your order, then we can reach a determination.

THE COURT:   Right.   And with regard to that bookkeeper data, I do, though -- I am curious about that one.   You have it, but you're not searching it right now.   So where I left off was, I know that you now just got the index.

Can you determine from it what, you know, can be -- are we already under a confidentiality order in this case?

MR. ROBINSON:   We proposed one.   We haven't gotten it.

THE COURT:   Okay.   So that might be one of your motions for protective order or something that I can deal with -- oh, do you know what docket entry -- oh, you proposed one to them?

MR. KELLOGG:   Yeah, we proposed it and haven't heard back.   On this issue --

THE COURT:   You proposed one to them?

MR. KELLOGG:   On this issue, look, I'm fine with the

proposal to try to do this among ourselves.

But as to the issue of Ms. Reed, specifically, it's premature because if they come back and tell us if they had interaction with so-and-so plaintiff on so-and-so date, and we have bank records of financial information that ties that week who he brought his leads from and who he sold it to, that could potentially be relevant to our plaintiffs, so --

THE COURT:  Well, yes, that's why the question was who should be responsible for going through that information to determine what's relevant to specific plaintiffs, which may come down to a specific time period, or that was one of my questions, concern, should that be Minerva?

MR. DONAHOE:  Your Honor, I think it would always be the parties who the records belong to.

THE COURT:  Which is Minerva.

MR. DONAHOE:  Your Honor, I agree with Mr. Williamson. I think that if we get an order that describes the faith-based discovery that we have been talking about and the parties meet and confer -- now that I'm thinking about it, it might be ambitious for me to get the Court to agree that a four-page index of documents, and every single one of those documents are not irrelevant.  I think they're all overbroad, categorically.

But of course I think you can benefit from meet and confer after the fact once we get an order on interactions of the plaintiffs being part of discovery.

THE COURT: So, I agree. What I'd like to do is -- I mean, I'm telling you orally that I'm granting in part the motion to stay and I'm narrowing the discovery to the named plaintiff, pending further order of the Court.

Further order of the Court, you know, may very well be plaintiffs didn't have a chance to read all the briefings in the motion to dismiss, or it may be because the plaintiffs didn't get that discovery and make a request for something else; and I'm not foreclosing that possibility if -- but none of that should be done without a meet and confer anyway.

But I agree that in light of that limitation, there should be a meet and confer regarding how -- you know, the discovery that's already out there, whether you want the plaintiff to re-do it and re-serve it without narrowing down, or if you just want to say, in light of the Court's ruling, you want to modify your response to any of your objections, including your objections to the subpoenas that have been served, that may be the most efficient thing to do.

But if you guys want to try and, you know, meet regarding with each one of the discovery requests, the 30 out there, and then bring any issues to the Court's attention, and then what do I do with the current motions to objections and motion to quash? Do I deny them as moot for now without prejudice for you to come back once you've looked at them from this vantage?

MR. DONAHOE:  At least with respect to Minerva, we're probably going to have to do a supplemental brief, there's going to be drafting after they meet and confer because the documents have already been provided to plaintiffs' counsel and we're going to have to hash out what's there, and hopefully we narrow it down to we still think this is within the discoverable scope of what the Court has ordered; that way the supplemental brief might resolve it, but I can't withdraw even if they are in possession of documents without some kind of scope of discovery.

THE COURT:  Yes, but you can -- right, you can come to some agreement about what it is that they can and should be able to have for review, maybe they thought you already reviewed.

MS. VIEIRA:  Your Honor, Olga Vieira for Enhance Health.  We have a pending motion to quash today.

Rather than deny it as moot, I would suggest grant it as moot, because if you say they're denied, the third parties may respond as this, we've already been served on the third parties.  We've been trying to --

THE COURT:  Oh, I see what you're saying.  Right.

MS. VIEIRA:  -- you and I, they're conditioned, we have been trying to keep talking about them and that sort of thing.

If we can just get the motions granted, they can re-serve the subpoenas to us, we'll discuss them, negotiate

them; and then if they're still worthy of being served, they can serve them or we'll come back to the Court.

THE COURT: Right, because if I deny that as moot, the third parties may look at that as, Oh, the motion to quash is denied. Okay. I will figure out a way to word that.

I think I'm going to do that as to all the outstanding discovery motions, in light of the Court's rulings, without prejudice. So it is -- I am sustaining -- basically, I am granting the motion to quash protective orders without prejudice to the plaintiffs to be re-served; the discovery, the defendants can reassess how they're going to respond.

MS. VIEIRA: Thank you.

MR. KELLOGG: Maybe one a caveat -- not a caveat, more like an addendum -- for the folks that we have subpoenaed, I believe, looking at the list, we have sent preservation letters to each of them.

I'd like to confer with defense counsel to make sure that these folks have also received preservation letters from defendants; so that everybody's clear, you're not destroying anything.

THE COURT: Yeah, I don't have an issue with you getting copies of all the preservation letters that had been sent out. I think that's something that -- yeah, what's the issue with giving them the preservation letters?

They were done in response to their request. Each

defendant would have to respond to that.

MR. KELLOGG:  Yeah, we can do it informally.  I just wanted to, you know, make an understanding that we have kind of a belt and suspenders approach.

THE COURT:  Since I am staying a lot of this discovery, I do think it makes sense, at least, to alleviate any claim of prejudice on behalf of the plaintiffs to at least know preservation letters were sent.

I don't have an issue with you giving them to them.

MS. VIEIRA:  And then just to be clear, would be to any downline agencies that have connections with the named plaintiffs?

THE COURT:  No, I think now give them all preservation letters because that will alleviate some of their prejudice concerns in the bigger scheme, but that is an exception to narrowing it to just named plaintiffs.

MR. DONAHOE:  Your Honor --

MS. VIEIRA:  That's not what happened.

MR. DONAHOE:  -- just a brief clarification, because the situation and with respect to Monica Reed, what required plaintiffs to lead to her production to be served with the subpoena document is it was demonstrated in her possession of documents.  Monica Reed produced a document -- we have to find a way to re-set the subpoena and get it back to the extent they're in the initial -- with respect to this man, we're in.

Monica Reed produced the documents.  We have to find a way to re-set that and get it back to --

MS. RICHARDSON:  I forget, we have the same thing with Mr. Montgomery.

THE COURT REPORTER:  Can I have your name, please.

MS. RICHARDSON:  I'm sorry, Amy Richardson.

THE COURT:  And the Montgomery subpoena was already responded to, already provided?

MS. RICHARDSON:  Yes.  So let's just say we have an agreement, they don't yet, but...

THE COURT:  So you want the subpoena itself to be limited or why not just the --

MS. RICHARDSON:  Now --

THE COURT:  A non-party subpoena was served; a non-party subpoena was responded to by the non-party.  The party is objecting to the scope of the information requested pursuant to the subpoena.

I don't know that we need to ask the non-party to re-respond.  I mean, it's like you're suggesting that Ms. Reed is the one that has the burden to narrow down what's relevant and not relevant.

MS. RICHARDSON:  I'm here on behalf of Mr. Montgomery, not Ms. Reed.

THE COURT:  Right.

MS. RICHARDSON:  Mr. Montgomery, I'm fine with that, as

long as they can hold, just not look.  We will re-view after a meet and confer and then you can indicate what should be reviewed.

THE COURT:  Right.

MS. RICHARDSON:  I am fine with that.  I don't think Mr. Montgomery needs to have to whittle through that, we can do that as parties.

THE COURT:  Right.  Okay.  I'll indicate that as to any subpoenas that have already been responded to at this point, I mean, know about Montgomery and I know about Reed.

Are there others that implicate the same concern?

MR. DONAHOE:  Not that we're aware of right now.

THE COURT:  Okay.

MR. ROBINSON:  Your Honor, there are -- it looks like three subpoenas that have not been responded to by the parties that have been served, and they're downlines.

MR. KELLOGG:  Actually, that just reminds me, Prince Health Group has produced something.  They did not object. We will hold that as well.

THE COURT:  If there's no objection --

MS. VIEIRA:  There's no objection because we had no notice, and this would be at least the second time subpoenas have been issued without providing proper notice to the defendants.

THE COURT:  Okay, so why don't we -- as to further your

meet and confer -- I'm going to direct the plaintiffs to send to all of the defense counsel a list of all subpoenas that have already gone out just to make sure nobody fell through the cracks, you know, who knows who and why somebody did not get notice.   But at this point, let's just make sure they have a list of all subpoenas that are out there.

I think that will help in the need for process anyway.

MR. KELLOGG:   We'll do a list of all the subpoenas that have gone out and who's responded to them; right?

THE COURT:   Right.   Okay.   I'll issue a written order today.   It won't be very lengthy, but it will at least give you the benefit of having a written order that sometimes helps you work with your clients that indicates the narrowing down that I've done, ordering you to provide that list, you will have by Wednesday of next week to do that.

And I'm going to have you all meet and confer, and I'm going to ask -- I won't make you all come back down here again. I'm going to ask first, I won't make you all come back down here again, I'm going to ask you all to file -- I will put a deadline in -- to file a status update for the Court as to how that process is going, just because I think it would benefit us to know.

I want to keep a check on you guys, so I'll issue a requirement of a joint status report maybe 30 days, because by then we'll be through most of the briefing on the motion to

dismiss this -- not all of it -- because I think if there's a lot of fighting going on about the discovery, I'll bring you in here, but if it's just miscellaneous issues, I'll give you a magistrate judge.

MR. KELLOGG:   Thank you.

THE COURT:   All right, I have another case waiting, so I appreciate you all coming down.   It's been very nice to see a lot of you.   I know a lot of you from my lawyer days.

So thank you all, nice seeing everybody.

We will get something out probably today.

COURTROOM DEPUTY:   Court is adjourned.

(Proceedings concluded at 1:15 p.m.)


C E R T I F I C A T E


  I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.


November 6th, 2024


                    S/Glenda M. Powers


                    GLENDA M. POWERS, RPR, CRR, FPR
                    United States District Court
                    400 North Miami Avenue
                    Miami, Florida
                    Glenda_Powers@flsd.uscourts.gov

| 0 |
|---|
| **0:24-CV-60591-MD** [1] - 1:3 |

| 1 |
|---|
| **1** [2] - 1:9, 15:23 |
| **110** [1] - 2:17 |
| **111** [1] - 40:10 |
| **11:30** [1] - 1:8 |
| **11:43** [1] - 1:8 |
| **12** [1] - 25:23 |
| **127** [1] - 1:22 |
| **12:56** [1] - 50:1 |
| **1500** [1] - 2:12 |
| **15th** [1] - 2:17 |
| **16** [1] - 1:6 |
| **1600** [1] - 2:20 |
| **185** [1] - 25:22 |
| **1:06** [1] - 50:1 |
| **1:15** [2] - 1:8, 59:12 |

| 2 |
|---|
| **2** [1] - 2:20 |
| **20** [1] - 16:1 |
| **200** [2] - 12:15, 31:12 |
| **201** [1] - 1:19 |
| **2024** [2] - 1:6, 59:19 |
| **220** [1] - 1:22 |
| **22nd** [1] - 1:19 |
| **24** [1] - 6:16 |
| **24-CV-60591-Damian** [1] - 3:6 |
| **2525** [1] - 2:6 |
| **26(f** [3] - 18:15, 18:16, 18:21 |
| **2601** [1] - 2:3 |
| **27601** [1] - 2:13 |

| 3 |
|---|
| **3** [1] - 49:16 |
| **30** [2] - 52:20, 58:24 |
| **30060** [1] - 1:23 |
| **30th** [1] - 4:22 |
| **33128** [1] - 2:24 |
| **33131** [2] - 1:20, 2:21 |
| **33133** [1] - 2:4 |
| **33134** [1] - 2:7 |
| **333** [2] - 2:9, 2:12 |
| **33301** [1] - 2:17 |

| 4 |
|---|
| **400** [2] - 2:24, 59:23 |

| 5 |
|---|
| **55** [1] - 25:22 |

| 6 |
|---|
| **60654** [1] - 2:9 |
| **69** [1] - 1:9 |
| **6th** [2] - 2:17, 59:19 |

| 7 |
|---|
| **74** [1] - 25:23 |

| 8 |
|---|
| **81** [2] - 46:9, 48:8 |
| **81-2** [1] - 49:16 |
| **84** [1] - 38:7 |
| **882** [1] - 25:23 |

| 9 |
|---|
| **9** [2] - 29:25, 30:6 |
| **9(b** [4] - 25:8, 25:10, 28:19, 29:13 |
| **93** [1] - 38:6 |
| **9th** [1] - 2:6 |

