# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:24-cv-60591-DAMIAN/Valle

CONSWALLO TURNER, TIESHA
FOREMAN, ANGELINA WELLS,
PAULA LANGLEY, VERONICA
KING, NAVAQUOTE, LLC
and WINN INSURANCE AGENCY, LLC,
individually and on behalf of all others
similarly situated,

**CLASS ACTION**

(Jury Trial Demanded)

       Plaintiffs,

v.

TRUECOVERAGE, LLC,
SPERIDIAN TECHNOLOGIES, LLC,
BENEFITALIGN, LLC, GIRISH PANICKER,
and MATTHEW GOLDFUSS,

       Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Class Plaintiffs, Conswallo Turner, Tiesha Foreman, Angelina Wells, Veronica King, Paula Langley, NavaQuote, LLC ("NavaQuote") and WINN Insurance Agency LLC ("WINN"), file this first amended class action complaint individually and on behalf of all others similarly situated against Defendants TrueCoverage, LLC, and to the extent it does business as Inshura ("True Coverage"), Speridian Technologies, LLC ("Speridian Technologies"), Benefitalign LLC, ("Benefitalign"), Girish Panicker ("Panicker") and Matthew Goldfuss ("Goldfuss"), and allege:

### I.      INTRODUCTION

1.      Since the filing of this lawsuit on April 12, 2024, the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services (or "CMS") has issued public statements acknowledging "the very concerning activity by some agents and brokers related to

unauthorized plan switches and unauthorized enrollments— where a consumer was switched from their selected plan into a new one or signed up for coverage without their knowledge or consent." Members of Congress have "express[ed] outrage with reports that agents and brokers are submitting plan changes and enrollments in the Federal marketplace without the consent of the people who rely on these plans."  And a recent think tank report contends that four to five million Americans are fraudulently enrolled in ACA plans.   "Unscrupulous brokers are certainly contributing to fraudulent enrollment and the enhanced direct enrollment feature of Heathcare.gov appears to be a problem. . . .  [A]nd reports indicate that many people have been recently removed from their plan and enrolled in another plan by brokers who earn commissions by doing so."

2.     Compiled from interviews with dozens of witnesses, including many of Defendants' former employees, this Second Amended Complaint attempts to cast a stronger light on the individuals and companies — each either based in South Florida or strongly tied to South Florida — that created this massive fraud, and to hold them accountable.

3.     Historically, the industry for selling ACA health insurance was an unappealing one. The reason was largely economic, as the cost to sell ACA plans was relatively high and the margins — and thus the commissions — slim.  ACA did not draw much attention from the insurance sales industry, especially compared to other, more lucrative products like the Medicare Advantage products seen offered 24/7 on television and in social media ads.

4.     But in 2021, in the wake of COVID, Congress passed the American Rescue Plan Act ("ARPA").  ARPA increased the scope and availability of premiums for the very poor.  In particular, ARPA allowed a certain segment of Americans — those with household incomes between 100 and 150 percent of the federal poverty level — to pay *zero* in premiums.

5.      Also in 2021, CMS announced a new rule that would allow poor Americans to enroll in ACA plans *year-round* starting March 2022.  Previously, enrollments had been limited to a three-month open enrollment period (or "OEP") from November to January.

6.      These changes created an opportunity.  More than 40 million Americans live within 100 to 150 percent of the poverty line, and only about 15 million had ACA insurance at the time.

7.      This RICO Enterprise begins with fraudulent ads that drive leads to insurance agents.  Defendants realized that the conversion rates for leads generated by "clean" ads — ads that simply invite consumers to sign up for an ACA plan — were relatively low.  Defendants figured out that certain "dirty" ads— ads that falsely offered poor Americans free cash rewards — not only generated more leads but were converted at much higher rates than clean ads.

8.      These ads lure consumers — and in particular, America's poorest consumers — with the false promise of hundreds and sometimes thousands of dollars per month in cash benefits such as subsidy cash cards to pay for common expenses like rent, groceries and gas. An example of the type of deceptive ad is illustrated below:



9.      Clicking these ads brings consumers to a landing page that asks a few qualifying questions.  Defendants capture the answers, and if those answers suggest that the consumer may qualify for a low- or no-cost ACA plan, then that consumer becomes an ACA "lead."  Choosing from among a list of agencies that have already purchased batches of leads from it, the ads provide the consumer a phone number that directs him or her to the agency.

10.     This structure presents a problem, though.  Consumers believe they are being routed to someone who will send them a free cash card, not enroll them in health insurance.  Drawing from his experience as an agent, trainer and consultant in the South Florida mini-med industry, which relied on strict adherence to a uniform script, Defendants trained its agents on how to "handle" dirty leads.  This training consisted of two main concepts for agents to follow.  One, when the consumer calls, don't mention a cash card.  Two, if the consumer brings up the cash card, "be vague" and suggest that the question is better answered later, by the insurance carrier.

11.     At all times material, TrueCoverage operated in the ACA space.  Its affiliate, Defendant Speridian Technologies LLC ("Speridian Technologies"), had created two enhanced direct enrollment platforms (or "EDE Platforms") called Benefitalign and Inshura.  These EDE Platforms gave TrueCoverage and other agencies in its downline[1] network direct access to the ACA Marketplace Exchange database (the "Marketplace" or "Exchange") maintained and facilitated by CMS.  Using Benefitalign and Inshura, TrueCoverage and its downlines could enroll consumers in ACA health insurance without requiring them to visit www.healthcare.gov (or "Healthcare.gov").  The EDE Platforms allowed TrueCoverage and their downlines to enroll the maximum number of consumers in the shortest amount of time without much scrutiny.  Defendant

---

[1]     A "downline" agency receives financing, oversight, training and support from its "upline" (also called a "managing general agent" or "MGA").  In return, an upline like TrueCoverage gets a portion of the downline's commissions for enrolling consumers in an ACA plan.

Garish Panicker maintains day-to-day control of TrueCoverage and Speridian Technologies, as well as Defendant Benefitalign LLC, all of which exist within the umbrella of Speridian Global Holdings LLC ("Speridian Global"), which is half-owned by Panicker.

12.     By summer of 2022, from an office in Broward County, TrueCoverage's director of sales, Defendant Matthew Goldfuss ("Goldfuss"), oversaw and directed TrueCoverage's ACA enrollment efforts.  TrueCoverage, Panicker, Goldfuss and nearly everyone at TrueCoverage knew that the leads TrueCoverage was buying offered free cash cards instead of ACA health insurance. TrueCoverage implemented a script designed to redirect consumers' questions about a cash card and enroll them within 10 minutes.

13.     TrueCoverage was adamant that its agents strive to enroll every consumer who called into a $0 health plan — *even those who didn't qualify for one*.  TrueCoverage trained its agents to coax callers into calculations of household income that fell within 100 to 150 percent of the federal poverty line.  If a caller's household income was too high to qualify, it trained agents to remove other family members' incomes from the application so that the caller's income fell within the range, a practice dubbed "Dual-Apping."  For many Americans, including Plaintiff Tiesha Foreman, these practices caused them to incur an IRS tax penalty for receiving greater subsidies than their actual incomes allowed.

14.     Even if the consumer decided not to voluntarily enroll — perhaps because, for example, they already had health insurance — TrueCoverage's scripted questions elicited personally identifiable information (or "PII") that TrueCoverage misused.  Each consumer's health insurance policy is associated with an agent of record (or "AOR") who has a national producer number (or "NPN").  Typically, this is the agent who brokered the consumer's original enrollment or purchase of the policy.  Simply by obtaining the consumer's name, date of birth and zip code,

TrueCoverage could access the Marketplace through Benefitalign and replace the consumer's AOR and NPN with those of a TrueCoverage agent.  Through these "AOR Swaps," TrueCoverage was essentially able to steal the consumer's policy without the knowledge or consent of the consumer or their original AOR.  This damaged consumers like Plaintiff Veronica King, whose existing health insurance was cancelled multiple time by TrueCoverage's downline agents.  It also damaged agencies like WINN Insurance Agency LLC, whose commissions were basically stolen, and whose principals spent countless hours and resources to restore their status as AOR on the policies.

15.     To further capture the enrollments, TrueCoverage began to grow its network of downline agencies and as a result. into 2023, that Enterprise continued to grow.  TrueCoverage began creating its own false cash card advertising.  By 2024, TrueCoverage had approximately 50 downlines, each using its Benefitalign or Inshura EDE Platforms.

16.     It also engaged in AOR Swaps, Twisting and Dual Apping.  A former agent one of TreuCoverage's downlines, Protect Health, stated that, in May 2024, the downline employed an internal "Tango Team" to swap the AORs of 875 consumers.  Another former Protect Health employee claims she was given a list of consumers' PII to access through Inshura and told to enroll those consumers for Protect Health.  Protect Health told her that if consumers did not qualify for $0 health insurance, she must change their incomes to $0 and make them qualify — without talking to the customers.  This $0 benchmark was important, because it reduced the chances Protect Health would get caught — consumers would never be alerted by unfamiliar premium charges, because there were no premiums.

17.     In sum, this is a RICO Enterprise.  It has damaged millions of the poorest Americans.  It has devastated legitimate ACA agencies.  The Enterprise was accelerated by

TrueCoverage, Speridian, Benefitalign, Panicker, Goldfuss, Harrison, , the downline agencies and others that expanded the scheme's reach and developed and implemented AOR Swaps, Twisting and Dual Apping.

18.     Consumer Plaintiffs, Agency Plaintiffs and the classes of victims they seek to represent have suffered damages and seek to hold Defendants accountable for their role in the Enterprise; for conspiring to violate the RICO Act; for aiding and abetting the Enterprise; and for aiding and abetting fraud and breaches of fiduciary duty.  Consumer Plaintiffs also seek to hold TrueCoverage, accountable for their use of the consumer Plaintiffs' and class members' PII.

## II.     PARTIES, JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

19.     The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Classes who are citizens of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed classes.  This Court also has federal question subject matter jurisdiction pursuant to 18 U.S.C. § 1964.

### B.     Parties and Personal Jurisdiction

20.     Plaintiff Conswallo Turner is a resident and citizen of the state of Texas.  Turner is a "person" under 18 U.S.C. § 1964.

21.     Plaintiff Tiesha Foreman is a resident and citizen of the state of Georgia.  Foreman is a "person" under 18 U.S.C. § 1964.

22.     Plaintiff Angelina Wells is a resident and citizen of the state of Texas.  Wells is a "person" under 18 U.S.C. § 1964.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

23.     Plaintiff <u>Veronica King</u> is a resident and citizen of the state of Georgia.  King is a "person" under 18 U.S.C. § 1964.

24.     Plaintiff <u>Paula Langley</u> is a resident and citizen of the state of Texas.  Mrs. Langley is a "person" under 18 U.S.C. § 1964.

25.     Plaintiff <u>NavaQuote, LLC</u> is a Delaware limited liability company with its principal place of business in the state of Georgia.  NavaQuote is a "person" under 18 U.S.C. § 1964. NavaQuote's members are Callie Navrides and Peter Navrides, both residents and citizens of Georgia.

26.     Plaintiff <u>WINN Insurance Agency LLC</u> is a Florida limited liability company with its principal place of business in the state of South Carolina.  WINN is a "person" under 18 U.S.C. § 1964.  WINN's sole member is Marsha Broyer, a resident and citizen of South Carolina.

27.     Defendant <u>TrueCoverage, LLC</u>, individually and to the extent it does business as "Inshura, LLC" is a New Mexico limited liability based in Albuquerque, New Mexico. TrueCoverage is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961. TrueCoverage's member is Girija Panicker, a citizen and resident of New Mexico.

28.     This Court has specific personal jurisdiction over TrueCoverage pursuant to Section 48.193(1)(a), Fla. Stat.  TrueCoverage regularly and systematically operates, conducts, engages in and carries on a business or business venture in Florida.  TrueCoverage maintains large offices in Miramar, Deerfield Beach and Miami with hundreds of employees.  It is registered with the Florida Secretary of State's office to do business in Florida.  Its Florida registered agent is Matthew Goldfuss, a Florida resident.  True Coverage also caused injury to persons or property within Florida arising out of acts and omissions it took inside and outside the state while engaging

CASE NO. 0:24-cv-60591-DAMIAN/Valle

in solicitation of, or service activities for, people within Florida. Moreover, as further alleged in this Complaint, TrueCoverage committed one or more tortious acts within Florida.

29.   This Court also has general personal jurisdiction over TrueCoverage pursuant to Section 48.193(2), Fla. Stat. TrueCoverage is engaged in substantial and not isolated activity within this state.

      a.   From its offices in South Florida, TrueCoverage solicited and interacted with consumers in Florida and throughout the country via telephone, internet, text, email and mail.

      b.   TrueCoverage's agents, from offices in South Florida, made misrepresentations and omissions that induced Consumer Class members, including a substantial number of Florida consumers, to enroll in $0 ACA health insurance plans that they did not qualify for.

      c.   From its offices in South Florida, it engaged in AOR Swaps, Twisting and Dual Apps.

      d.   From its offices in South Florida, TrueCoverage obtained Consumer Class members' PII, and subsequently used that information to re-enroll Consumer Class members (thousands of whom were in Florida) into new or additional health insurance plan(s) without proper knowledge and consent.

      e.   From South Florida, TrueCoverage agents submitted Consumer Class members' health insurance applications to the ACA Marketplace.

      f.   TrueCoverage received commission payments to its offices in South Florida.

      g.   TrueCoverage wired commissions to its agents from its offices in South

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Florida.

h.      TrueCoverage wired payments to downline agents in Florida.

i.       TrueCoverage entered into contracts in the State of Florida, including but not limited to contracts with agents that operated from TrueCoverage call centers located in its offices in South Florida.

j.       TrueCoverage provided customer service to Class Plaintiffs and class members from its offices in Florida.

k.      TrueCoverage trained its downline agencies in Florida.

l.       TrueCoverage sent enrollment documents to the Marketplace as well as documents and communications to Plaintiffs and class members from its offices in Florida.

m.     From its Florida offices, TrueCoverage paid advance payments to its downline agents to support the unlawful misconduct alleged herein.

30.     Defendant Speridian Technologies, LLC is a New Mexico limited liability with its principal place of business in Albuquerque, New Mexico.  Speridian Technologies is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Speridian Technologies' manager is Girish Panicker and its member is Hari Pillai, who are both residents and citizens of New Mexico.

31.     This Court has specific personal jurisdiction over Speridian Technologies pursuant to Section 48.193(1)(a), Fla. Stat.  Speridian Technologies regularly and systematically operates, conducts, engages in and carries on a business or business venture in in Florida.  Speridian Technologies is registered with the Florida Secretary of State's office to do business in Florida. As further alleged in this Amended Complaint, Speridian Technologies committed one or more

tortious acts within Florida by controlling and financing the Florida operations of TrueCoverage and Benefitalign, including but not limited to paying the salaries of TrueCoverage's agents in Broward and Miami-Dade counties, with knowledge that TrueCoverage and Benefitalign were committing a fraud.

32.     This Court also has general personal jurisdiction over Speridian Technologies pursuant to Section 48.193(2), Fla. Stat.  Speridian Technologies is engaged in substantial and not isolated activity within this state.

> a.     Speridian Technologies developed and provided access to the platform used by Florida-based companies, including TrueCoverage's downlines, and companies operating in Florida, to enroll and manage consumers in the ACA space, including a substantial percentage of more than 2.7 million Florida-based, low-income consumers who enrolled during the relevant period.

> b.     Speridian Technologies financed TrueCoverage's operations and growth in South Florida by paying advanced commissions as well as by paying the salaries of TrueCoverage's health insurance agents in Florida.  These financial arrangements were memorialized in loan agreements and employment agreements executed in Florida.

33.     Defendant <u>Benefitalign, LLC</u> is a New Mexico limited liability company with its principal place of business in Albuquerque, New Mexico.  Benefitalign is an entity capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Benefitalign's manager is Girish Panicker and its member is Hari Pillai, who are both residents and citizens of New Mexico.

34.     This Court has specific personal jurisdiction over Benefitalign pursuant to Section

48.193(1)(a), Fla. Stat.  Benefitalign regularly and systematically operates, conducts, engages in and carries on a business or business venture in in Florida.  Benefitalign is registered with the Florida Secretary of State's office to do business in Florida.  As further alleged in this Amended Complaint, Benefitalign committed one or more tortious acts within Florida by contracting with dozens of companies located in Broward and Miami-Dade counties to use its proprietary EDE Platform, with knowledge that those companies were using the EDE Platform to commit a fraud.

35.     This Court also has general personal jurisdiction over Benefitalign pursuant to Section 48.193(2), Fla. Stat.  Benefitalign is engaged in substantial and not isolated activity within this state.

      a.     During the relevant period, Benefitalign provided access to its proprietary EDE Platform to dozens of Florida-based companies, to enroll and manage consumers in the ACA space, including a substantial percentage of more than 2.7 million Florida-based, low-income consumers who enrolled during the relevant period.  Benefitalign generates a significant portion of its revenue from customers based in Florida.

      b.     One of the companies Benefitalign contracts with is an affiliate, Defendant TrueCoverage, with multiple, large offices in South Florida from which agents access Benefitalign's EDE Platform to enroll consumers into ADA plans, and to conduct the AOR- and plan-switching alleged in this lawsuit.