| A |
|---|
| **a.m** [2] - 1:8, 1:8 |
| **abetting** [2] - 5:14, 38:4 |
| **abeyance** [1] - 50:8 |
| **ability** [1] - 37:12 |
| **able** [20] - 7:19, 12:3, 12:22, 14:7, 14:23, 16:3, 16:7, 16:14, 17:7, 18:6, 18:10, 18:24, 20:16, 38:2, 39:10, 40:2, 43:6, 44:8, 45:14, 53:13 |
| **above-entitled** [1] - 59:17 |
| **abused** [1] - 25:14 |
| **ACA** [6] - 14:6, 14:14, 16:7, 16:25, 17:5, 18:8 |
| **account** [2] - 17:24, 17:25 |
| **accurate** [2] - 46:16, 59:16 |
| **accusations** [1] - 22:14 |
| **action** [2] - 22:24, 47:11 |
| **actions** [2] - 35:1 |
| **actors** [1] - 16:22 |
| **actual** [4] - 16:25, |

| 17:4, 48:1, 48:21 |
|---|
| **ad** [2] - 12:20, 49:13 |
| **addendum** [1] - 54:14 |
| **addition** [1] - 9:15 |
| **address** [3] - 15:16, 20:6, 31:20 |
| **adjourned** [1] - 59:11 |
| **admits** [1] - 22:17 |
| **ads** [2] - 47:8 |
| **affected** [3] - 35:13, 36:7, 42:24 |
| **affecting** [1] - 16:23 |
| **affidavit** [5] - 19:13, 20:4, 28:22, 28:25 |
| **affidavits** [2] - 13:12, 22:22 |
| **affiliated** [1] - 15:18 |
| **AFFILIATES** [1] - 2:19 |
| **Affiliates** [2] - 4:7, 10:5 |
| **afford** [1] - 13:24 |
| **afield** [1] - 37:1 |
| **agencies** [6] - 9:16, 9:18, 9:19, 9:21, 16:14, 55:11 |
| **Agency** [1] - 13:2 |
| **agency** [5] - 9:12, 13:1, 15:18, 17:11, 43:22 |
| **agent** [12] - 10:12, 12:2, 13:9, 14:13, 15:1, 15:2, 15:12, 15:18, 16:3, 16:4, 27:13, 34:13 |
| **agents** [8] - 6:22, 8:25, 9:13, 10:10, 10:20, 10:21, 14:25, 16:18 |
| **agree** [4] - 51:16, 51:20, 52:1, 52:11 |
| **agreement** [4] - 21:14, 48:13, 53:12, 56:10 |
| **ahead** [4] - 8:2, 10:23, 14:4, 20:12 |
| **aiding** [2] - 5:14, 38:3 |
| **al** [2] - 3:6, 3:7 |
| **AL** [2] - 1:5, 1:8 |
| **alert** [1] - 17:12 |
| **aligned** [1] - 35:23 |
| **allegations** [16] - 5:6, 5:11, 5:23, 7:1, 7:8, 23:7, 29:23, 30:3, 31:2, 36:2, 37:2, 38:1, 40:9, 41:11, 48:3 |
| **allege** [12] - 5:18, 6:21, 6:22, 9:15, 21:20, 26:21, 26:22, 28:10, 29:2, 29:9, 37:2 |

| **alleged** [3] - 9:2, 32:12, 38:5 |
|---|
| **alleging** [4] - 12:23, 17:9, 27:22, 33:9 |
| **alleviate** [2] - 55:6, 55:14 |
| **almost** [1] - 17:10 |
| **alter** [1] - 26:3 |
| **alternative** [1] - 48:22 |
| **Ambetter** [2] - 13:8, 13:18 |
| **ambitious** [1] - 51:20 |
| **amended** [2] - 25:6, 37:8 |
| **AMY** [1] - 2:11 |
| **Amy** [2] - 3:23, 56:6 |
| **analyze** [1] - 37:7 |
| **AND** [3] - 2:3, 2:13, 2:15 |
| **ANDREW** [1] - 2:18 |
| **answered** [1] - 20:23 |
| **anyway** [4] - 10:3, 36:13, 52:10, 58:7 |
| **AOR** [2] - 15:11, 15:12 |
| **appear** [1] - 43:15 |
| **appearances** [1] - 3:8 |
| **APPEARANCES** [2] - 1:16, 2:1 |
| **appointment** [1] - 13:21 |
| **appreciate** [2] - 32:2, 59:7 |
| **approach** [1] - 55:4 |
| **appropriate** [1] - 41:13 |
| **approval** [1] - 39:2 |
| **approve** [1] - 10:13 |
| **areas** [2] - 26:15, 27:23 |
| **argue** [2] - 5:7, 11:20 |
| **argument** [1] - 27:20 |
| **arguments** [2] - 26:15, 28:24 |
| **arriving** [1] - 28:15 |
| **Article** [2] - 6:20, 6:24 |
| **associated** [1] - 49:7 |
| **assume** [4] - 8:24, 26:25, 31:1, 35:3 |
| **assuming** [2] - 37:15, 43:20 |
| **Atlanta** [1] - 13:13 |
| **attach** [1] - 15:21 |
| **attached** [3] - 18:18, 23:5, 48:20 |
| **attack** [2] - 6:18, 26:17 |
| **attempting** [1] - 42:23 |
| **attention** [2] - 45:4, 52:21 |
| **attenuated** [1] - 35:15 |

| **August** [1] - 18:14 |
|---|
| **authority** [1] - 19:25 |
| **authorize** [1] - 13:20 |
| **Avenue** [2] - 2:24, 59:23 |
| **awaiting** [1] - 4:16 |
| **aware** [1] - 57:12 |
| **awhile** [2] - 31:10, 31:11 |

| B |
|---|
| **baby** [3] - 36:14, 39:21, 41:8 |
| **Bach** [2] - 16:5, 16:6 |
| **backlog** [1] - 31:15 |
| **bad** [4] - 6:17, 9:1, 14:24, 18:3 |
| **BAIN** [1] - 2:8 |
| **Bain** [1] - 3:21 |
| **Bain's** [1] - 4:19 |
| **ball** [1] - 33:18 |
| **bank** [4] - 20:3, 46:21, 48:17, 51:5 |
| **barely** [1] - 11:1 |
| **based** [8] - 14:10, 14:20, 18:6, 23:7, 26:8, 34:18, 36:2, 51:17 |
| **bases** [2] - 5:15, 28:10 |
| **basic** [1] - 31:20 |
| **basis** [2] - 35:23, 39:17 |
| **Bayshore** [1] - 2:3 |
| **Beach** [1] - 22:17 |
| **became** [1] - 10:1 |
| **BEFORE** [1] - 1:13 |
| **beginning** [1] - 3:8 |
| **behalf** [11] - 3:12, 3:19, 3:21, 3:23, 4:4, 4:7, 41:14, 46:8, 47:18, 55:7, 56:22 |
| **belong** [1] - 51:14 |
| **belt** [1] - 55:4 |
| **benefit** [4] - 34:8, 51:23, 58:12, 58:21 |
| **Benefitalign** [6] - 3:24, 14:23, 23:2, 23:3, 23:11 |
| **BENEFITALIGN** [1] - 2:12 |
| **better** [2] - 33:20, 50:3 |
| **between** [3] - 27:24, 34:21, 37:20 |
| **beyond** [1] - 37:3 |
| **biased** [1] - 34:4 |
| **bifurcation** [3] - 39:3, 39:4, 39:5 |
| **big** [8] - 7:7, 10:1, 17:19, 17:20, 17:21, |

18:2, 36:12, 44:20
**bigger** [1] - 55:15
**Biscayne** [2] - 1:19, 2:20
**bit** [8] - 4:14, 5:2, 5:5, 5:15, 11:22, 24:19, 40:12, 46:15
**board** [1] - 31:21
**Boger** [1] - 29:7
**boiler** [1] - 43:16
**bookkeeper** [4] - 19:9, 19:23, 46:19, 50:12
**books** [1] - 33:2
**Books** [5] - 19:9, 19:10, 19:21, 46:21, 49:11
**bottom** [1] - 18:10
**bought** [6] - 5:24, 19:16, 44:7, 46:18, 47:1, 49:1
**Boulevard** [3] - 1:19, 2:6, 2:20
**BOWSKY** [1] - 2:15
**Bowsky** [4] - 4:4, 46:2, 46:9, 46:18
**brakes** [3] - 8:1, 8:2, 8:3
**BRANDON** [1] - 2:15
**Brandon** [4] - 4:4, 46:2, 46:9, 46:18
**breach** [2] - 26:22, 38:6
**break** [1] - 49:20
**brief** [4] - 36:16, 53:2, 53:8, 55:19
**briefed** [2] - 19:11, 31:11
**briefing** [3] - 4:24, 5:8, 58:25
**briefings** [1] - 52:6
**bring** [2] - 52:21, 59:2
**broad** [7] - 27:10, 27:15, 28:9, 38:1, 41:12, 41:20, 41:21
**broaden** [1] - 35:2
**broader** [5] - 38:2, 39:6, 42:24, 43:7, 44:2
**brought** [2] - 28:21, 51:6
**Broyer** [6] - 13:1, 13:9, 13:10, 14:7, 14:9
**bunch** [2] - 7:17, 20:13
**burden** [3] - 27:15, 31:22, 56:20
**business** [6] - 7:7, 12:5, 12:8, 14:23, 20:3, 46:23
**but..** [1] - 56:10

**buttresses** [1] - 28:24
**buy** [1] - 44:14
**BY** [1] - 2:22

**C**

**cancel** [3] - 15:4, 16:11, 18:22
**canceled** [6] - 13:8, 13:11, 13:19, 14:4, 14:16, 38:19
**canceling** [2] - 14:18, 39:1
**cancellation** [1] - 13:20
**cancels** [1] - 38:23
**cannot** [2] - 13:24, 39:9
**Capital** [1] - 3:21
**CAPITAL** [1] - 2:8
**card** [1] - 10:14
**care** [3] - 32:2, 49:21, 50:4
**CARIBBEAN** [1] - 2:11
**Caribbean** [1] - 3:24
**Carolina** [1] - 2:13
**carrier** [4] - 10:14, 15:19, 15:20, 28:15
**carriers** [1] - 28:12
**CASE** [1] - 1:3
**case** [28] - 13:6, 24:15, 25:20, 25:21, 26:4, 26:20, 28:20, 29:7, 29:16, 29:22, 30:18, 30:21, 31:17, 33:20, 34:6, 34:18, 34:23, 35:9, 39:8, 40:1, 40:2, 44:25, 45:10, 45:23, 48:6, 50:17, 59:6
**Case** [1] - 3:6
**cases** [4] - 25:11, 25:17, 27:4, 31:12
**casting** [1] - 23:17
**categorically** [1] - 51:22
**category** [2] - 32:16
**caught** [1] - 13:3
**caused** [2] - 39:12, 39:18
**causes** [1] - 7:5
**caveat** [2] - 54:13
**center** [2] - 21:20, 43:23
**Center** [3] - 1:19, 14:11, 22:17
**certain** [1] - 45:5
**certification** [2] - 39:11, 40:17
**certified** [1] - 39:19

**certify** [1] - 59:15
**chain** [2] - 11:16, 11:19
**challenges** [4] - 30:13, 30:15, 44:22, 45:4
**challenging** [1] - 30:19
**chance** [2] - 50:8, 52:6
**change** [5] - 15:16, 20:5, 30:23, 30:24
**changes** [4] - 14:21, 14:22, 30:25, 34:5
**channel** [1] - 46:14
**check** [4] - 33:2, 35:3, 37:15, 58:23
**Chicago** [1] - 2:9
**child** [1] - 49:21
**Church** [1] - 1:22
**Circuit** [3] - 25:9, 25:13, 25:15
**circumstance** [2] - 29:4, 29:10
**circumstances** [3] - 25:17, 33:16, 33:18
**cite** [1] - 12:18
**cited** [2] - 29:6, 40:7
**claim** [6] - 26:16, 27:2, 30:1, 37:19, 38:4, 55:6
**claims** [17] - 5:13, 5:14, 5:15, 5:18, 6:5, 6:6, 6:8, 6:10, 26:7, 26:10, 26:11, 27:3, 31:21, 37:3, 41:3, 44:19, 45:10
**clarification** [3] - 42:2, 42:14, 55:19
**class** [25] - 12:24, 17:21, 35:1, 39:5, 39:6, 39:10, 39:11, 39:12, 39:13, 39:17, 40:9, 40:11, 40:13, 40:14, 40:17, 43:5, 45:6, 47:5, 47:10, 47:13, 47:15, 47:25, 49:9
**class-wide** [1] - 39:17
**classes** [1] - 39:13
**cleaned** [1] - 41:4
**clear** [5] - 27:6, 42:25, 44:1, 54:19, 55:10
**client** [4] - 10:6, 13:2, 17:16, 46:20
**clients** [4] - 17:4, 21:11, 49:5, 58:13
**clients'** [1] - 21:11
**close** [1] - 4:24
**CMS** [8] - 14:11, 14:21, 15:2, 15:7,