36.     Defendant Girish Panicker is a resident and citizen of New Mexico.  Panicker is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Panicker is manager of Defendant Speridian Technologies.  He is the manager and one of two members of Speridian Global, which is the parent entity of

Defendants TrueCoverage and Speridian Technologies, as well as the parent entity of Defendant Benefitalign.  Panicker serves as Chairman of the Board of Speridian Technologies.  Panicker oversees and directs Speridian, TrueCoverage and Benefitalign.  During the relevant timeframe, he directed those companies' operations and growth, embracing a strategy that relied upon the creation and use of fraudulent leads to enroll consumers, including a substantial number of Florida customers, in ACA health plans, and to twist those plans and/or remove and replace agents of record.

37.     This Court has specific personal jurisdiction over Panicker pursuant to Section 48.193(1)(a), Fla. Stat.  Panicker regularly and systematically operates, conducts, engages in and carries on a business or business venture with substantial offices in Broward and Miami-Dade counties, TrueCoverage.  Panicker also caused injury to persons or property within Florida arising out of acts and omissions he took inside and outside the state while engaging in solicitation of ACA consumers within Florida.  Panicker committed one or more tortious acts within Florida, including aiding and abetting fraud and breach of fiduciary duty by instructing agents to twist consumers' ACA plans, including substantial numbers of consumers in Florida, and/or remove and replace agents of record, including agents in Florida.

38.     This Court also has general personal jurisdiction over Panicker pursuant to Section 48.193(2), Fla. Stat.  Panicker is engaged in substantial and not isolated activity within this state.  Panicker directs and manages businesses with significant operations in this state.  More than 2.7 million Floridians with incomes between 100 and 150 percent of the poverty level signed up for ACA plans since 2022, and Panicker's companies TrueCoverage, Speridian Technologies, Benefitalign and Inshura were integral to the enrollment of a significant percentage of these low-income Floridians.  Panicker often travels to South Florida to manage TrueCoverage's South

Florida offices.

39.     Defendant <u>Matthew Goldfuss</u> is a resident and citizen of Brevard County, Florida. Goldfuss is an individual capable of holding a legal or beneficial interest in property and is therefore a culpable "person" under 18 U.S.C. § 1961.  Goldfuss is TrueCoverage's National Director: Individual and Medicare Sales.  Often from TrueCoverage's Broward County offices, Goldfuss oversees and directs the TrueCoverage ACA enrollment team and the misleading scripts that they used with consumers.

**C.     <u>Venue</u>**

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because (i) a substantial part of the events or omissions giving rise to Class Plaintiffs' claims occurred in this District, and (ii) each of the Defendants' contacts with this District would be sufficient to subject them to personal jurisdiction in this District if this District were a separate State.  Defendants regularly and systematically operate, conduct, engage in and carry on a business or business venture in this District, and have generated significant revenue from consumers in this District.  Defendants committed one or more tortious acts within this District.  Defendants' contacts within this District were substantial and not isolated.

### III.     <u>RELEVANT NONPARTIES</u>

**A.     <u>TrueCoverage Downlines</u>**

41.     <u>ACA Helpline LLC</u>.  ACA Helpline LLC is a downline agency of TrueCoverage. It is a Florida limited liability company formed in 2022, and its principal place of business is in Delray Beach, Florida.  Michael Zuckerberg is ACA Helpline LLC's Manager.

42.     <u>Axis Health Group, Inc.</u> ("Axis").  Axis is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2008, and its principal place of business is in Coral Springs,

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Florida.  Deborah King is Axis' President and Agent in Charge.

43.     Compass Health Agency LLC d/b/a Atlantic Senior Benefits ("Compass Health"). Compass Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Orlando, Florida.  Arthur Ramirez is Compass Health's Manager and Gustavo Fraga is its Agent in Charge.

44.     Empire Marketing & Events LLC d/b/a HVO Insurance Services ("HVO").  HVO is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Homestead, Florida.  Helen Valdez Obando and Miguelangel Marquez are HVO's Authorized Members.

45.     Engage Health Insurance, LLC d/b/a Engage Direct ("Engage Health").  Engage Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Pompano Beach, Florida.  Edward Lovell is Engage Health's Manager and its Agent in Charge.

46.     Ensure Health Group Corporation and Barachy Lucien.  Ensure Health Group Corporation is a Delaware corporation with a principal place of business in Plantation, Florida. According to the Florida Secretary of State's website, Barachy Lucien is the Vice President of Ensure Health Group.  Ensure Health Group is a downline agency of TrueCoverage and has a downline producer agreement with Protect Health and is involved in selling ACA health plans to class members.  Beginning in at least 2022, Barachy Lucien was involved in training TrueCoverage's agents on selling ACA health insurance plans through Speridian's EDE platform, Benefitalign.

47.     Every Health Group II LLC ("Every Health Group").  Every Health Group is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and

its principal place of business is in Fort Lauderdale, Florida.  Richard Troher is Every Health Group's Agent in Charge.

48.     Family Health First LLC ("Family Health").  Family Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2022, and its principal place of business is in Boca Raton, Florida.  Connor Thompson is its Manager and its Agent in Charge.

49.     The Healthcare Tutor, LLC ("Healthcare Tutor").  Healthcare Tutor is a downline agency of TrueCoverage.  It is an Oregon limited liability company formed in 2020, and its principal place of business is Portland, Oregon.  David Williams is Healthcare Tutor's Authorized Member.

50.     Health Coverage Helpers LLC ("HCH").  HCH is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in St. Petersburg, Florida.  Jarred Bock is its Authorized Member.

51.     Health Coverage Plus, Inc. ("HCP").  HCP is a downline agency of TrueCoverage. It is a Florida corporation formed in 2023, and its principal place of business is in Boca Raton, Florida.  Barbara Leeds is HCP's President.

52.     Health Process Center Insurance Agency Inc ("Health Process").  Health Process is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2022, and its principal place of business is in Fort Lauderdale, Florida.  Paul Greenberg is its President and its Agent in Charge.

53.     Healthy Streets Healthcare Services Inc ("Healthy Streets").  Healthy Streets is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Hollywood, Florida.  Patrick Houser is Healthy Streets' President.

54.     Insurance Line One LLC ("Line One").   Line One is a downline agency of

TrueCoverage.  It is a Florida limited liability company formed in 2019, and its principal place of business is in Pompano Beach, Florida.  Kristian Baso is Line One's President and Agent in Charge.

55.     Licensed Insurance Advisors LLC ("LIA").   LIA is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2016, and its principal place of business is in Fort Lauderdale, Florida.  Jason McDowell is LIA's Manager and its Agent in Charge.

56.     Marcharmi Investments LLC d/b/a CContreras Insurance ("CContreras Insurance").   CContreras Insurance is a downline agency of TrueCoverage.  It is a fictitious entity formed in 2022, and its principal place of business is in Coconut Creek, Florida.  Charles Contreras is its Authorized Member and Agent in Charge.

57.     N & J Associates, Inc. ("N & J").  N & J is a downline agency of TrueCoverage.  It is a Florida corporation formed in 1996, and its principal place of business is in Parkland, Florida.  Jeri Hill-Billow is N & J's President, and David Robert Billow is its Vice President.

58.     No Cost ACA, LLC d/b/a NCA Insurance Group ("No Cost ACA").   NCA Insurance is a downline agency of TrueCoverage.  It is a Delaware limited liability company formed in 2023, and its principal place of business is in Boynton Beach, Florida.  Robert Ginberg is NCA Insurance's Manager and its Agent in Charge.

59.     No Cost ACA Dos, LLC d/b/a NCAD Insurance Group ("NCAD Insurance").  NCAD Insurance is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2023, and its principal place of business is in Boca Raton, Florida.  Robert Ginberg is NCAD Insurance's Manager and its Agent in Charge.

60.     Nsure Now Insurance Agency Inc ("Nsure Now").  Nsure Now is a downline

CASE NO. 0:24-cv-60591-DAMIAN/Valle

agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Fort Lauderdale, Florida.  Paul Greenberg is its President and its Agent in Charge.

61.   <u>Prince Health Group LLC</u> ("Prince Health").  Prince Health is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Deerfield, Florida.  Victoria Casserino is its CEO and its Agent in Charge.

62.   <u>Smart Care LLC</u>.  Smart Care LLC is a downline agency of TrueCoverage.  It is an Ohio limited liability company formed in 2019, and its principal place of business is in Mason, Ohio.  Andrew Rathman is Smart Care LLC's Agent in Charge.

63.   <u>SRA Healthcare Corp</u> ("SRA").  SRA is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2023, and its principal place of business is in Virginia Gardens, Florida.  Randy Rojas, Mariam Anez, and Ysmael Sandoval are SRA's Authorized Members.

64.   <u>TSO Insurance Group Inc</u> ("TSO").  TSO is a downline agency of TrueCoverage. It is a Florida corporation formed in 2023, and its principal place of business is in Hollywood, Florida.  Trisha Perez is TSO's President and its Agent in Charge.

65.   <u>Tobias & Associates LLC</u>.  Tobias & Associates LLC is a downline agency of TrueCoverage.  It is a Florida limited liability company formed in 2021, and its principal place of business is in Boca Raton, Florida.  Michael Tobias is its Manager, and William Cox is its Agent in Charge.

66.   <u>United Branch Services, Inc.</u> ("UBS").   UBS is a downline agency of TrueCoverage.  It is a Tennessee corporation formed in 2021, and its principal place of business is in Brentwood, Tennessee.  Gregory Loerzel is its Agent in Charge.

67.   <u>Your Health Solutions Inc</u> ("Your Health").  Your Health is a downline agency of TrueCoverage.  It is a Florida corporation formed in 2013, and its principal place of business is in

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Naples, Florida.  Darlene Shaw is Your Health's President.

**B.      The Enhanced Direct Enrollment ("EDE") Platforms**

68.      <u>Inshura</u>.   Inshura is owned and controlled by Speridian Technologies and/or TrueCoverage.  It is a CMS-approved, Phase 3 Enhanced Direct Enrollment platform.  Certain TrueCoverage downlines such as Protect Health use Inshura to enroll class members, including some of the Class Plaintiffs, into ACA plans through that EDE platform.

**C.      The Lead Generation Entities**

69.      <u>PolicyBind, LLC</u>.  PolicyBind, LLC is a Florida limited liability company with a principal place of business in Miami, Florida.  Upon information and belief, PolicyBind generated Leads from deceptive and fraudulent advertisements and sold them to TrueCoverage.

70.      <u>WeCall Media, Inc</u>.  Upon information and belief, WeCall generated leads from deceptive and fraudulent advertisements and sold them to TrueCoverage.

71.      <u>My ACA, LLC</u>.  Upon information and belief, My ACA, LLC is related to WeCall Media.   My ACA sold leads to TrueCoverage that were generated from the deceptive and fraudulent advertisements at issue.

72.      <u>ScaleUp Media</u>.  Upon information and belief, ScaleUp Media generated leads from deceptive and fraudulent advertisements and sold them to TrueCoverage.

**D.      The Dialing Software Companies**

73.      <u>Esotech d/b/a Total Leads Domination ("TLDCRM")</u>.  TLDCRM is a Florida corporation with its principal place of business located in Hialeah, Florida.  According to its website, TLDCRM provides, among other things, dialer services, lead management services and data management services.  Throughout the class period, TrueCoverage used the TLDCRM software for their CRM ("Customer Relationship Management") system.  They used TLDCRM,

CASE NO. 0:24-cv-60591-DAMIAN/Valle

in part, to accept inbound calls at their call centers that were routed to them by software throughout the Class Period.

74.     <u>MME</u>.    MME is a proprietary telephonic dialing/CRM system designed by Speridian Technologies.  MME was integrated into Inshura as well as Benefitalign.  MME allows for inbound and outbound text messaging and calls to and from consumers.  It was used by TrueCoverage and its downlines to market and communicate with consumers.

**E.          <u>Others</u>.**

75.     <u>Gabriel Harrison</u>.    Harrison was the ACA enrollment manager at TrueCoverage's Deerfield Beach office and directed and oversaw agents who engaged in AOR Swaps, Twisting and Dual-Apps.

76.     <u>My Health Advisers, Inc., Gabriel Pasztor and Paola Fritz</u>.  My Health Advisers, Inc. is a Florida corporation created on April 18, 2019.  It has a principal place of business in Broward County, Florida.  My Health Advisers is an insurance agency located in Oakland Park, Florida.  According to records maintained by the Florida Department of Financial Services, Gabriel Pasztor is listed as the agent in charge of My Health Advisers, Inc.  Gabriel Pasztor is listed on the Florida Secretary of State's records as President of the company from August 26, 2022, to the present.  Upon information and belief, Gabriel Pasztor and his wife Paola Fritz are listed as AOR on many of ACA health plans sold to Plaintiffs and class members.  Gabriel Pasztor and his wife Paola Fritz have relevant information about the sale of the policies and the allegations related to AOR switching.

## IV.     <u>FACTUAL BACKGROUND</u>

77.     As a starting point, it is helpful to understand the ACA regulations that address how consumers, including Class Plaintiffs and class members, are enrolled into ACA plans, how Defendants fit into the regulatory framework and how Defendants violate those regulations.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

A.    **The ACA and How the Private Sector Became Involved in the Enrollment Process**

78.    The Patient Protection and Affordable Care Act ("ACA"), signed into law on March 23, 2010, was intended to reform aspects of the private health insurance market and expand the availability and affordability of health care coverage.  The ACA provides an opportunity for individuals who do not have group health insurance through their employer and are not on Medicare or public assistance programs such as Medicaid, to purchase individual health insurance each year.

79.    The ACA required the establishment of a health insurance marketplace in each state and the District of Columbia to assist individuals and small businesses in comparing, selecting and enrolling in health plans offered by participating private issuers of qualified health plans.  CMS is responsible for overseeing the establishment of these marketplaces, including creating a federally facilitated marketplace ("FFM" or the "Marketplace") for states not establishing their own.  CMS was responsible for designing, developing and implementing the IT systems needed to support the Marketplace.  This included the creation of Healthcare.gov — the website that provides a consumer portal to the Marketplace — and related data systems supporting eligibility and enrollment.



States That Allow Enrollment Through FFM Marketplace (2024)
(IN BLUE)

80.     The Marketplace began accepting applications for consumer enrollment on October 1, 2013.   However, individuals attempting to access Healthcare.gov encountered numerous problems.   In response to these problems, CMS began seeking ways to incorporate the private sector into developing and integrating technology into the enrollment process.

### 1.     The private sector enters the picture through "Direct Enrollment"

81.     As an initial step, CMS created and allowed for a service called "Direct Enrollment" or "DE."   Direct Enrollment allows private insurance carriers of approved Qualified Health Plans (or "QHPs") and private third-party "web-brokers" (online insurance agents) to enroll consumers through the Exchange, with or without the assistance of an agent or broker.   In this "classic" DE experience, consumers start at a carrier or web-broker's website and are redirected to Healthcare.gov to complete an eligibility application.   After completing the application, they are sent back to the issuer or web-broker's website to shop for and enroll in a plan.

82.     For the first few years, DE experienced technical challenges, in part because many consumers who attempted to enroll through carriers or web-brokers were dropping off in the middle of the process while being directed back and forth between Healthcare.gov and the carrier or web-broker's site.

### 2.     Enhanced Direct Enrollment is introduced to expand and improve the private sector's enrollment efforts, but critics become concerned

83.     To address the issue, in 2017 the Department of Human Health and Performance announced that the agency was considering creating an "Enhanced Direct Enrollment" (or "EDE") pathway.   EDE allows certain private entities, including insurance carriers and web-brokers, to directly enroll consumers into QHPs through the Exchange without redirecting consumers to Healthcare.gov.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

84.     In November 2018, CMS issued a release that described the rollout of the EDE pathway as a partnership with the private sector to help make enrollment more user friendly.  CMS announced that the EDE program would allow the private sector to connect directly to Healthcare.gov and touted a "great new opportunity [for] the private sector to come up with innovative ways to create a uniquely tailored end-to-end user experience."

85.     But critics of the EDE pathway model foresaw problems.  They warned that giving the private sector such access to the Marketplace database could expose consumers to fraudulent schemes and misleading information on web-broker sites.  For example, on March 15, 2019, the Center on Budget and Policy Priorities published a report entitled "'Direct Enrollment' in Marketplace Coverage Lacks Protections for Consumers, Exposes Them to Harm — New 'Enhanced Direct Enrollment' Heightens Risks."  The report warned that web-brokers, through the use of marketing technology, could use the database information to target and harm consumers.

86.     CMS released detailed guidance for entities wishing to implement the EDE pathway.  These guidelines noted that entities would be allowed to implement one of three phase options of the technology, each successive phase allowing the entity to directly enroll a greater percentage of consumers.  The highest and most stringent level, Phase 3, allows an entity to support all consumer applicants.  Phase 3 requires the entity to sign a privacy and security agreement with CMS that contains important consumer protections.  Among other things, these protections restrict how consumer PII can be created, collected, used and/or disclosed, and impose safeguards for safeguarding consumer PII.

87.     Benefitalign and Inshura are both Phase 3 EDE platforms.  Each publicly touts the heightened security and privacy safeguards that need to be implemented to achieve Phase 3 status.  For example, Speridian Technologies' website claims that Benefitalign has been audited by a third

party for extensive security and privacy, is compliant with nearly 300 CMS security and privacy standards and has been reviewed, approved and audited by CMS.