15:16, 23:1, 23:5, 23:6
**CMS'** [1] - 23:10
**co** [1] - 31:24
**co-defendants** [1] - 31:24
**Coala** [1] - 10:11
**colleague** [1] - 3:11
**colleagues** [2] - 24:23, 31:13
**collective** [2] - 35:1, 46:14
**coming** [6] - 4:17, 11:25, 12:6, 30:10, 31:7, 59:7
**commission** [1] - 15:20
**commissions** [2] - 6:22, 9:24
**common** [6] - 5:14, 6:5, 6:10, 26:11, 38:3, 45:18
**communicate** [1] - 9:8
**communicating** [1] - 9:5
**communication** [1] - 37:20
**communications** [2] - 34:11, 34:13
**companies** [2] - 12:1, 21:21
**company** [6] - 10:16, 19:20, 19:23, 21:6, 21:7, 21:8
**compel** [1] - 18:16
**complaint** [27] - 5:1, 12:18, 14:21, 15:22, 15:23, 24:7, 24:8, 24:25, 25:3, 25:5, 25:6, 25:7, 25:22, 26:18, 27:19, 27:22, 29:24, 31:1, 34:4, 37:8, 37:24, 38:7, 39:15, 39:23, 40:7, 41:12
**complaints** [2] - 10:25, 25:4
**completely** [1] - 45:22
**complex** [1] - 24:15
**compliance** [1] - 27:13
**complicated** [3] - 5:1, 27:4, 44:17
**concern** [5] - 18:12, 22:25, 23:13, 51:12, 57:11
**concerns** [1] - 55:15
**concluded** [1] - 59:12
**conditioned** [1] - 53:22

**conduct** [1] - 17:9
**confer** [11] - 50:6, 50:9, 51:19, 51:24, 52:10, 52:12, 53:3, 54:17, 57:2, 58:1, 58:16
**CONFERENCE** [1] - 1:12
**conferences** [3] - 18:15, 18:16, 18:21
**confidentiality** [2] - 21:13, 50:17
**confirmed** [1] - 21:14
**confused** [1] - 13:19
**connected** [2] - 28:12, 29:11
**connections** [1] - 55:11
**consented** [1] - 33:3
**consider** [1] - 34:3
**consideration** [1] - 33:11
**considering** [1] - 31:9
**constructed** [1] - 33:23
**consumer** [6] - 13:3, 15:2, 33:6, 44:11, 47:5, 49:9
**consumers** [2] - 6:23, 24:4
**CONSWALLOW** [1] - 1:5
**contact** [2] - 8:24, 14:7
**contacted** [1] - 37:19
**contacts** [1] - 17:14
**contended** [1] - 33:12
**context** [1] - 7:22
**continue** [3] - 6:9, 22:10, 29:15
**CONTINUED** [1] - 2:1
**continuing** [2] - 12:24, 17:3
**control** [1] - 12:11
**conversation** [1] - 34:21
**copies** [3] - 13:15, 15:24, 54:22
**Coral** [1] - 2:7
**core** [2] - 37:2, 37:24
**corners** [1] - 38:10
**correct** [1] - 26:17
**cost** [1] - 13:22
**Cost** [5] - 14:6, 14:13, 16:25, 17:5, 18:8
**counsel** [6] - 3:8, 46:13, 48:10, 53:4, 54:17, 58:2
**count** [1] - 26:17
**counts** [4] - 25:22,

30:6, 30:9, 39:24
**couple** [3] - 4:13, 39:13, 46:13
**course** [1] - 51:23
**court** [4] - 3:2, 19:10, 49:25, 59:11
**COURT** [95] - 1:1, 1:14, 3:13, 3:22, 4:1, 4:8, 4:20, 4:23, 7:16, 8:10, 8:18, 9:9, 9:14, 9:17, 9:20, 10:18, 11:2, 11:6, 11:14, 11:18, 11:22, 14:3, 15:9, 17:8, 17:17, 17:23, 19:1, 19:20, 20:14, 20:22, 21:1, 22:6, 22:19, 24:13, 25:3, 25:25, 26:5, 27:9, 28:3, 28:7, 29:17, 32:9, 32:17, 33:6, 34:7, 34:25, 35:8, 35:16, 37:14, 38:13, 38:17, 38:20, 40:4, 40:8, 40:11, 40:19, 40:22, 42:10, 42:13, 42:17, 43:3, 43:8, 43:12, 43:25, 44:10, 44:20, 46:11, 47:18, 47:21, 48:18, 50:3, 50:12, 50:19, 50:24, 51:8, 51:15, 52:1, 53:11, 53:21, 54:3, 54:21, 55:5, 55:13, 56:5, 56:7, 56:11, 56:14, 56:24, 57:4, 57:8, 57:13, 57:20, 57:25, 58:10, 59:6
**Court** [26] - 2:23, 2:23, 3:1, 3:3, 18:17, 22:15, 25:19, 26:2, 27:3, 28:20, 29:9, 31:3, 31:9, 33:11, 34:16, 39:21, 40:1, 44:1, 47:3, 51:20, 52:4, 52:5, 53:7, 54:2, 58:20, 59:22
**Court's** [3] - 52:15, 52:21, 54:7
**courtroom** [1] - 28:1
**COURTROOM** [4] - 3:2, 49:25, 50:2, 59:11
**courts** [1] - 26:19
**coverage** [2] - 13:22, 33:17
**cracks** [1] - 58:4
**craft** [1] - 45:19
**create** [4] - 9:6, 9:7, 36:21

**created** [2] - 6:25, 10:1
**crime** [1] - 16:11
**CRR** [2] - 2:22, 59:22
**crusade** [1] - 17:16
**curing** [1] - 29:3
**curious** [4] - 7:24, 31:22, 46:4, 50:13
**current** [2] - 33:22, 52:22
**custody** [1] - 12:11
**customers'** [1] - 24:2
**cuts** [1] - 20:8

**D**

**D/B/A** [2] - 2:16, 4:5
**Daily** [1] - 12:2
**damage** [1] - 39:12
**damages** [1] - 39:19
**DAMIAN** [1] - 1:13
**Damian** [2] - 3:5, 3:10
**data** [9] - 20:9, 21:11, 22:2, 22:4, 23:10, 37:6, 39:15, 50:13
**database** [2] - 15:17, 23:10
**date** [1] - 51:4
**daughter** [1] - 49:22
**days** [2] - 58:24, 59:8
**de** [1] - 2:6
**deadline** [1] - 58:20
**deal** [2] - 41:16, 50:20
**dealing** [2] - 45:4, 45:5
**dealt** [1] - 43:15
**decided** [1] - 23:8
**deciding** [1] - 5:9
**declaration** [4] - 14:9, 38:21, 49:17, 49:18
**declarations** [3] - 13:14, 22:15
**Deerfield** [1] - 22:16
**defendant** [12] - 20:20, 24:13, 24:23, 32:6, 32:10, 32:15, 32:16, 42:8, 42:22, 42:23, 46:14, 55:1
**DEFENDANT** [2] - 2:8, 2:18
**defendants** [25] - 3:16, 11:16, 12:11, 21:24, 25:23, 28:19, 29:11, 29:13, 31:24, 32:6, 34:16, 34:22, 35:5, 36:8, 36:22, 42:21, 43:15, 46:3, 47:12, 48:2, 48:7, 48:9, 54:11, 54:19, 57:24

**DEFENDANTS** [4] - 1:9, 2:2, 2:11, 2:15
**defendants'** [2] - 35:14, 36:12
**defense** [2] - 54:17, 58:2
**deficiencies** [4] - 26:19, 26:20, 30:8, 30:13
**delay** [2] - 31:14, 31:17
**delete** [1] - 48:11
**deleted** [1] - 12:16
**demonstrate** [1] - 24:1
**demonstrated** [1] - 55:22
**denied** [2] - 53:18, 54:5
**deny** [3] - 52:23, 53:17, 54:3
**department** [1] - 9:4
**deposition** [1] - 43:5
**DEPUTY** [4] - 3:2, 49:25, 50:2, 59:11
**describes** [2] - 25:15, 51:17
**describing** [3] - 18:18, 29:4
**despite** [1] - 16:21
**destroyed** [4] - 12:12, 22:12, 22:17, 22:19
**destroying** [1] - 54:19
**detail** [3] - 7:11, 21:18, 38:5
**detailed** [4] - 7:9, 16:15, 24:8, 39:24
**details** [1] - 29:20
**determination** [1] - 50:11
**determine** [7] - 5:8, 46:25, 47:3, 47:11, 49:12, 50:16, 51:10
**determined** [1] - 27:3
**develop** [1] - 5:11
**dialing** [3] - 21:8, 43:22
**difference** [1] - 32:13
**different** [6] - 26:9, 28:5, 29:8, 35:19, 40:12, 45:7
**difficulty** [1] - 31:6
**direct** [5] - 7:8, 12:21, 19:2, 37:20, 58:1
**directed** [2] - 48:10, 48:11
**direction** [1] - 41:5
**directly** [2] - 14:2, 37:19
**director** [1] - 23:25
**discoverable** [2] -

48:23, 53:7
**discovery** [82] - 5:10, 5:12, 5:21, 6:9, 6:17, 7:13, 7:17, 8:6, 8:10, 8:13, 11:6, 11:23, 18:5, 18:14, 18:19, 18:23, 19:3, 20:15, 21:2, 22:22, 25:11, 25:14, 25:19, 26:4, 26:12, 27:2, 27:7, 28:9, 28:20, 28:21, 29:15, 30:24, 30:25, 31:4, 31:20, 32:8, 32:24, 36:1, 36:18, 36:22, 36:23, 37:10, 39:5, 39:6, 39:9, 39:14, 40:2, 40:11, 40:13, 40:14, 40:23, 41:1, 41:6, 41:10, 41:15, 41:18, 41:20, 43:1, 43:7, 45:20, 45:22, 45:24, 46:4, 46:6, 47:2, 49:3, 51:18, 51:25, 52:3, 52:8, 52:13, 52:20, 53:10, 54:7, 54:10, 55:5, 59:2
**discuss** [1] - 53:25
**discussed** [1] - 7:22
**discussing** [1] - 47:24
**dismiss** [32] - 4:12, 4:17, 4:24, 5:7, 5:9, 20:15, 21:3, 21:5, 21:10, 21:25, 22:8, 26:7, 26:15, 29:21, 30:7, 30:12, 30:18, 31:16, 35:17, 36:17, 38:3, 39:25, 40:18, 40:24, 41:1, 41:2, 45:14, 52:7, 59:1
**dismissal** [2] - 30:22, 40:15
**dismissed** [4] - 26:11, 31:21, 32:10, 41:4
**disputes** [1] - 28:21
**District** [6] - 2:23, 3:3, 3:4, 25:16, 29:7, 59:22
**DISTRICT** [3] - 1:1, 1:1, 1:14
**district** [1] - 26:2
**diving** [1] - 29:20
**DIVISION** [1] - 1:2
**Docket** [1] - 48:8
**docket** [1] - 50:21
**doctor** [1] - 16:12
**doctor's** [1] - 13:21
**document** [12] - 8:21, 8:23, 11:3, 11:9, 41:24, 41:25, 42:6,

42:9, 46:9, 49:2, 55:22, 55:23
**documents** [11] - 11:3, 46:17, 48:11, 48:15, 48:24, 51:21, 53:4, 53:9, 55:23, 56:1
**dollars** [2] - 13:23, 44:13
**Domination** [2] - 21:6, 43:9
**DONAHOE** [12] - 2:15, 46:7, 46:12, 47:20, 47:22, 48:20, 51:13, 51:16, 53:1, 55:17, 55:19, 57:12
**Donahoe** [2] - 4:3, 46:7
**done** [12] - 7:21, 11:6, 11:8, 14:21, 18:4, 24:8, 28:16, 29:14, 49:9, 52:10, 54:25, 58:14
**DOSS** [16] - 1:22, 11:24, 13:6, 14:5, 15:10, 17:14, 17:22, 18:2, 19:6, 19:22, 22:13, 22:21, 38:14, 38:18, 38:22, 40:6
**Doss** [9] - 3:11, 6:14, 7:14, 8:11, 11:12, 11:22, 28:10, 33:1, 36:20
**down** [15] - 3:13, 13:13, 15:25, 22:1, 44:25, 45:1, 45:4, 51:11, 52:14, 53:6, 56:20, 58:13, 58:17, 58:18, 59:7
**Downline** [1] - 22:3
**downline** [11] - 5:25, 8:22, 9:16, 9:21, 9:25, 14:6, 16:7, 16:19, 35:10, 36:9, 55:11
**Downlines** [1] - 21:23
**downlines** [17] - 6:1, 8:23, 8:25, 9:5, 9:8, 9:9, 9:17, 10:2, 10:8, 11:10, 21:8, 27:13, 27:25, 34:13, 36:5, 37:21, 57:16
**downlines'** [1] - 10:10
**drafting** [2] - 13:14, 53:3
**Drake** [1] - 12:13
**drawn** [1] - 30:5
**drinking** [1] - 12:5
**Drive** [1] - 2:3
**driven** [1] - 8:1