88.     Benefitalign and Inshura are agent-facing EDE platforms, meaning that they are designed to be used by health insurance agents to enroll consumers in ACA health insurance plans on the Marketplace database:



### B.      The ACA Imposes Important Regulatory Requirements That Defendants Violated

89.     Before delving into the fraudulent advertisements, scripts, AOR Swaps and Twisting conducted by the RICO Enterprise, it is important to describe the regulatory environment that Defendants TrueCoverage, Speridian Technologies, Benefitalign, the downlines, Panicker, Goldfuss, Harrison, exist in — and how those Defendants flouted its requirements and restrictions. Viewed within this context, the Enterprise's actions directed toward consumers and agents becomes even clearer.

90.     These Defendants fall within three categories of entities described by the ACA regulations.

91.     TrueCoverage, Goldfuss and the other TrueCoverage downlines are each considered an "Agent or broker" because they are "licensed by the State as an agent, broker or insurance producer" pursuant to 45 CFR § 155.20.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

92.     Speridian Technologies, TrueCoverage, Benefitalign and the relevant non-party EDE Platform Inshura is each a "Web-broker" under 45 CFR § 155.20.  A web-broker is an Exchange-registered individual or group of agents or brokers "that develops and hosts a non-Exchange website that interfaces with an Exchange to assist consumers with direct enrollment in QHPs offered through the Exchange . . . ."

93.     And Panicker is considered a "Non-Exchange entities," defined under 45 CFR § 155.260 to include those who are not part of the Exchange but who obtain and use consumers' PII. They are "any individual or entity that (i) Gains access to personally identifiable information submitted to an Exchange; or (ii) Collects, uses, or discloses personally identifiable information gathered directly from applicants, qualified individuals, or enrollees while that individual or entity is performing functions agreed to with the Exchange."

94.     Because they are agents, brokers and/or web-brokers, ACA's regulations place "standards of conduct" on Defendants TrueCoverage, Speridian Technologies, Benefitalign, Goldfuss and TrueCoverage downlines.  Pursuant to 45 CFR § 155.220(j)(2), they must not deceive consumers.  They must "[p]rovide consumers with correct information, without omission of material fact, regarding the Federally-facilitated Exchanges, QHPs (ACA health insurance plans) offered through the Federally-facilitated Exchanges, and insurance affordability programs, and refrain from marketing or conduct that is misleading (including by having a direct enrollment website that HHS determines could mislead a consumer into believing they are visiting *HealthCare.gov*), coercive, or discriminates based on race, color, national origin, disability, age, or sex." (emphasis added).

95.     Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, these Defendants and relevant nonparties must execute an agreement that

CASE NO. 0:24-cv-60591-DAMIAN/Valle

includes provisions binding them to comply with ACA's privacy and security standards and obligations and must also execute agreements with any downstream entities binding them to the same privacy and security standards.  *See* 45 CFR §§ 155.220(j)(2)(iv), 155.260(b)(2).

96.     As described in more detail in the sections below, these Defendants flouted the standards of conduct for agents, brokers and web-brokers outlined in 45 CFR § 155.220(j)(2). They created, sold, purchased and/or financed the purchase of leads that deceived consumers into thinking they would receive cash cards or other cash benefits.  They used or directed the use of misleading scripts to deflect questions about those cash benefits and engaged in twisting and AOR-swapping that harmed consumers.

97.     Moreover, because they are each agents, brokers, web-brokers and/or non-Exchange entities, all Defendants violated the regulations' security standards and obligations.

**C.     An Opportunity Arises in 2022, When the Sale of ACA Plans to Low-Income Americans Is Allowed Year-Round**

98.     Prior to 2022, the private ACA health insurance industry was relatively modest. Compared to other insurance products, including Medicare Advantage, marketing costs were high, margins slim and commissions low.  Time restraints placed on ACA enrollment did not help.  Prior to March 2022, almost all ACA plan enrollments were limited to the three-month open enrollment period (or "OEP") between November and January.  Once consumers purchased ACA plan(s) during the OEP, they were locked into that plan until the next OEP.  Other than occasional and limited "special enrollment periods" (or "SEPs") between OEPs, ACA agencies had little to sell for most of the year.

99.     Things began to change in 2021 when, in the wake of COVID, Congress passed ARPA.  Among other provisions, ARPA allowed consumers with household incomes between 100 and 150 percent of the federal poverty level to receive advance premium tax credits (or "APTCs")

CASE NO. 0:24-cv-60591-DAMIAN/Valle

to cover the cost of the plan.  APTCs are tax subsidies paid by the federal government directly to insurance carriers to offset the cost of monthly health insurance premiums.  To qualify for APTCs, consumers must satisfy income requirements.  During the enrollment process, consumers' estimated household incomes are included on their Marketplace application.  They receive premium reductions throughout the year, which are paid by the federal government to insurance carriers to subsidize the cost of health insurance coverage.  At the end of the year, when consumers file their tax returns showing their actual household income, their final reconciled APTC is determined.  If the actual household income falls below the minimum threshold to qualify for the APTC or if it exceeds the estimated household income provided with their application, then the consumer  must repay to the IRS any excess APTCs received (the "Tax Penalty.")

100.    Also in 2021, the U.S. Department of Health & Human Services ("HHS") announced the creation of a new *year-round* SEP.  It was set to begin March 2022.  This new SEP allowed qualifying consumers to enroll in a $0 ACA plan any time of the year.

101.    These changes created a tremendous opportunity.  According to the U.S. Census Bureau, in 2022, approximately 40 million Americans under the age of 65 earned incomes within the target range for a $0 plan.

**D.**     **TrueCoverage Generated Leads Based on Misleading "Cash Card" Ads**

102.    TrueCoverage created and purchased leads generated by advertisements falsely representing to consumers that they could receive cash benefits, such as cash cards or stimulus checks ("stimmys"), to cover household expenses like groceries, medical bills and rent.  Just a few examples of the types of  advertisements used to generate these leads include:



103.    When customers clicked these advertisements or text messages, they were asked a couple of short questions, including whether the consumer earned less than a certain amount per year and whether they were on Medicaid.  While these questions were made to appear to relate to the consumer's qualifications for a cash benefit, these questions were actually posed to determine whether the consumer qualified for APTCs to pay for health insurance.  If the consumer's answers came close to qualifying him or her for APTCs, that consumer was brought to a landing page that told them they were "prequalified."   The landing pages continued to use language that misled consumers to believe they were applying for cash benefits that could be used for daily expenses:




CASE NO. 0:24-cv-60591-DAMIAN/Valle

104.    The landing pages contained toll-free phone numbers for consumers to call.  These phone numbers led to the agents of TrueCoverage and/or its downlines.  The calls were routed through routing software, which also recorded the confidential calls without Consumer Class Plaintiffs' and class members' consent.

E.    **TrueCoverage Buys Fraudulently Generated Leads and Also Creates Its Own**

105.    Since at least 2019, TrueCoverage has acted as an agency and FMO.

106.    The key to TrueCoverage's ability to enroll consumers into ACA plans was Benefitalign, the proprietary Phase 3 EDE platform that is fully integrated into CMS's Marketplace database.  Benefitalign provides TrueCoverage with access to virtually the entire Marketplace database, including highly confidential information about consumers such as social security numbers and confidential health and medical information.

107.    Benefitalign was developed by TrueCoverage's affiliate Speridian Technologies. Both TrueCoverage and Speridian Technologies are subsidiaries of Speridian Global Holdings LLC ("Speridian Global"), which is owned and controlled by Speridian Global's two managers, Garish Panicker and Hari Pillai.

108.    In 2022, Speridian Technologies also developed a second Phase 3 EDE platform called Inshura, which was marketed primarily to third-party agencies, including but not limited to TrueCoverage's downlines, including Defendant Protect Health.   Inshura is a d/b/a of TrueCoverage.  TrueCoverage required its downlines to use its proprietary EDE platform(s), Inshura and/or Benefitalign, as their ACA enrollment platforms.   Inshura is owned by TrueCoverage.

109.    A diagram illustrating this general structure is below:

CASE NO. 0:24-cv-60591-DAMIAN/Valle



110.    Presented with this new opportunity, in early 2022 TrueCoverage and its downlines began to expand their operations to year-round levels.  TrueCoverage,  directed by Goldfuss, grew its sales force and South Florida became the nerve center that guided TrueCoverage's high volume ACA call center sales model.

111.    Even before March 2022, TrueCoverage had a marketing department that targeted consumers in the market for ACA plans through social media advertising, on platforms like Facebook and YouTube.  To execute its online marketing strategy, TrueCoverage both created and purchased leads, which would drive consumers to TrueCoverage's agents.  For the latter, it hired third-party lead generation firms to drive call volume using advertisements that were either created by the lead generation firms or from a marketer (or "publisher") hired by the lead generation firms.

112.    After March 2022, TrueCoverage noticed that cash card leads drove more ACA enrollments than others: leads derived from advertisements that promised something for free, like cash.  TrueCoverage also noticed that many of the consumers were calling for cash rewards.

113.    TrueCoverage's ads took the "future cash reward card" offers made by some carriers (to encourage insureds to earn cash rewards by taking proactive wellness steps over time, such as annual checkups) and made them seem like free cash.  Offers of a cash reward card of "up

to $500" became a "$500 cash card" in TrueCoverage's advertisements.  TrueCoverage also began using advertisements that conflated the subsidy paid by the federal government to insurance carriers and mispresented it as being paid directly to the consumer in cash or a cash card.

114.    The success of the fraudulently sourced leads allowed TrueCoverage to expand its downline network. TrueCoverage advanced commissions to its downline agencies in return for payments from future commissions. In the past, the ACA industry had been too volatile to support longer-term advance commission financing because enrollments generally were limited to just three months, commissions were low and volumes of enrollments too small to support large call center operations.  The year-round SEP for low-income Americans and the explosion of fraudulent leads changed the advance commission financing landscape.

## F.    TrueCoverage Knew About the Fraudulent Ads and Used the Volume of Leads Generated From Them to Recruit and Incentivize New Agents

115.    One former human resources manager states that while working at TrueCoverage from March 2023 to April 2024, consumers called in expecting the cash cards.  He affirms that TrueCoverage's executives knew exactly what was going on.  Rather than stop the practice, they promoted it:

> TrueCoverage and Speridian executives and management, including but not limited to Garish Panicker (President and Owner), Ashwini Despende (CEO), K.P. Hari (CFO), Matthew Goldfuss (National Sales Director), John Runkel (Sr. Director of Quality Assurance), Season Davis (Director of HR) knew that consumers were calling in response to the false advertisements promising cash cards and implemented policies and practices that pressured and incentivized call center agents to enroll consumers into ACA plans based on the fraudulent ads.

116.    Goldfuss led TrueCoverage's fraudulent enrollment efforts.  According to the former H.R. manager, Goldfuss "was in charge of purchasing leads and drafting sales scripts and he knew that TrueCoverage was purchasing leads based on fraudulent advertisements and relied

on those leads to drive consumers to call into our call centers.  The sales scripts were designed to be deceptive about the cash payouts being promised in the ads."

117.    Another former employee, Heather Cattaneo, worked in the Deerfield Beach office. She states that "TrueCoverage and Speridian executives and management, including Matthew Goldfuss, National Sales Director, John Runkel, Sr. Director of Quality Assurance, and Gabriel Harrison, Regional Director, knew that consumers were calling in response to the false advertisements promising cash cards and they pressured agents to use them to enroll consumers into ACA plans."

118.    All Deerfield Beach agents participated in an officewide Microsoft Teams group chat.  On the chat, agents often complained about the cash card calls.  According to Cattaneo, Goldfuss and Harrison would tell agents "to stop complaining and they threatened to pull us off the sales floor."  For example, On October 6, 2023, Harrison scolded agents for complaining about the prevalence of ads falsely promising the cash cards.  He wrote, "NEXT PERSON WHO SAYS SOMETHING NEGATIVE IS OFF THE PHONES[.]"

119.    Goldfuss chimed in, adding that "If you have issues with it, speak to Gabe, we don't need toxicity spread to everyone," prompting Harrison to write "BUYERS ARE LIARS" and "If YOU dont WANT UNLIMITED FREE LEADS THEN COME SEE ME."

120.    On November 3, 2023, TrueCoverage's Senior Director of Quality Assurance, John Runkel, sent an email instructing agents not to bring up the cash cards, and telling them that they "must be vague and cannot give any specifics about any rewards programs, under any circumstances":

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**Cash Card Reminder**

John Runkel <john.runke@speridian.com>
Fri 11/3/2023 1:16 PM
**Cash Card Reminder**

The customer must bring up the Cash Card to you first before you can engage in any general information.

You must be vague and <u>cannot give any specifics,</u> about any rewards program, under any circumstances.

Despite what ads are promoting, we must always encourage the customer to contact the insurance carrier for additional information about the <u>possibility</u> of additional benefits.

**John Runkel | Sr. Director Quality Assurance**
TrueCoverage LLC | 2400 Louisiana Blvd SE, Bldg. 3, Albuquerque, NM 87110
O: (505) 591-1327 |
Email: john.runkel@speridian.com | www.truecoverage.com



121.     If an agent told a consumer that the cash cards did not exist, that agent could be reprimanded by TrueCoverage's management for breaching company policy.   On January 26, 2024, Manager Kevin Hale overheard Cattaneo telling a consumer that they would not be receiving a cash card.  Hale told Cattaneo that he never wanted to hear her say that to a customer again.  Hale told her "sometimes you have to be the bad guy."  Cattaneo complained to Harrison, who told her to go to the Michelle Wilson in human resources, but nothing was done.

122.     TrueCoverage praised agents who followed the script and remained vague about the existence of the cash cards.  On January 30, 2024, Hale sent the following message to a group chat of Deerfield Beach agents, telling them that they should enroll consumers who ask "Where's my money?" and refrain from telling consumers they won't get a cash reward:

> I've got agents like Adolfo with 20 deals today.  So if you have 5 or less, there actually may be some shame in your game. . . .  <u>As always, [the] Where's my money? Folks should be sales.  I heard someone telling the client they don't get a check, WRONG! and the call went South from there. Read your rebuttals.</u>

(emphasis added).

CASE NO. 0:24-cv-60591-DAMIAN/Valle

123.    Goldfuss and Harrison instructed agents to enroll consumers in ACA plans even if they already had health insurance, regardless of whether it was appropriate for their needs.  For example, on November 20, 2023, Goldfuss sent a message on the group chat instructing agents that "For right now, <u>WE DO WANT YOU TO ENROLL EVERYONE</u> that comes your way. . . . <u>SO ENROLL THEM ALL!</u>"

124.    On December 15, 2023, Harrison sent an email to the agents stating, "Every call that comes in that line you are to enroll them[.]"

125.    Two days prior, on December 13, 2023, Runkel had sent an email to TrueCoverage's agents from his Speridian Technologies email address acknowledging that *"[w]e are misquoting subsidies and additional benefits. . . .* **We have been quoting to consumers that they are going to receive a 'subsidy card' in the mail to help pay for groceries, bills, rent and expenses."** (emphasis added).  Runkel explained that the subsidies were not cash benefits.  Rather, they were health insurance premium payments made directly from the government to the insurance carrier for the consumer's benefit.  Runkel also explained that while some carriers provided cash rewards (such as a gym membership or "$10 Subway card") for healthy activities, TrueCoverage had no authority to speak about additional benefits.  Finally, Runkel told TrueCoverage's agents that **"[t]he only thing we can do is follow our script and be vague."** (emphasis added).

126.    Runkel's email caused a stir among TrueCoverage's agents, some of whom were worried that they may not be paid commissions on their enrollments.  Harrison responded to reassure his agents by essentially telling them to ignore Runkel's email because it was meant for other TrueCoverage call centers, not Deerfield Beach:

> That email was mainly directed to other centers not ours, we are the **TOP PRODUCERS**, if you are putting in your numbers then losing 1 sale or even 3 by the end of the week is not going to Affect you!!  Get with the Picture guys, everything is great and you all have been paid very well, plus we feed you, plus we

CASE NO. 0:24-cv-60591-DAMIAN/Valle

give you Bonus for just doing your job, we give out cash spiffs to push you to hit numbers for your own Gain, we give out Prizes for those of you who Put in that extra work to be successful, Guys we pay out Huge checks and everyone knows it, why would we as a company  Harm your pay?  We are here to Help you all Become Fat and Happy With a Wheel Borrow full of **CASH**!

Guys don't get stuck in your head, lets push forward and continue the success we have started and make next year an awesome year with a Big book of Business!

127.     Ultimately, consumer complaints to CMS brought regulatory scrutiny.  In a January 11, 2024, email, Goldfuss instructed agents not to speak with any government agent or CMS: "If you receive an email from CMS or a Department of Insurance from any particular state, **DO NOT RESPOND!**"

128.     In February 2024, TrueCoverage learned that the undersigned counsel had issued a press release asking the public for information about TrueCoverage's practices.  TrueCoverage turned off the flow of fraudulently generated leads coming from to its call centers.  On February 26, 2024, Goldfuss told agents that TrueCoverage had stopped using the fraudulent ads.  He acknowledged that the ads were deceptive and had been the cause of the company's high call volume:

Good early evening team,

Many of you are most likely wondering why call volume has dropped off over the past few weeks and especially so the past few days.  We have made a decision to have 0 tolerance policy with companies that are sending us ads that are either outright deceptive or could be misconstrued as misleading.  We have informed our lead partners of this policy and as a result this is why you are seeing call volumes decline.  The call volume will pick back up but before we begin that process we are committed to rooting out the bad ads and call volumes will most likely remain weak for most likely the next couple of weeks.

There are other calls centers that don't care if they run bad ads and they are willing to take that risk.  If TrueCoverage wanted to we could easily open back up the spigots and have a lot more call volume but we are in this for the long-term.  We would rather do things the right way.