**due** [3] - 4:18, 4:21, 17:1
**during** [1] - 19:17
**duty** [5] - 26:22, 26:23, 38:6, 38:7

**E**

**e-mailed** [1] - 24:2
**e-mails** [1] - 24:1
**easy** [4] - 8:23, 15:13, 32:19, 32:21
**effect** [1] - 33:5
**efficiency** [2] - 25:18
**efficient** [1] - 52:18
**either** [1] - 7:3
**element** [1] - 6:13
**Eleventh** [3] - 25:9, 25:13, 25:15
**Ellis** [2] - 2:8, 3:21
**Emanuel** [3] - 2:3, 2:5, 3:18
**emphasize** [1] - 5:16
**employed** [1] - 46:20
**employees** [2] - 46:22
**encompasses** [1] - 11:3
**end** [6] - 19:5, 21:5, 24:19, 32:10, 38:11, 39:22
**ended** [3] - 14:14, 14:18, 28:15
**endless** [1] - 19:4
**endlessly** [1] - 36:11
**ends** [2] - 35:11, 49:18
**enforcement** [1] - 17:11
**engage** [1] - 32:23
**engagement** [1] - 46:24
**engaging** [1] - 27:2
**ENHANCE** [2] - 1:8, 2:3
**enhance** [1] - 5:25
**Enhance** [31] - 3:7, 3:19, 5:24, 7:2, 7:3, 8:7, 8:14, 9:4, 9:11, 9:12, 9:16, 9:22, 9:23, 9:24, 9:25, 10:6, 10:8, 11:17, 16:18, 20:21, 20:23, 21:7, 21:21, 27:12, 27:25, 33:4, 33:13, 35:11, 42:19, 44:12, 53:15
**Enhance's** [1] - 33:3
**enroll** [2] - 9:13, 15:6
**enrollment** [2] - 14:8, 23:3
**enterprise** [1] - 6:2

**entire** [5] - 19:17, 25:20, 27:14, 46:21, 49:11
**entities** [3] - 23:3, 35:22, 37:21
**entitled** [3] - 6:9, 45:8, 59:17
**entry** [2] - 46:9, 50:21
**Entry** [1] - 48:8
**environmental** [1] - 29:9
**error** [1] - 49:17
**especially** [2] - 10:9, 38:4
**ESQ** [10] - 1:17, 1:22, 2:2, 2:5, 2:8, 2:11, 2:15, 2:15, 2:16, 2:18
**et** [2] - 3:6, 3:7
**ET** [2] - 1:5, 1:8
**evaluate** [1] - 34:18
**evaluation** [1] - 33:20
**eventually** [4] - 7:1, 7:2, 35:11, 44:22
**everyday** [1] - 10:14
**evidence** [12] - 12:10, 12:21, 12:22, 18:12, 18:19, 22:13, 22:18, 22:24, 23:1, 23:12, 23:14, 44:18
**exactly** [2] - 5:22, 43:19
**example** [13] - 9:12, 12:13, 17:14, 18:8, 19:8, 21:17, 26:21, 28:10, 36:4, 37:4, 37:14, 43:9, 43:12
**examples** [1] - 15:21
**exceedingly** [1] - 19:4
**except** [1] - 28:3
**exception** [1] - 55:15
**excuse** [2] - 48:10, 49:16
**Exhibit** [1] - 15:23
**existing** [2] - 14:25, 50:9
**exists** [2] - 25:8, 25:10
**expanded** [1] - 6:1
**expedited** [2] - 18:14, 22:22
**expedition** [3] - 23:16, 35:20, 39:23
**expense** [2] - 31:4, 49:12
**expenses** [2] - 6:23, 13:23
**expert** [1] - 39:17
**explain** [1] - 10:12
**explained** [1] - 36:4
**exposed** [1] - 24:9

**expound** [1] - 11:12
**expressly** [1] - 23:8
**extended** [1] - 14:22
**extensive** [1] - 7:11
**extent** [4] - 23:16, 39:22, 42:16, 55:24
**extremely** [4] - 27:10, 27:15, 28:9, 41:20

**F**

**facial** [1] - 26:20
**fact** [14] - 6:20, 7:5, 9:25, 14:10, 16:13, 16:21, 23:11, 23:12, 23:19, 29:8, 34:5, 36:15, 49:13, 51:24
**facts** [1] - 29:24
**factual** [2] - 5:14, 30:3
**faith** [1] - 51:17
**faith-based** [1] - 51:17
**family** [1] - 4:9
**far** [13] - 4:12, 6:18, 7:21, 7:24, 8:1, 8:6, 8:9, 8:13, 8:16, 11:7, 11:11, 37:1
**favor** [1] - 30:5
**favorable** [1] - 30:4
**Fayetteville** [1] - 2:12
**fell** [1] - 58:3
**ferret** [1] - 47:25
**few** [3] - 7:14, 16:2, 32:3
**fiduciary** [5] - 26:22, 26:23, 38:6, 38:7
**fight** [1] - 45:16
**fighting** [1] - 59:2
**figure** [9] - 13:10, 15:14, 16:4, 16:15, 29:17, 31:7, 31:19, 48:19, 54:5
**figured** [2] - 14:5
**file** [8] - 13:15, 18:16, 25:5, 27:18, 45:14, 49:11, 58:19, 58:20
**filed** [10] - 8:22, 13:12, 14:20, 18:13, 22:15, 22:21, 23:23, 24:25, 27:22, 28:22
**files** [3] - 19:9, 19:10, 46:21
**financial** [1] - 51:5
**fine** [4] - 7:16, 50:25, 56:25, 57:5
**fire** [1] - 12:6
**firing** [1] - 14:25
**firms** [1] - 46:24
**first** [6] - 4:20, 5:13, 27:25, 28:1, 39:4, 58:18

**fishing** [5] - 23:16, 23:17, 35:20, 35:21, 39:23
**five** [1] - 49:23
**five-minute** [1] - 49:23
**fixated** [1] - 26:5
**fixed** [2] - 30:9, 30:20
**Floor** [3] - 1:19, 2:6, 2:17
**FLORIDA** [1] - 1:1
**Florida** [11] - 1:5, 1:20, 2:4, 2:7, 2:17, 2:21, 2:24, 3:4, 25:17, 29:7, 59:23
**flying** [1] - 13:13
**focused** [4] - 5:17, 11:13, 26:19, 47:4
**focusing** [1] - 45:3
**folks** [5] - 5:22, 19:7, 39:16, 54:14, 54:18
**follow** [2] - 12:3, 16:16
**follow-up** [1] - 12:3
**food** [2] - 11:16, 11:19
**FOR** [6] - 1:17, 2:2, 2:8, 2:11, 2:15, 2:18
**foreclosing** [1] - 52:9
**foregoing** [1] - 59:15
**forever** [2] - 17:18, 36:11
**forget** [1] - 56:3
**form** [2] - 20:24, 31:1
**Forman** [1] - 37:16
**former** [9] - 10:21, 12:2, 12:9, 12:13, 12:19, 19:9, 23:25, 46:19, 46:22
**formerly** [1] - 12:1
**forward** [12] - 18:22, 24:9, 24:12, 25:2, 27:4, 31:5, 33:18, 34:6, 39:8, 41:9, 45:10
**four** [5] - 25:5, 26:24, 32:21, 38:9, 51:20
**four-page** [1] - 51:20
**FPR** [2] - 2:22, 59:22
**frankly** [2] - 21:17, 31:10
**fraud** [9] - 25:11, 27:19, 28:16, 37:2, 38:1, 38:8, 39:18, 42:24, 43:7
**fraudulent** [4] - 12:20, 12:23, 24:5, 44:8
**Frederick** [2] - 16:5, 16:6
**Friedlander** [1] - 25:9
**friend** [1] - 9:6
**friends** [1] - 4:9
**FT** [1] - 1:2

**Ft** [2] - 1:5, 2:17
**full** [3] - 4:24, 38:7, 40:1
**fully** [4] - 31:10, 33:3, 33:12, 36:16
**FUND** [1] - 2:9
**future** [1] - 14:1

**G**

**Gables** [1] - 2:7
**Gabriel** [1] - 22:16
**game** [1] - 20:12
**GARISH** [1] - 2:13
**GATES** [1] - 2:2
**general** [3] - 19:15, 24:21, 26:8
**generally** [1] - 18:3
**generated** [1] - 49:14
**generators** [1] - 43:20
**Georgia** [3] - 1:23, 13:3, 16:21
**gifted** [1] - 31:13
**Ginberg** [8] - 14:13, 14:18, 15:4, 15:11, 16:20, 16:24, 28:24, 28:25
**given** [1] - 34:4
**GLENDA** [2] - 2:22, 59:22
**Glenda_Powers@ flsd.uscourts.gov** [1] - 59:24
**GOLDFUSS** [1] - 2:13
**Goldfuss** [1] - 3:25
**graciously** [1] - 31:13
**grant** [1] - 53:17
**granted** [3] - 18:17, 25:17, 53:24
**granting** [2] - 52:2, 54:9
**Grossman** [1] - 1:18
**group** [3] - 9:7, 10:3, 10:4
**Group** [2] - 16:19, 57:18
**guardrails** [3] - 33:23, 36:24
**guess** [7] - 4:9, 24:17, 29:17, 30:14, 32:13, 32:24, 43:16
**guy** [1] - 22:23
**guys** [8] - 7:23, 18:3, 24:25, 26:25, 45:16, 46:24, 52:19, 58:23

**H**

**halt** [1] - 36:14
**halting** [1] - 29:18

handle [1] - 24:23
hanging [1] - 46:1
hard [2] - 30:1, 38:3
harm [5] - 12:25, 14:1, 16:13, 17:4, 38:19
harmed [4] - 17:15, 22:10, 35:25, 39:11
harms [1] - 35:24
Harrison [1] - 22:16
hash [2] - 50:7, 53:5
HEALTH [3] - 1:8, 2:3, 2:19
Health [21] - 3:7, 3:19, 4:7, 7:2, 7:3, 8:7, 8:14, 9:12, 9:16, 10:5, 10:6, 16:7, 16:18, 16:19, 20:21, 20:23, 21:7, 33:13, 53:16, 57:18
health [5] - 10:13, 10:16, 13:18, 13:25, 16:23
Health's [1] - 9:4
healthcare [2] - 9:13, 33:16
HealthSherpa [3] - 14:7, 14:11, 14:14
hear [6] - 4:25, 5:5, 6:15, 24:13, 31:24, 37:3
heard [8] - 7:19, 22:23, 27:25, 28:2, 38:9, 38:18, 48:15, 50:22
hearing [4] - 18:14, 18:22, 33:1, 49:24
HELMY [1] - 2:16
help [5] - 9:13, 22:8, 41:6, 41:10, 58:7
helped [1] - 40:23
helpful [3] - 21:17, 22:1, 37:7
helps [3] - 41:1, 43:1, 58:12
hereby [1] - 59:15
Herman [1] - 3:19
HERMAN [1] - 2:3
high [2] - 21:17, 25:12
highly [1] - 27:6
hits [3] - 21:15, 37:17, 37:18
hold [6] - 20:17, 40:5, 45:8, 49:21, 57:1, 57:19
holding [2] - 5:10, 37:4
honestly [1] - 28:23
Honor [28] - 3:17, 3:20, 4:2, 24:20, 24:24, 25:21, 26:13,

27:17, 28:1, 28:8, 28:13, 29:6, 29:14, 32:1, 32:3, 32:23, 38:15, 46:7, 47:15, 47:22, 47:23, 48:16, 50:5, 51:13, 51:16, 53:15, 55:17, 57:14
Honor's [1] - 47:4
HONORABLE [1] - 1:13
Honorable [1] - 3:4
hopefully [1] - 53:5
hose [1] - 12:6
hours [2] - 6:16, 13:10
huge [3] - 31:17, 44:24, 45:9
hundreds [3] - 13:23, 17:22, 17:25
husband [2] - 33:7, 33:9
HWG [2] - 2:11, 3:23