We appreciate everyone's patience on the matter.

129.     Cattaneo confirms that call volume dropped dramatically in February 2024.   In January 2024, she received approximately 20 to 30 calls per day.   By the end of February 2024, she received only eight to 10 calls daily.

130.     But TrueCoverage "opened back up the spigots" in March 2024.   On March 5, 2024, a consumer sent Cattaneo a copy of the false advertisement that led that consumer to call TrueCoverage that day:



131.     Other agents also corroborated TrueCoverage's use of fraudulently generated leads. One said, "I would estimate that 99% of my callers were responding to an online advertisement and expected a cash card or other cash subsidy."   He also confirmed using the misleading rebuttal script: "We would tell the callers that the packet would come in the mail 7-10 business days, and if they had any questions they could reach out to the carrier."

132.     TrueCoverage's success in driving enrollments from fraudulent advertising helped the company recruit agents.   The former H.R. manager stated that he "was instructed to tell new hires that one of the benefits of working at TrueCoverage was they did not have to cold call consumers because there was an unlimited supply of consumers calling in and as an agent, they

CASE NO. 0:24-cv-60591-DAMIAN/Valle

could start their careers in sales making large amounts in commissions." He told new agents that "given our technology and call volumes, sales would be easy and more in line with 'order taking' as opposed to selling ACA plans."

133.    TrueCoverage agents who leaned into the scheme did very well. TrueCoverage's highest producing agents were in the company's Florida call centers and made approximately $20,000 to $24,000 in commissions each month. TrueCoverage used these figures in its recruitment pitch to new agents.

134.    TrueCoverage's Florida call centers collectively had the most agents in the company. The Deerfield Beach call center was the largest, if not one of the largest TrueCoverage call centers. The agents who worked in Florida received heavily incentivized compensation and commission schedules that were highest in the company.

135.    Still, the pressure to mislead consumers hit some agents hard. The former H.R. manager stated that many enrollment agents complained about what TrueCoverage asked them to do:

> A consistent complaint that I received from sales agents was that they did not feel comfortable having to mislead consumers. I also saw similar complaints on occasion on the Microsoft Teams group chats for the New Mexico call center. Each call center has its own Microsoft Teams chat groups. Over two dozen different sales agents came to me with these complaints and showed me the false advertisements that consumers who called in were showing them. In or around November - December 2023, two different agents quit because they did not feel comfortable lying to consumers. I documented their complaints in the employment files and specifically noted it in their exit interviews. I also notified my supervisor, Season Davis, the human resources director for TrueCoverage, and she did nothing.

## G.    TrueCoverage's Downlines, Including Protect Health, Also Use Fraudulent Leads

136.    Agents who worked at TrueCoverage downlines also had similar stories. One former Protect Health agent stated that the "vast majority of calls that I received were from consumers that were expecting to receive cash cards promising them thousands of dollars per

CASE NO. 0:24-cv-60591-DAMIAN/Valle

month that could be used for groceries, rent, etc." He said that "When consumers were transferred to live agents like me, we were required by Protect Health in a sales script to first ask whether they were calling in about the [$6,400] benefit."

137.     Another former Protect Health agent explained her experience at Protect Health and stated that almost all consumers calling into Protect Health sought cash cards:

> The company used a dialing system called Convoso and a CRM/enrollment platform called Inshura. When a warm transfer came to me from a fronter, my screen would state "ACA DMS." When a consumer called in directly in response an online advertisement, my screen would identify the phone number of the consumer. Regardless of whether the calls that I fielded were from fronters or inbound calls from consumers responding to an online ad, virtually every consumer was expecting to receive a cash card worth thousands of dollars a month that they could use to pay for personal expenses such as groceries, rent, etc.

> Based on my experience fielding these calls, the consumers were misled by the fronters and online advertisements because the cash card did not exist, and the money being promised was actually a subsidy that the federal government paid to the insurance carriers to reduce the premiums for the health insurance. Consumers who called thought that they were prequalified for these benefits, which was not true.

> [Protect Health] knew that these consumers were misled by the fronters and false advertisements. We were instructed to lie to these consumers and lead them to believe that the insurance carrier would send them the cash card after they enrolled in the health insurance plan. We were also instructed to tell customers that they would need to call the phone number on the back of their health insurance card to receive the cash card.

138.     Protect Health used TrueCoverage's EDE platform, Inshura, and TrueCoverage's proprietary dialing system MME, which was integrated into Inshura as well as Benefitalign. MME is a telephonic dialing/CRM system that was designed by Speridian Technologies. MME allows for inbound and outbound text messaging and calls to and from consumers. It was used by TrueCoverage and its downlines to market and communicate with consumers.

139.     TrueCoverage also trained Protect Health agents. For example, an agent who worked at both TrueCoverage and Protect Health corroborates Cattaneo's experience at

TrueCoverage. The agent was terminated by TrueCoverage on or about February 1, 2024. But a few days later. TrueCoverage referred him to Protect Health, which hired him. When he started at Protect Health, the agent's initial training was conducted by Harrison of TrueCoverage. The agent stated that "[b]ecause I had previously complained to TrueCoverage about its deceptive sales practices and TrueCoverage was clearly controlling [Protect Health]'s sales practices, I was concerned that [Protect Health] would be engaging in the same type of misconduct." During the training session, the agent "posted a question on the Microsoft Teams Q&A chat asking whether Protect Health going to be using the same type of misleading advertisements to lure in customers. Gabriel Harrison did not respond.

## H.   TrueCoverage and its Downlines Use Uniform Scripts to Support the Misleading Advertisements

140.    Because consumers thought they were calling in for free cash cards and not health insurance, TrueCoverage and its downlines trained agents to use scripts designed to deflect questions about the cash cards.

141.    TrueCoverage's script was created to work seamlessly with the landing page from a misleading advertisement. It begins with a question that references the landing page: "Fantastic, and you saw that prequalified result that led you to us? Great!" From there, the script asks just a few more simple questions designed to verify the consumer's qualifications for an ACA insurance plan: current healthcare coverage, name, date of birth, zip code, marital status, dependents and "anticipated" income.

142.    If the consumer referenced the cash benefits he or she had seen in the advertisement and landing page, TrueCoverage provided its agents with another script — a rebuttal script — to guide them. The rebuttal script instructed the agent to quickly deflect the consumer's question about a cash card. For example:

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**Online Ad Rebuttals**

**REBUTTALS TO CASH CARDS AND $$ QUESTION**

**They say—I am calling about the cash card?**

**Rebuttal**: Yes, you may qualify for additional benefits with eligible plans.  Let us start the qualification process to find the plan that fits your needs, what is your zip code?

143.    Another purpose for the scripts was to quickly enroll consumers into ACA health insurance in less than 10 minutes, an extremely fast pace.  Because ACA plans pay smaller commissions, volume was key to the success of the business model.

144.    TrueCoverage told its agents that failure to follow the scripts was grounds for termination.

145.    Heather Cattaneo, who worked for TrueCoverage and Speridian Technologies from September 2023 to March 2024, stated that "[t]he sales scripts that TrueCoverage required us to follow misled consumers about the cash cards being promised."  She said TrueCoverage made agents use rebuttal scripts that "required us to be vague about the cash card" and to contact the carrier about the reward programs they offer.

146.    As for Class Plaintiffs and class members, they justifiably relied on the advertisements and the statements and omissions made in the scripts.  The misleading nature of the advertisements and scripts caused them to enroll and/or provide their PII.

147.    TrueCoverage and its downlines engaged in hundreds of thousands of AOR Swaps to steal other agents' commissions.  Using the Benefitalign and Inshura platforms, they created large spreadsheet lists of consumer names, dates of birth and zip codes.  They provided those spreadsheets to agents and instructed the agents to access the EDE Platforms and change the consumers' AOR without telling the client or providing informed consent.

148.    In doing so, they immediately captured the monthly commissions of agents like NavaQuote and Broyer who had originally worked with the consumers directly to sign them up.

149.    A former TrueCoverage agent stated that the company gave him lists and instructed him to "switch the health plans of consumers who already had ACA plans regardless of whether it was appropriate for the consumer."   TrueCoverage trained its agents to distinguish between policies in which a TrueCoverage agent already was the AOR, and those that were not.  For the former, the switching agent was instructed to change the consumer's plan, not the AOR.  They accomplished this by making a clerical change to the existing customer's application — such as changing the address — which allowed the agent to change the consumer's existing plan.  This was done without telling the consumer.  For the latter, the agent was instructed to simply change the AOR and leave the consumer's existing plan untouched.  Either method generated a new commission stream for TrueCoverage — the former by creating a new plan, the latter by stealing a commission.

150.    TrueCoverage's downlines also took part.  Matthew Ginberg of No Cost ACA canceled at least 57 of one Florida-based agent's customers, including Veronica King's policy.

151.    One former employee in Protect Health's "research department" recounted being given a list of 875 consumers to swap to Protect Health.  He was also tasked with researching Protect Health policies that had been recently cancelled.  Cancellations were sent to a "Tango Team" that accessed Inshura to recapture them.  The Tango Team swapped the former customers' AORs back to Protect Health.  So that consumers were not alerted, the Tango Team changed the incomes on the consumers' applications to ensure that they had a $0 premium.  That way, the consumer would not be alerted to the change by a new charge or bill.

152.     Another former Protect Health employee who worked on the Tango Team confirmed the former research department employee's testimony.  She said she was instructed to do the switching by manager, John Asherl.

153.     The volume of switching quickly became so great that TrueCoverage began to run out of AORs to use for replacements.  TrueCoverage was concerned that if CMS saw one of its agents as the AOR on thousands of polices, CMS would investigate.  So TrueCoverage began to offer its agents payments of $4,000 to $5,000 in exchange for using the agents' NPNs on policies those agents did not write.  This allowed TrueCoverage to expand the pool of NPNs with which to engage in switching and to avoid drawing attention to what it was doing.  Sometimes if an agent declined the offer, TrueCoverage would use that agent's NPN to do AOR Swaps anyway, without the agent's knowledge.

154.     These actions exemplify the scale of the AOR- and plan-swapping.  TrueCoverage was swapping at such a rate that they needed more and more NPNs to handle the volume, and would go as far as using an agent's NPN without authorization to accomplish it.

155.     This swapping was crucial to TrueCoverage and the downlines.  It allowed them to essentially churn insurance policies, changing consumers' policies from carrier to carrier or policy to policy to collect new, or regain old, commissions.

156.     The swapping activities generated revenues and padded agent commissions and executives' bonuses.  Just as importantly, it concealed from carriers the high ACA cancellation rates by consumers who became upset when they received no cash card.

157.     Eventually the switching became so prevalent that carriers took notice.  For example, on December 6, 2023, Ambetter created an "Agent of Record Rule" to address the

switching.  The rule locked in the AORs on its policies for a year, effective January 1, 2024.  This led to more than 200,000 AOR Swaps on December 31, 2023.

158.    As managers of their respective companies, e.g. Goldfuss, directed, knew of and/or learned of the switching and did nothing to stop it.  To the contrary, they promoted it.

159.    On February 26, 2024, CMS published a notice acknowledging the swapping problem.  The first three bullet points outlined the issue:

- CMS has identified instances of consumers being enrolled into an unwanted plan.

- This action, referred to as an Unauthorized Plan Switch (UPS), results in the consumer's desired policy being cancelled or terminated.

- Many consumers are unaware of the switch until they attempt to use the desired policy to see a doctor or fill a prescription and are denied.

160.    On July 19, 2024, CMS issued a "Statement on System Changes to Stop Unauthorized Agent and Broker Marketplace Activity."  The statement announced that CMS would immediately begin requiring unassociated or "new" brokers to conduct a three-way call with the consumer and the Marketplace in order to switch a policy's agent of record.

161.    TrueCoverage and its downline agents also engaged in the creation of dual applications, or "Dual-Apping."  In this scenario, they left a consumer's original plan in place, but submitted a new application — a dual policy — for that consumer without the consumer's knowledge or consent.  This created a new policy and a new commission.  Sometimes, this Dual-Apping was achieved by splitting up a family plan; for example, by submitting an application and creating a separate policy for a husband, leaving the wife and children on the original plan.

162.    These schemes hurt consumers in multiple ways.  Some consumers were signed up into twisted or dual plans that they do not qualify for.  The APTCs they received, sometimes

unknowingly, caused a Tax Penalty at the end of the year.  Some were put into plans that their doctors are not a part of.  Or the new plans had higher deductibles or copays.

**I.      TrueCoverage Had a Fiduciary Relationship to the Class**

163.    Consumers, including Class Plaintiffs and class members, relied on TrueCoverage and the downlines for assistance and protection.  The consumers targeted in this scheme include our country's most poor and vulnerable.

164.    Consumers trusted that they were being enrolled into health insurance that was appropriate for their needs.  The agencies knew and encouraged that reliance and trust.  TrueCoverage's Call Flow Guidelines required agents to "choose the best plan that fits customers' needs and provide plan details, like deductibles, copays, prescriptions, preventative care, and other services that are on the plan."

165.    TrueCoverage and the downlines purposely created a special, fiduciary relationship with its customers, including Class Plaintiffs and class members.  Their scripts directed the agents to investigate a customer's insurance needs by asking a series of personal questions.

166.    The scripts led Plaintiffs and Class Members to believe that the agents would determine the health plan that was best suited to meet their needs.

167.    The scripts also solicited consent from Plaintiffs and Class Members to access their confidential health and PII on the federal Marketplace database.

168.    To further engender trust, the scripts reinforced their expertise and agents' commitment to being trustworthy.

169.    By encouraging and engaging their customers, including Class Plaintiffs and class members, in a special, fiduciary relationship, TrueCoverage and its downlines triggered a duty to advise consumers, including Class Plaintiffs and class members, prudently about their coverage needs.  That included a duty not to mislead them.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

170.     This fiduciary duty is also memorialized in the CMS regulations applicable to the sale of ACA plans.  45 CFR 220(j)(2) states that agents of TrueCoverage and the downlines have an obligation to provide consumers with accurate information:

> **Standards of conduct.** An individual or entity described in <u>paragraph (j)(1)</u> of this section must—
>
> (i) <u>Provide consumers with correct information, without omission of material fact, regarding the Federally-facilitated Exchanges, QHPs offered through the Federally-facilitated Exchanges, and insurance affordability programs, and refrain from marketing or conduct that is misleading</u> (including by having a direct enrollment website that HHS determines could mislead a consumer into believing they are visiting *HealthCare.gov*), coercive, or discriminates based on race, color, national origin, disability, age, or sex (which includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes)

171.     TrueCoverage and the downlines breached their fiduciary duties by placing Plaintiffs and Class Members in policies that were unsuitable and/or that they did not qualify for. They breached their fiduciary duties by switching Plaintiffs' and Class Members' plans, canceling their insurance and changing the agents of record without prior notice or consent.

## J.     <u>Thousands of Consumers Have Complained About the Scheme</u>

172.     TrueCoverage's online reviews contain numerous testimonials from consumers describing their experience with the schemes:

> I received this insurance through a $6,400 subsidy that was offered. I received an insurance with 0 deductible but my doctor or therapist does not accept that insurance.
>
> > -Maria
>
> I think that you shouldn't act like people are getting money to get people to get coverage through your agency.  Also shouldn't tell people you're on health.gov because I found nothing on health.gov about truecoverage.
>
> > -Sarah L.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

On November 30th I called and signed up for the $6,400 subsidy. THEIR WEBSITE said it was to help pay for gas, bills, utilities. I even asked the lady and texted her and she said YES, ITS TO PAY FOR ANYTHING. I was told it would be in 30 days. 30 days later I call back (she would never respond to text when I asked about it) and the guy said that she forgot to finish last step and that it ($6,400)would be in in ***** days but they'd make sure it was sent in next week. Never received it. All a huge scam.

-Shane K

On November 30th 2023, I was calling for the stimulus package the government was offering, and the number I was provided sent me to this company. I was told by ******** ****** that I was going to be getting a stimulus package of $1730.54 monthly to cover gas, groceries, and bills. I was also getting a medical coverage from ***** effective Jan. 1 2024 with a $0 premium. I was told that this was from the Stimulus program to help the middle class stuck in the middle financially and medically, and we took the offer and I had to provide the SSN for my ENTIRE family to be Automatically qualified. I told her my children already had medical coverage from ********** and she said it was fine. We signed up due to the prior knowledge presented to us, and after a few days I became skeptical and reached out to ******** on December 11th 2023 to clarify what we were getting and the call was automatically sent to voice-mail. I called the business number and was told that the information presented to us was NOT accurate, and I immediately went to cancel my policy. My concern is my family's personal information (SSN most importantly) is in their system and im worried for potential fraud due to already being misled and lied to.

-"Initial Complaint" 12/11/23

This company is advertising $6400 for individual that need assistance with health coverage. Once I reached out they tried to sell me a low cost health coverage. I am complaining because they are using foul advertising practices. I'm sure this is just the tip of the iceberg. Stop them now!!!

-Initial Complaint 10/30/23

Falsely advertising a savings benefit card that you can use to purchase groceries or pay rent get gas. However I never received it and the agent has not responded to any of my calls or messages. I specifically signed up for this for this card only

-Initial Complaint 9/26/23

46

CASE NO. 0:24-cv-60591-DAMIAN/Valle

K.      **Defendants' Actions Caused Injury to Plaintiffs and the Class**

173.    Leads generated by fraudulent ads directly influenced consumers to call in and provide their PII.  Those who enrolled were calling to get a cash card.