**I**

idea [8] - 5:22, 5:24, 6:17, 13:8, 16:2, 28:25, 32:24, 33:22
identify [2] - 31:23, 45:6
identity [1] - 38:25
III [2] - 6:20, 6:24
Illinois [1] - 2:9
imminent [1] - 14:1
implicate [1] - 57:11
important [6] - 6:5, 6:15, 7:12, 12:17, 12:21, 13:14
improperly [1] - 48:11
Inaudible [1] - 47:21
inclined [4] - 31:18, 31:19, 36:14, 41:17
include [1] - 43:6
included [1] - 32:6
including [1] - 52:17
income [1] - 15:16
incorporate [1] - 37:9
index [6] - 48:20, 49:15, 49:18, 49:19, 50:15, 51:21
India [2] - 23:11, 24:3
indicate [2] - 57:2, 57:8
indicates [1] - 58:13
indicating [1] - 48:16
individual [2] - 8:18, 37:25
individuals [6] - 9:18, 34:17, 34:19, 35:10, 35:22, 35:23
inference [1] - 30:4

informally [1] - 55:2
information [50] - 5:20, 10:24, 11:25, 12:2, 12:3, 12:6, 14:8, 17:1, 17:2, 17:13, 18:7, 18:23, 19:2, 19:7, 19:12, 19:18, 19:25, 20:6, 20:8, 20:11, 20:14, 20:16, 21:1, 22:9, 22:11, 23:19, 23:21, 24:2, 24:4, 24:6, 27:18, 32:11, 34:10, 36:3, 36:9, 36:10, 37:5, 37:17, 37:22, 37:23, 38:11, 39:22, 41:20, 41:21, 43:17, 44:25, 45:9, 51:5, 51:9, 56:16
initial [5] - 7:9, 14:10, 40:13, 44:22, 55:25
injured [3] - 6:21, 38:23, 48:1
injury [4] - 6:20, 7:5, 7:6, 16:13
instead [1] - 22:14
instructs [1] - 10:7
INSURANCE [1] - 2:8
insurance [8] - 10:16, 13:18, 13:22, 13:25, 15:20, 16:11, 16:23, 46:23
Insurance [2] - 3:21, 13:2
Insure [1] - 16:19
intend [1] - 21:4
intends [1] - 15:5
intention [1] - 44:3
interact [3] - 33:15, 47:15, 49:5
interacted [3] - 5:22, 47:13, 47:14
interaction [1] - 51:4
interactions [7] - 32:25, 33:4, 33:13, 34:18, 47:24, 48:5, 51:24
interesting [3] - 22:2, 33:1, 38:11
interrogatories [2] - 11:15, 20:19
interrogatory [1] - 11:8
intertwined [2] - 39:14
involved [4] - 10:24, 16:20, 18:9, 22:5
involving [1] - 29:8
irrelevant [1] - 51:22
issue [16] - 7:12, 14:2, 19:11, 32:3, 39:3,

43:2, 49:21, 50:23, 50:25, 51:2, 54:21, 54:24, 55:9, 58:10, 58:23
issued [2] - 18:11, 57:23
issues [6] - 33:10, 34:4, 38:3, 39:14, 52:21, 59:3
item [1] - 32:7
itself [2] - 7:4, 56:11

**J**

Jaffe [1] - 29:7
JASON [2] - 1:17, 1:22
Jason [2] - 3:11
JENNIFER [1] - 2:16
Jennifer [1] - 4:3
JOHN [1] - 2:8
John [1] - 3:20
joined [1] - 5:24
joint [1] - 58:24
jointly [1] - 33:14
Juan [1] - 10:11
JUDGE [1] - 1:14
Judge [8] - 3:4, 3:10, 7:19, 18:15, 24:6, 36:25, 42:2, 46:1
judge [2] - 42:14, 59:4
judicial [1] - 25:18
jump [2] - 14:3, 46:15
June [1] - 9:3

**K**

keep [6] - 7:12, 20:11, 23:22, 45:11, 53:23, 58:23
KELLOGG [36] - 1:17, 3:10, 4:22, 5:13, 8:5, 8:12, 8:20, 9:11, 9:15, 9:19, 9:21, 10:19, 11:5, 11:8, 11:17, 11:20, 13:5, 20:20, 20:23, 21:4, 36:20, 37:23, 40:10, 42:8, 42:12, 42:14, 42:20, 43:4, 43:11, 50:22, 50:25, 54:13, 55:2, 57:17, 58:8, 59:5
Kellogg [5] - 1:18, 3:11, 18:18, 24:11, 40:6
KENNETH [1] - 1:17
kind [17] - 5:1, 6:2, 6:11, 9:1, 10:1, 27:2, 30:16, 30:24, 34:3, 34:25, 36:13, 37:24,

38:1, 41:9, 41:17, 53:9, 55:3
kinds [1] - 48:17
king [5] - 13:7, 15:6, 16:21, 17:14, 38:21
King [5] - 13:2, 13:17, 14:17, 28:11, 28:25
king's [1] - 28:22
Kirkland [2] - 2:8, 3:20
knowing [2] - 24:18, 42:10
knows [2] - 41:10, 58:4
KOLAYA [2] - 2:18, 4:6
Kolaya [2] - 2:19, 4:7
Kolaya's [1] - 10:5

**L**

L.P [1] - 2:9
Langley [12] - 15:22, 33:2, 33:3, 33:8, 33:12, 37:16, 38:10, 38:12, 38:13, 38:14, 38:15
langley [1] - 16:20
Langley's [2] - 16:16, 38:18
languish [1] - 41:8
large [2] - 18:4, 25:22
last [8] - 4:6, 6:7, 6:16, 13:12, 13:16, 20:3, 28:22, 49:19
LAUDERDALE [1] - 1:2
Lauderdale [2] - 1:5, 2:17
law [7] - 5:14, 6:5, 6:10, 26:11, 30:14, 38:3, 46:24
lawsuit [2] - 8:22, 23:8
lawyer [1] - 59:8
lay [1] - 7:8
lays [1] - 7:10
LD [1] - 43:9
lead [7] - 34:20, 43:19, 43:22, 44:16, 47:8, 49:14, 55:21
Lead [1] - 21:6
leading [1] - 44:22
leads [15] - 19:16, 27:13, 27:14, 44:6, 44:7, 44:8, 44:9, 44:10, 44:13, 44:14, 46:18, 47:1, 49:2, 51:6
learned [1] - 18:7
least [11] - 4:6, 7:23, 31:18, 38:2, 48:6,

53:1, 55:6, 55:7, 57:22, 58:11
**ledger** [1] - 19:15
**left** [4] - 19:20, 24:1, 26:11, 50:14
**legal** [5] - 25:1, 25:7, 26:18, 26:20, 28:9
**Lehman** [1] - 1:18
**LEHRER** [2] - 2:15, 4:2
**Lehrer** [1] - 4:3
**lengthy** [1] - 58:11
**Leon** [1] - 2:6
**Lerma** [1] - 12:13
**letter** [1] - 13:7
**letters** [14] - 8:21, 12:14, 12:15, 41:24, 41:25, 42:6, 42:9, 46:24, 54:15, 54:18, 54:22, 54:24, 55:8, 55:14
**level** [3] - 21:18, 30:13, 32:3
**Levine** [1] - 1:18
**light** [4] - 30:3, 52:11, 52:15, 54:7
**likewise** [1] - 35:25
**limit** [3] - 32:24, 34:8, 48:22
**limitation** [1] - 52:11
**limited** [8] - 18:19, 18:23, 19:2, 39:9, 43:1, 45:24, 48:5, 56:12
**limiting** [2] - 37:10, 46:4
**limits** [1] - 32:8
**Line** [1] - 16:7
**link** [1] - 37:20
**linked** [1] - 35:5
**list** [11] - 8:24, 8:25, 9:1, 15:23, 15:24, 54:15, 58:2, 58:6, 58:8, 58:14
**listed** [2] - 15:1, 39:20
**listen** [1] - 44:25
**listening** [1] - 10:9
**litigation** [1] - 42:11
**live** [1] - 16:22
**LLC** [2] - 1:8, 3:7
**LLP** [2] - 2:8, 2:11
**logged** [1] - 14:14
**logical** [1] - 34:17
**logs** [1] - 43:16
**look** [12] - 9:11, 19:12, 22:4, 25:8, 25:16, 25:21, 29:6, 38:2, 46:3, 50:25, 54:4, 57:1
**looked** [1] - 52:24

**looking** [7] - 28:22, 34:3, 40:4, 40:8, 43:13, 47:3, 54:15
**looks** [2] - 15:24, 57:14
**lost** [3] - 6:22, 10:17, 22:12
**loud** [1] - 30:17
**love** [1] - 43:12

**M**

**Magistrate** [1] - 36:25
**magistrate** [1] - 59:4
**mailed** [2] - 20:4, 24:2
**mailing** [1] - 20:5
**mails** [1] - 24:1
**main** [1] - 26:7
**man** [1] - 55:25
**manager** [4] - 10:7, 10:12, 12:13, 22:16
**Marietta** [1] - 1:23
**Marketing** [4] - 4:5, 46:8, 46:18, 47:20
**marketing** [4] - 9:4, 10:7, 10:12, 23:25
**MARKETING** [1] - 2:16
**marketplace** [1] - 23:10
**Marsha** [2] - 12:25, 13:1
**materially** [1] - 26:3
**matter** [4] - 16:2, 30:14, 45:1, 59:17
**MATTHEW** [2] - 2:3, 2:12
**Matthew** [2] - 3:19, 14:13
**mean** [24] - 4:25, 8:18, 15:12, 17:8, 17:10, 17:17, 17:23, 19:4, 26:10, 29:17, 29:19, 30:21, 33:3, 34:10, 34:25, 35:17, 35:18, 39:4, 40:5, 40:15, 43:18, 52:2, 56:19, 57:10
**meaning** [2] - 34:11, 41:24
**means** [2] - 30:23, 39:13
**mediation** [1] - 33:21
**Medicaid** [1] - 14:12
**Medicare** [1] - 14:12
**meet** [14] - 25:1, 28:18, 50:6, 50:8, 51:18, 51:23, 52:10, 52:12, 52:19, 53:3, 57:2, 58:1, 58:16

**Melissa** [1] - 3:4
**MELISSA** [1] - 1:13
**members** [2] - 12:24, 45:6
**mentioned** [1] - 46:13
**mergings** [1] - 49:17
**merit** [1] - 39:13
**meritorious** [1] - 48:3
**merits** [2] - 33:20, 39:5
**message** [2] - 27:12, 40:6
**messages** [5] - 8:25, 12:16, 12:18, 27:11, 27:24
**Miami** [8] - 1:19, 1:20, 2:4, 2:21, 2:24, 2:24, 59:23, 59:23
**MICHAEL** [1] - 2:8
**middle** [1] - 41:17
**Middle** [1] - 29:7
**might** [8] - 7:19, 32:24, 33:18, 34:23, 43:6, 50:19, 51:19, 53:8
**million** [1] - 44:13
**mind** [2] - 7:13, 49:20
**Minerva** [25] - 4:5, 5:23, 11:21, 12:14, 12:19, 19:9, 19:15, 20:3, 21:7, 21:20, 23:22, 35:12, 44:5, 44:6, 44:7, 44:15, 44:16, 46:8, 46:18, 47:4, 47:12, 49:13, 51:12, 51:15, 53:1
**minerva** [1] - 47:20
**MINERVA** [1] - 2:16
**Minerva's** [4] - 12:13, 47:8, 48:6
**minimum** [1] - 34:6
**minute** [1] - 49:23
**minutes** [1] - 7:14
**miscellaneous** [1] - 59:3
**misconduct** [1] - 27:23
**misrepresentation** [4] - 29:1, 29:2, 38:16, 38:25
**misrepresentations** [1] - 33:10
**Miss** [1] - 28:11
**modify** [1] - 52:16
**monetarily** [1] - 6:22
**Monica** [8] - 19:8, 19:14, 46:12, 48:8, 48:12, 55:20, 55:23, 56:1
**monitored** [1] - 9:22

**montgomery** [1] - 56:25
**Montgomery** [8] - 23:23, 23:24, 44:6, 56:4, 56:7, 56:22, 57:6, 57:10
**month** [2] - 16:1, 21:5
**months** [7] - 12:6, 15:13, 16:2, 16:15, 25:5, 26:24, 32:21
**moot** [4] - 52:23, 53:17, 53:18, 54:3
**morning** [10] - 3:10, 3:13, 3:14, 3:17, 3:22, 4:1, 4:2, 4:6, 4:8, 23:24
**most** [5] - 24:7, 30:3, 30:6, 52:18, 58:25
**motion** [50] - 4:12, 4:15, 4:16, 4:17, 4:24, 5:7, 5:16, 6:13, 7:22, 18:13, 18:16, 20:15, 20:19, 21:2, 21:4, 21:9, 21:25, 22:7, 22:8, 22:21, 23:6, 23:23, 24:14, 24:15, 24:18, 26:7, 26:14, 29:21, 30:7, 30:12, 30:18, 35:17, 36:16, 39:25, 40:18, 40:24, 40:25, 41:1, 41:2, 45:14, 46:2, 46:10, 48:21, 52:3, 52:7, 52:23, 53:16, 54:4, 54:9, 58:25
**motions** [13] - 5:9, 7:17, 7:18, 31:9, 31:16, 46:3, 46:5, 50:5, 50:19, 52:22, 53:24, 54:7
**move** [1] - 33:18
**moved** [1] - 19:11
**MR** [88] - 3:10, 3:17, 3:20, 4:2, 4:6, 4:19, 4:22, 5:13, 8:5, 8:12, 8:20, 9:11, 9:15, 9:19, 9:21, 10:19, 11:5, 11:8, 11:17, 11:20, 11:24, 13:5, 13:6, 14:5, 15:10, 17:14, 17:22, 18:2, 19:6, 19:22, 20:20, 20:23, 21:4, 22:13, 22:21, 24:20, 25:4, 26:1, 26:13, 27:10, 28:5, 28:8, 32:1, 32:13, 32:18, 33:7, 34:11, 35:7, 35:15, 36:20, 37:23, 38:14, 38:18, 38:22, 40:6,