174.    For example, when the undersigned issued a press release about an investigation into TrueCoverage's practices, TrueCoverage reduced its purchases of the fraudulent leads and call volumes went down immediately.   Harrison's February 26, 2024, email to agents acknowledges this.

175.    A manager in TrueCoverage's Albuquerque office told one agent who complained about the ads, "without these ads they wouldn't call in."

176.    In addition, when this lawsuit was filed on April 12, 2024, numerous downline agencies of TrueCoverage shuttered almost instantly.

177.    The PII generated from the cash card leads allowed Defendants to engage in the swapping activities that have become epidemic.  A June 2024 report by a policy thinktank called paragon Health Institute titled "The Great Obamacare Enrollment Fraud" discovered that in nine states, the number of enrollments in $0 ACA plans exceeds the number of residents who qualify for them.  "The problem is particularly acute in Florida, where we estimate there are four times a many enrollees reporting income in that range as meet legal requirements."  The report attributes the problem to brokers using PII to enroll consumers and capture commissions:

> Unscrupulous brokers are certainly contributing to fraudulent enrollment and the enhanced direct enrollment feature of Healthcare.gov appears to be a problem *Brokers just need a person's name, date of birth, and address to enroll them in coverage, and reports indicate that many people have been recently removed from their plan and enrolled in another plan by brokers who earn commissions by doing so.*

(emphasis added).

178.    The report also posits that the problem is caused by "counseling of income

manipulation by outside entities [ie., unscrupulous agents] aware of the program rules."

179.    On May 6, 2024, just three weeks after this lawsuit was filed, CMS issued a "Statement on Agent and Broker Marketplace Activity, Update," confirming that it "received approximately 40,000 complaints of unauthorized plan switches in the first three months of 2024," as well as "approximately 50,000 complaints of unauthorized enrollments . . . ."

180.    The scheme has also gotten the attention of Congress.  On May 20, 2024, Oregon senator Ron Wyden wrote a letter to CMS "to express my outrage with reports that agents and brokers and submitting plan changes and enrollments in the Federal marketplace without the consent of the people who rely on these plans."

181.    On June 28, 2024, three house committees, the Committee on Energy and Commerce, the Committee on Ways and Means and the Committee on the Judiciary sent a joint letter to the Comptroller General of the United States requesting information about the "astonishing level of improper, and potentially fraudulent, behavior in Obamacare markets."

182.    And on July 8, 2024, Senator Chuck Grassley wrote a letter to HHS and CMS seeking information about the nature and extent of the scheme.

## L.    **Victims Included the Class Plaintiffs**

183.    The scheme described above was applied to Class Plaintiffs, including consumers and agents.

### 1.    **The Consumer Class Plaintiffs**

184.    Veronica King.  King is 53 years old and lives in Warner Robins, Georgia.  Since 2011, King has used agent Marsha Broyer of WINN Insurance to help her navigate and purchase health insurance.

185.    On or about November 30, 2023, Broyer consulted with King and enrolled her into

CASE NO. 0:24-cv-60591-DAMIAN/Valle

a health plan that met her needs.

186.    In a three-month period from November 30, 2023, to February 25, 2024, at least eight other agents switched themselves as AOR on King's health plan and changed when them without King's valid consent.

187.    At least six of the eight switches were done by downlines of TrueCoverage.

188.    On November 30, 2023, which is the same day that Broyer enrolled King into her policy, agent Christhian Crevoisier with Ensure Health Group, a downline of TrueCoverage, canceled the original policy and enrolled King into another health plan.

189.    On December 12, 2023, Ms. King's application was accessed and switched to Matthew Ginberg, who became King's AOR without her valid consent.  Matthew Ginberg is an agent of No Cost ACA, LLC, which is a downline of TrueCoverage.

190.    On or about December 19, 2023, Broyer discovered that the plan had been switched and she reenrolled King back into the original health plan. Broyer also reported the misconduct to CMS.

191.    On December 30, 2023, Marsha Broyer discovered the illegal switch and again switched the policy back and listed herself as AOR on Ms. King's policy.

192.    On December 31, 2023, New Year's Eve at 11:59 p.m., Ms. King's account was again accessed and switched to TrueCoverage downline agent Matthew Ginberg as AOR. The health plan that Veronica was enrolled in was Ambetter. Upon information and belief. Ginberg switched himself to be the AOR because the prior month on December 6, 2023, Ambetter announced that the agent listed as AOR as of 1/1/2024 would receive the commission for all of the 2024 plan year even if the AOR was subsequently switched.

193.    Broyer discovered the Ginberg switch and switched herself back as AOR on or

about January 6, 2024.

194.    That same day, Ms. King's application accessed again and Alexis Vanella, another agent with TrueCoverage downline, No Cost ACA, switched and lists herself as AOR on the policy.

195.    As a result of these twisting actions, King has been damaged including loss of continuity of care resulting from the agent of record and enrollment into additional health plans, and out-of-pocket costs spent attempting to deal with the issues created.

196.    <u>Paula Langley</u>. Mrs. Langley lives in Texas and suffers from serious health conditions.  She suffered a heart attack and uses a pacemaker to alleviate a chronic heart condition. Mrs. Langley works as an office manager at a pest control company.  She and her husband, Lee, live in an extended-stay hotel.

197.    In 2022, Mrs. Langley's health insurance provider notified her that it would not renew her plan for 2023, prompting her and her husband to search the internet for new health insurance plans.

198.    While searching for the right health insurance to cover Mrs. Langley's heart condition, the Langleys came across an ad promising a cash card.  Mr. Langley called the number listed on the ad and was enrolled in a new plan effective February 1, 2023.

199.    However, the Langleys never received a cash card and instead the couple began to receive new health insurance cards from different carriers almost immediately following her enrollment in this plan.  During several of her visits to the doctor, she presented her health insurance information but was told that she did not have health insurance or that she did not have the plan she thought she did.

200.    In one such instance, on or around March 29, 2024, Mrs. Langley sought to renew

CASE NO. 0:24-cv-60591-DAMIAN/Valle

her prescription medication for her heart condition with her doctor and presented her health insurance information. However, the doctor told Mrs. Langley that she did not have any health insurance.

201. In a panic, Mrs. Langley called a friend who referred her to Plaintiff WINN Insurance Agency and spoke with agent Marsha Broyer. Broyer enrolled Mrs. Langley in a health insurance plan to cover her from April 1, 2024 through the end of 2024.

202. Following a review of her plan history, Broyer discovered that Mrs. Langley was the target of persistent twisting by TrueCoverage and/or its downlines.

203. For example, from February 1, 2023 through April 2024, when Class Plaintiff WINN agency and Marsha Broyer helped her, Mrs. Langley had her health insurance plan changed at least 22 times without her valid consent. Some examples of this twisting by TrueCoverage and/or its downlines are as follows:

    a.    March 2023: ACA Helpline, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Frederick Bock as AOR;

    b.    May 2023: ACA Helpline, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Frederick Bock as AOR.

    c.    December 2023: Ensure Health Group, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Christhian Crevoisier as AOR;

    d.    December 2023: No Cost ACA Insurance, a downline agency of TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Matthew Ginberg as AOR;

    e.    January 2024: No Cost ACA Insurance, a downline agency of

CASE NO. 0:24-cv-60591-DAMIAN/Valle

TrueCoverage, switches Mrs. Langley's plan and carrier, and adds Matthew Ginberg as AOR;

204.    A more complete chronology of all the switching and twisting done to Mrs. Langley is attached as **Exhibit 1**.  As a result of the unauthorized switching and twisting of policies and agents of record described herein, Mrs. Langley has incurred damages in the form of thousands of dollars in uncovered medical bills.

205.    <u>Tiesha Foreman</u>.  Foreman is 50 years old and lives in Douglasville, Georgia.

206.    In or around December 9, 2022, Mrs. Foreman's husband, Larry Foreman, responded to an online ad stating that he prequalified for a cash card.  He spoke with a TrueCoverage agent who enrolled him (but not Mrs. Foreman or their child) into an Oscar Health Plan.  Upon information and belief, the agent led Mr. Foreman to believe that he would receive a cash card and $0 health insurance by falsely mischaracterizing that the advanced premium tax credit ("APTC"), which is paid by the government to the insurance carrier, would be paid to Mr. Foreman in the form of a cash card.

207.    To qualify Mr. Foreman for the tax credit, TrueCoverage underreported the family's household income.  Specifically, TrueCoverage did not include Tiesha Foreman's income in the household income calculation.  Mrs. Foreman is an accountant that makes approximately $95,000 per year, an income amount that disqualified her and her family from receiving the APTC.

208.    The following year, the Foremans received a 1095-A showing that that the Oscar policy was only in effect from January 1, 2023, to January 31, 2023 (one month), and that the Foremans owed the IRS approximately $871 for the APTC that it paid to Oscar Health.

209.    On or about February 13, 2023, TrueCoverage agent Marius Boncea re-enrolled Mr. Foreman (but not his wife or child) into a second health insurance policy issued by Cigna

HealthCare of Georgia. Mr. Foreman does not recall ever agreeing to enroll into this policy. Once again, TrueCoverage underreported the Foremans' household income to qualify Mr. Foreman for the APTC, even though the Foremans' household income was too high to qualify for the subsidy.

210.    The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from March 1, 2023, to April 30, 2023 (two months), and that the Foremans owed the IRS approximately $1,741.76 for the APTC that it paid to Cigna.

211.    In April 2023, Mrs. Foreman was unaware that her husband had responded to the online ad and had been enrolled in multiple policies in the months prior. At that time, the Foremans' oldest son was removed as a dependent on their income taxes, which qualified as the event that allowed the Foremans to enroll in an ACA plan outside the standard open enrollment period. As a result, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace to provide health insurance coverage for the remainder of 2023.

212.    On or around October 17, 2023, agent Hans Mardy enrolled Mrs. Foreman into a Cigna plan without valid consent. The following year, the Foremans received a 1095-A showing that that the Cigna Health of Georgia plan was only in effect from November 1, 2023, to November 30, 2023 (one month), and that the Foremans owed the IRS approximately $1,793.32 for the APTC that it paid to Cigna.

213.    On or about October 26, 2023, Mr. Foreman was switched into an Ambetter health by another agent, Gabriel Pasztor.

214.    A couple of weeks later, on November 4, 2023, another agent believed to be affiliated with TrueCoverage, Christopher Morales, submitted another application without the Foremans' valid consent.

215.     In December 2023, during the Open Enrollment Period, Mrs. Foreman enrolled in and purchased an Oscar health plan for her and her family directly through the Marketplace, to provide health insurance coverage for 2024, effective January 1, 2024.

216.     On January 22, 2024, Foreman learned that the Oscar coverage that she purchased in December 2023 had been cancelled.  She called the Marketplace and learned that without her knowledge or consent, Pasztor submitted a health insurance application on her behalf.

217.     As a result of this switching of plans, the Foremans were left without health insurance in 2024 and incurred uncovered medical expenses.

218.     At this point, Mrs. Foreman sought help from Callie Navrides and NavaQuote. Navrides and Mrs. Foreman spent a significant amount of time attempting to unwind the problem through the Marketplace.  It is still ongoing.

219.     As a result of these actions, Mrs. Foreman suffered significant damages, including tax damages, loss of benefits, unpaid medical expenses and uncovered medications.  Mrs. Foreman has also suffered damage by having to expend unnecessary time fixing these problems.

220.     <u>Conswallo Turner</u>.  Turner is 52 years old and lives in Orange, Texas, with her son, Joshua Janice.  In late 2023, she started looking for health insurance.  With the help of Callie Navrides at NavaQuote, on December 9, 2023, Turner applied for a UnitedHealthcare Gold plan through the Healthcare marketplace.  The application was approved, and the policy was set to go into effect on January 1, 2024.

221.     Shortly thereafter, Turner saw a Facebook ad promising a monthly cash card to pay household expenses.  She called the number on the ad and provided her name, date of birth and state of residence.  Armed with this information, agents switched Turner's plan and her AOR no less than five times in a span of weeks in December 2023 without her valid consent.

222.    As a result of these actions, Turner has been damaged including but not limited to the loss of coverage and resulting medical payments for her son Joshua and higher deductibles and co-pays than the policy sold to her by NavaQuote. In addition, Plaintiff suffered damages resulting from the time and expense she has spent trying to correct the problems caused by the unlawful conduct.

223.    <u>Angelina Wells</u>.  Wells is 53 years old and a resident of Texas.

224.    In or around January 22, 2024, Wells contacted NavaQuote and expressed concern to Callie Navrides that she had been enrolled in health insurance policies that did not meet her needs without her consent.

225.    Specifically, Wells stated that she learned that she had a United Healthcare plan but that the plan did not her meet needs.   Wells stated that she did not recall enrolling into the health plan at all.

226.    In response, Navrides researched the issue on Healthsherpa and learned that Wells had been switched at least three times to different policies between November 2023 and January 22, 2024.

227.    Specifically, Navrides learned that Wells was switched into a Cigna Bronze plan by TrueCoverage agent Maurice Thrower, and then switched again into a United Healthcare plan by another agent, Gabriel Pasztor.

228.    In an effort to help Wells and get her enrolled into a policy that met her needs, on or about January 22, 2024, Navrides enrolled Wells into a Cigna Connect Gold Enhanced Diabetes Care plan, which would ensure that Wells' diabetes treatment and medication(s) would be covered in an affordable way.

229.    Four days later, on January 26, 2024, TrueCoverage removed Navrides as AOR and

replaced her with one of its downline agents, Francisco Umana, and then enrolled Wells into an Ambetter Everyday Gold plan.  TrueCoverage did so without Wells' valid consent.  The change caused Wells' Cigna Connect Gold Enhanced Diabetes Care plan to be canceled.

230.   On February 22, 2024, Wells received an unsolicited text message from TrueCoverage thanking her for enrolling into another Cigna health plan.   Wells does not recall consenting to enroll in another Cigna plan other than the one sold to her by Navrides.

231.   On March 18, 2024, Wells contacted Navrides and expressed concern that the pharmacy told her that her Cigna plan sold by Navrides had been cancelled and that her diabetes medication had a $50 copay.

232.   After learning about these issues, Navrides and Wells spent a significant amount of time unwinding the problem through the Marketplace.  Ultimately, they were able to reinstate the Cigna Connect Gold Enhanced Diabetes Care plan originally sold by Callie Navrides.

233.   As a result of these actions, Wells has been damaged.  Wells suffered significant damages including loss of benefits and medication.   Wells also suffered damage by having to expend unnecessary time fixing these problems.

### 2.     **The Agent Class Plaintiffs**

234.   <u>NavaQuote LLC</u>.  NavaQuote LLC is a small, family-owned and -operated insurance agency based in Augusta, Georgia.  NavaQuote was founded by the husband-and-wife team of Peter and Callie Navrides.  It specializes in health, life and Medicare insurance products. Callie Navrides serves as the company's principal agent.  Peter Navrides leverages his background in software, marketing and technology to help grow the agency.

235.   NavaQuote takes pride in seeking to develop long-term relationships with its clients through trust and open communication.  To accomplish this, the Navarides commit themselves to

the highest ethical standards and to providing expert guidance to help clients make informed insurance decisions.

236.    NavaQuote expends significant resources to market its services online and maintain an online presence, including its website.  The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of ACA health plans.  When NavaQuote sells an insurance policy through the Marketplace, Callie Navrides becomes listed as AOR and NavaQuote receives a monthly commission.

237.    Since the agency opened in October 2023, NavaQuote sold approximately 50 health plans to consumer, but lost 23 to the AOR Swaps.  Through continued and laborious researching, as well as frequent communication with their clients, the Navrides have determined that other agencies are removing Callie Navrides as AOR without the consent or knowledge of either NavaQuote or its clients.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Navrides as AOR, those agents are essentially stealing or poaching NavaQuote's clients — and its commissions.

238.    Each time a client is poached, Callie Navrides must spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent. The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the reestablishment of Navrides' status as AOR.

239.    Through its investigation, which has been difficult, laborious and costly — not only

in terms of lost time that could have been used to help more clients and generate more commissions, but also out-of-pocket costs expended through these efforts — NavaQuote has determined that TrueCoverage agents are among the biggest offenders.

240.    The actions of TrueCoverage have damaged NavaQuote through a loss of commissions.  It may take weeks for Healthcare.gov to reinstate Callie Navrides as agent of record. If the calendar rolls into a new month during that period, she does not receive that month's commission.  It goes to the poacher.  NavaQuote has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional leads to replace lost clients.

241.    Because of TrueCoverage's actions, NavaQuote intends to pivot away from sales of health insurance plans in the Marketplace.

242.    WINN Insurance Agency.  Marsha Broyer, who is licensed to sell insurance in 13 states, owns WINN Insurance Agency LLC.  Broyer's mission is to do what is right for her clients by providing the best service and the best health insurance products.  Broyer was one of only a handful of the thousands of licensed health insurance agents in the U.S. to be invited to participate in the 2023 CMS Agent and Broker Summit and provide feedback to the government.

243.    Broyer experienced first-hand the importance of comprehensive medical insurance. In 2003, Broyer lost sight in her right eye.  Doctors discovered a brain tumor.  Fortunately, the tumor was treated with gamma knife technology and Broyer regained her eyesight.  But because she had inadequate insurance, Broyer was left with tens of thousands of dollars in medical bills and had no choice but to file for bankruptcy.  This experience informs every interaction she has with her clients and potential clients.

244.    With the help of a $94,000 SBA loan, Broyer started WINN in October 2021.

Working seven days a week, within a year she had developed 350 customers, largely through client referrals.