40:10, 40:17, 40:20, 42:8, 42:12, 42:14, 42:20, 43:4, 43:11, 43:21, 44:1, 44:11, 46:7, 46:12, 47:20, 47:22, 48:20, 50:5, 50:18, 50:22, 50:25, 51:13, 51:16, 53:1, 54:13, 55:2, 55:17, 55:19, 57:12, 57:14, 57:17, 58:8, 59:5
**MS** [14] - 3:23, 53:15, 53:22, 54:12, 55:10, 55:18, 56:3, 56:6, 56:9, 56:13, 56:22, 56:25, 57:5, 57:21

**N**

**Nadler** [1] - 2:19
**name** [3] - 15:17, 43:12, 56:5
**named** [32] - 14:13, 32:25, 33:8, 33:9, 33:15, 34:8, 34:9, 34:12, 34:14, 34:19, 35:2, 35:3, 35:4, 35:5, 35:22, 36:2, 36:18, 36:22, 40:14, 40:23, 41:5, 41:14, 41:15, 41:18, 43:18, 45:12, 45:17, 45:21, 52:3, 55:11, 55:16
**names** [1] - 41:14
**narrative** [1] - 40:25
**narrow** [4] - 18:5, 41:11, 53:6, 56:20
**narrowed** [5] - 36:1, 36:18, 41:22, 44:25, 45:1
**narrowing** [6] - 34:7, 45:4, 52:3, 52:14, 55:16, 58:13
**nature** [1] - 48:24
**necessarily** [1] - 43:19
**necessary** [1] - 44:21
**need** [38] - 5:11, 5:18, 5:19, 5:20, 6:9, 6:12, 6:15, 6:20, 8:10, 11:23, 12:3, 12:22, 13:15, 13:21, 17:2, 17:6, 17:24, 20:12, 20:14, 21:1, 22:3, 24:12, 36:5, 36:6, 37:4, 39:15, 39:22, 40:2, 42:3, 42:15, 43:6, 44:7, 45:9, 46:25, 49:8, 49:11, 56:18, 58:7
**needed** [1] - 10:12

**needing** [1] - 17:8
**needs** [7] - 10:14, 30:9, 41:4, 48:9, 48:10, 57:6
**negligence** [1] - 26:21
**negotiate** [1] - 53:25
**NET** [1] - 2:19
**Net** [2] - 4:7, 10:5
**nets** [1] - 23:17
**network** [1] - 6:1
**never** [3] - 10:17, 14:17, 39:19
**new** [3] - 15:6, 25:5, 32:5
**next** [1] - 58:15
**NHA** [1] - 10:8
**NHA/EH** [1] - 10:5
**nice** [2] - 59:7, 59:9
**night** [3] - 13:12, 13:16, 28:23
**Nims** [1] - 25:9
**nine** [2] - 10:4, 12:6
**NO** [1] - 1:3
**No-Cost** [5] - 14:6, 14:13, 16:25, 17:5, 18:8
**nobody** [1] - 58:3
**non** [12] - 12:4, 18:6, 19:5, 19:6, 20:13, 25:23, 32:11, 46:22, 56:14, 56:15, 56:18
**non-parties** [3] - 12:4, 18:6, 25:23
**non-party** [9] - 19:5, 19:6, 20:13, 32:11, 46:22, 56:14, 56:15, 56:18
**none** [1] - 52:9
**North** [3] - 2:13, 2:24, 59:23
**nothing** [1] - 34:1
**notice** [7] - 13:17, 22:20, 23:5, 23:8, 57:22, 57:23, 58:5
**november** [1] - 59:19
**Number** [2] - 3:6, 4:4
**number** [8] - 12:23, 16:17, 17:2, 23:7, 23:9, 49:7, 49:8
**NUMBER** [1] - 2:16
**numbers** [3] - 21:11, 21:15, 47:6

### O

**object** [2] - 37:12, 57:18
**objected** [1] - 36:23
**objecting** [1] - 56:16
**objection** [2] - 57:20,

57:21
**objections** [4] - 20:24, 52:16, 52:17, 52:22
**obligation** [2] - 28:17, 29:13
**obligations** [2] - 25:1, 25:7
**observed** [1] - 26:2
**obtained** [1] - 23:22
**obviate** [1] - 46:5
**obviously** [6] - 4:13, 24:14, 25:21, 27:8, 32:5, 32:8
**October** [3] - 1:6, 4:22, 14:16
**OF** [1] - 1:1
**office** [1] - 20:2
**Official** [1] - 2:23
**often** [1] - 25:14
**Olga** [2] - 3:18, 53:15
**OLGA** [1] - 2:5
**once** [3] - 21:9, 51:24, 52:24
**one** [58] - 4:21, 8:5, 8:12, 8:20, 11:2, 11:8, 11:9, 11:10, 12:23, 14:6, 15:22, 16:4, 16:18, 16:19, 17:3, 19:1, 23:7, 26:15, 28:12, 30:9, 32:3, 32:6, 32:24, 33:7, 33:8, 33:22, 35:9, 35:12, 35:13, 36:5, 38:4, 38:12, 38:15, 40:10, 42:3, 42:15, 42:22, 42:23, 45:13, 46:3, 47:1, 47:7, 47:8, 47:9, 48:1, 49:21, 49:22, 50:13, 50:18, 50:19, 50:21, 50:24, 51:11, 51:21, 52:20, 54:13, 56:20
**ONE** [1] - 2:16
**One** [1] - 4:4
**ones** [2] - 19:19, 47:16
**ongoing** [1] - 12:24
**opinion** [2] - 25:9, 34:5
**opportunity** [1] - 26:6
**opposed** [1] - 42:10
**opposing** [1] - 19:24
**optimistic** [1] - 41:9
**orally** [1] - 52:2
**order** [16] - 3:1, 3:15, 23:24, 31:16, 36:16, 46:2, 49:12, 50:10, 50:17, 50:20, 51:17, 51:24, 52:4, 52:5, 58:10, 58:12

**ordered** [1] - 53:7
**ordering** [1] - 58:14
**orders** [1] - 54:9
**original** [3] - 25:3, 25:5, 48:12
**otherwise** [1] - 45:13
**ourselves** [1] - 51:1
**out-of-pocket** [3] - 6:23, 13:23, 16:12
**outside** [2] - 19:23, 38:9
**outstanding** [1] - 54:6
**overall** [2] - 38:8, 44:20
**overbroad** [3] - 48:25, 49:16, 51:22
**overlap** [2] - 5:15, 7:7
**overlapping** [1] - 26:8
**overseas** [2] - 23:11, 23:12
**own** [2] - 10:1, 34:12

### P

**P.A** [1] - 2:16
**P.I.I** [1] - 24:2
**p.m** [4] - 1:8, 50:1, 59:12
**page** [4] - 38:6, 38:7, 40:10, 51:20
**pages** [2] - 25:22, 38:7
**Pages** [1] - 1:9
**Panicker** [1] - 3:25
**PANICKER** [1] - 2:13
**papers** [1] - 30:22
**paragraphs** [1] - 25:23
**parcel** [1] - 38:8
**parse** [1] - 22:4
**part** [12] - 6:12, 7:14, 15:9, 15:10, 16:24, 23:7, 38:8, 45:13, 48:21, 49:19, 51:25, 52:2
**particular** [4] - 5:11, 12:4, 27:22, 47:14
**particularity** [1] - 29:12
**parties** [14] - 7:24, 11:13, 12:4, 18:6, 25:18, 25:23, 31:3, 51:14, 51:18, 53:18, 53:20, 54:4, 57:7, 57:15
**parts** [1] - 25:20
**party** [14] - 19:2, 19:5, 19:6, 20:13, 32:11, 32:14, 32:16, 46:22, 47:2, 56:14, 56:15, 56:16, 56:18
**past** [2] - 21:24, 33:12

**pattern** [3] - 6:2, 28:16, 29:8
**Paul** [5] - 12:2, 23:23, 23:24, 38:13, 44:6
**Paula** [3] - 15:22, 38:13, 38:14
**pay** [2] - 13:22, 15:20
**payroll** [1] - 49:12
**peak** [2] - 29:21, 30:12
**pending** [3] - 46:5, 52:4, 53:16
**people** [17] - 5:20, 9:13, 10:4, 10:20, 10:22, 10:23, 10:25, 12:1, 12:9, 12:19, 16:2, 17:23, 22:10, 23:18, 26:9, 34:15, 37:21
**perhaps** [1] - 33:21
**period** [2] - 19:17, 51:11
**permit** [1] - 41:17
**perpetrate** [1] - 24:4
**person** [3] - 14:13, 14:25, 43:23
**personal** [1] - 12:9
**perspective** [3] - 28:23, 33:3, 43:14
**phased** [1] - 35:1
**phases** [1] - 40:12
**phasing** [1] - 36:19
**phone** [8] - 8:24, 12:9, 15:2, 33:5, 43:24, 47:6, 49:7, 49:8
**phonetic** [1] - 10:11
**pictures** [1] - 40:5
**picturing** [1] - 43:16
**pinpoint** [1] - 16:8
**place** [5] - 17:5, 20:2, 21:14, 28:19, 36:24
**plain** [1] - 40:25
**plaintiff** [27] - 3:9, 13:1, 13:5, 13:6, 30:4, 30:5, 31:23, 34:8, 34:9, 35:2, 38:14, 40:14, 40:23, 41:5, 41:15, 41:18, 42:3, 42:4, 42:15, 42:16, 42:23, 42:24, 44:10, 49:13, 51:4, 52:4, 52:14
**PLAINTIFFS** [2] - 1:6, 1:17
**Plaintiffs** [1] - 46:8
**plaintiffs** [64] - 3:12, 6:21, 7:1, 12:24, 15:22, 21:22, 21:23, 32:25, 33:8, 33:9, 33:15, 34:12, 34:14, 34:21, 35:4, 35:13,

36:2, 36:5, 36:19, 37:5, 37:11, 37:21, 38:12, 39:4, 39:7, 39:9, 39:20, 41:14, 43:5, 43:6, 43:18, 44:12, 44:18, 45:12, 45:17, 45:21, 46:25, 47:5, 47:10, 47:13, 47:14, 47:16, 47:17, 47:25, 48:1, 48:2, 48:16, 49:5, 49:10, 50:7, 51:7, 51:10, 51:25, 52:6, 52:7, 54:10, 55:7, 55:12, 55:16, 55:21, 58:1
**plaintiffs'** [7] - 33:21, 34:12, 37:25, 46:13, 47:6, 48:10, 53:4
**plan** [1] - 10:13
**platform** [2] - 14:8, 23:4
**play** [1] - 6:7
**Plaza** [1] - 2:9
**plea** [1] - 32:7
**plead** [5] - 26:24, 27:1, 29:12, 32:4
**pleading** [8] - 5:5, 7:9, 25:12, 28:18, 30:8, 30:11, 30:13, 41:5
**pleading-wise** [1] - 41:5
**pleadings** [2] - 4:11, 45:5
**pled** [2] - 26:25, 29:24
**PLLC** [1] - 2:19
**plus** [2] - 6:7, 26:24
**pocket** [3] - 6:23, 13:23, 16:12
**point** [19] - 8:5, 8:12, 11:18, 25:4, 30:2, 30:16, 30:22, 35:12, 35:13, 35:16, 38:24, 39:25, 41:3, 44:24, 45:5, 45:8, 49:6, 57:9, 58:5
**Point** [1] - 2:9
**policies** [3] - 34:12, 34:19, 46:23
**policy** [11] - 13:8, 14:15, 14:16, 14:18, 14:25, 15:5, 15:6, 35:10, 38:18, 38:23, 39:1
**Ponce** [1] - 2:6
**portion** [1] - 26:3
**portions** [1] - 9:23
**posited** [1] - 34:16
**position** [2] - 19:24, 48:18
**possession** [4] -