245.    WINN expends significant resources to market its services, including the creation and maintenance of a website and the purchase of exclusive leads, which cost $100 each.   The agency's revenue, and by extension its profits, relies on the generation of commissions from the sale of insurance policies.  When WINN sells an insurance policy through the Marketplace, Broyer becomes listed as AOR and receives a monthly sales commission of approximately $30 per month per member for each application.  So if a family of four is on a single application, WINN receives $1,440/year for that policy ($30 x 4 = $120 for 12 months).

246.    Since the beginning of 2023, Broyer has been removed as AOR more than 100 times from her clients' policies and replaced by agents that have no relationship to her.  More than 20 of those clients have been lost for good.  Through continued and laborious researching, as well as frequent communication with their clients, Broyer has determined that other agencies are removing her as AOR without consent.  In most instances, these agents are changing the clients' health care plans and information within the Marketplace system.  By replacing Broyer as AOR, those agents are essentially stealing or poaching WINN's clients — and its commissions.

247.    Through Broyer's investigation, which has been difficult, laborious and costly — not only in terms of lost time that could have been used to help more clients and generate more commissions, but also out-of-pocket costs expended through these efforts — WINN has determined that TrueCoverage's agents are among the biggest offenders.

248.    Each time a client is poached, Broyer is forced to spend significant time to reestablish her position as AOR.  She spends time each day checking her clients' statuses to see if she has been removed as AOR, because formal notices of removal do not reach her until the end

CASE NO. 0:24-cv-60591-DAMIAN/Valle

of the month.  When she discovers a client has been switched, she must call that client to try and explain what happened.  She must then call Healthcare.gov, often waiting on queue for long periods of time, to report that she was removed as AOR without her client's knowledge or consent. The client is then brought into the call for Healthcare.gov to confirm that the client agrees to the reestablishment of Broyer's status as AOR.

249.     And then, in all likelihood, Broyer must repeat this process all over again, because the switching occurs over and over.  One of WINN's clients, Langley, who is a 59-year-old with a pacemaker and a heart condition, has been switched no less than 20 times since February 2023.

250.     In all, Broyer estimates that she spends about 1/3 of her time dealing with this scheme.

251.     The actions of TrueCoverage have damaged WINN through a loss of commissions. It may take weeks for Healthcare.gov to reinstate Broyer as AOR.  If the calendar rolls into a new month during that period, WINN does not receive that month's commission.  It goes to the poaching agent.  WINN has also been damaged through loss of profits and out-of-pocket costs relating to the time spent to investigate and address the problem, and for extra expenses associated with buying additional leads to replace lost clients.

252.     Because of Defendants' actions, WINN has lost a sizeable percentage of its income.

## V.     RICO ALLEGATIONS

### A.     The Enterprise

253.     **The entities and individuals constituting the Enterprise include** Defendants TrueCoverage, Speridian, Benefitalign, Panicker, and Goldfuss.  It also includes relevant nonparties Harrison; the downlines and their principals; Inshura; MME; and lead generation firms that sold fraudulent leads to TrueCoverage.

**B.**     **Allegations Relating to Violations of 1962(c)**

254.     **The Enterprise's purpose** was to artificially and exponentially grow the newly developing, year-round industry for low-income ACA health insurance, and to use fraudulent means to exploit and capture as much of that industry as possible, as quickly as possible, for monetary gain.

255.     Defendants **conducted or participated, directly or indirectly, in the conduct of the affairs** of the Enterprise as follows:

a.     <u>TrueCoverage</u> directed the Enterprise's affairs in numerous ways.  It acted as the upline agency for its downlines.  TrueCoverage not only obtained and misused Plaintiffs' and Class Members' PII itself, TrueCoverage created the downline structure of entities that expanded the sales capabilities of the Enterprise.  It recruited agents and placed them with the downlines, including Protect Health.  TrueCoverage facilitated the downlines' relationships with insurers, including the facilitation of the downlines' relationships with field market organizations (FMOs) like Messer Financial that allowed those downlines to immediately sell ACA insurance policies.  To many of the downlines, TrueCoverage provided key financing through the use of advanced commissions and/or prepaid commissions called "heap deals."  And to many if not all of the downlines, TrueCoverage provided training.  TrueCoverage facilitated the downlines' use of EDE Platforms Benefitalign and Inshura to access the Healthcare Marketplace.  TrueCoverage directed and monitored the downlines' fraudulent marketing and sales activities.  It provided fraudulent scripts to the downlines and/or consulted with the downlines on the fraudulent scripts used by the downlines.  It accounted for, audited and distributed commissions to the downlines for AOR Swaps and Twists, and received payments from the downlines.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

TrueCoverage purchased fraudulent leads from lead vendors.  It directed the downlines to do the same.  TrueCoverage also produced its own fraudulent advertising and distributed those leads to its agents and the downlines.

b.      Speridian created, provided, directed, managed and maintained the Enterprise's technology platforms, including Benefitalign and Inshura, which allowed TrueCoverage and the downlines to access the Healthcare Marketplace. Speridian also entered into employment agreements with TrueCoverage agents and paid them a salary.

c.      Benefitalign provided, directed, managed and maintained the Enterprise's EDE platform Benefitalign, and provided TrueCoverage and the downlines with access to the Healthcare Marketplace.

d.      Panicker directed the operations or management of the Enterprise through his ownership, membership and direction of Defendants TrueCoverage and Speridian, as well as the EDE Platforms Benefitalign and Inshura.  He directed the creation of a downline network.

e.      Goldfuss directed the operations or management of the Enterprise by managing and directing the fraudulent marketing and sales efforts of TrueCoverage and its downlines, and by incorporating and using leads generated by fraudulent ads.

256.    **The Enterprise engaged in a pattern of racketeering activity**.  Defendants violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials by **wire and/or email** for the purpose of executing the scheme.  The materials that Defendants sent or caused to be sent include but were not limited to tens of thousands if not hundreds of thousands of social media advertisements, text messages and enrollment packets containing membership cards and customer service-related letters.  Defendants also transmitted

(or routed) or caused to be transmitted by wire hundreds of thousands of consumer calls to the agencies comprising the Enterprise.

257.   Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received, materials **via U.S. mail or commercial interstate carriers** for the purpose of executing the scheme.  The materials that Defendants sent or caused to be sent include but were not limited to tens of thousands if not hundreds of thousands of enrollment packets containing membership cards, and customer service-related letters.

258.   Throughout its existence, the Enterprise engaged in, and its activities affected, **interstate commerce**.  The Enterprise involved commercial activities across state lines, including marketing campaigns, phone and internet solicitations and the solicitation and receipt by wire of money and PII from Consumer Class Plaintiffs and class members across the country.

259.   Defendants **had knowledge of the essential nature of the scheme**.  They knew that false advertisements were being used to lure consumers to enroll in ACA healthcare plans, misuse PII and capture commissions.  They knew about the use of PII to perpetrate AOR Swaps, Twisting and Dual Apps.  Despite that knowledge, Defendants committed the predicate acts of wire and mail fraud described above.

260.   Defendants **each has an ascertainable structure** separate and apart from the pattern of racketeering activity in which they engaged.  The Enterprise is separate and distinct from Defendants TrueCoverage, Speridian, Benefitalign, Panicker and Goldfuss.  Defendants each have aspects of their respective businesses that are not fraudulent or involved with the scheme alleged in this lawsuit.

261.   Defendants committed or caused to be committed hundreds of thousands of racketeering acts.  The **racketeering acts were not isolated, but rather were related** in that they

CASE NO. 0:24-cv-60591-DAMIAN/Valle

had the same or similar purposes and results, participants, victims and methods of commission. Defendants were able to commit the racketeering offenses because of their respective positions in the Enterprise and/or their involvement or control over the Enterprise's affairs.

262.    Further, the **racketeering acts were continuous**, occurring on a regular (daily) basis throughout a time period beginning in 2022 through the present.  The racketeering activity threatens to extend into the future.  For example, upon the undersigned's January 2024 press release regarding an investigation into TrueCoverage's activities, TrueCoverage sent many of its agents to downlines, ostensibly to reduce the financial impact of any lawsuit directed at TrueCoverage and allow the scheme to continue.

263.    Defendants **benefited from the pattern of racketeering activity**.  It lured consumers to provide their PII and sign them up for ACA healthcare plans that could then be AOR Swapped, Twisted or Dual Apped for money.  The activity created a larger industry, greater market share within that industry, and profits.

## VI.    <u>CLASS ACTION ALLEGATIONS</u>

264.    Class Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes described as follows:

> **<u>Consumer Class</u>**.    Each individual who, within the applicable statutes of limitations:
>
>> (i)    responded to an advertisement falsely offering cash benefits that resulted in the individual being enrolled in an ACA policy through TrueCoverage, its agents and/or subagents;
>>
>> (ii)    had an existing ACA policy's agent of record changed by TrueCoverage, its agents and/or subagents; and/or
>>
>> (iii)    had an existing ACA policy's carrier or plan level changed by TrueCoverage, its agents and/or subagents.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**Agent Class**. Each insurance agent with a national provider number who, within the applicable statutes of limitations, was removed or replaced as "agent of record" on a consumer's ACA policy by TrueCoverage and/or its downlines.

**Data Breach Class 1**. Within the applicable statutes of limitations, each individual residing in the United States whose personal identifiable information was compromised in an incident or breach, as those terms are defined by OMB M-17-12 and OMB M-18-2, from the CMS Marketplace database through the EDE platforms BenefitAlign and/or Inshura.

**Data Breach Class 2**. Within the applicable statutes of limitations, each individual residing in the United States whose phone call(s) was recorded by Defendants without valid consent.

265. The Customer Class is represented by Turner, King, Wells and Foreman. The Agent Class is represented by NavaQuote and Broyer.

266. Excluded from the Classes are TrueCoverage, Speridian, their agents and/or subagents, and their directors, officers, employees or independent contractors.

267. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

268. Numerosity. The members of the Classes are so numerous that joinder of all members is impracticable. The Customer Class exceeds the numerosity requirement because hundreds of thousands of consumers have been victimized by the scheme. The false ads that created leads to TrueCoverage and its downlines resulted in hundreds of thousands of enrollments by class members. As for the Agent Class, the CMS reported that 74,100 Marketplace-registered agents and brokers assisted on nearly 5.5 million consumers enrolled in 2023 OEP alone.

269. Commonality. There are numerous questions of fact or law that are common to Class Plaintiffs and all the members of the Classes. Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members

CASE NO. 0:24-cv-60591-DAMIAN/Valle

include, but are not limited to the following:

    a.  Whether Defendants, their agents and/or subagents engaged in a scheme to buy and utilize leads generated from advertisements that falsely offered consumers cash benefits;

    b.  Whether Defendants, their agents and/or subagents engaged in, directed or helped cause AOL Swaps, Twisting and/or Dual-Apps;

    c.  Whether Defendants, their agents and/or subagents obtained Class Plaintiffs' and class members' PII without their knowledge and used it to enroll them in an ACA policy;

    d.  Whether Defendants directed, operated and/or managed the scheme;

    e.  Whether Defendants violated 18 U.S.C. § 1962(c) or (d);

    f.  Whether Defendants violated a duty to prevent Class Plaintiffs' and class members' PII from unlawfully being accessed, collected, used or disclosed;

    g.  Whether Class Plaintiffs and class members suffered damages; and

    h.  Whether Class Plaintiffs and class members are entitled to treble damages, punitive damages, attorneys' fees and/or expenses.

270.  <u>Typicality</u>.  Turner, King, Wells and Foreman have claims that are typical of the members of the Consumer Class in that they received a false advertisement that caused them to purchase an ACA plan from TrueCoverage, its agents and/or subagents.  Turner, King, Wells and Foreman were all the victim of AOL Swaps, Twisting and/or Dual Apps.  NavaQuote and Broyer have claims that are typical of the members of the Agent Class.  Each was damaged when they were removed as AOR on their clients' ACA health insurance plans.  Furthermore, the claims of the Classes arise under legal theories that apply to Class Plaintiffs and all other class members

CASE NO. 0:24-cv-60591-DAMIAN/Valle

within those respective Classes.

271.    <u>Adequacy of Representation</u>.  Class Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Class Plaintiffs do not have claims that are unique to Class Plaintiffs and not the other class members within their respective Classes, nor are there defenses unique to Class Plaintiffs that could undermine the efficient resolution of the claims of the Classes.  Further, Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.  There is no hostility between Class Plaintiffs and the unnamed class members.  Class Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

272.    <u>Predominance</u>.  Common questions of law and fact predominate over questions affecting only individual class members.  The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

273.    <u>Superiority</u>.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.  The damages sought by Class Plaintiffs and class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute claims for those fees and premiums.

274.    <u>Manageability</u>.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

275.    <u>Ascertainability</u>.   Class members are readily ascertainable.   Some or all of Defendants keep detailed electronic records that show, among other information, the false advertisements, the names of those who responded to the false advertisements and the names and transaction histories of class members whose plan or AOR status was changed by one or more Defendants.

## **COUNT 1**
### **(Violation of RICO § 1962(c) Against TrueCoverage)**

276.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

277.    The Enterprise engages in, and its activities affect, interstate commerce.

278.    Defendant TrueCoverage is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

279.    TrueCoverage is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

280.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

281.    TrueCoverage has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that TrueCoverage has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

282.    TrueCoverage has used for at least the past two years and/or continues to use

CASE NO. 0:24-cv-60591-DAMIAN/Valle

thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

283.    TrueCoverage knows about and directs these activities.

284.    TrueCoverage obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

285.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of TrueCoverage's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

286.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of TrueCoverage's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

287.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of TrueCoverage.

288.    TrueCoverage knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

289.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 2
### (Violation of RICO § 1962(c) Against Speridian Technologies)

290.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

291.    The Enterprise engages in, and its activities affect, interstate commerce.

292.    Defendant Speridian is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

293.    Speridian is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

294.    The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

295.    Speridian has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Speridian has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

296.    Speridian has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support

CASE NO. 0:24-cv-60591-DAMIAN/Valle

of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

297.   Speridian knows about and directs these activities.

298.   Speridian obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

299.   Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Speridian's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

300.   Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Speridian's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

301.   Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Speridian.

302.   Speridian knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

303.   Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Speridian awarding actual damages,

treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 3
### (Violation of RICO § 1962(c) Against Benefitalign)

304.   Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

305.   The Enterprise engages in, and its activities affect, interstate commerce.

306.   Defendant Benefitalign is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

307.   Benefitalign is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

308.   The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

309.   Benefitalign has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Benefitalign has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

310.   Benefitalign has used for at least the past two years and/or continues to use thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

311.     Benefitalign knows about and directs these activities.

312.     Benefitalign obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

313.     Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Benefitalign's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

314.     Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Benefitalign's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

315.     Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Benefitalign.

316.     Benefitalign knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## COUNT 4
### (Violation of RICO § 1962(c) Against Panicker)

317.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

318.     The Enterprise engages in, and its activities affect, interstate commerce.

319.     Defendant Panicker is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

320.     Panicker is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

321.     The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

322.     Panicker has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Panicker has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

323.     Panicker has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

324.     Panicker knows about and directs these activities.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

325.    Panicker obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

326.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Panicker's violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

327.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Panicker's violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

328.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Panicker.

329.    Panicker knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

330.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 5</u>
### (Violation of RICO § 1962(c) Against Goldfuss)

331.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

332.     The Enterprise engages in, and its activities affect, interstate commerce.

333.     Defendant Goldfuss is an entity or individual capable of holding a legal or beneficial interest in property, and therefore meets the definition of a culpable "person" under 18 U.S.C. § 1961.

334.     Goldfuss is associated with the Enterprise and conducts and participates in the Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), comprised of numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).

335.     The Enterprise was created and/or used as a tool to carry out the scheme and pattern of racketeering activity.

336.     Goldfuss has committed or caused the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity that Goldfuss has committed and/or caused the commission of were related to each other and constitute a "pattern of racketeering activity."

337.     Goldfuss has caused to be used for at least the past two years, and/or continues to cause to be used, thousands of interstate mail, wire and email communications to create and perpetuate the scheme in support of the false advertisements, AOR Swaps, Twisting and Dual Apps that injure consumers and agents, including Class Plaintiffs and class members.

338.     Goldfuss knows about and directs these activities.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

339.    Goldfuss obtains money and property belonging to Class Plaintiffs and class members as a result of these violations.

340.    Consumer Class Plaintiffs and members of the Consumer Class have been injured in their property by reason of Goldfuss' violations of 18 U.S.C. § 1962, including but not limited to payment of out-of-pocket medical expenses, out-of-pocket expenses to address and undo the results of the scheme and/or the payment of tax penalties.

341.    Class Plaintiffs and class members of the Agent Class have been injured in their property by reason of Goldfuss' violations of 18 U.S.C. § 1962, including loss of commissions and/or payment of out-of-pocket expenses to address and undo the results of the scheme.

342.    Class Plaintiffs and class members' injuries were directly and proximately caused by the racketeering activity of Goldfuss.

343.    Goldfuss knows and intends that Class Plaintiffs and class members rely on the scheme's misrepresentations and omissions.