12:10, 12:11, 53:9, 55:22
**possibility** [1] - 52:9
**possible** [1] - 44:7
**possibly** [2] - 13:13, 36:25
**potential** [2] - 17:19, 18:13
**potentially** [5] - 21:16, 23:12, 33:14, 33:19, 51:7
**Powers** [1] - 59:20
**POWERS** [2] - 2:22, 59:22
**practices** [2] - 12:5, 12:8
**prejudice** [13] - 6:13, 7:14, 22:6, 22:7, 22:10, 27:17, 27:20, 39:10, 52:24, 54:8, 54:10, 55:7, 55:14
**prejudiced** [1] - 11:25
**premature** [1] - 51:3
**prepared** [1] - 6:14
**presentation** [1] - 6:11
**preservation** [17] - 8:21, 12:14, 12:15, 18:12, 22:19, 22:25, 41:24, 41:25, 42:5, 42:6, 42:9, 54:15, 54:18, 54:22, 54:24, 55:8, 55:13
**preserve** [3] - 12:22, 18:19, 23:14
**presiding** [1] - 3:5
**presumably** [2] - 37:18, 45:12
**pretty** [8] - 5:22, 7:9, 7:10, 8:23, 30:2, 30:10, 31:12, 36:11
**prevailed** [1] - 39:25
**prevent** [2] - 25:10, 25:13
**primarily** [1] - 11:12
**prime** [1] - 24:25
**Prince** [1] - 57:17
**principal** [1] - 20:2
**problem** [4] - 14:24, 20:1, 27:20, 29:10
**problems** [8] - 5:5, 17:6, 26:16, 29:3, 32:21, 36:21, 44:4, 45:15
**proceed** [3] - 31:8, 31:19, 41:18
**proceedings** [2] - 59:12, 59:16
**proceeds** [1] - 31:9
**process** [4] - 49:6,

50:10, 58:7, 58:21
**processing** [1] - 12:7
**produce** [1] - 21:13
**produced** [4] - 19:12, 55:23, 56:1, 57:18
**producing** [1] - 36:9
**production** [9] - 8:8, 8:15, 8:20, 11:2, 11:15, 20:18, 28:4, 28:6, 55:21
**productive** [1] - 34:21
**profits** [1] - 6:23
**prolific** [1] - 15:11
**proper** [2] - 48:25, 57:23
**properly** [1] - 48:23
**property** [1] - 7:7
**proposal** [2] - 35:18, 51:1
**propose** [1] - 50:6
**proposed** [4] - 50:18, 50:21, 50:22, 50:24
**proposition** [1] - 35:18
**PROSPECTING** [1] - 2:16
**Prospecting** [1] - 4:4
**protect** [4] - 17:16, 22:24, 28:19, 28:20
**protection** [1] - 34:3
**protective** [4] - 23:24, 46:2, 50:20, 54:9
**prove** [3] - 39:10, 42:24, 43:1
**proves** [1] - 38:24
**provide** [2] - 49:8, 58:14
**provided** [6] - 14:9, 19:13, 20:5, 53:4, 56:8
**providing** [1] - 57:23
**pulling** [2] - 14:14, 38:21
**punitive** [1] - 47:10
**purchased** [1] - 44:13
**purposes** [3] - 20:15, 21:2, 40:14
**pursuant** [1] - 56:17
**put** [5] - 8:2, 15:17, 50:8, 58:19
**putting** [2] - 7:25, 8:3

**Q**

**quash** [8] - 19:11, 46:10, 48:21, 50:5, 52:23, 53:16, 54:4, 54:9
**quashed** [1] - 48:9
**questions** [2] - 24:22,

51:12
**Quick** [5] - 19:9, 19:10, 19:20, 46:21, 49:11
**quick** [1] - 49:20
**quickly** [1] - 45:25
**Quinn** [3] - 2:3, 2:5, 3:18
**quit** [1] - 12:17
**quite** [2] - 5:15, 35:15

**R**

**Raleigh** [1] - 2:13
**rather** [3] - 32:15, 43:13, 53:17
**re** [14] - 15:6, 26:24, 32:4, 32:7, 45:19, 52:14, 53:25, 54:10, 55:24, 56:2, 56:19, 57:1
**re-craft** [1] - 45:19
**re-do** [1] - 52:14
**re-enroll** [1] - 15:6
**re-plea** [1] - 32:7
**re-plead** [3] - 26:24, 32:4
**re-respond** [1] - 56:19
**re-serve** [2] - 52:14, 53:25
**re-served** [1] - 54:10
**re-set** [2] - 55:24, 56:2
**re-view** [1] - 57:1
**reach** [2] - 49:23, 50:10
**reaction** [1] - 32:3
**reactions** [1] - 32:3
**read** [7] - 4:25, 24:14, 24:18, 25:25, 26:6, 30:12, 52:6
**ready** [1] - 24:25
**real** [1] - 16:13
**really** [14] - 5:17, 6:18, 7:9, 7:10, 11:18, 12:17, 29:20, 29:21, 31:23, 34:24, 40:15, 42:17
**reason** [6] - 5:10, 11:24, 25:8, 25:10, 25:12, 45:21
**reasonable** [1] - 30:4
**reasoning** [1] - 48:25
**reasons** [2] - 23:6, 40:3
**reassess** [1] - 54:11
**receipts** [1] - 46:23
**receive** [1] - 49:7
**received** [8] - 12:25, 13:7, 13:17, 33:16, 38:15, 48:11, 48:20,

54:18
**receiving** [3] - 22:19, 32:14, 32:15
**recently** [1] - 6:16
**recess** [3] - 49:23, 49:25, 50:1
**record** [8] - 15:1, 15:12, 15:18, 16:3, 16:4, 16:18, 19:10, 43:24
**records** [3] - 20:3, 51:5, 51:14
**Reed** [10] - 19:8, 19:14, 48:12, 51:2, 55:20, 55:23, 56:1, 56:19, 56:23, 57:10
**Reed's** [2] - 46:12, 48:8
**refer** [1] - 33:21
**referring** [1] - 46:9
**regard** [3] - 8:7, 8:14, 50:12
**regarding** [5] - 27:13, 36:9, 43:17, 52:12, 52:20
**related** [4] - 7:18, 23:3, 38:12, 45:21
**relates** [1] - 37:24
**relating** [2] - 37:10, 37:24
**relationship** [1] - 27:14
**relevant** [13] - 7:25, 25:23, 44:19, 44:20, 45:2, 45:16, 48:19, 49:1, 49:16, 51:7, 51:10, 56:20, 56:21
**remember** [1] - 35:4
**remind** [1] - 47:18
**reminds** [1] - 57:17
**rep** [1] - 40:14
**repeatedly** [1] - 26:2
**report** [1] - 58:24
**REPORTED** [1] - 2:22
**reported** [2] - 33:4, 33:5
**REPORTER** [1] - 56:5
**Reporter** [1] - 2:23
**reporting** [1] - 43:24
**request** [13] - 8:8, 8:15, 8:20, 11:2, 11:9, 11:14, 18:17, 19:3, 20:18, 28:3, 28:5, 52:8, 54:25
**requested** [1] - 56:16
**requests** [15] - 8:8, 8:9, 8:15, 8:16, 8:18, 8:21, 11:4, 11:8, 18:18, 18:20, 18:23, 27:15, 41:21, 45:20,

52:20
**require** [2] - 14:23, 15:1
**required** [2] - 21:18, 55:20
**requirement** [1] - 58:24
**research** [2] - 14:10, 16:6
**resolve** [3] - 7:19, 49:24, 53:8
**respect** [3] - 53:1, 55:20, 55:25
**respond** [10] - 17:6, 21:4, 22:7, 22:8, 22:9, 27:16, 53:19, 54:11, 55:1, 56:19
**responded** [5] - 56:8, 56:15, 57:9, 57:15, 58:9
**responding** [4] - 20:15, 21:2, 40:24, 41:2
**response** [4] - 4:20, 5:16, 52:16, 54:25
**responses** [2] - 4:16, 20:18
**responsible** [2] - 29:5, 51:9
**result** [1] - 17:4
**returns** [2] - 46:21, 48:17
**review** [3] - 48:12, 48:14, 53:13
**reviewed** [2] - 53:14, 57:3
**RFP** [1] - 49:6
**RFPs** [1] - 27:10
**Richardson** [2] - 3:23, 56:6
**RICHARDSON** [9] - 2:11, 3:23, 56:3, 56:6, 56:9, 56:13, 56:22, 56:25, 57:5
**RICO** [18] - 5:6, 5:11, 5:13, 5:17, 6:2, 6:6, 6:8, 6:18, 6:19, 7:6, 25:12, 25:15, 26:10, 26:16, 27:18, 30:1, 39:13
**rid** [1] - 46:5
**rifling** [1] - 48:16
**rise** [2] - 49:25, 50:2
**risk** [1] - 14:1
**road** [2] - 22:1, 41:17
**Robinson** [2] - 3:20, 24:18
**ROBINSON** [25] - 2:8, 3:20, 4:19, 24:20, 25:4, 26:1, 26:13,

27:10, 28:5, 28:8, 32:1, 32:13, 32:18, 33:7, 34:11, 35:7, 35:15, 40:17, 40:20, 43:21, 44:1, 44:11, 50:5, 50:18, 57:14
**role** [1] - 17:11
**room** [1] - 43:16
**route** [1] - 34:20
**routes** [1] - 43:22
**RPR** [2] - 2:22, 59:22
**Rule** [5] - 25:8, 25:10, 29:13, 29:25, 30:6
**ruling** [1] - 52:15
**rulings** [1] - 54:7
**run** [5] - 12:20, 21:10, 37:15, 44:4, 45:15
**Ryan** [1] - 4:3
**RYAN** [2] - 1:22, 2:15

## S

**S.E** [1] - 2:17
**s/Glenda** [1] - 59:20
**Sam** [1] - 3:18
**SAMUEL** [1] - 2:2
**satisfy** [4] - 25:6, 29:13, 29:25, 30:6
**save** [1] - 31:3
**saw** [1] - 47:7
**scare** [1] - 17:13
**schedule** [1] - 7:23
**Scheduled** [1] - 1:8
**scheme** [19] - 5:18, 5:21, 6:4, 6:22, 6:25, 7:4, 7:11, 12:23, 13:4, 15:9, 15:10, 21:20, 24:5, 26:8, 39:11, 44:20, 44:21, 45:13, 55:15
**Schneider** [1] - 1:18
**scientist** [1] - 22:4
**scope** [6] - 18:5, 26:4, 48:22, 53:7, 53:10, 56:16
**Scott** [2] - 2:16, 46:8
**searching** [1] - 50:14
**seated** [2] - 4:10, 50:3
**sec** [1] - 49:21
**second** [3] - 25:7, 49:22, 57:22
**see** [18] - 3:15, 6:2, 15:25, 16:17, 21:11, 23:1, 25:25, 27:4, 30:1, 30:6, 32:5, 34:23, 40:8, 46:15, 50:7, 53:21, 59:7
**seeing** [3] - 19:2, 24:24, 59:9
**seek** [1] - 46:17

**seeking** [3] - 18:24, 21:2, 22:18
**send** [3] - 9:23, 37:14, 58:1
**sense** [3] - 24:21, 47:24, 55:6
**sent** [19] - 8:8, 8:15, 8:22, 11:2, 11:11, 11:14, 12:14, 12:15, 18:20, 20:24, 21:9, 27:8, 28:3, 41:25, 42:7, 42:8, 54:15, 54:23, 55:8
**sentence** [1] - 28:14
**separate** [2] - 11:3, 16:22
**serious** [1] - 33:11
**serve** [7] - 18:22, 20:12, 36:22, 49:2, 52:14, 53:25, 54:2
**served** [8] - 19:6, 52:18, 53:19, 54:1, 54:10, 55:21, 56:14, 57:16
**service** [1] - 49:6
**Services** [1] - 14:12
**session** [1] - 3:2
**set** [7] - 8:20, 9:16, 11:9, 18:14, 33:19, 55:24, 56:2
**Seth** [2] - 4:3, 46:7
**SETH** [1] - 2:15
**sets** [1] - 8:19
**several** [2] - 20:3, 29:8
**shape** [1] - 31:1
**shooting** [1] - 22:14
**show** [10] - 6:20, 6:24, 7:2, 7:6, 8:23, 15:21, 27:18, 46:17, 47:13, 49:2
**shows** [2] - 19:16, 44:6
**side** [3] - 33:21, 36:12, 46:6
**sides** [1] - 19:24
**significant** [4] - 26:18, 26:20, 32:7, 34:5
**significantly** [2] - 18:5, 32:8
**similar** [1] - 29:8
**similarly** [1] - 17:20
**single** [3] - 12:9, 30:9, 51:21
**situated** [1] - 17:20
**situation** [1] - 55:20
**situations** [1] - 37:25
**Sloman** [1] - 2:19
**sloppiness** [1] - 20:1
**sloppy** [1] - 12:8
**small** [1] - 26:3