344.    Under the provisions of 18 U.S.C. § 1964(c), Class Plaintiffs are entitled to bring this action on behalf of Class Plaintiffs and class members and to recover three times Class Plaintiffs' and class members' actual damages as proved at trial, plus interest, reasonable attorneys' fees and the costs of bringing this suit.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter judgment against Defendant Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 6
### (Section 1962(d) RICO Conspiracy Against TrueCoverage)

345.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

346.     TrueCoverage agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, TrueCoverage conspired with others within the Enterprise, including but not necessarily limited to its downlines, and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

347.     With knowledge of the essential nature of the scheme, TrueCoverage committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

348.     TrueCoverage agreed that others within the Enterprise, including but not necessarily limited to including its downlines, and their respective principals, would commit other predicate acts as well.

349.     As a direct and proximate result of TrueCoverage's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

**COUNT 7**
**(Section 1962(d) RICO Conspiracy Against Speridian Technologies)**

350.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

351.    Speridian agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Speridian conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

352.    With knowledge of the essential nature of the scheme, Speridian committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

353.    Speridian agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines and their respective principals, would commit other predicate acts as well.

354.    As a direct and proximate result of Speridian's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Speridian awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 8
### (Section 1962(d) RICO Conspiracy Against Benefitalign)

355.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

356.    Benefitalign agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Benefitalign conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, Speridian, and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

357.    With knowledge of the essential nature of the scheme, Benefitalign committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

358.    Benefitalign agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, and their respective principals, would commit other predicate acts as well.

359.    As a direct and proximate result of Benefitalign's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## **COUNT 9**
### (Section 1962(d) RICO Conspiracy Against Panicker)

360.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

361.    Panicker agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Panicker conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

362.    With knowledge of the essential nature of the scheme, Panicker committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

363.    Panicker agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, and their respective principals, would commit other predicate acts as well.

364.    As a direct and proximate result of Panicker's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 10</u>
### (Section 1962(d) RICO Conspiracy Against Goldfuss)

365.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

366.    Goldfuss agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Goldfuss conspired with others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines, and their respective principals, to conduct and participate in, or at the very least facilitate, the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

367.    With knowledge of the essential nature of the scheme, Goldfuss committed predicate acts knowing those acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

368.    Goldfuss agreed that others within the Enterprise, including but not necessarily limited to TrueCoverage, its downlines and their respective principals, would commit other predicate acts as well.

369.    As a direct and proximate result of Goldfuss's conspiracy, the overt acts taken in furtherance of that conspiracy and violations of 18 U.S.C. § 1962(d), Class Plaintiffs have been injured in their business or property.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendant Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

## COUNT 11
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against TrueCoverage)

370.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

371.     TrueCoverage aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

372.     TrueCoverage had knowledge of the scheme and provided substantial assistance toward its commission.

373.     TrueCoverage substantially benefited from its participation in the scheme, including but not limited to monetarily.

374.     As a direct and proximate result of TrueCoverage aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against TrueCoverage awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 12
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Speridian Technologies)

375.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

376.    Speridian aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

377.    Speridian had knowledge of the scheme and provided substantial assistance toward its commission.

378.    Speridian substantially benefited from its participation in the scheme, including but not limited to monetarily.

379.    As a direct and proximate result of Speridian aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Speridian awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 13
### (Aiding and Abetting a Violation of RICO Section 1962(c) Against Benefitalign)

380.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

381.    Benefitalign aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to

improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

382.    Benefitalign had knowledge of the scheme and provided substantial assistance toward its commission.

383.    Benefitalign substantially benefited from its participation in the scheme, including but not limited to monetarily.

As a direct and proximate result of Benefitalign aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Benefitalign awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 14
**(Aiding and Abetting a Violation of RICO Section 1962(c) Against Panicker)**

384.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

385.    Panicker aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

386.    Panicker had knowledge of the scheme and provided substantial assistance toward its commission.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

387.    Panicker substantially benefited from participation in the scheme, including but not limited to monetarily.

388.    As a direct and proximate result of Panicker aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Panicker awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

### COUNT 15
**(Aiding and Abetting a Violation of RICO Section 1962V(c) Against Goldfuss)**

389.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

390.    Goldfuss aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme that used false advertisements, the use of EDE platforms tied to the ACA Marketplace, AOR Swaps, Twisting and Dual Apps activities to improperly collect commissions and/or revenues, injuring consumers and agents, including Class Plaintiffs and class members.

391.    Goldfuss had knowledge of the scheme and provided substantial assistance toward its commission.

392.    Goldfuss substantially benefited from participation in the scheme, including but not limited to monetarily.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

393.     As a direct and proximate result of Goldfuss aiding and abetting the predicate acts of a Section 1962(c) RICO violation, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Goldfuss awarding actual damages, treble damages, interest, reasonable attorney's fees, the costs of bringing this suit and/or such other and further relief as the Court deems just and proper.

## COUNT 16
### (Aiding and Abetting Fraud Against TrueCoverage)

394.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

395.     As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

396.     Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

397.     TrueCoverage knew about and/or discovered the fraud.

398.     Despite this knowledge, True Coverage substantially assisted in the fraud.

399.     In connection with providing substantial and material assistance to the fraud, TrueCoverage knew its role in the scheme and knowingly acted in assisting.

400.     TrueCoverage substantially benefited from participation in the scheme, including but not limited to monetarily.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

401.     As a direct and proximate result of TrueCoverage's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of TrueCoverage's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against TrueCoverage for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### **COUNT 17**
**(Aiding and Abetting Fraud Against Speridian Technologies)**

402.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

403.     As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

404.     Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

405.     Speridian knew about and/or discovered the fraud.

406.     Despite this knowledge, Speridian substantially assisted in the fraud.

407.     In connection with providing substantial and material assistance to the fraud, Speridian knew its role in the scheme and knowingly acted in assisting.

408.     Speridian substantially benefited from participation in the scheme, including but not limited to monetarily.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

409.    As a direct and proximate result of Speridian's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

<b><u>COUNT 18</u></b><br><b>(Aiding and Abetting Fraud Against Benefitalign)</b>

410.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

411.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

412.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

413.    Benefitalign knew about and/or discovered the fraud.

414.    Despite this knowledge, Benefitalign substantially assisted in the fraud.

415.    In connection with providing substantial and material assistance to the fraud, Speridian knew its role in the scheme and knowingly acted in assisting.

416.    Benefitalign substantially benefited from participation in the scheme, including but not limited to monetarily.

417.    As a direct and proximate result of Benefitalign's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Benefitalign for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 19
### (Aiding and Abetting Fraud Against Panicker)

418.     Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

419.     As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

420.     Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

421.     Panicker knew about and/or discovered the fraud.

422.     Despite this knowledge, Panicker substantially assisted in the fraud.

423.     In connection with providing substantial and material assistance to the fraud, Panicker knew his role in the scheme and knowingly acted in assisting.

424.     Panicker substantially benefited from participation in the scheme, including but not limited to monetarily.

425.     As a direct and proximate result of Panicker's aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Panicker's profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Panicker for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 20
### (Aiding and Abetting Fraud Against Goldfuss)

426.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

427.    As set forth above, a fraud was perpetrated upon Class Plaintiffs and class members through uniform, material and knowingly false and misleading advertisements, statements and omissions that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit.

428.    Reasonably relying to their detriment upon those misrepresentations and omissions, Class Plaintiffs and class members provided PII that was used to engage in AOR Swaps, Twisting and Dual Apps.

429.    Goldfuss knew about and/or discovered the fraud.

430.    Despite this knowledge, Goldfuss substantially assisted in the fraud.

431.    In connection with providing substantial and material assistance to the fraud, Goldfuss knew his role in the scheme and knowingly acted in assisting.

432.    Goldfuss substantially benefited from participation in the scheme, including but not limited to monetarily.

433.    As a direct and proximate result of Goldfuss' aiding and abetting the fraud, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Goldfuss' profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Goldfuss for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 21</u>
**(Aiding and Abetting a Breach of Fiduciary Duty Against TrueCoverage)**

434.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 649-51, 68-296 and 307-425 as if fully set forth herein.

435.    The downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

436.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

437.    TrueCoverage knew about these fiduciary duties.

438.    TrueCoverage knew that these fiduciary duties were being breached.

439.    Despite this knowledge, TrueCoverage substantially assisted in the breach of fiduciary duties.

440.    And TrueCoverage substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

441.    As a direct and proximate result of TrueCoverage's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of TrueCoverage's profits therefrom.

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against TrueCoverage for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## <u>COUNT 22</u>
### (Aiding and Abetting a Breach of Fiduciary Duty Against Speridian Technologies)

442.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 52-54, 68-296 and 307-425 as if fully set forth herein.

443.    TrueCoverage, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

444.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

445.    Speridian knew about these fiduciary duties.

446.    Speridian knew that these fiduciary duties were being breached.

447.    Despite this knowledge, Speridian substantially assisted in the breach of fiduciary duties.

448.    And Speridian substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

449.    As a direct and proximate result of Speridian's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Speridian's profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Speridian for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 23
### (Aiding and Abetting a Breach of Fiduciary Duty Against Benefitalign)

450.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 55-57, 68-296 and 307-425 as if fully set forth herein.

451.    TrueCoverage, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

452.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

453.    Benefitalign knew about these fiduciary duties.

454.    Benefitalign knew that these fiduciary duties were being breached.

455.    Despite this knowledge, Benefitalign substantially assisted in the breach of fiduciary duties.

456.    And Benefitalign substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

457.    As a direct and proximate result of Benefitalign's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Benefitalign's profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Benefitalign for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## COUNT 24
### (Aiding and Abetting a Breach of Fiduciary Duty Against Panicker)

458.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 58-60, 68-296 and 307-425 as if fully set forth herein.

459.    TrueCoverage, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

460.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

461.    Panicker knew about these fiduciary duties.

462.    Panicker knew that these fiduciary duties were being breached.

463.    Despite this knowledge, Panicker substantially assisted in the breach of fiduciary duties.

464.    And Panicker substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

465.    As a direct and proximate result of Panicker's aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Panicker's profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Panicker for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## **COUNT 25**
### **(Aiding and Abetting a Breach of Fiduciary Duty Against Goldfuss)**

466.    Class Plaintiffs incorporate the allegations of paragraphs 1 through 43, 61, 68-296 and 307-425 as if fully set forth herein.

467.    TrueCoverage, the downlines and/or the licensed agents working for them fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

468.    As set forth above, those fiduciary duties were breached by a scheme that misled Class Plaintiffs and class members to believe they were going to receive a cash card or other cash benefit, lured Class Plaintiffs and class members to provide their PII and used the PII to engage in AOR Swaps, Twisting and Dual Apps.

469.    Goldfuss knew about these fiduciary duties.

470.    Goldfuss knew that these fiduciary duties were being breached.

471.    Despite this knowledge, Goldfuss substantially assisted in the breach of fiduciary duties.

472.    And Goldfuss substantially benefited from the breaches of fiduciary duty, including but not limited to monetarily.

473.    As a direct and proximate result of Goldfuss' aiding and abetting the breaches of fiduciary duty, Class Plaintiffs and class members have suffered damages in an amount to be determined at trial, and/or are entitled to the disgorgement of Goldfuss' profits therefrom.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

WHEREFORE, Class Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Goldfuss for damages; disgorgement of profits on fees and premiums; punitive damages; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT 26
### (Negligence Against All Defendants)

474.    Plaintiffs restate and reallege Paragraphs 1 through 425 as if fully set forth herein.

475.    Federal agencies, including the United States Department of Health and Human Services (HHS) and CMS, are required to have policies in place to prepare for and respond to breaches of personally identifiable information ("PII").

476.    On or about January 17, 2017, the Executive Office of the President, Office of Management and Budget ("OMB") issued OMB M-17-12, which sets forth the policies and procedures for HHS and CMS to prepare and respond to a breach of the CMS Marketplace database, which is a Federal Information System.  See OMB M-17-12 at 8.

477.    Pursuant to OMB M-17-12, consumers' data contained in the CMS Marketplace database falls within the definition of Federal Information, i.e. information created, collected, processed, maintained, disseminated, disclosed, or disposed of by or for the Federal Government, in any medium or form.  *Id.*, see also Glossary at 47.

478.    "Federal Information" includes consumers' "Personally Identifiable Information" ("PII") contained in the CMS Marketplace database.

479.    Pursuant to OMB M-17-12, PII is defined as "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual."  *Id.*

CASE NO. 0:24-cv-60591-DAMIAN/Valle

480.    Pursuant to OMB M-17-12, a "Breach" is defined as "the loss of control, compromise, <u>unauthorized disclosure</u>, unauthorized acquisition, or any similar occurrence where (1) <u>a person other than an authorized user accesses or potentially accesses personally identifiable information</u> or (2) <u>an authorized user accesses personally identifiable information for an other than authorized purpose</u>."  *Id*. (emphasis added).

481.    Pursuant to OMB M-17-12, an "Incident" means an occurrence that (1) actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality, or availability of information or an information system; or (2) constitutes a violation of imminent threat of violation of law, security policies, security procedures, or acceptable use policies."

482.    OMB M-18-2 further defines a breach as "a type of incident and <u>constitutes a major incident</u> when it involves <u>personally identifiable information (PII) that, if exfiltrated, modified, deleted, or otherwise compromised, is likely to result in demonstrable harm to</u> the national security interests, foreign relations, or <u>economy of the United States</u>, or to the <u>public confidence</u>, civil liberties, or <u>public health and safety of the American people</u>."  (emphasis added).

483.    In determining whether a breach or incident constitutes a "major incident," DHS and CMS are directed in OMB M-18-2 to access each breach on a case-by-case basis, the memorandum states that "<u>an unauthorized modification of</u>, <u>unauthorized deletion of, unauthorized exfiltration of</u>, <u>or unauthorized access to 100,000 or more individuals' PII</u> automatically constitutes a "major breach." (emphasis added).

484.    Defendants TrueCoverage, their downlines and agents used the BenefitAlign, Inshura EDE platforms to access Plaintiffs' and class members' PII on the CMS Marketplace database without authorization or for an other than authorized purpose, i.e. AOR Swaps, Twisting and Dual Apps.

485.    In addition, Defendants TrueCoverage, their downlines and agents allowed lead generation firms to record and collect Plaintiffs' and class members' PII in the confidential phone conversations between agents and consumers without authorization or for an other than authorized purpose.

486.    Each instance of Defendants engaging in AOR Swapping, Twisting and Dual App or otherwise accessing Plaintiffs' and class members' PII without authorization of for an other than authorized purpose through the BenefitAlign and Inshura platforms constitutes a "breach" and "incident" pursuant to OMB M-18-2 and OMB M-17-12 as defined above.

487.    In addition, instances in which lead generations firms recorded and collected Plaintiffs' and class members' confidential phone conversations between agents and consumers and obtained their PII without authorization or for an other than authorized purpose constitutes a "breach" and "incident" pursuant to OMB M-18-2 and OMB M-17-12 as defined above.

488.    This type of breach constitutes a major incident because it involves unauthorized access to 100,000 or more individuals' personally identifiable information (PII) that, if exfiltrated, modified, deleted, or otherwise compromised, is likely to result in demonstrable harm to the national security interests, foreign relations, or economy of the United States, or to the public confidence, civil liberties, or public health and safety of the American people." (emphasis added).

489.    CMS has acknowledged that the type of misconduct alleged herein constitutes unauthorized activity.  For example, in an April 12, 2024 public statement, CMS acknowledges that unauthorized activity was occurring.

> CMS is evaluating all regulatory, operational, and technological options to prevent unauthorized activity. CMS' technical teams are rapidly evaluating options for additional system controls to help block unauthorized or fraudulent activity in the near term. In the longer term, CMS will also evaluate options for system changes to help curtail unauthorized and fraudulent activities without creating roadblocks for consumers to obtain the coverage they need.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

490.    On May 6, 2024, CMS released another public statement related to authorized plan switching:

> CMS remains committed to protecting consumers in the Marketplaces to ensure they are enrolled in the plan of their choosing and to terminate brokers who defraud consumers. We are taking stronger actions given very concerning activity by some agents and brokers related to unauthorized plan switches and unauthorized enrollments—where a consumer was switched from their selected plan into a new one or signed up for coverage without their knowledge or consent.

491.    On July 19, 2024, CMS again acknowledged the problem and publicly stated:

> The Centers for Medicare & Medicaid Services (CMS) is committed to protecting consumers from bad actors and ensuring the program integrity of the Federally-facilitated Marketplace (FFM). That's why CMS is taking additional action to address increases in unauthorized changes in consumers' enrollments by agents and brokers. Starting on July 19, 2024, CMS will block an agent or broker from making changes to a consumer's FFM enrollment unless the agent is already associated with the consumer's enrollment. Today's new steps build on CMS' previous work to protect consumers on the FFM by suspending and terminating agents and brokers who perform unauthorized Marketplace activity.

492.    Defendants Speridian Technologies and TrueCoverage and their EDE platforms, Benefitalign and Inshura, as web-brokers under the ACA regulations, entered into agreement(s) with CMS governing the way each is required to operate under federal regulations, including provisions related to protecting Consumer Class Plaintiffs' and class members' PII from unlawful dissemination.

493.    Defendant BenefitAlign breached its duties under this provision when it extracted U.S. consumers' information, including PII, from the CMS Marketplace database using Speridian Technologies' EDE platform(s) Benefitalign and/Inshura.

494.    CMS's    standard    web-broker    agreement    with    Speridian    Technologies, TrueCoverage, Benefitalign and Inshura required those entities to comply with, among other things, all regulations related to preventing Consumer Class Plaintiffs' and class members' PII from being collected, accessed and/or disclosed to any downline persons or entities, including

agents, brokers and non-exchange entities and the lead generation firms, without informed consent from Consumer Class Plaintiffs and class members.