**smart** [1] - 26:25
**so-and-so** [2] - 51:4
**so..** [1] - 38:12
**software** [3] - 21:6, 21:8, 23:11
**sold** [7] - 19:17, 44:9, 46:18, 47:1, 49:2, 49:13, 51:6
**solid** [1] - 30:2
**solve** [3] - 32:19, 32:21
**solved** [3] - 20:25, 32:20, 47:2
**someone** [6] - 15:15, 28:11, 28:13, 35:10, 38:22
**sometimes** [1] - 58:12
**soon** [2] - 13:13, 13:16
**sophisticated** [1] - 15:14
**sorry** [5] - 38:6, 40:4, 49:22, 50:3, 56:6
**sort** [5] - 17:12, 26:7, 36:19, 50:7, 53:23
**sounds** [3] - 17:10, 17:18, 42:25
**South** [1] - 2:3
**SOUTHERN** [1] - 1:1
**Southern** [2] - 3:4, 25:16
**speaking** [1] - 30:17
**spear** [2] - 23:17, 35:21
**specific** [11] - 24:22, 26:14, 26:21, 35:22, 35:23, 35:24, 44:12, 44:18, 51:10, 51:11
**specifically** [1] - 51:2
**spending** [1] - 10:14
**spent** [3] - 13:10, 26:1, 29:19
**split** [3] - 6:11, 39:21, 41:8
**splitting** [1] - 36:13
**spoken** [2] - 14:17, 23:20
**spoliation** [2] - 18:13, 22:13
**spreadsheets** [1] - 24:3
**stage** [6] - 27:22, 30:18, 32:24, 39:4, 40:21, 49:3
**standard** [1] - 28:18
**standards** [1] - 25:12
**standing** [9] - 6:19, 6:20, 7:6, 14:2, 16:10, 21:10, 33:10, 43:2

**start** [2] - 35:2, 47:9
**started** [3] - 5:23, 9:25, 30:24
**starting** [2] - 24:17, 37:7
**starts** [1] - 49:18
**state** [3] - 3:8, 47:11, 49:1
**statement** [1] - 44:6
**statements** [2] - 46:21, 48:17
**States** [4] - 2:23, 3:3, 24:3, 59:22
**states** [1] - 16:22
**STATES** [2] - 1:1, 1:14
**status** [2] - 58:20, 58:24
**STATUS** [1] - 1:12
**statute** [2] - 25:14, 25:15
**statutes** [1] - 29:8
**stay** [9] - 4:15, 5:16, 6:13, 11:25, 18:24, 20:25, 24:15, 45:22, 52:3
**staying** [1] - 55:5
**stays** [2] - 17:4, 25:17
**STENOGRAPHICAL LY** [1] - 2:22
**step** [1] - 49:22
**still** [8] - 20:17, 36:3, 37:25, 39:12, 42:23, 48:14, 53:6, 54:1
**stop** [1] - 17:9
**stopping** [2] - 6:17, 34:1
**story** [1] - 16:16
**streamlines** [1] - 19:17
**Street** [3] - 1:22, 2:12, 2:17
**strengthen** [1] - 34:18
**strengthens** [1] - 37:9
**stuff** [3] - 22:12, 23:22, 40:17
**Stumphauzer** [1] - 2:19
**subject** [2] - 20:19, 33:9
**submitted** [1] - 25:13
**subpoena** [22] - 7:18, 16:25, 17:5, 18:9, 19:11, 21:5, 21:9, 22:3, 32:14, 37:14, 43:13, 44:5, 46:12, 48:8, 48:21, 55:22, 55:24, 56:7, 56:11, 56:14, 56:15, 56:17
**subpoena-related** [1] - 7:18

**subpoenaed** [2] - 17:24, 54:14
**subpoenas** [24] - 11:11, 11:13, 12:4, 17:8, 17:12, 18:6, 18:11, 19:4, 19:5, 19:6, 20:13, 23:18, 27:8, 32:11, 41:19, 45:20, 52:17, 53:25, 57:9, 57:15, 57:22, 58:2, 58:6, 58:8
**subset** [1] - 10:2
**substantial** [1] - 14:1
**suffer** [2] - 12:25, 14:1
**suffered** [1] - 38:19
**suffering** [1] - 17:4
**suffers** [1] - 26:18
**sufficient** [5] - 8:23, 29:25, 46:17, 48:7, 49:2
**sufficiently** [1] - 48:5
**suggest** [1] - 53:17
**suggesting** [2] - 20:2, 56:19
**Suite** [3] - 1:22, 2:12, 2:20
**Sullivan** [2] - 2:3, 2:5
**supplemental** [2] - 53:2, 53:8
**supposed** [4] - 27:18, 27:19, 27:21, 49:19
**survive** [13] - 5:3, 5:4, 30:22, 31:2, 40:15, 40:18, 40:24, 41:1, 42:3, 42:15, 42:18, 44:21
**suspect** [1] - 17:22
**suspected** [1] - 23:9
**suspended** [2] - 23:1, 23:6
**suspenders** [1] - 55:4
**suspension** [2] - 23:5, 23:8
**sustain** [3] - 29:25, 37:19, 45:10
**sustaining** [1] - 54:8
**switch** [2] - 15:3, 15:15
**switched** [2] - 16:1, 33:17
**switches** [3] - 7:3, 16:9, 16:17
**switching** [4] - 14:24, 15:11, 15:25, 17:1
**system** [4] - 15:7, 43:18, 43:22, 49:9

## T

**talks** [2] - 14:9, 43:23

**target** [1] - 24:4
**targeted** [7] - 5:21, 18:6, 19:19, 20:10, 23:18, 27:7, 33:25
**tax** [3] - 46:20, 46:23, 48:16
**technically** [1] - 35:8
**Technologies** [1] - 3:24
**TECHNOLOGIES** [1] - 2:12
**tentative** [1] - 48:13
**terabytes** [1] - 20:9
**terms** [3] - 22:25, 27:17, 48:3
**tested** [1] - 7:10
**Texas** [1] - 16:21
**text** [12] - 8:25, 10:3, 10:4, 10:7, 10:8, 12:16, 12:18, 27:11, 27:12, 27:24, 40:6
**texts** [3] - 9:5, 9:6, 12:9
**THE** [100] - 1:13, 1:17, 2:2, 2:8, 2:11, 2:15, 2:18, 3:13, 3:22, 4:1, 4:8, 4:20, 4:23, 7:16, 8:10, 8:18, 9:9, 9:14, 9:17, 9:20, 10:18, 11:2, 11:6, 11:14, 11:18, 11:22, 14:3, 15:9, 17:8, 17:17, 17:23, 19:1, 19:20, 20:14, 20:22, 21:1, 22:6, 22:19, 24:13, 25:3, 25:25, 26:5, 27:9, 28:3, 28:7, 29:17, 32:9, 32:17, 33:6, 34:7, 34:25, 35:8, 35:16, 37:14, 38:13, 38:17, 38:20, 40:4, 40:8, 40:11, 40:19, 40:22, 42:10, 42:13, 42:17, 43:3, 43:8, 43:12, 43:25, 44:10, 44:20, 46:11, 47:18, 47:21, 48:18, 50:3, 50:12, 50:19, 50:24, 51:8, 51:15, 52:1, 53:11, 53:21, 54:3, 54:21, 55:5, 55:13, 56:5, 56:7, 56:11, 56:14, 56:24, 57:4, 57:8, 57:13, 57:20, 57:25, 58:10, 59:6
**theft** [1] - 39:1
**theory** [4] - 35:9, 35:11, 35:24, 36:4
**they've** [11] - 5:17, 14:21, 14:22, 19:11, 23:20, 27:8, 29:14, 30:2, 30:10, 32:11, 33:25
**thinking** [1] - 51:19
**third** [6] - 11:13, 32:14, 32:16, 53:18, 53:19, 54:4
**thousands** [2] - 17:22, 18:1
**three** [15] - 8:8, 8:15, 8:18, 8:21, 11:3, 11:9, 15:1, 21:21, 21:24, 27:10, 41:13, 57:15
**three-way** [1] - 15:1
**Thursday** [1] - 13:21
**tie** [1] - 43:6
**tied** [1] - 32:12
**ties** [2] - 29:13, 51:5
**Timothy** [1] - 4:7
**TIMOTHY** [1] - 2:18
**TLD** [8] - 21:6, 21:25, 22:1, 37:4, 37:15, 43:11, 43:24, 49:9
**today** [10] - 4:19, 7:20, 28:1, 30:23, 34:2, 46:13, 48:15, 53:16, 58:11, 59:10
**together** [2] - 6:3, 29:19
**ton** [1] - 20:8
**took** [3] - 19:20, 22:23, 25:5
**top** [2] - 11:16, 11:18
**Total** [1] - 21:6
**touched** [4] - 21:21, 21:23, 45:13, 47:5
**touches** [3] - 35:13, 37:2, 37:5
**tough** [1] - 37:11
**trace** [2] - 16:8, 16:14
**traceability** [2] - 6:24, 7:5
**track** [1] - 47:23
**traditional** [1] - 6:2
**trail** [1] - 36:6
**trained** [1] - 9:22
**training** [2] - 27:13, 34:14
**transactions** [1] - 15:12
**transcription** [1] - 59:16
**transferring** [1] - 23:10
**treatment** [2] - 13:22, 16:13
**tremendously** [1] - 19:18

**tried** [2] - 21:19, 33:2
**Tripp** [2] - 2:16, 46:8
**TrueCoverage** [23] - 3:24, 5:24, 5:25, 7:2, 7:3, 8:7, 8:14, 9:16, 9:22, 9:23, 9:24, 9:25, 11:17, 16:7, 16:8, 20:20, 20:24, 21:7, 21:21, 22:16, 23:2, 23:25
**TRUECOVERAGE** [1] - 2:11
**TrueCoverage's** [3] - 14:6, 14:22, 16:19
**try** [4] - 17:24, 50:7, 51:1, 52:19
**trying** [14] - 10:23, 13:10, 15:7, 17:16, 22:24, 29:17, 31:6, 39:21, 41:7, 46:14, 49:23, 53:20, 53:23
**TURNER** [1] - 1:5
**Turner** [2] - 3:6, 37:16
**two** [10] - 5:15, 6:7, 11:20, 13:14, 20:9, 22:17, 23:6, 23:9, 38:7, 46:20
**two-plus** [1] - 6:7
**type** [3] - 30:14, 31:16, 44:17
**types** [1] - 48:5
**typically** [1] - 39:5

### U

**unable** [1] - 22:9
**uncommon** [2] - 24:15, 45:22
**under** [5] - 33:16, 33:17, 35:8, 49:9, 50:17
**united** [1] - 2:23
**United** [3] - 3:3, 24:3, 59:22
**UNITED** [2] - 1:1, 1:14
**universe** [5] - 18:2, 18:3, 36:10, 36:11, 45:9
**universes** [1] - 44:24
**unlawful** [1] - 15:3
**unnecessary** [7] - 25:10, 25:14, 25:19, 28:19, 28:21, 31:4
**unusual** [2] - 24:16, 41:16
**up** [20] - 6:11, 9:16, 9:24, 12:3, 13:3, 14:14, 14:18, 27:18, 28:15, 30:10, 32:5, 32:10, 32:12, 33:19,

35:11, 38:21, 41:4, 43:18, 46:15, 50:4
**update** [1] - 58:20
**uplines** [1] - 11:9
**Urquhart** [2] - 2:3, 2:5
**uses** [1] - 14:8

### V

**valid** [1] - 35:18
**Valle** [4] - 7:19, 18:15, 36:25, 46:1
**vantage** [1] - 52:25
**vendor's** [1] - 47:8
**verify** [1] - 45:11
**Veronica** [2] - 13:2, 13:17
**Veronica's** [1] - 14:15
**versus** [4] - 3:7, 25:9, 29:7, 39:5
**victim** [1] - 33:6
**victimless** [1] - 16:11
**victims** [2] - 18:1, 39:16
**VIEIRA** [7] - 2:5, 53:15, 53:22, 54:12, 55:10, 55:18, 57:21
**Vieira** [2] - 3:18, 53:15
**view** [2] - 35:12, 57:1
**vote** [1] - 3:14
**VS** [1] - 1:7

### W

**W-2** [1] - 49:12
**W-2s** [2] - 46:21, 46:22
**WAHBA** [1] - 2:16
**Wahba** [1] - 4:4
**wait** [1] - 47:18
**waiting** [1] - 59:6
**walk** [1] - 34:2
**walking** [1] - 31:18
**warrants** [1] - 33:11
**weakness** [1] - 34:4
**Wednesday** [2] - 1:6, 58:15
**week** [5] - 17:2, 42:4, 44:13, 51:5, 58:15
**weekend** [2] - 13:7, 13:18
**weigh** [1] - 36:20
**wells** [1] - 37:16
**West** [1] - 2:9
**whittle** [1] - 57:6
**who've** [1] - 24:9
**whole** [10] - 18:24, 20:13, 30:7, 30:18, 32:12, 35:16, 36:10, 36:15, 40:1, 45:7

**wide** [2] - 23:17, 39:17
**wife** [1] - 38:14
**Williamson** [3] - 3:18, 38:9, 51:16
**WILLIAMSON** [2] - 2:2, 3:17
**win** [1] - 45:23
**Winn** [1] - 13:2
**wise** [1] - 41:5
**withdraw** [1] - 53:8
**witnesses** [4] - 10:20, 22:17, 22:23, 24:9
**Wolf** [1] - 2:9
**word** [2] - 41:13, 54:5
**works** [3] - 12:14, 16:6, 21:12
**worthy** [1] - 54:1
**wrap** [1] - 50:4
**written** [2] - 58:10, 58:12

### Y

**years** [3] - 6:7, 20:3, 46:20
**yesterday** [2] - 12:25, 13:10