495.    Federal regulations promulgated under the ACA also impose duties to ensure that all Exchange privacy and security standards implemented were consistent with the following principles: PII should be created, collected, used and/or disclosed only to the extent necessary to accomplish a specified purpose or purposes(s).  *See* 45 CFR 155.260(a)(3)(v).

496.    These regulations, which are designed to protect consumers' PII from unlawful disclosure, also apply to agents and brokers that are downline of Speridian Technologies and TrueCoverage.  For example, 45 CFR 155.220(j)(2)(iv) requires all web-brokers, agents and brokers to protect Consumer Class Plaintiffs' and class members' PII.  That duty also extends all who fall within the definition of a non-exchange entity.  *See* 45 CFR § 155.260(b)(3).

497.    In addition, Defendants TrueCoverage and Speridian Technologies were required to enter into contracts with non-exchange entities that included provisions that included, among other things, (i) a description of the functions to be performed by the non-Exchange entity, (ii) language binding the non-Exchange entity to comply with the privacy and security standards and obligations adopted in accordance with 45 CFR § 155.260(b)(3) and (iii) language requiring the non-Exchange entities to bind any other downstream entities, including but not limited to other lead generation firms that Defendants purchased leads from, to the same privacy and security standards and obligations to which the non-Exchange entity has agreed in its contract or agreement with the Exchange.  *See* 45 CFR 155.260(b)(2).

498.    Upon information and belief, TrueCoverage and Speridian Technologies did not enter into such an agreement with non-exchange entities, and if they did, those indiviuduals and/or

entities did not comply with their obligations to protect Consumer Class Plaintiffs' and class members' PII from being disclosed.

499.    Upon information and belief, the other lead generation firms used by Defendants to obtain leads also use routing software that records the confidential calls between consumers and the agents for TrueCoverage and their downlines at the same time without consent of Consumer Class Plaintiffs and class members.

500.    The purpose of web-broker agreements and the above federal regulations is to protect consumers like Consumer Class Plaintiffs and class members by providing that each QHP issuer that uses a provider network must ensure that the provider network consisting of in-network healthcare providers, as available to all enrollees, meet certain standards, including but not limited to requiring QHP issuers to publish an up-to-date, accurate and complete provider directory.

501.    Consumer Class Plaintiffs and class members were harmed as a result of Defendants' violations of the agreement(s) and federal regulations cited above.  The harm includes but may not be limited to:

    a.  unauthorized use of the Consumer Class Plaintiffs' and class members' PII, resulting in harm including but not limited to unauthorized AOL Swaps, Twisting and/or Dual Apps;

    b.  theft of the Consumer Class Plaintiffs and class members' personal, financial and confidential medical information;

    c.  costs associated with the detection and prevention of the Consumer Class Plaintiffs and class members' identity theft and unauthorized use of the Consumer Plaintiffs and class members' PII;

    d.   the imminent and certainly impending injury flowing from the substantial risk of potential fraud and identify theft posed to the Consumer Class Plaintiffs and class members by their PII being placed in the hands of criminals on the Internet black market; and

    e.   the loss of the Consumer Class Plaintiffs' and class members' privacy.

502.   Consumer Class Plaintiffs and class members fall within the class of persons that the web-broker agreement and federal regulations were intended to protect.

503.   The harm or injury suffered by the Consumer Class Plaintiffs and class members as a result of Defendants' violation of the obligations contained in the web-broker agreement and applicable federal regulations was foreseeable and as a result, Defendants owed a duty to Class Plaintiffs and class members.

504.   Defendants' violations are capable of having a causal connection between it and the damage or injury inflicted.

WHEREFORE, Consumer Class Plaintiffs, individually and on behalf of all others similarly situated, pray this Court to enter judgment against Defendants that awards damages, interest and/or such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Class Plaintiffs hereby demand a trial by jury on all allowable claims and forms of relief.

CASE NO. 0:24-cv-60591-DAMIAN/Valle

Dated: May 8, 2025

Respectfully submitted,

By: /s/ *Jason K. Kellogg*
Jason K. Kellogg, P.A.
Florida Bar No. 0578401
Primary email: jk@lklsg.com
Secondary email: ame@lklsg.com
Victoria J. Wilson
Florida Bar No. 92157
Primary email: vjw@lklsg.com
Secondary email: service@lklsg.com
100 Southeast Second Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: /s/ *Jason R. Doss*
Jason R. Doss
Florida Bar No. 0569496
Primary email: jasondoss@dossfirm.com
1827 Powers Ferry Road Southeast
Atlanta, Georgia 30339
Telephone: (770) 578-1314
Facsimile: (770) 578-1302

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 8, 2025, a true and correct copy of the foregoing was filed via CM/ECF and served upon parties registered with CM/ECF in this case.

By: /s/ *Jason Kellogg*

# Exhibit 1

Paula and Lee Langley

| | |
|---|---|
| Plan Name | BSW Prime Silver HMO 003 (CMS Standardized Plan $0 deductible, $0 PCP copay) - HMO |
| Status | Terminated |
| Member | Paula Langley, Lee Langley |
| Effective | 2/1/2023 |
| Expiration | 3/31/2023 |
| Carrier | Scott and White Health Plan |
| Agent of Record | 🛈 matt mungia (NPN: 8682296) |

MUNGIA, MATTHEW RYAN 111 DOVETAIL ST BOERNE, TX, 780062730

| | |
|---|---|
| Plan Name | UHC Gold Standard $0 Deductible ($3 T1 Preferred Rx) - HMO |
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 4/1/2023 |
| Expiration | 12/31/2023 |
| Carrier | UnitedHealthcare |
| Agent of Record | 🛈 Frederick Bock (NPN: 9393745) |

BOCK, FREDERICK STEPHEN 4781 S CITATION DR DELRAY BEACH, FL, 334456522
FRED@ACAHELPLINE.COM

Frederick Bock is an agent with ACA Helpline LLC, which is a downline agency of TrueCoverage.

| Plan Name | UHC Gold Standard $0 Deductible ($3 T1 Preferred Rx) - HMO |
| --- | --- |
| Status | Terminated |
| Member | Lee Langley |
| Effective | 4/1/2023 |
| Expiration | 4/30/2023 |
| Carrier | UnitedHealthcare |

Agent of Record 🛈 Paola Fritz (NPN: 18205745)

FRITZ, PAOLA, 3215 NW 10TH TER STE 211, FORT LAUDERDALE, FL, 333095938

---

**United Healthcare**  GOLD

UHC Gold Standard $0 Deductible ($3 T1 Preferred Rx) - HMO

| $0.00 | $0 | $9,100 |
| --- | --- | --- |
| Premium ~~Was $1,681.91~~ | Deductible | OOP max |

View full plan details     View summary of benefits

🛈 For questions about ID cards, please contact the carrier directly.

| Status | 🛈 Terminated |
| --- | --- |
| Effective | 5/1/2023 |
| Expiration | 5/31/2023 |
| Members | Paula Langley, Lee Langley |
| Subscriber ID | ████████ |
| FFM ID | ████████ |
| Carrier phone | 1(844) 390-4522 |
| Payment phone | (855) 882-1271 |
| Agent of Record 🛈 | FREDERICK BOCK (NPN: 9393745) |

BOCK, FREDERICK STEPHEN, 4781 S CITATION DR DELRAY BEACH, FL 334456522
FRED@ACAHELPLINE.COM

**Frederick Bock is an agent with ACA Helpline LLC, which is a downline agency of TrueCoverage.**

| Plan Name | CMS Standard Gold VALUE - HMO |
|---|---|
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 6/1/2023 |
| Expiration | 7/31/2023 |
| Carrier | Ambetter from Superior Health Plan |
| Agent of Record | ⓘ Frederick Bock (NPN: 9393745) |

BOCK, FREDERICK STEPHEN, 4781 S CITATION DR DELRAY BEACH, FL 334456522
FRED@ACAHELPLINE.COM

**Frederick Bock is an agent with ACA Helpline LLC, which is a downline agency of TrueCoverage.**

| Plan Name | UHC Gold Standard $0 Deductible ($3 T1 Preferred Rx) - HMO |
|---|---|
| Status | Terminated |
| Member | Lee Langley |
| Effective | 6/1/2023 |
| Expiration | 6/30/2023 |
| Carrier | UnitedHealthcare |
| Agent of Record | ⓘ Jordan Freeborn (NPN: 20595433) |

FREEBORN, JORDAN VANCE, 220 HILLSBORO TECHNOLOGY DR STE 240, DEERFIELD BEACH, FL, 334411845
JFREEBORN@BLACKSQUAREFINANCIAL.COM



| Status | ⊘ Terminated |
|---|---|
| Effective | 7/1/2023 |
| Expiration | 7/31/2023 |
| Members | Lee Langley |
| Subscriber ID | ⬛ |
| FFM ID | |
| Carrier phone | 1(888) 697-0683 |
| Payment phone | (888) 697-0683 |
| Agent of Record ⓘ | ⊘ MCCARTENEY PIERRE-LOUIS (NPN: 20202608) |

**McCarteney Wood Pierre-Louis is an agent with Enhance Health**

PIERRE-LOUIS, MCCARTENEY WOOD, 1550 SAWGRASS CORPORATE PKWY, SUNRISE, FL, 333232818
MPIERRE-LOUIS@ENHANCEIFPLANS.COM



| Status | ⊘ Terminated |
|---|---|
| Effective | 10/1/2023 |
| Expiration | 12/31/2023 |
| Members | paula langley, Lee Langley |
| Subscriber ID | ⬛ |
| FFM ID | |
| Carrier phone | 1(844) 390-4522 |
| Payment phone | (855) 882-1271 |
| Agent of Record ⓘ | ⊘ Coleman Pollock (NPN: 18924817) |

POLLOCK, COLEMAN ANDREW, 140 CYPRESS STATION DR STE 230, HOUSTON, TX, 770901633
ADMIN@ADVANTAGEHEALTH.CO



| Status | ⊘ Cancelled |
|---|---|
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Members | paula langley, Lee Langley |
| Subscriber ID | ⬛ |
| FFM ID | |
| Carrier phone | 1(888) 697-0683 |
| Payment phone | (888) 697-0683 |
| Agent of Record ⓘ | ⊘ Matt Mungia (NPN: 8682296) |

MUNGIA, MATTHEW RYAN, 111 DOVETAIL ST, BOERNE, TX, 780062730



| Status | Cancelled |
|---|---|
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Members | paula langley, lee langley |
| Subscriber ID | ■■■■ |
| FFM ID | |
| Carrier phone | 1(888) 697-0683 |
| Payment phone | (888) 697-0683 |
| Agent of Record | David Hongach (NPN: 20372094) |

HONGACH, DAVID, 467 NE 1ST AVE, DEERFIELD BEACH, FL, 334412004



| Status | Cancelled |
|---|---|
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Members | Paula Langley, Lee Langley |
| Subscriber ID | ■■■■ |
| FFM ID | |
| Carrier phone | 1(888) 697-0683 |
| Payment phone | (888) 697-0683 |
| Agent of Record | CRISTHIAN CREVOISIER (NPN: 19656967) |

Christian Crevoisier is an agent with Ensure Health Group, which is a downline agency of TrueCoverage

CREVOISIER, CRISTHIAN DALAI, 1000 N.W. 65TH STREET SUITE 110, FORT LAUDERDALE, FL, 33309
CCREVOISIER@EHGCORP.COM



| Status | Terminated |
|---|---|
| Effective | 1/1/2024 |
| Expiration | 1/31/2024 |
| Members | paula langley, Lee Langley |
| Subscriber ID | ■■■■ |
| FFM ID | |
| Carrier phone | 1(844) 390-4522 |
| Payment phone | (855) 882-1271 |
| Agent of Record | Coleman Pollock (NPN: 18924817) |

POLLOCK, COLEMAN ANDREW, 140 CYPRESS STATION DR STE 230, HOUSTON, TX, 770901633
ADMIN@ADVANTAGEHEALTH.CO



**Matthew Ginberg is an agent with No Cost ACA, LLC d/b/a NCA Insurance Group's ("NCA Insurance"). NCA Insurance is a downline agency of TrueCoverage.**

GINBERG, MATTHEW ERIC, 951 BROKEN SOUND PKWY NW STE 108, BOCA RATON, FL, 334873531

| Plan Name | BSW Prime Silver HMO 003 (CMS Standardized Plan with $0 Pediatric PCP copay) - HMO |
|---|---|
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Carrier | Scott and White Health Plan |
| Agent of Record | Anthony Walters (NPN: 18767434) |

WALTERS, ANTHONY,
14902 PRESTON RD STE 404-325, DALLAS, TX, 752549191

TWALTERS@LONESTARSENIORINSURANCE.COM

| Plan Name | Bronze Elite + PCP Saver Plus - EPO |
|---|---|
| Status | Cancelled |
| Member | paula langley, Lee Langley |
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Carrier | Oscar |
| Agent of Record | ⓘ Gabriel Pasztor (NPN: 19664585) |

PASZTOR, GABRIEL, 3215 NW 10TH TER STE 211 OAKLAND PARK, FL, 333095938
GPASZTOR@MYHEALTHADVISERS.COM

| Plan Name | UHC Gold Standard $0 Indiv Ded ($0 Virtual Urgent Care + $0 PCP Visits, $3 Tier 2 Rx, $0 Insulin) - HMO |
|---|---|
| Status | Cancelled |
| Member | paula langley, Lee Langley |
| Effective | 1/1/2024 |
| Expiration | 12/31/2024 |
| Carrier | UnitedHealthcare |
| Agent of Record | ⓘ Margot Mungia (NPN: 20130031) |

MUNGIA, MARGOT LEYVA, 111 DOVETAIL ST, BOERNE, TX, 78006

| Plan Name | UHC Bronze Virtual First (Unlimited $0 App-based Care, $3 Tier 2 Rx, $0 Insulin) (Disponible en espanol) - HMO |
|---|---|
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 1/1/2024 |
| Expiration | 1/31/2024 |
| Carrier | UnitedHealthcare |
| Agent of Record | Steven Hensley (NPN: 17541051) |

HENSLEY, STEVEN ANDREW, 10302 CECILE DR, FRISCO, TX, 750358186
LICENSING@LTCGLOBAL.COM



| | |
|---|---|
| **United Healthcare** | ● EXPANDED BRONZE |
| UHC Bronze Copay Focus $0 Indiv Med Ded ($0 Insulin) - HMO | |

| $0.00 | $0 | $9,450 |
|---|---|---|
| Premium <br> ~~Was $1,602.92~~ | Deductible | OOP max |

View full plan details     View summary of benefits

ⓘ For questions about ID cards, please contact the carrier directly.

| Status | ① Cancelled |
|---|---|
| Effective | 2/1/2024 |
| Expiration | 12/31/2024 |
| Members | Paula Langley, Lee Langley |
| Subscriber ID | ■■■■■■ |
| FFM ID | |
| Carrier phone | 1(844) 390-4522 |
| Payment phone | (855) 882-1271 |
| Agent of Record ⓘ | ① Matthew Ginberg (NPN: 19573961) |

**Matthew Ginberg is an agent with NCA Insurance, which is a downline agency of TrueCoverage**

GINBERG, MATTHEW ERIC, 951 BROKEN SOUND PKWY NW STE 108, BOCA RATON, FL, 334873531

| Plan Name | UHC Bronze Copay Focus $0 Indiv Med Ded ($0 Insulin) - HMO |
|---|---|
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 2/1/2024 |
| Expiration | 12/31/2024 |
| Carrier | UnitedHealthcare |
| Agent of Record | ⓘ Alexis Vanella (NPN: 19762985) |

**Alexis Vanella is an agent with NCA Insurance, which is a downline agency of TrueCoverage**

VANELLA, ALEXIS, 1225 SEABAY RD, WESTON, FL, 333263324

| Plan Name | BSW Prime Silver HMO 003 (CMS Standardized Plan with $0 Pediatric PCP copay) - HMO |
|---|---|
| Status | Cancelled |
| Member | Paula Langley, Lee Langley |
| Effective | 2/1/2024 |
| Expiration | 12/31/2024 |
| Carrier | Scott and White Health Plan |
| Agent of Record | ⓘ Anthony Walters (NPN: 18767434) |

WALTERS, ANTHONY,
14902 PRESTON RD STE 404-325 DALLAS, TX, 752549191
TWALTERS@**LONESTARSENIORINSURANCE.COM**





JEROME, CHRISTIAN, 6300 NW 5TH WAY 100, FT LAUDERDALE, FL, 33309
https://peacetreeinsurance.com/major-medical/
christianj@peacetreeinsurance.com



LATTA, REGAN LEE
REGAN ASSURANCE
709 N THOMPSON ST
CONROE, TX 773012545





| Status | ✔ Enrolled |
|---|---|
| Effective | 4/1/2024 |
| Expiration | 12/31/2024 |
| Members | Paula Langley, Lee Langley |
| Subscriber ID | ███████ |
| FFM ID | |
| Carrier phone | 1(254) 298-3000 |
| Payment phone | (800) 321-7947 |
| Agent of Record ⓘ | HealthSherpa referral - submitted by Marsha Broyer (NPN: 19015085) |

SILVER + CSR

Scott&White
HEALTH PLAN

BSW Prime Silver HMO 008 (Two free PCP visits, $0 Pediatric PCP visit) - HMO

$0.00
Premium
Was $1,728.58

$0
Deductible

$1,800
OOP max

View full plan details    View summary of benefits

ⓘ For questions about ID cards, please contact the carrier directly.